THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC.,

        Plaintiff,

   -against-


LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,

        Defendants.

Civil Action: _____

**COMPLAINT**

Jury Trial Demanded

Plaintiff The Andy Warhol Foundation for the Visual Arts, Inc., by its attorneys Boies Schiller Flexner LLP, for its Complaint against Defendants Lynn Goldsmith and Lynn Goldsmith Ltd. (collectively, "Defendants"), alleges as follows:

<u>**NATURE OF THE CASE**</u>

1.      This is a civil action to protect the works and legacy of Andy Warhol, one of the most celebrated American artists of the 20th Century.

2.      Warhol was a leading figure in the Pop Art movement of the 1950s and 1960s. Like many Pop Artists, Warhol challenged the tradition of fine art by creating works about everyday items like Campbell's soup cans, Brillo pads, and widely circulated images of celebrities. Although Warhol drew inspiration from these everyday items, his works are lauded for transforming and commenting upon them. Because of their transformative nature, Warhol's works have been displayed in museums, discussed in universities around the world, analyzed by numerous art critics and historians, and viewed by millions of people.

3.      In 1984, Warhol used his signature style of celebrity portraiture to create a series of portraits of the musical artist Prince Rogers Nelson, commonly known as "Prince" and, to a

lesser extent, as "☥," "Camille, "the Artist Formerly Known As Prince," and "the Artist." Like Warhol's other celebrity portraits, the *Prince* Series drew inspiration from and transformed a publicity photograph of Prince in circulation at the time.

4.     In 1984, one of Warhol's *Prince* Portraits was published in *Vanity Fair*, a magazine widely circulated throughout the United States.

5.     Now, more than thirty years after that magazine article was published, Defendants, a photographer named Lynn Goldsmith and her company, are complaining for the first time that Warhol's *Prince* Series infringes upon Goldsmith's copyright on a photograph of Prince that she took in 1981. Defendants claim that the *Prince* Series copies the photograph and contains derivative works, in violation of their copyright, and that the works are not transformative or otherwise protected fair use.

6.     Defendants have threatened to file litigation if they are not paid a substantial sum of money by The Andy Warhol Foundation for the Visual Arts, Inc. ("The Foundation"), a charitable organization established pursuant to Warhol's will after his untimely death.

7.     To protect Warhol's legacy and resolve Defendants' baseless claims, the Foundation requests a declaratory judgment that (1) the portraits in Warhol's *Prince* Series do not infringe upon Defendants' copyright in the photograph, (2) the portraits are transformative or are otherwise protected fair use, and (3) Defendants' claims are barred by the statute of limitations and the equitable doctrine of laches.

**PARTIES**

8.     The Foundation is a New York not-for-profit corporation that maintains its principal place of business at 65 Bleecker Street, New York, New York 10012.

9.     Defendant Lynn Goldsmith, Ltd. is a New York corporation, which, upon information and belief, previously operated under the name Lynn Goldsmith, Inc. Records maintained by the New York Department of State indicate that Lynn Goldsmith, Ltd.'s principal place of business is 40 Sunset Drive, Suite 10A, Basalt, Colorado 81621-8362.

10.    Defendant Lynn Goldsmith is a photographer and the Chief Executive Officer of Defendant Lynn Goldsmith, Ltd. Upon information and belief, Goldsmith resides in Colorado.

### JURISDICTION AND VENUE

11.    Because this action arises under the copyright laws of the United States, 17 U.S.C. §§ 101 et seq., this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

12.    The Court has personal jurisdiction over Defendant Lynn Goldsmith, Ltd. because it is a New York corporation.

13.    The Court has personal jurisdiction over Lynn Goldsmith because she is the Chief Executive Officer of Lynn Goldsmith, Ltd., a New York corporation. Alternatively, the Court has personal jurisdiction over Lynn Goldsmith because, upon information and belief, she regularly does or solicits business in New York.

14.    Venue is proper in this District under 28 U.S.C. § 1391 and 28 U.S.C. § 1400 because a substantial part of the events giving rise to the claims occurred in this District and because, upon information and belief, Defendants may be found in this District and regularly do or solicit business in this District.

