UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE ANDY WARHOL FOUNDATION FOR THE
VISUAL ARTS, INC.,

                          Plaintiff,

                      vs.

LYNN GOLDSMITH AND LYNN GOLDSMITH,
LTD.

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
LYNN GOLDSMITH,

                      Counterclaim Plaintiff,

                vs.

THE ANDY WARHOL FOUNDATION FOR THE
VISUAL ARTS, INC.,

                      Counterclaim Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.  17-cv-02532-JGK

ECF Case

## MEMORANDUM OF LAW IN SUPPORT OF MOTION BY DEFENDANTS AND COUNTERCLAIM PLAINTIFF LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD. FOR SUMMARY JUDGMENT PURSUANT TO RULE 56

HERRICK, FEINSTEIN LLP
Barry Werbin
Gabrielle C. Wilson
2 Park Avenue
New York, N.Y. 10016
(212) 592-1418
Email: bwerbin@herrick.com

LAW OFFICES OF JOEL L. HECKER
Joel Hecker
230 Park Avenue, Suite 660
New York, N.Y. 10169
(212) 481-1850
HeckerEsq@aol.com

*Attorneys for Defendants Lynn Goldsmith and Lynn Goldsmith, Ltd., and Counterclaim Plaintiff Lynn Goldsmith*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

    A.    The Parties ..................................................................................................... 2

    B.    Goldsmith's 1981 photo shoot of Prince ...................................................... 2

    C.    Vanity Fair licenses the Goldsmith Photo for an artist reference ................. 5

    D.    Vanity Fair commissioned Warhol to create an illustration based on the Goldsmith Photo .............................................................................. 6

    E.    Warhol created 16 distinct images based on the Goldsmith Photo ............... 7

    F.    Warhol copied the Goldsmith Photo ........................................................... 10

    G.    AWF's acquisition and divestment of the Warhol Prince Series ................. 11

    H.    Artist Rights Society acts as AWF's agency ............................................... 12

    I.    AWF licenses a Warhol Prince Series image to Condé Nast ...................... 12

    J.    Goldsmith first becomes aware of the Warhol Prince Series ...................... 15

    K.    Warhol Prince Series images are available for licensing by AWF ............. 16

    L.    Goldsmith's markets for her prints and images ......................................... 17

    M.    Warhol and AWF previously were sued for copyright infringement ........... 18

    N.    Procedural history ....................................................................................... 19

ARGUMENT ............................................................................................................... 19

POINT I     The standards for granting summary judgment have been met ..................... 19

POINT II    The Warhol Prince Series images infringe the Goldsmith Photo copyright ....... 20

    A.    Goldsmith owns a protectible copyright in the Goldsmith Photo ............... 21

    B.    Direct copying is proven .............................................................................. 22

i

      C.      The Warhol Prince Series images are substantially similar to the Goldsmith Photo ........................................................................... 22

POINT III      AWF is not entitled to a fair use defense under 17 U.S.C. § 107 ...................... 28

      A.      Purpose and character of use: the Warhol Prince Series is not "transformative" ................................................................................. 29

      B.      The nature of the copyrighted work favors Goldsmith ....................................... 34

      C.      The amount and substantiality of the portion used favors Goldsmith ............... 35

      D.      The effect of the use upon the potential market favors Goldsmith ................... 36

POINT IV      Goldsmith's infringement claim is not barred by the statute of limitations or laches ........................................................................ 39

CONCLUSION ............................................................................................................... 40

## **TABLE OF AUTHORITIES**

**Page**

### **Federal Cases**

*American Geophysical Union v. Texaco Inc.*,
    60 F.3d 913 (2d Cir. 1994) ................................................................................ 34

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ....................................................................................... 19

*Associated Press v. Meltwater US Holdings, Inc.*,
    931 F. Supp. 2d 537 (S.D.N.Y. 2013) .............................................................. 35

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006) ............................................................................... 4

*Boisson v. American County Quilts and Linens, Inc.*,
    273 F. 3d 262 (2d Cir. 2001) .......................................................................... 23

*Campbell v. Acuff–Rose Music, Inc.*,
    510 U.S. 569 (1994) ................................................................................. passim

*Cariou v. Prince*,
    714 F.3d 694 (2d. Cir. 2013) ..................................................................... passim

*Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*,
    150 F.3d 132 (2d Cir. 1998) ........................................................................... 33

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ....................................................................................... 19

*Friedman v. Guetta*,
    2011 WL 3510890 (C.D. Cal. May 27, 2011) ...................................... 24, 25, 27, 33

*Gallo v. Prudential Residential Servs., Ltd.*,
    22 F.3d 1219 (2d Cir. 1994) ........................................................................... 19

*Gaylord v. United States*,
    595 F.3d 1364 (Fed. Cir. 2010) ...................................................................... 32

*Graham v. Prince*,
    265 F. Supp. 3d 366 (S.D.N.Y. 2017) ........................................................ 32, 33

*Hamil Am. Inc. v. GFI*,
    193 F.3d 92 (2d Cir. 1999) ........................................................................ 20, 21

*Heublein, Inc. v. United States*,
   996 F.2d 1455 (2d Cir. 1993) ................................................................................20

*Jaramillo v. Weyerhaeuser Co.*,
   536 F.3d 140 (2d Cir. 2008) .................................................................................19

*LaChapelle v. Fenty*,
   812 F. Supp. 2d 434 (S.D.N.Y. 2011) ...........................................................21, 23

*Leibovitz v. Paramount Pictures Corp.*,
   137 F.3d 109 (2d Cir. 1998) .................................................................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .............................................................................................20

*Morris v. Guetta*,
   2013 WL 440127 (C.D. Cal. Feb. 4, 2013) ...............................................25, 26, 33

*Papazian v. Sony Music Entm't*,
   2017 WL 4339662 (S.D.N.Y. Sept. 28, 2017) .....................................................40

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
   602 F.3d 57 (2d Cir. 2010) .........................................................................21, 22, 23

*Petrella v. Metro-Goldwyn-Mayer, Inc.*,
   572 U.S. 663, 134 S. Ct. 1962 (2014) ............................................................39, 40

*Psihoyos v. John Wiley & Sons, Inc.*,
   748 F.3d 120 (2d Cir. 2014) ...........................................................................39, 40

*Rogers v. Koons*,
   960 F.2d 301(2d Cir. 1992) ............................................................................21, 26

*TCA Television Corp. v. McCollum*,
   839 F.3d 168 (2d. Cir. 2016) .....................................................................20, 28, 29

*Tufenkian Import/Export v. Einstein Moomjy Inc.*,
   338 F.3d 127 (2d Cir. 2003) .................................................................................23

## **Statutes**

17 U.S.C. § 106(1)................................................................................................22

17 U.S.C. § 106(2)................................................................................................22

17 U.S.C. § 106(3)..........................................................................................22, 36

17 U.S.C. § 107 .....................................................................................27, 28, 29, 34

17 U.S.C. § 107(2)............................................................................................34

17 U.S.C. § 107(3)............................................................................................35

17 U.S.C. § 107(4)............................................................................................36

17 U.S.C. § 302(a)............................................................................................37

17 U.S.C. § 507................................................................................................39

17 U.S.C. § 507(b)........................................................................................39, 40

Fed. R. Civ. P. 56..............................................................................................1

Fed. R. Civ. P. 56(a)..........................................................................................19

## Miscellaneous

Nimmer on Copyright § 13.05[B][6].........................................................................29

Defendants and Counterclaim Plaintiff Lynn Goldsmith ("Goldsmith") and Lynn Goldsmith, Ltd. (collectively, the "Goldsmith Parties"), respectfully submit this Memorandum of Law in support of their motion for an order pursuant to Fed. R. Civ. P. 56, granting summary judgment in favor of (i) the Goldsmith Parties with respect to the declaratory judgment complaint of the plaintiff, The Andy Warhol Foundation For The Visual Arts, Inc. ("AWF"), and (ii) in favor of Goldsmith on her counterclaim against AWF for copyright infringement, and granting such other relief as this Court deems just and proper.