**<u>FACTUAL BACKGROUND</u>**

**I.    WARHOL WAS ONE OF THE MOST IMPORTANT ARTISTS OF THE
        20TH CENTURY AND A LEADING FIGURE OF THE POP ART MOVEMENT.**

15.    Born in 1928 and deceased in 1987, Andy Warhol was one of the most influential and celebrated American artists of the 20th Century. After beginning his career in magazine illustration and advertising, Warhol rose to prominence in the fine arts as a leading figure of the Pop Art movement of the 1950s and 1960s. During his prolific career, he produced tens of thousands of works of art.

16.    The Pop Art movement distinguished itself from prior artistic movements by drawing on imagery from contemporary popular culture and media. According to the Guggenheim Art Museum, "Pop art explored the image world of popular culture, from which its name derives. Basing their techniques, style, and imagery on certain aspects of reproduction, the media, and consumer society, these artists took inspiration from advertising, pulp magazines, billboards, movies, television, comic strips, and shop windows. These images, presented with (and sometimes transformed by) humor, wit, and irony, can be seen as both a celebration and a critique of popular culture."

**II.   THE ART WORLD HAS LONG CELEBRATED
        WARHOL'S SIGNATURE METHOD OF PORTRAITURE.**

17.    Among Warhol's most important contributions to the Pop Art canon were his portraits of public figures such as Marilyn Monroe and Mao Zedong. These works, images of which are reproduced below, have been viewed by millions of people and exhibited in museums around the world.



**Andy Warhol,** *Marilyn Diptych* **(1962)**
Acrylic on canvas; 80 7/8 x 57"



**Andy Warhol,** *Mao* **(1973)**
Synthetic polymer paint and silkscreen ink on canvas; 176 1/2 x 136 1/2"

18.     Although these classic works by Warhol were inspired by photographic images of his subjects, his unique method of portraiture invariably altered the visual aesthetic of the original photographic images, as well as the meaning conveyed to the viewer.  For example, as curator and art historian Tina Rivers Ryan has observed regarding *Marilyn Diptych*, "At first glance, the work—which explicitly references a form of Christian painting (see below) in its title—invites us to worship the legendary icon, whose image Warhol plucked from popular culture and immortalized as art.  But as in all of Warhol's early paintings, this image is also a carefully crafted critique of both modern art and contemporary life. . . .  Even if we don't recognize the source (a publicity photo for Monroe's 1953 film *Niagara*), we know the image is a photo."



[Image from an essay by Tina Rivers Ryan]

19.     Ryan continued to discuss Warhol's transformation of the photograph, noting, "Warhol's use of the silkscreen technique further 'flattens' the star's face.  By screening broad planes of unmodulated color, the artist removes the gradual shading that creates a sense of three-dimensional volume and suspends the actress in an abstract void.  Through these choices, Warhol transforms the literal flatness of the paper-thin publicity photo into an emotional 'flatness,' and the actress into a kind of automaton.  In this way, the painting suggests that 'Marilyn Monroe,' a

manufactured star with a made-up name, is merely a one-dimensional (sex) symbol—perhaps not the most appropriate object of our almost religious devotion."

20.     Although Warhol often used photographs taken by others as inspiration for his portraits, Warhol's works were entirely new creations.   Unlike the photographs he used as inspiration, "[m]uch of Andy Warhol's work, including work incorporating appropriated images of Campbell's soup cans or of Marilyn Monroe, comments on consumer culture and explores the relationship between celebrity culture and advertising."   *Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013).   In part for this reason, Warhol's portraits have been analyzed by a significant number of academics and art critics.

**III.     IN 1984, WARHOL CREATED THE *PRINCE* SERIES USING HIS SIGNATURE METHOD OF PORTRAITURE.**

21.     In 1984, Warhol applied his signature method of portraiture to create a series of 16 portraits of the popular musician Prince Rogers Nelson, commonly known as "Prince" and, at times, "⚤," "Camille, "The Artist Formerly Known As Prince," and "The Artist."   These works were later sold or donated by the Foundation.   For the purposes of this Complaint, this series of portraits will be referred to as the "*Prince* Series."   Images of each portrait contained in the *Prince* Series are displayed below.