## PRELIMINARY STATEMENT

In today's digital world, anyone can easily modify a photograph on a computer to add high contrast, coloration and artifacts. Upon being commissioned by Vanity Fair to illustrate an article on the musician Prince Rogers Nelson ("Prince") using Goldsmith's unpublished expressive studio portrait of the musician, Andy Warhol ("Warhol") did little more than that in creating his series of Prince works. Finding such superficial revisions to be "transformative" fair use would give a free pass to appropriation artists and destroy derivative licensing markets for commercial photographers whose works are used without permission.

In comparing Warhol's images of Prince to Goldsmith's photograph, an ordinary observer would readily find substantial similarity to support infringement. Moreover, AWF's past and future commercial licensing of the Warhol images usurps Goldsmith's derivative licensing markets for her photo that may otherwise be exploited by her and her heirs over the long life of her copyright.

## STATEMENT OF FACTS

A.  The Parties

Goldsmith is an acclaimed celebrity portrait, documentary and fine art photographer, whose works are in the collections of prominent museums and cultural institutions.  Goldsmith Parties' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment ("Goldsmith 56.1 Stmt.") ¶¶ 6, 7.

Since the 1960s, Goldsmith has photographed innumerable rock and pop music celebrities and bands.  *Id.* ¶ 11.  Her photographs have appeared on over 100 music album covers and have been exhibited in shows for over 30 years. *Id.* ¶ 14.  Goldsmith's photography extends to non-music documentary works and portraits of non-music celebrities.  *Id.* ¶ 13.  Goldsmith's editorial photography has appeared on and between the covers of numerous esteemed publications.  *Id.* ¶ 9.  Goldsmith has published 13 books of photography.  *Id.* ¶ 10.

Lynn Goldsmith, Inc. ("LGI") was a licensing agency formed by Goldsmith focusing on celebrity portraiture, representing over 200 worldwide photographers, including Goldsmith.  *Id.* ¶ 17.  After 1984, LGI changed its name to Lynn Goldsmith, Ltd.  *Id.* ¶ 18.

Warhol died on February 22, 1987. *Id.* ¶ 71.  AWF was created as a not-for-profit organization in 1987 in accordance with Warhol's will. *Id.* ¶ 72.  AWF commercially licenses Warhol images it controls to fund its programs. *Id.* ¶ 5.

B.  Goldsmith's 1981 photo shoot of Prince

In 1981, Goldsmith contacted Newsweek about doing a photo shoot of Prince. *Id.* ¶ 20.  Goldsmith knew Michael Jackson's co-manager, Ron Weisner, who advised her that he was managing Prince. *Id.* ¶ 19.  Goldsmith previously had worked with Michael Jackson, who was a very shy person, and she knew that Prince was an up and coming artist. *Id.* ¶¶ 19-20.  Goldsmith

spoke with Myra Kreiman, an art photo editor at Newsweek, who agreed that Goldsmith should photograph Prince for Newsweek. *Id.* ¶¶ 20, 23.

Goldsmith photographed Prince in concert on December 2, 1981, and in her Manhattan studio on December 3, 1981. *Id.* ¶¶ 35. Goldsmith selected the camera, lenses and types of film. *Id.* ¶ 32. During the studio session, Goldsmith applied makeup to Prince and gave him lip gloss to apply to accentuate his sensuality; the gloss reflected light off of his lower lip. *Id.* ¶ 25. She added additional eye shadow because she felt Prince was in touch with the female part of himself, yet he was very much male. *Id.* ¶ 26. Goldsmith used lighting to accent Prince's chiseled bone structure. *Id.* ¶ 27. The studio photos reflect two white lights in the pupil of each eye from flashes as Prince was looking at the camera. *Id.* ¶ 30. Goldsmith rarely forgets her subjects' eyes, and Prince's eyes reflected an uncomfortable person who was a "vulnerable human being." *Id.* ¶ 31.

Goldsmith started taking black and white photographs in the studio before switching to color film. *Id.* ¶ 28. Prince said nothing and appeared fragile to Goldsmith. Prince left early, but the next day he sent Goldsmith a note about how sick and nervous he was feeling at the shoot. *Id.* ¶ 29. The studio session was far shorter than Goldsmith's usual sessions, which can take up to 12 hours. *Id.*

Goldsmith's studio photographs of Prince included only 12 black and white film images and 11 color transparency film images. *Id.* ¶ 37. The following black and white photo (the "Goldsmith Photo") is the subject of Goldsmith's Counterclaim (*Id.* ¶ 38):



Goldsmith was trying to capture a sense of someone who was very expressive and willing to break through what must have been his immense fears to make the type of creative works he wanted, but that he was frightened. *Id.* ¶ 33. Goldsmith did not consider Prince's clothing, including his buttoned up look and suspenders, as contributing to an understanding of who Prince was in the studio photos. *Id.* ¶ 34.

Goldsmith retained the copyrights in her photos of Prince. *Id.* ¶ 36. One of Goldsmith's color concert photos of Prince was published by Newsweek on Dec. 21, 1981, pursuant to a license granted to Newsweek, with the photo credit "Lynn Goldsmith – LGI," which reflected the name of the photographer and her agency. *Id.* ¶¶ 35 and 39. None of the black and white studio photos, including the Goldsmith Photo, have ever been published.

A Certificate of Copyright Registration dated November 17, 2017, was issued for the Goldsmith Photo as an unpublished work, specifying a creation date of 1981 and designating Goldsmith as author and copyright claimant. *Id.* ¶ 159.

4

C.  <u>Vanity Fair licenses the Goldsmith Photo for an artist reference</u>

In October 1984, in response to a request by Vanity Fair, a photo submission approval form dated September 25, 1984, was sent by LGI to Vanity Fair, attention of its photo editor Esin Goknar, which specified: "11" X 14" B&W STUDIO PORTRAIT OF PRINCE BY © 1981 LYNN GOLDSMITH FOR POSSIBLE USE AS AN ARTIST REFERENCE."  Goknar testified that the term "artist reference" meant an artist "would create a work of art based on image reference."  *Id.* ¶¶ 40-42.  The submission form specified on its reverse side: "Material submitted on approval is not sold and no rights are acquired until an invoice is submitted by Lynn Goldsmith.  All rights no specifically granted on invoice are reserved by Lynn Goldsmith."  *Id.* ¶ 43.

LGI issued Vanity Fair an invoice dated October 29, 1984, which specified: "ordered by Esin Goknar."  *Id.* ¶ 44.  The invoice granted Vanity Fair a license to use one of Goldsmith's 1981 studio black and white photographs of Prince, subject to the following terms (*Id.*):

> FEE FOR THE USE OF ONE PHOTOGRAPH OF PRINCE, COPYRIGHT 1981 LYNN GOLDSMITH FOR USE AS ARTIST REFERENCE FOR AN ILLUSTRATION TO BE PUBLISHED IN VANITY FAIR NOVEMBER 1984 ISSUE.  IT CAN APPEAR ONE TIME FULL PAGE AND ONE TIME UNDER ONE QUARTER PAGE. NO OTHER USAGE RIGHTS GRANTED. ONE TIME ENGLISH LANGUAGE ONLY NORTH AMERICAN DISTRIBUTION ONLY.