**Andy Warhol, PO 50.537,**
***Prince* (1984)**
Synthetic polymer paint and silkscreen
ink on canvas; 20 x 16"



**Andy Warhol, PO 50.539,**
***Prince* (1984)**
Synthetic polymer paint and silkscreen
ink on canvas; 20 x 16"



**Andy Warhol, PO 50.538,**
***Prince* (1984)**
Synthetic polymer paint and silkscreen
ink on canvas; 20 x 16"



**Andy Warhol, PO 50.541,**
***Prince* (1984)**
Synthetic polymer paint and silkscreen
ink on canvas; 20 x 16"



**Andy Warhol, PO 50.540,**
***Prince* (1984)**
Synthetic polymer paint and silkscreen
ink on canvas; 20 x 16"



**Andy Warhol, PO 50.543,**
***Prince* (1984)**
Synthetic polymer paint and silkscreen
ink on canvas; 20 x 16"



**Andy Warhol, PO 50.542,**
***Prince* (1984)**
Synthetic polymer paint and silkscreen
ink on canvas; 20 x 16"



**Andy Warhol, PO 50.545,**
***Prince* (1984)**
Synthetic polymer paint and silkscreen
ink on canvas; 20 x 16"



**Andy Warhol, PO 50.544,**
*Prince* **(1984)**
Synthetic polymer paint and silkscreen
ink on canvas; 20 x 16"



**Andy Warhol, PO 50.547,**
*Prince* **(1984)**
Synthetic polymer paint and silkscreen
ink on canvas; 20 x 16"



**Andy Warhol, PO 50.546,**
*Prince* **(1984)**
Synthetic polymer paint and silkscreen
ink on canvas; 20 x 16"



**Andy Warhol, TOP115.260,**
*Prince* **(1984)**
Graphite on HMP paper; 31 3/4 x 23
3/4"



**Andy Warhol, TOP115.259,**
*Prince* **(1984)**
Graphite on HMP paper; 31 3/4 x 23 3/4"



**Andy Warhol, PO 50.458**
*Prince* **(1984)**
Synthetic polymer paint and silkscreen ink on canvas; 20 x 16"



**Andy Warhol, UP 42.72,**
*Prince* **(1984)**
Screenprint on Moulin du Verger paper; 29 3/4 x 21 3/4"



**Andy Warhol, UP 42.73,**
*Prince* **(1984)**
Screenprint on Moulin du Verger paper; 30 x 21 3/4"

22.     Like many of Warhol's classic Pop Art portraits, these portraits of Prince were inspired by a publicity photograph (hereafter "the *Prince* Publicity Photograph"), which is reproduced below.



23.     Goldsmith claims she took this photograph in 1981 and that she or Lynn Goldsmith, Ltd. holds the copyright to it.

## IV. THE *PRINCE* SERIES TRANSFORMS THE AESTHETIC AND MEANING OF THE *PRINCE* PUBLICITY PHOTOGRAPH.

24.     As would be plain to any reasonable observer, each portrait in Warhol's *Prince* Series fundamentally transformed the visual aesthetic and meaning of the *Prince* Publicity Photograph.

25.     The portraits in Warhol's *Prince* Series differ visually from the *Prince* Publicity Photograph in the following ways, at a minimum:

a.     As is the case with many of his portraits, Warhol's signature use of the silkscreen printing technique in the *Prince* Series flattens the appearance of the subject's face by removing the gradual shading in the *Prince* Publicity Photograph, which creates a sense of three-dimensional volume, and replaces it with the use of unmodulated color.

b.     Each of the portraits in the *Prince* Series focuses on the subject's face, whereas the *Prince* Publicity Photograph is centered at the body of the subject and extends to below the waist.