The invoice required publication of the credit line "LYNN GOLDSMITH."  *Id.*

D. <u>Vanity Fair commissioned Warhol to create an illustration based on the Goldsmith Photo</u>

Pursuant to this LGI license, Vanity Fair commissioned Warhol to create an illustration of Prince for its November 1984 magazine issue (the "VF Issue"). *Id.* ¶ 48. The VF Issue contained an article entitled "Purple Fame" (the "VF Article"), which depicted the following full-page color illustration of Prince created by Warhol (the "VF Warhol Image"):



*Id.* ¶ 49.

The VF Article stated it featured "a special portrait for *Vanity Fair* by ANDY WARHOL" and contained the attribution credit "LYNN GOLDSMITH/LGI" in the gutter, as follows:



*Id.* ¶¶ 49-50.   A copyright credit on page 121 of the VF Issue stated: "Page 67: source photograph © 1984 by Lynn Goldsmith/LGI."  *Id.* ¶ 51.  Condé Nast's vice president of business affairs and rights management, Chris Donnellan, testified that this reference to "source photograph" meant "[t]he underlying image that was used to create the artwork." *Id.* ¶ 52. Goknar testified that she would have submitted the credits accompanying the VF Article for publication and these credits reflected that Vanity Fair used one of Goldsmith's photographs. *Id.* ¶ 52.

E.  <u>Warhol created 16 distinct images based on the Goldsmith Photo</u>

Warhol created 16 separate works derived from the Goldsmith Photo (inclusive of the VF Warhol Image), as identified on pages 9 – 12 of the Complaint [Docket #6] by the following images and AWF inventory numbers (collectively, the "Warhol Prince Series"):



PO 50.537                    PO 50.539



PO 50.538

PO 50.541

PO 50.540

PO 50.543

PO 50.542

PO 50.545

PO  50.544  [the Warhol VF Image; Goldsmith 56.1 Stmt. ¶ 62]

PO 50.547



PO 50.546

TOP115.260

TOP115.259

PO 50.548

[A typographical error in the Complaint

listed this as PO 50.458.]

42.72

UP

42.73

UP

The above inventory prefixes mean the following: "PO" is for "portraits," "TOP" is for "temporary on paper," which includes drawings on paper, and "UP" is for "unpublished print." *Id.* ¶¶ 57-58.  AWF's catalogue raisonné editor, Neil Allen Printz ("Printz"), testified that "PO" means the original work was created by Warhol using silk screen printing and painting on canvas, "UP" means the original work was created by Warhol as a screen print on paper, and "TOP" means the original work was created by Warhol as a drawing on paper. *Id.* ¶ 59.  Each of the 16 works was a unique and distinct image, and there are no other images of Prince that were created by Warhol. *Id.* ¶ 60.

AWF's catalogue raisonné records for PO 50.548 refer to ███████████████████████ ███████████████████████████████████████ *Id.* ¶ 65.  Printz has never seen any such publicity photograph. *Id.* ¶ 65.

F.  <u>Warhol copied the Goldsmith Photo</u>

To create the Warhol Prince Series, Warhol made a copy of the Goldsmith Photo provided by Vanity Fair.  Printz testified that the 12 "PO" silkscreen works and the two "UP" screen prints were based on a photograph and created through a process that started with Warhol "having his silkscreen printer create a high contrast half tone silkscreen from a photograph":

> The photograph would be enlarged and photographically reproduced onto a sheet of clear plastic, otherwise known as an acetate, to create a halftone image. In other words, the continuous tone, all the values of light to dark in the photograph would be reduced into a high contrast imagine so transitional tones would be dropped out, deliberately dropped out.

> Andy Warhol would look at that image, decide how he wanted to modify it, and if he did the – they would make another acetate that he could use to trace local color shapes onto the canvas and paint, for example, the face area in PO 50537. And then the printer would use the acetate to photo mechanically reproduce that onto a silkscreen.

The Goldsmith Photo would have been reproduced onto a silkscreen by treating the silkscreen with photosensitive material. *Id.* ¶ 66.  Once a silkscreen was created from the underlying photograph, Warhol would have created the silkscreen "PO" works on canvas by placing the screen on top of a pre-painted canvas, and then applying ink to the silkscreen and having a printer use a squeegee "to pull the ink across the mesh of the screen leaving an image on the surface of the canvas…."  *Id.* ¶ 67.  "Local color" would then have been added to Prince's face in the images designated PO 50537, PO 50544, PO 50547 and PO 50458.  *Id.*

Printz testified that the two "UP" screenprints were done on paper, not canvas, and would have been created using only the silkscreen technique without painted backgrounds or faces.  *Id.* ¶ 69.  The two "TOP" drawings were created by projecting the underlying photograph and creating a contoured drawing based on that image, meaning a "drawing [that] follows the contours, the outlines of the head, the face, the features to the degree he chooses to."  *Id.* ¶ 70.

G.  AWF's acquisition and divestment of the Warhol Prince Series

After Warhol's death, AWF acquired title to and copyrights in the Warhol Prince Series. *Id.* ¶ 73.  By 2004, AWF had divested itself of ownership of the original Warhol Prince Series works.  *Id.* ¶¶ 74-75.

Between 1993 and 2004, AWF sold or transferred custody of 12 of the original Warhol

Prince Series works to third parties.  *Id.* ¶ 74.  Custody of works PO 50.538, PO 50.542, PO 50.544 and PO 50.547 was transferred to The Andy Warhol Museum by AWF by 1998.  *Id.* ¶ 75.

## H.  Artist Rights Society acts as AWF's agency

Artist Rights Society ("ARS") has acted as a copyright licensing agency for AWF since at least 1989 pursuant to agent or "membership" agreements, which authorize ARS to issue licenses to third parties for editorial rights, commercial rights and museum rights.  *Id.* ¶¶ 76-80.

All Warhol images, including the Warhol Prince Series, are within the scope of ARS' agreements with AWF and that scope has not changed since 2004.  *Id.* ¶¶ 83-84.

## I.  AWF licenses a Warhol Prince Series image to Condé Nast

Prince died on April 21, 2016.  *Id.* ¶ 87.  On April 22, 2016, Vanity Fair published on its website and Facebook page a re-formatted copy of the 1984 VF Article, with this attribution credit: "By Lynn Goldsmith/LGI/Andy Warhol AWF."  The re-published article also displayed the original 1984 gutter credit "Lynn Goldsmith/LGI."  *Id.* ¶ 88.  These postings appeared as follows:



*Id.* ¶¶ 87 and 89.

Vanity Fair is, and was in 1984, owned and published by Condé Nast.  *Id.* ¶ 91.  Condé Nast's database included an image of the 1984 VF Article.  *Id.* ¶ 89.

A series of emails from April 22 - 29, 2016, describe how Condé Nast licensed Warhol Prince Image PO 50.541 from AWF, through its agent ARS, to use on the cover of a special tribute magazine dedicated to Prince.  *Id.* ¶¶ 92-96; 98 - 112.



*Id.* ¶ 96.

*Id.* ¶ 103.

*Id.* ¶ 104.

*Id.*

*Id.* ¶ 110.

*Id.* ¶ 112.