c.     Each of the portraits in the *Prince* Series portrays the subject with something other than his natural skin color, sometimes with unnatural neon colors, whereas the *Prince* Publicity Photograph does little or nothing to alter the subject's natural skin color.

d.     Each of the portraits in the *Prince* Series, except for UP 42.72, uses the one color (usually black) to depict the subject's hair, lips, and facial features, whereas the *Prince* Publicity Photograph uses natural colors (*e.g.*, dark brown for the subject's hair and red for the subject's lips).

e.     Each of the portraits in the *Prince* Series portrays the subject's hair as a solid block of color, whereas the subject's strands of hair are plainly visible in the *Prince* Publicity Photograph.

f.  The makeup around the subject's eyes in Warhol's *Prince* Series is substantially heavier than the makeup around the subject's eyes in the *Prince* Publicity Photograph.

 

g.  The angle of the subject's face in the *Prince* Series differs from the angle of the subject's face in the *Prince* Publicity Photograph, as demonstrated by a comparison of lines connecting the subject's tear ducts and lines across the subject's chin in the different works.



h.   Many lines that appear on the subject's face in the *Prince* Publicity Photograph, including the lines underneath the subject's eyes, the lines in the subject's forehead, and the line on the right side of the subject's nose, are omitted from each of the *Prince* Series.

 

i. The light reflected on the subject's face in the *Prince* Publicity Photograph does not appear in any of the portraits in the *Prince* Series.

 

j. Many of the portraits in the *Prince* Series have a colored screen of the subject's head that is set off next to another outline of the subject's head. For example, Andy Warhol, UP 42.73, depicts the subject's head in black and white and an offset outline of the head in a different color. Warhol himself drew this distinct form by hand and then screened his drawing as part of the works in the *Prince* Series.

26. These are just some of the many readily observable differences between the *Prince* Series and the *Prince* Publicity Photograph, the cumulative effect of which is to give the *Prince* Series an entirely different visual aesthetic from the *Prince* Publicity Photograph.

27. The different visual aesthetic of the *Prince* Series also may reasonably be perceived to convey a different meaning than the *Prince* Publicity Photograph. Whereas the *Prince* Publicity Photograph is a straightforward picture of the subject with makeup and lighting,

the *Prince* Series, like many of Warhol's signature portraits, may reasonably be perceived as simultaneously honoring the celebrity of Prince while also conveying that Prince (like Marilyn Monroe and many other subjects of Warhol's works) is a manufactured star with a stage name, whom society has reduced to a commodity.

## V. THE *PRINCE* SERIES DID NOT USURP THE MARKET OF THE *PRINCE* PUBLICITY PHOTOGRAPH.

28.    Goldsmith is a photographer.

29.    Upon information and belief, as of the date of this Complaint, Defendants' business does not involve developing, or licensing others to develop for them, works resembling the *Prince* Series, except for Defendants' assertion that the *Prince* Publicity Photograph resembles the *Prince* Series.

30.    Upon information and belief, as of the date of this Complaint, Defendants have not painted, screen printed, or drawn works of art that resemble the *Prince* Series and that Defendants made available for sale or public exhibition.

31.    Upon information and belief, as of the date of this Complaint, Defendants have not licensed others to paint, screen print, or draw works of art for them that resemble the *Prince* Series and that Defendants made available for sale or public exhibition, except for Defendants' assertion that the *Prince* Publicity Photograph resembles the *Prince* Series.

32.    Upon information and belief, Warhol's *Prince* Series and Defendants' *Prince* Publicity Photograph do not target the same audiences.

33.    Upon information and belief, Warhol's *Prince* Series and Defendants' *Prince* Publicity Photograph do not target the same art collectors.

34.    Upon information and belief, Warhol's *Prince* Series and Defendants' *Prince* Publicity Photograph do not target the same commercial markets.

35.    Upon information and belief, Warhol's *Prince* Series contains works of fine art that are primarily sold to collectors of high-end Pop Art.

36.    Upon information and belief, the *Prince* Publicity Photograph is not primarily sold to collectors of high-end Pop Art.