In May 2016, Condé Nast published a commemorative magazine (the "CN Magazine") devoted to Prince, entitled "The Genius of Prince," which featured on its cover the licensed image PO 50.541 (the "Warhol CN Image"), appearing as follows:

13



*Id.* ¶ 113.  The CN Magazine remained on newsstands for three months and listed copyright credits only for Warhol and AWF.  *Id.* ¶¶ 114-15.  Condé Nast paid a $10,000 license fee and $250 image use fee for the Warhol CN Image.  *Id.* ¶ 136.

Condé Nast's internal emails acknowledged on April 21, 2016, the day Prince died, that "Andy Warhol DREW HIM on a special assignment for Vanity Fair, November 1984…."  *Id.* ¶ 118.  Condé Nast's vice president of business affairs and rights management, Chris Donnellan ("Donnellan"), testified this meant that Warhol was commissioned by Vanity Fair for a special assignment and that "commissioned" meant that in contrast to "numerous instances where [Condé Nast has] republished Warhol images in our magazines, this was something he was creating for the magazine at the request of the magazine."  *Id.*  Donnellan noted "it was so rare for Warhol to create something for a magazine…."  *Id.*

███████████████████████████████████████████████████████████  *Id.* ¶ 119.

J.  <u>Goldsmith first becomes aware of the Warhol Prince Series</u>

Goldsmith first learned of the Warhol VF Image after seeing images of Prince posted online following his death, and these included the Warhol VF Image and Warhol CN Image.  *Id.* ¶ 120.  Goldsmith had never previously seen a Warhol image of Prince, so she did a Google image search and the VF Article came up in the results showing Goldsmith's name in the credits. *Id.* ¶ 121.

Goldsmith called AWF and advised Michael Hermann, AWF's Director of Licensing, that she believed one of her images had been infringed, in reference to the CN Magazine; Hermann asked her to send him a copy of the image.  *Id.* ¶ 122.  On July 28, 2016, Goldsmith emailed Hermann one of her 1981 color studio photographs of Prince, which was a three-quarter shot that showed Prince with his hands in his pockets against a white background.  *Id.* ¶ 123. Goldsmith initially thought this color photograph had been used because she found a scan of it in her digital archive and it had been printed in one of her photography books.  *Id.*  Goldsmith's email included copies of her color photograph of Prince and also that same photograph with the VF Warhol Image superimposed on it.  *Id.*

Upon seeing online images of the 1984 VF Article with her attribution credit, however, Goldsmith then found the LGI license to Vanity Fair, which confirmed that a black and white photo had been licensed.  *Id.* ¶ 124.  Goldsmith compared the Warhol CN Image to the Goldsmith Photo by digitally scanning her black and white negative and superimposing the magazine cover digitally on top of it to create the following digital "GIF" image:




*Id.* ¶ 125.

Goldsmith emailed Hermann again on July 28, 2016, advising him that after further research, the Warhol CN Image was not based on her color portrait of Prince but on her black and white Goldsmith Image.  She also advised Hermann she had found the 1984 license to Vanity Fair and attached to that email the above animated "GIF" image superimposed over the Goldsmith Photo.  *Id.* ¶ 126.  The Goldsmith Photo that was included with this email is not referenced in the Complaint, as opposed to the three-quarter color photo Goldsmith included with her first email of July 28, 2016.  *Id.* ¶ 127.

K.  Warhol Prince Series images are available for licensing by AWF

All the Warhol Prince Series images have been made available for licensing by AWF, directly or through its agents, to third parties.  *Id.* ¶ 128. ███████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ *Id.* ¶ 129. ████████



*Id.*

*Id.* ¶ 130.

*Id.* ¶¶ 136 (vii), viii), 136.

L. <u>Goldsmith's markets for her prints and images</u>

Between 2003 and 2016, single images of Goldsmith's stock photography were licensed for myriad editorial and commercial uses, including to magazines and record companies, for fees ranging between $100 to $70,000. *Id.* ¶ 138. In that same period, fine art print sales of Goldsmith's photographs were sold for prices ranging from $125 to $8,250. *Id.* ¶ 139.

Goldsmith creates "rock mosaics," each of which depicts an image of a celebrity comprised of at least 2,000 photographs taken by Goldsmith herself, and offers them for sale in limited editions of 10 for prices ranging from $5,000 to $12,000, with higher prices for the last print in an edition. *Id.* ¶¶ 140-41.

Goldsmith also offers her fine art prints of rock musicians for sale in editions of 20 at prices ranging from $1,700 to $12,000, with higher prices for the last print in an edition, and this pricing also applies to Goldsmith's 1981 photographs of Prince. *Id.* ¶ 142.

Goldsmith has not yet editioned the Goldsmith Photo because she does not edition all her work at once; however, as she gets older, she intends to edition her unpublished works and anticipates that prices will then rise. *Id.* ¶ 143. Goldsmith has editioned her concert photos of

Prince from 1981 and other portraits she did of Prince in 1993, but, for the same reasons, she has not yet editioned the 1981 studio portraits of Prince.  *Id*.

Between 2005 and 2016, LGI licensed to various magazines and venues different Goldsmith photographs of Prince, apart from the 1981 Newsweek studio photos, for fees ranging from $150 to $2,300.  *Id*. ¶¶ 144-54.

In 2004, Goldsmith sold a fine art print she made in 1993 of Prince holding a guitar to a private billionaire collector, who also owns three Warhol works of art and an extensive rock and roll collection.  *Id*. ¶ 155.

M.  Warhol and AWF previously were sued for copyright infringement

In 1966, Warhol was sued by photographer Patricia Caulfield for copyright infringement for his unauthorized use of Caulfield's photograph of flowers to create his Flower series of artworks; the case settled.  *Id*. ¶ 156.  According to his assistant Gerard Malanga, after this lawsuit Warhol realized he had to be very careful about appropriating others' images for fear of being sued again and wanted to start taking his own photographs rather than using images that were in the print media.  *Id*. ¶ 157.

AWF was sued in 1996 for copyright infringement by Henri Dauman and Time Inc. over photographs taken by Dauman at John F. Kennedy's funeral that appeared in a December 6, 1963 issue of Life.  The complaint alleged: "Warhol created a series of artworks by reproducing images of Jacqueline Kennedy; that Warhol used a total of eight 'source images' culled from newspapers and magazines; and that one of these images ... was taken from the Dauman photograph published in Life."  The case settled and was voluntarily discontinued on November 13, 2001.  *Id*. ¶ 158.

N. Procedural history

AWF filed a Complaint seeking declaratory relief on April 7, 2017 (Docket #6).   The Goldsmith parties filed an Amended Answer and Counterclaim on July 10, 2017 (Docket #20).   AWF filed an Answer to Counterclaim on July 24, 2017 (Docket #22).   By Order entered July 13, 2017, the Court authorized the parties to file cross-motions for summary judgment (Docket #44).

## ARGUMENT

### POINT I

### The standards for granting summary judgment have been met

To prevail on a motion for summary judgment, a movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   If the moving party meets its burden, the nonmoving party must produce admissible evidence in the record and may not rely on conclusory statements or on non-credible contentions. *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).   "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   A court must resolve all ambiguities

and draw all reasonable inferences against the moving party, and view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A court faced with cross-motions for summary judgment need not grant judgment as a matter of law for one side or the other, but "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). "Courts most frequently address a proffered fair use defense at summary judgment" and may decide the issue if there are no genuine issues of fact. *TCA Television Corp. v. McCollum*, 839 F.3d 168, 178 (2d. Cir. 2016).