37.    Upon information and belief, Warhol's *Prince* Series has not decreased demand among art collectors or the commercial art market for Defendants' *Prince* Publicity Photograph.

## VI.    GOLDSMITH HAS KNOWN OR SHOULD HAVE KNOWN ABOUT WARHOL'S *PRINCE* SERIES FOR AT LEAST THREE DECADES.

38.    In 1984, Goldsmith and Lynn Goldsmith Inc. (the apparent corporate predecessor to Defendant Lynn Goldsmith Ltd.) issued a written license to *Vanity Fair* magazine for using the *Prince* Publicity Photograph in exchange for a fee.  The license stated as follows:

> FEE FOR THE USE OF ONE PHOTOGRAPH OF PRINCE, COPYRIGHT 1981 LYNN GOLDSMITH
> FOR USE AS ARTIST REFERENCE FOR AN ILLUSTRATION TO BE PUBLISHED IN VANITY FAIR
> NOVEMBER 1984 ISSUE. IT CAN APPEAR ONE TIME FULL PAGE AND ONE TIME UNDER ONE QUARTER PAGE.
> NO OTHER USAGE RIGHT GRANTED.

A true and correct copy of this license is attached hereto as Exhibit A.

39.    Upon information and belief, Warhol did not enter into any agreements with *Vanity Fair* concerning the *Prince* Publicity Photograph or the *Prince* Series that limited his use of the *Prince* Publicity Photograph or impacted his rights in the *Prince* Series.

40.    Warhol did not enter into any agreements with Defendants concerning the *Prince* Publicity Photograph or the *Prince* Series that limited his use of the *Prince* Publicity Photograph or impacted his rights in the *Prince* Series.

41.    In or around November 1984, *Vanity Fair* magazine published an article by Tristan Vox titled "Purple Fame: An Appreciation of Prince at the Height of His Powers."  The Article was printed on page 66 of the November 1984 issue of *Vanity Fair*.  One of Warhol's *Prince* portraits was displayed on Page 67 of the same issue.

42.     Copies of the November 1984 *Vanity Fair* were circulated throughout the nation and widely available for purchase by anyone.

43.     A true and correct copy of pages 66 and 67 of the November 1984 issue of *Vanity Fair* Article is reproduced below.



44.     Upon the publication of the November 1984 issue of *Vanity Fair*, Defendants knew or should have known about Warhol's *Prince* Series.   Any reasonable person in Defendants' position would have reviewed the November 1984 issue of *Vanity Fair*, if only to confirm that *Vanity Fair* had complied with the license terms described above.

45.     Since the publication of the November 1984 *Vanity Fair* article, portraits in the *Prince* Series have been displayed in museums, books, and exhibits around the world.  For example:

a.   In 1993, PO 50.458 and PO 50.539 were part of the exhibition *Andy Warhol: Portraits of the Seventies and Eighties* at the Museum of Contemporary Art in Sydney, Australia and in the Anthony d'Offay Gallery in London, England.

b.   PO 50.458 and PO 50.539 appeared in *Andy Warhol Portraits* by Henry Geldzahler and Robert Rosenblum, which was published in 1993 by Thames and Hudson Ltd.

c.   PO 50.547 appeared in *Andy Warhol Portraits* by Tony Shafrazi, which was published by Phaidon in 2007.

d.   UP 42.72 and UP 42.73 appeared in *Andy Warhol Prints: A Catalogue Raisonne 1962 – 1987* by Frayda Feldman and Jörg Schellmann, the fourth edition of which was published in 2003 by D.A.P.

e.   In 2005, PO 50.547 was exhibited at Tony Shafrazi Gallery in NYC.

f.   PO 50.544 and PO 50.547 appeared in *Warhol Live* by Stephane Aquin, which was published in 2008 by Prestel Publishing.

g.   PO 50.547 appeared in *Andy Warhol Treasures* by Matt Wrbican and Geralyn Huxley, which was published in 2009 by Carlton Books.

h.   As part of the touring *Warhol Live* exhibition in 2009 through 2011, PO 50.544 and PO 50.547 were exhibited at The Montreal Museum of Fine Arts in Montreal, Canada; Andy Warhol Museum in Pittsburgh, PA; The Frist Center for the Visual Arts in Nashville, Tennessee; and the de Young Museum in San Francisco, CA.

i.  PO 50.544 appeared in *Andy Warhol: The Complete Commissioned Magazine Work* by Paul Marechal, which was published in 2014 by Prestel Verlag.