The material facts in this case are not genuinely in dispute, save one question posed by AWF as to which photo LGI licensed to Vanity Fair in 1984. As to that issue, the underlying LGI license documentation confirms it was a "black and white" photo, and Goldsmith testified that the Goldsmith Photo was in fact the licensed photo. Goldsmith 56.1 Stmt. ¶¶ 40-41. Goldsmith so advised AWF's Director of Licensing and sent him a digital "GIF" comparison, overlaying her Goldsmith Photo with a scan of the Warhol CN Image, and it was a near perfect match. *Id*. ¶ 126.

## POINT II

### <u>The Warhol Prince Series images infringe the Goldsmith Photo copyright</u>

To establish copyright infringement, a plaintiff must show "both ownership of a copyright and unauthorized copying by the defendant." *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 98 (2d Cir. 1999). A plaintiff must demonstrate that "(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the

defendant's work and the protectable elements of plaintiff's."  *Id.* at 99; *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010).

### A.  Goldsmith owns a protectible copyright in the Goldsmith Photo

Goldsmith's ownership of a valid copyright in the Goldsmith Photo is not being contested by AWF, which seeks a declaration in the First Cause of Action in its Complaint that none of the Warhol Prince Series images infringe that copyright.

"For more than a century photographs have been held to be copyrightable 'writings' under Article I, § 8 of the Constitution." *Rogers v. Koons*, 960 F.2d 301(2d Cir. 1992) (citation omitted).  As noted in *Rogers,* 960 F.2d at 307: "Elements of originality in a photograph may include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved."  "[A photographer] is entitled to protection for such artistic elements as the particular lighting, the resulting skin tone of the subject and the camera angle that she selected." *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 116 (2d Cir. 1998).  Copyright protection for photographs may extend to the originality in the "rendition of a subject." *LaChapelle v. Fenty*, 812 F. Supp. 2d 434, 440–41 (S.D.N.Y. 2011).

In creating the Goldsmith Photo, Goldsmith set up the studio lighting, selected the film, applied makeup and gave Prince lip gloss to accentuate his sensuality.  Goldsmith 56.1 Stmt. ¶¶ 25-27, 30.  Goldsmith made specific "orchestrated" creative choices when photographing Prince at the abbreviated 1981 studio session.  The range of creative choices was exceptionally broad. The image she captured of Prince in the Goldsmith Photo was unique to that moment and froze a telling portrait, which in her mind reflected an expressive yet uncomfortable person who was a "vulnerable human being." *Id.* ¶¶ 31, 33.  Prince's eyes and expression are the focal points; in contrast, Prince's clothing did not contribute to an understanding of who Prince was.  *Id.* ¶¶ 31,

34.

## B.  Direct copying is proven

Direct copying is acknowledged by AWF because Warhol was provided with the Goldsmith Photo by Vanity Fair to use as an artist reference.  Moreover, AWF's catalogue raisonné editor, Neil Printz, testified that Warhol would have made a physical copy of that photo in creating each of the 12 "PO" designated silk screen works and "UP" designated screen prints, and would have drawn over a projected image of the photo to create the "TOP" images.  *Id.* ¶¶ 66-70.

Absent the Vanity Fair commission, Warhol would never have had access to the Goldsmith Photo because it was *unpublished*—contrary to the erroneous allegation in the Complaint that Warhol referenced a "publicity photo" to create the Warhol Prince Series. Complaint ¶ 3.  The credits in the VF Issue confirm that the VF Warhol Image was based on the Goldsmith Photo.  *Id.* ¶¶ 50-52.  AWF's business records and emails reflect that the VF Warhol Image was "commissioned" by Vanity Fair, as does testimony from Condé Nast.  *Id.* ¶ 48, 55.

The Copyright Act grants a copyright owner the exclusive rights to reproduction, creation of derivative works, and distribution. 17 U.S.C. § 106(1) - (3).  The Warhol Prince Series, other than the one use of the Warhol VF Image in the VF Article, are unauthorized derivative works based on the Goldsmith Photo.  AWF further infringed Goldsmith's rights by creating unauthorized copies of the Warhol Prince Series images and distributing them to licensees.

## C.  The Warhol Prince Series images are substantially similar to the Goldsmith Photo

"The standard test for substantial similarity between two items is whether an 'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'"  *Gaito*, 602 F.3d at 66 (citations omitted).  The

"ordinary observer test" asks whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Id*.  In assessing substantial similarity, the Second Circuit has "disavowed any notion that 'we are required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable.'… Instead, we are principally guided 'by comparing the contested design's "total concept and overall feel' with that of the allegedly infringed work,"….as instructed by our 'good eyes and common sense….'" *Id*. (citations omitted).

Where infringing works are "'inexact copies' in recognition of the fact that they alter the prior image yet mimic its structure in some fashion," the Second Circuit has compared "the contested [work's] 'total concept and overall feel' with that of the allegedly infringed work." *Tufenkian Import/Export v. Einstein Moomjy Inc.*, 338 F.3d 127, 133 (2d Cir. 2003). "Accordingly, the Second Circuit has recognized that 'the defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work ... are considered in relation to one another.'" *LaChapelle*, 812 F.Supp.2d at 441-42.  Substantial similarity may be found where the protected and accused works "exist in entirely different media" and the ultimate "inquiry focuses on whether the alleged infringer has misappropriated 'the original way in which the author has `selected, coordinated, and arranged' the elements of his or her work.'" *Id*. (citations omitted).  In determining substantial similarity, "credibility is not at stake and all that is required is a visual comparison of the products." *Boisson v. American County Quilts and Linens, Inc.*, 273 F. 3d 262, 272 (2d Cir. 2001).

This is not even a close call: Warhol physically copied the Goldsmith Photo to create his images.  A visual comparison reveals that the Warhol Prince Series retain the original and

distinctive protectable elements expressed in the Goldsmith Photo, including its "total concept and overall feel."  The essence of that unpublished photo was carried over into each of those Warhol images.  Indeed, having been commissioned by Vanity Fair to create an illustration for the VF Article using the Goldsmith Photo as an artist reference, as opposed to some other photo, it would have been irrational for Warhol to have created an image that differed so dramatically from the Goldsmith Photo as to no longer capture its essential expression.

Here, the overall composition, pose and angle of Prince's head, detailed hair curls, long gall of hair down the left side of his face, deep-set intensity of his eyes, pursed lips, facial hair details, the mole on his cheek, dual reflections in each pupil, reflection on the lower lip, deep shadows under his eyes that were accentuated by makeup, and Prince's intense stare into the eye of the camera — were all retained in the Warhol Prince Series.

Two analogous cases support this conclusion where an appropriation artist infringed photographs of the rap group Run-DMC and rock star Sid Vicious.  In *Friedman v. Guetta*, 2011 WL 3510890 (C.D. Cal. May 27, 2011), plaintiff's published black and white photo (below left) was infringed by other images created by the artist (right to left, titled "Broken Records" and "Stencil"):

  

Declaration of Barry Werbin dated October 12, 2018 ("Werbin Decl.") Exh. H [at pp. 2, 3]. After obtaining plaintiff's photo off the Internet, Guetta created "Broken Records" by altering the photo digitally, eliminating the background, and projecting the altered image onto a piece of

painted wood on which he glued pieces of phonograph records.  *Friedman*, at 2011 WL 3510890, at *1.  "Stencil" was created by altering the photo digitally to make it into a stencil, which was placed atop three canvases with different backgrounds, and using "black spray paint to superimpose the image of Run–DMC."  *Id*. at *2.