46.  Since the publication of the November 1984 *Vanity Fair* article, portraits in the *Prince* Series have been sold at public auctions.  For example, upon information and belief, works from the *Prince* series were offered for sale and, in all but two instances, sold at the following public auction houses on the following dates:

a.  Christie's New York on November 10, 1999;

b.  Cornette de Saint-Cyr on December 11, 1999;

c.  Sotheby's London on March 30, 2000;

d.  Tajan on August 2, 2000;

e.  De Vuyst on October 7, 2000;

f.  Cornette de Saint-Cyr on December 9, 2000;

g.  Cornette de Saint-Cyr on January 29, 2001;

h.  Christie's London on June 28, 2002;

i.  Christie's London on February 10, 2005;

j.  Sotheby's London on October 25, 2005;

k.  Phillips de Pury & Company on May 12, 2006; and

l.  Sotheby's London on October 16, 2015.

## VII.  THE FOUNDATION OWNS WARHOL'S COPYRIGHT INTEREST IN THE *PRINCE* SERIES.

47.  When Warhol died unexpectedly on February 22, 1987, he left an inventory of works of art and personal possessions.  His will dictated that his entire estate, with the exception of certain legacies to family members, should be used to create a foundation dedicated to the "advancement of the visual arts."

48.    To carry out Warhol's wishes, the Foundation was created and has worked to advance the visual arts from 1987 to the present.

49.    Around 1994, the Foundation took ownership of the copyrights and trademarks that were in Warhol's possession at the time of his death, including ownership of the *Prince* Series.

**VIII.    MORE THAN 30 YEARS AFTER ONE OF WARHOL'S *PRINCE* PORTRAITS APPEARED IN *VANITY FAIR*, GOLDSMITH CLAIMED THAT SHE FIRST LEARNED ABOUT THE *PRINCE* SERIES IN 2016 AND ATTEMPTED TO SHAKE DOWN THE FOUNDATION.**

50.    On April 21, 2016, Prince Rogers Nelson died.

51.    The media conglomerate Condé Nast published a special magazine called *The Genius of Prince* on or around May 18, 2016.  This magazine was created by the editors of *Vanity Fair*, *The New Yorker*, *WIRED*, and *Pitchfork*.

52.    One of Warhol's *Prince* Portraits was used for the cover of *The Genius of Prince*. A true and correct copy of the cover is reproduced below.



53.      In early 2016, the Foundation, through the Artist Rights Society, granted a license to Condé Nast to publish this work from the *Prince* Series in the magazine.  The publisher paid a fee for the license.

54.      In July 2016—over thirty years after the *Prince* Series was created and widely published throughout the United States—Defendants contacted the Foundation and began complaining for the first time that the *Prince* Series infringed upon the copyright associated with the 1981 *Prince* Publicity Photograph.  Defendants demanded that the Foundation pay a substantial sum of money and threatened to sue if the Foundation refused.

55.      Incredibly, Defendants claim that they were unaware of the *Prince* Series even though they granted a license to *Vanity Fair* in 1984 and one of Warhol's *Prince* Portraits was published in the November 1984 issue of *Vanity Fair*.

56.      Defendants' effort to shake down the Foundation with its time-barred and meritless infringement claim is apparently part of their campaign to profit from Prince Rogers Nelson's tragic death.  Upon information and belief, around the same time, Defendants made demands from the Smithsonian Institution for its display of a photograph of Prince taken by Goldsmith.