The court held that "no reasonable fact finder could find that the works are not substantially similar, and therefore Plaintiff is entitled to summary judgment." *Id*. at *4. "Here, the [infringing] works plainly borrow original elements of Plaintiff's Photograph, including, for example, the following: the selection of the Run–DMC subjects, the arrangement of the three subjects, the poses of the individual subjects, the subjects' accessories and outfits, the lighting, and the perspective."  *Id*. at *5.  Removing the background and changing the coloring were "minor changes [that] do not alter the fact that the distinct figures in Plaintiff's Photograph remain clearly visible and readily identifiable.  In fact, the outline of each figure is almost exactly replicated in the Broken Records [and] Stencil …. works…." *Id*.

Similarly, in *Morris v. Guetta*, 2013 WL 440127 (C.D. Cal. Feb. 4, 2013), the same appropriation artist infringed the copyright in the following published black and white portrait photo of Sid Vicious (below left), in creating these other images:





Werbin Decl. Exh. I [at pp. 1 - 4; 6 - 7].  "Sid Vicious struck a pose of his own design for the Photograph."  *Morris*, 2013 WL 440127 at *1.  Guetta's images showed Vicious "tilting his head and winking," with higher contrast and less greyscale, a stencil-like image, with added "splashes of brightly colored paint."  *Id*.  Guetta admitted direct copying of the photograph, which he then altered, and the court found that the protectable elements of the photo carried over into the infringing works notwithstanding the changes Guetta made.  *Id*. at *4.  *See also Rogers*, 960 F.2d at 307 ("Koons' access to the copyrighted work is conceded, and the accused work is so substantially similar to the copyrighted work that reasonable jurors could not differ on this issue.").

Here, in comparing the Goldsmith Photo to the Warhol Prince Series images, the ordinary observer would be disposed to overlook any disparities and find that Warhol used the specific expression of the Goldsmith Photo in each of his images.  *See Rogers*, 960 F.2d at 308 (granting summary judgment where sculptor used the identical expression in a photo of a couple with eight small puppies seated on a bench, including the composition, poses, and expressions incorporated into the sculpture).

The essence of the Goldsmith Photo's protectible elements are readily apparent in comparing it, for example, to the Warhol CN Image (PO 50.541):




Analogous to the *Guetta* cases, Warhol added contrast and dropped out greyscale, added a solid color to the background and face, and drew fine outlines around the perimeter of the image and facial features.  But the overall look and feel of the Goldsmith Photo remain in this Warhol image and all the others.

The Goldsmith Photo captures a unique and passing private moment in Prince's burgeoning career, an image of a fearful and uncomfortable  person that was fleeting and never publicly disseminated.  It is a unique portrait of Prince whose essence was directly copied by Warhol and exploited commercially by AWF after his death.

Accordingly, Goldsmith has established the *prima facie* elements of a copyright infringement claim against AWF respecting the Warhol CN Image, and is entitled to judgment on AWF's claim of non-infringement respecting all Warhol Prince Series images.

## POINT III

### <u>AWF is not entitled to a fair use defense under 17 U.S.C. § 107</u>

AWF seeks a declaration in the Second Cause of Action of its Complaint that all images in the Warhol Prince Series are entitled to a fair use defense under Section 107 of the Copyright

Act, 17 U.S.C. § 107 ("Section 107"), and pleads fair use as an affirmative defense to Goldsmith's infringement claim.  Werbin Decl. Exhs. A and C [Complaint ¶¶ 67-69; Answer to Counterclaims, Seventh Defense].  Those Warhol images, however, are not "transformative" of the Goldsmith Image and, left unchecked, AWF's ongoing commercial exploitation of those images will usurp the derivative licensing markets for the Goldsmith Photo.

The Preamble to Section 107 informs its overall intent: "[T]he fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching … scholarly, or research is not an infringement of copyright."  17 U.S.C. § 107.  The words "including" and "such as" make the stated examples "illustrative and not limitative," and courts must grapple with the four enumerated non-exclusive statutory factors on a case by case basis.  *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577 (1994); *TCA Television Corp.*, 839 F.3d at 178.  The factors are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  All four factors must be explored and viewed collectively, with their results "weighed together, in light of the purposes of copyright." *Campbell,* 510 U.S. at 578.

A. Purpose and character of use: the Warhol Prince Series is not "transformative"

The *Campbell* Court infused into the first fair use factor the concept of "transformative use," which does not appear in Section 107 itself:

> The central purpose of this investigation is to see … whether the new work merely "supersede[s] the objects" of the original creation … or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative." … [T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.

*Campbell*, 510 U.S. at 579 (citations omitted).

AWF relies heavily on *Cariou v. Prince*, 714 F.3d 694 (2d. Cir. 2013).  *See* Werbin Exh. A [Complaint at ¶¶ 59-60].  The application of "transformative" use in that case has been criticized.  *See* Nimmer on Copyright § 13.05[B][6], at 13.224.20 (with respect to *Cariou*: "It would seem that the pendulum has swung too far in the direction of recognizing any alteration as transformative, such that this doctrine now threatens to swallow fair use.  It is respectfully submitted that a correction is needed in the law.").  Indeed, the Second Circuit recently observed: "Insofar as *Cariou* might be thought to represent the high-water mark of our court's recognition of transformative works, it has drawn some criticism."  *TCA Television Corp.*, 839 F.3d at 181.

*Cariou* held that a work may be "transformative" without commenting on the original, but made it clear that in assessing the first factor, "[w]hat is critical is how the work in question

appears to the reasonable observer, not simply what an artist might say about a particular piece or body of work." *Cariou*, 714 F.3d at 707.

In *Cariou,* the appropriation artist Richard Prince created 30 works that were derived from black and white photos of Rastafarians, which had been taken by Cariou and published in a book.  The Second Circuit held that 25 of those 30 images were transformative as a matter of law because they "manifest an entirely different aesthetic from Cariou's photographs."  *Cariou*, 714 F.3d at 706.  The Court observed that "Prince has created collages on canvas that incorporate color, feature distorted human and other forms and settings, and measure between ten and nearly a hundred times the size of the photographs.  Prince's composition, presentation, scale, color palette, and media are fundamentally different and new compared to the photographs, as is the expressive nature of Prince's work."  *Id*.

But the "collages" the Court was addressing included substantial additional "form and settings" and additional content from *other* sources (including extensive depictions of nude women and artifacts) that were not present in the original photos; indeed, Cariou's photography was hard to discern in many of the 25 images found to be fair use, such as these examples from the Court's Appendix:

  

  

http://www.ca2.uscourts.gov/docs/opn1197/11-1197apx.html

In contrast, the Second Circuit remanded the following five images (labeled in the Court's Appendix as "*Graduation*, *Meditation*, *Canal Zone (2007)*, *Canal Zone (2008)*, and *Charlie Company)*, which it could not deem transformative as a matter of law, observing that they displayed only "relatively minimal alterations" and that each "differs from, but is still similar in key aesthetic ways, to Cariou's photographs," *Cariou*, 714 F.3d at 710-11:

  

 

http://www.ca2.uscourts.gov/docs/opn1197/11-1197apx.html

The Warhol Prince Series imagery is far closer to the remanded works in *Cariou* and a far cry from the other 25 works the Court found transformative. Enlarging one element of the remanded image *Canal Zone (2007)*, for example, reveals an original black and white photo with added line drawings, a white outline, added color, and artifacts placed on the face:

31




In the context of these remanded images, in comparing the Warhol Prince Series to the Goldsmith Photo, a "reasonable observer" would not find the types of changes Warhol made to be "transformative."  Warhol copied the entirety of the Goldsmith Photo to make each of his 16 images.  Through the silkscreen process, high contrast was added, the lower portion of the photo displaying suspenders and Prince's shoulders was cropped out, color was placed on the background and in some cases on Prince's face, and outlines were drawn on some of the images. These "relatively minimal alterations" are not transformative because they retain the essence of the same unique image of Prince that defines the Goldsmith Photo.  And merely changing the "expressive character" of a copyrighted photograph cannot be transformative.  *See Campbell*, 510 U.S. at 577-80; *Gaylord v. United States*, 595 F.3d 1364, 1372–73 (Fed. Cir. 2010).