## IX.    WHEN GOLDSMITH TRIED TO SHAKE DOWN THE FOUNDATION, SHE KNEW THAT WARHOL'S SIGNATURE STYLE OF PORTRAITURE WAS A PROTECTED FAIR USE.

57.      In 2016 and 2017, Goldsmith was well aware that Warhol's signature style of portraiture was a protected fair use.

58.      For example, on January 6, 2015, she wrote a public Facebook post stating, "I'm pretty knowledgeable about copyright laws and they are changing as Francoise Kirkland pointed out due to the latest ruling in the RIchard [sic] Prince case...they are not changing in our favor." A true and correct copy of this Facebook post is attached hereto as Exhibit B.

59.     When Goldsmith wrote the Facebook post attached hereto as Exhibit B, she was aware of the Second Circuit's landmark decision in *Cariou v. Prince*, 714 F. 3d 694 (2d Cir. 2013).

60.     At this time, Goldsmith was also aware that Warhol's signature style of portraiture is a protected fair use.  *Cariou v. Prince* made this clear, stating, "Certainly, many types of fair use, such as satire and parody, invariably comment on an original work and/or on popular culture.  For example, the rap group 2 Live Crew's parody of Roy Orbison's 'Oh, Pretty Woman' 'was clearly intended to ridicule the whitebread original.' *Campbell* [*v. Acuff-Rose Music, Inc.*], 510 U.S. [569,] 582 [1994] (quotation marks omitted). Much of Andy Warhol's work, including work incorporating appropriated images of Campbell's soup cans or of Marilyn Monroe, comments on consumer culture and explores the relationship between celebrity culture and advertising."  714 F. 3d 694, 706 (2d Cir. 2013).

61.     Despite knowing that Warhol's portraits are a protected fair use, Defendants have attempted to extort a settlement from the Foundation.  Goldsmith herself made this clear when she wrote in another public Facebook post dated January 5, 2015, "It is a crime that so many 'artists' can get away with taking photographers images and painting on them or doing whatever to them without asking permission of the 'artist' who created the image in the first place." Goldsmith also complained about Peter Max, another leading figure in the Pop Art movement whom she has unsuccessfully sued.

62.     In that Facebook post, Goldsmith further revealed her understanding about the limits of her copyright interest—which also undermines her case here—when she wrote, "why doesn't the copyright law protect photographers as artists?"  A true and correct copy of this Facebook post is attached hereto as Exhibit C.

63. Goldsmith's threatened litigation against the Foundation is frivolous. The Foundation is entitled to a declaration that Warhol's *Prince* Series does not infringe Goldsmith's copyright in the *Prince* Publicity Photograph, that the portraits are transformative or otherwise a protected fair use, and that Defendants' claims are barred by the statute of limitations and the equitable doctrine of laches.

## FIRST CAUSE OF ACTION
**Declaratory Judgment of Non-Infringement
Under 28 U.S.C. § 2201, *et seq.* (Declaratory Judgment Act) and
17 U.S.C. § 101, *et seq.* (the Copyright Act)
(Against Defendants)**

64. The Foundation incorporates all of the above allegations as if they were fully stated here.

65. There is a real and actual controversy between the Foundation and Defendants as to whether Warhol's *Prince* Series infringes Defendants' 1981 copyright.

66. The Foundation is entitled to a judgment declaring that the *Prince* Series does not infringe Defendants' 1981 copyright because none of the portraits in the *Prince* Series is a copy of, a phonorecord of, derivative work based on, a performance of, a display of, or a transmission of the *Prince* Publicity Photograph.

## SECOND CAUSE OF ACTION
**Declaratory Judgment of Fair Use
Under 28 U.S.C. § 2201, *et seq.* (Declaratory Judgment Act) and
17 U.S.C. § 101, *et seq.* (the Copyright Act)
(Against Defendants)**

67. The Foundation incorporates all of the above allegations as if they were fully stated here.

68. There is a real and actual controversy between the Foundation and Defendants as to whether Warhol's *Prince* Series is a fair use of the *Prince* Publicity Photograph.