Viewing Warhol's images side-by-side with the Goldsmith Photo "it is evident that [the Warhol Prince Series] does *not* belong to a class of secondary works that are so aesthetically different from the originals that they can pass the Second Circuit's 'reasonable viewer' test as a matter of law."  *Graham v. Prince*, 265 F. Supp. 3d 366, 380 (S.D.N.Y. 2017).  The five works

remanded in *Cariou* were created "by extensively cropping, collaging, and tinting the originals, and [Richard Prince] superimposed new and incongruous elements — including color guitars, lozenges, and 'cartoonish appendages' — over Cariou's classical black-and-white photographs." *Id*. at 381 (citation omitted).  Here, the Warhol Prince Series reflect far fewer modifications to the Goldsmith Photo than existed in the remanded Cariou works in relation to Cariou's original photos.  Warhol's images retained the core of the Goldsmith Photo without transforming its essence.

For similar reasons, the courts in the *Guetta* cases also found no transformative uses in rejecting fair use defenses.  *Friedman*, 2011 WL 3510890, at *6 ("[Plaintiff's] image was used by both in works of visual art for public display.  Although the statements made by those respective artworks and the mediums by which those respective statements were made differ, the use itself is not so distinct as to render Defendant's use a transformation of Plaintiff's copyright."); *Morris*, 2013 WL 440127, at *8 ("The Photograph is a picture of Sid Vicious making a distinct facial expression. Defendants' works are of Sid Vicious making that same expression.  Most of Defendants' works add certain new elements, but the overall effect of each is not transformative; Defendants' works remain at their core pictures of Sid Vicious.").

The Warhol Prince Series images do not transform the Goldsmith Photo "in the creation of new information, new aesthetics, new insights and understandings." *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 142 (2d Cir. 1998).  The original Warhol VF Image was created and used for the same illustrative commercial purpose for which the Goldsmith Photo was licensed to Vanity Fair for use as an artist reference.  Warhol made actual copies of that photo to create his images, and then added background colors and facial coloration on some of the images, increased the contrast and drew outlines.  As in the *Guetta* cases, no extraneous

content, collages or other creative elements were added so as to be "transformative," in contrast to the 25 images in *Cariou*.

The first Section 107 factor also looks to whether the "allegedly infringing work has a commercial or nonprofit educational purpose." *Cariou*, 714 F.3d at 708. "'The commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work.'" *Id.*, *quoting American Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 922 (2d Cir. 1994). This element favors Goldsmith because of AWF's past and potential future licensing of the Warhol Prince Series images for editorial, commercial and merchandising purposes in exchange for licensing and image rental fees. Where transformative use does not exist, as here, the commercial nature of AWF's use becomes more significant and favors Goldsmith. *See Cariou*, 714 F.3d at 708.

## B.   The nature of the copyrighted work favors Goldsmith

The second factor in 17 U.S.C. § 107(2) examines the nature of the copyrighted work itself and "'calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.'" *Id.* 709-10 (quoting *Campbell*, 510 U.S. at 586). As the Second Circuit emphasized, a court must consider "'(1) whether the work is expressive or creative, ... with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower.'" *Id.* (*quoting Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006)).

Cariou's work was found to be "creative and published" and "this factor weigh[ed]

against a fair use determination," although the Court found that the transformative nature of the Richard Prince works gave this factor "limited usefulness." *Cariou*, 714 F.3d at 710. In contrast, there is no question that the Goldsmith Photo is a highly expressive original work that has never been published. Both its expression and unpublished nature heavily favor Goldsmith, such that the "scope of fair use … is considerably narrower," especially where the Warhol Prince Series images are not transformative.

C.   The amount and substantiality of the portion used favors Goldsmith

The third factor examines "the amount and substantiality of the portion of the copyright work used," 17 U.S.C. § 107(3), and "calls for thought not only about the quantity of the materials used, but about their quality and importance." *Campbell*, 510 U.S. at 587. "The qualitative dimension of this factor considers the importance of the expressive components of the portion copied." *Associated Press v. Meltwater US Holdings, Inc.*, 931 F. Supp. 2d 537, 557 (S.D.N.Y. 2013).

Each image within the Warhol Prince Series is a variation of the same theme and incorporates a substantial portion of the Goldsmith Photo, which was copied to create those works. Unlike the 25 disparate works found to be a fair use in *Cariou*, all the Warhol images immediately convey the same protected expressive content that appears in the Goldsmith Photo, with only some color, high contrast and outlines added.

Qualitatively, Warhol had to use and incorporate the same expression of the Goldsmith Photo in creating the Warhol VF image because he was commissioned by Vanity Fair to do just that. But that one licensed use did not give Warhol free reign to then create 15 other versions; nor did it give AWF any right to commercially license all 16 images after his death.

This factor therefor also favors Goldsmith.

D.  <u>The effect of the use upon the potential market favors Goldsmith</u>

The fourth factor is the "effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  This "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original."  *Campbell*, 510 U.S at 590 (citations omitted).  Particularly apropos to this case, "[t]he enquiry 'must take account not only of harm to the original but also of harm to the market for derivative works.'"  *Id.* (citation omitted).  Actual and potential derivative markets for the Goldsmith Photo must be assessed because "the licensing of derivatives is an important economic incentive to the creation of originals.  See 17 U. S. C. § 106(2) (copyright owner has rights to derivative works)."  *Campbell*, 510 U.S at 593.  It is the "harm of market substitution" that this factor addresses.  *Id.*

Application of this factor focuses on "whether the secondary use *usurps* the market of the original work." *Cariou*, 714 F.3d at 708 (citations omitted).  "The market for potential derivative uses includes only those that creators of original works would in general develop or license others to develop." *Campbell*, 510 U.S. at 592.  *Cariou* also emphasized that "an accused infringer has usurped the market for copyrighted works, including the derivative market, where the infringer's target audience and the nature of the infringing content is the same as the original." *Cariou*, 714 F.3d at 709.

Goldsmith has been selling fine art prints and extensively licensing that imagery throughout her career.  Her licensing markets overlap the same markets into which AWF has licensed Warhol's imagery for editorial and commercial uses, including magazines.  Goldsmith 56.1 Stmt. ¶¶ 9, 129-38, 144-54.  Both Goldsmith's photos and Warhol's images have appeared

on numerous music album covers. *Id.* ¶¶ 14, 134. Her works are in museum collections and she sold a 1993 fine art print of Prince to a wealthy collector who also owns Warhol works. *Id.* ¶¶ 7, 155.