69.     The Foundation is entitled to a judgment declaring that the *Prince* Series is a fair use of the *Prince* Publicity Photograph because, among other facts alleged above and incorporated here, each portrait in the *Prince* Series is transformative.

### THIRD CAUSE OF ACTION
**Declaratory Judgment that Defendants' Threatened Claims Are Time-Barred
Under 28 U.S.C. § 2201, *et seq.* (Declaratory Judgment Act) and
17 U.S.C. § 507 (the Copyright Act)
(Against Defendants)**

70.     The Foundation incorporates all of the above allegations as if they were fully stated here.

71.     There is a real and actual controversy between the Foundation and Defendants as to whether Defendants' meritless copyright claims against the Foundation based on the *Prince* Series are barred by the Copyright Act's three-year statute of limitations.

72.     Because Defendants knew or with reasonable diligence should have known of the *Prince* Series as early as November 1984, since one of Warhol's *Prince* Portraits was published in *Vanity Fair* in November 1984, the statute of limitations governing Defendants' claims lapsed in November 1987.

73.     Because works from the *Prince* Series were exhibited in museums, published in books, and sold in public auctions as early as the 1990s through 2014, the three-year statute of limitations governing Defendants' claims has expired.

### FOURTH CAUSE OF ACTION
**Declaratory Judgment of Laches
Under 28 U.S.C. § 2201, *et seq.* (Declaratory Judgment Act)
(Against Defendants)**

74.     The Foundation incorporates all of the above allegations as if they were fully stated here.

75.     There is a real and actual controversy between the Foundation and Defendants as to whether Defendants' meritless copyright claims against the Foundation are barred by the equitable doctrine of laches.

76.     Defendants knew or with reasonable diligence should have known of the *Prince* Series as early as November 1984, because one of Warhol's *Prince* Portraits was published in *Vanity Fair* in November 1984.

77.     Defendants knew or with reasonable diligence should have known of the *Prince* Series as early as the 1990s, because Warhol's *Prince* Portraits have been widely exhibited in museums, published in books, and sold in public auctions as early as the 1980s.

78.     Defendants' failure to timely raise their purported infringement concerns with Warhol and the Foundation has prejudiced the Foundation's ability to defend itself.  Since the publication of one of Warhol's *Prince* Portraits in 1984, Warhol—one of the key witnesses with personal knowledge relevant to this dispute—has died.

79.     Moreover, upon information and belief, documents that might have related to Warhol's creation of the *Prince* Series and to the *Prince* Publicity Photograph have been lost or destroyed for reasons outside the Foundation's control.

80.     Due to Defendants' inexcusable delay of multiple decades, the evidentiary record in this case has become prejudicially stale.

81.     The public interest would not be served by permitting Defendants to harass the Foundation with its meritless and time-barred claims.  The Foundation is a not-for-profit corporation that seeks to promote the visual arts, and Warhol is considered by many to be one of the greatest American artists of the last century.  Defendants attempt to shake down the Foundation and tarnish Warhol's legacy is squarely contrary to the public interest.

82. For these and other reasons, Defendants' potential copyright claims against the Foundation are barred by the equitable doctrine of laches.

## DEMAND FOR RELIEF

WHEREFORE, the Foundation demands judgment as follows:

- Declaring that the *Prince* Series does not infringe upon Defendants' alleged copyright;

- Declaring that works in the *Prince* Series are transformative works protected by fair use;

- Declaring that Defendants' potential copyright claims based on the *Prince* Series are barred by the statute of limitations;

- Declaring that Defendants' potential copyright claims based on the *Prince* Series are barred by the equitable doctrine of laches;

- Awarding the Foundation the cost of suit as incurred in this action and attorneys' fees under 17 U.S.C. § 505; and

- Awarding the Foundation all other relief as may be appropriate.

Dated:  April 7, 2017
 New York, New York

BOIES SCHILLER FLEXNER LLP


By:     */s/ Luke Nikas*

Luke Nikas
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
Email:  lnikas@bsfllp.com


*Attorneys for Plaintiff The Andy Warhol Foundation for the Visual Arts, Inc.*