While Goldsmith has never editioned or licensed the Goldsmith Photo except to Vanity Fair for use as an artist reference, she has reserved that right for the future when she expects the value of that photograph to increase. *Id.* ¶ 143. Derivative licensing markets for her photo exist for the duration of its copyright: life plus 70 years. *See* 17 U.S.C. §302(a). Goldsmith has, however, licensed different photos she took of Prince for editorial and commercial uses. Goldsmith 56.1 Stmt. ¶¶ 144-54.

Goldsmith's licensing fees for her photography parallel, and even exceed, licensing fees charged by AWF through ARS. Her fees for editorial and commercial uses have ranged from $100 to $70,000, while ARS is authorized to charge fees for the same purposes in the range of ██████████ *Id.* ¶¶ 129, 138. Notably, ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ *Id.* ¶¶ 104-105.

Goldsmith's market expert, Jeffrey Sedlik ("Sedlik"), explains that "photographers, like other creators, typically rely on both primary and derivative markets for their works." Werbin Decl. Exh. E [Preliminary Expert Report of Professor Jeffrey Sedlik, dated May 3, 2018, at p. 17 ("Sedlik Report")]. Sedlik observes that a photo may serve multiple purposes during its economic life, and may be licensed for numerous commercial, editorial and merchandising uses. *Id.* A photographer reserves the right to monetize an image at any time at her discretion, and "may elect against the licensing or sale of the work, for any period of time determined by the photographer, in an effort to protect, maintain, or enhance the value of the work in the derivative

marketplace." *Id*. at 18.  This includes a photographer creating derivative works based on her

own photos.  *Id*. at 18 – 19.  Sedlik cautions that a specific photograph's "past licenses, sales,

derivative markets, and the quantity and character of the variations derived – is an inaccurate,

misleading, and otherwise unreliable indicator in determining the future purposes for/methods by

which that photograph may be exploited throughout its copyright life, in any and all derivative

versions [and] markets" by a photographer and her heirs.  *Id*. at 19.

      Sedlik's opinion as to the effect on Goldsmith's market of AWF's ongoing licensing of

the Warhol Prince Series images is as follows:

> AWF's commercial and non-commercial exploitation of the
> Warhol Prince Series positions those works as plausible substitutes
> for the Goldsmith Prince Work, displaces the Goldsmith Prince
> Work in traditional, reasonable, and likely to be developed
> derivative markets, deprives Goldsmith of revenue, and usurps the
> actual and potential markets for the Goldsmith Prince Work,
> including markets that Goldsmith might license others to develop.
> Left unchecked, AWF's licensing of the Warhol Prince Series will
> influence others and thereby cause harm resulting from widespread
> and unrestricted conduct of the same sort.  *Id*. at 31.

      As informed by *Cariou*, AWF's past and future licensing of the Warhol Prince Series

images usurps the derivative markets for the Goldsmith Photo because the "target audience" for

the Warhol images and "the nature of the infringing content is the same as the" Goldsmith Photo.

This is evident by Condé Nast's licensing of the Warhol CN Image in 2016 and the Warhol VF

image in 2013 from AWF without obtaining a license from Goldsmith or even considering

whether she owned any rights.  The availability of the Warhol images in the market for the same core licensing uses that Goldsmith relies on for her photography eliminates any need for a licensee to seek Goldsmith's permission.  This is particularly significant with respect to the uniqueness of the unpublished Goldsmith Photo, which captured a singular expression of Prince that is replicated in the Warhol Prince Series.  That uniqueness cannot be replicated by any other photo of Prince, but it can be substituted by the Warhol images that reflect the essence of that photo.

Accordingly, the fourth factor also weighs in favor of Goldsmith.

**POINT IV**

**<u>Goldsmith's infringement claim is not barred by the statute of limitations or laches</u>**

AWF's Third and Fourth Causes of Action in the Complaint, and its affirmative defenses to infringement, allege that Goldsmith's infringement claim is barred by the three year statute of limitations under 17 U.S.C. § 507 and laches.  AWF is wrong on both counts.

The Supreme Court held in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 134 S. Ct. 1962, 1973 (2014), that laches cannot be invoked as a defense to an infringement action that is otherwise timely brought with the Copyright Act's three year statute of limitations under 17 U.S.C. § 507(b) because the statute itself "takes account of delay" and "a successful plaintiff can gain retrospective relief only three years back from the time of suit."  *Petrella* also adopted the rolling approach: "Each time an infringing work is reproduced or distributed, the infringer commits a new wrong.  Each wrong gives rise to a discrete 'claim' that 'accrue[s]' at the time the wrong occurs.  In short, each infringing act starts a new limitations period."  134 S. Ct. at 1969.

"Civil actions for copyright infringement must be 'commenced within three years after the claim accrued.'"  *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 124 (2d Cir. 2014)

(*quoting* 217 U.S.C. § 507(b)).  In *Psihoyos*, the Second Circuit joined other circuits that have adopted the "discovery rule" to determine when an infringement claim accrues: "[W]e conclude that copyright infringement claims do not accrue until actual or constructive discovery of the relevant infringement."  *Id*. at 125.

"Since *Petrella* was handed down, courts in the Second Circuit have continued to follow the discovery rule as announced in *Psihoyos,* and the Court can find no reason to depart from that approach here."  *Papazian v. Sony Music Entm't*, 2017 WL 4339662, at *4 (S.D.N.Y. Sept. 28, 2017) (Sullivan, J.).  The Second Circuit "has always applied the rolling approach" to multiple acts of infringement occurring over time.  *Id*.

Regardless of whether Goldsmith's infringement claim is limited by the retrospective three-year limitations period from the date this action was commenced or from when she first discovered the existence of the Warhol Prince Series after Prince died in April 2016, her infringement claim against AWF for copying the Warhol CN Image and licensing it to Condé Nast in April 2016 is timely under the "rolling" rule, as the Complaint was filed on April 17, 2017, and Goldsmith's initial Counterclaim was filed on June 9, 2017.  [Docket Nos. 6, 18]. Similarly, any future licensing of the Warhol Prince Series images by AWF would constitute new and separate acts of infringement for which Goldsmith would have a remedy.

Accordingly, AWF's laches and statute of limitations defenses should be dismissed and its request for declaratory relief denied.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Goldsmith Parties respectfully request that the Court grant judgment in favor of the Goldsmith Parties, finding in favor of Goldsmith on her

counterclaim and against AWF for the declaratory relief in its complaint, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
October 12, 2018

Respectfully submitted,

HERRICK, FEINSTEIN LLP

By: _____ s/ Barry Werbin, Esq.
Barry Werbin
Gabrielle C. Wilson
2 Park Avenue
New York, NY 10016
(212) 592-1418
bwerbin@herrick.com

LAW OFFICES OF JOEL L. HECKER
By: _____ s/ Joel L. Hecker, Esq.
Joel L. Hecker
230 Park Avenue, Suite 660
New York, NY 10169
(212) 481-1850
HeckerEsq@aol.com

*Attorneys for Lynn Goldsmith and Lynn Goldsmith, Ltd.*

<u>Certification of Compliance with Court's Word Count and Formatting Rules</u>

The undersigned counsel for Defendants Lynn Goldsmith and Lynn Goldsmith, Ltd., and Counterclaim Plaintiff Lynn Goldsmith, hereby certifies that the body of the within Memorandum of Law contains 9,928 words (excluding the cover page, this certification of compliance, table of contents, and table of authorities) and complies with this Court's formatting rules for memorandum of law in civil cases and the word limit set forth in the Court's Order entered July 13, 2017 [Docket #44].

<u>*s/Barry Werbin, Esq*</u>.

Barry Werbin, Esq.

Herrick, Feinstein LLP

HF 12342471v.1