UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC.,

        Plaintiff,

    -against-

LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.,

        Defendants.

LYNN GOLDSMITH,

        Counterclaim Plaintiff,

    -against-

THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC.,

        Counterclaim Defendant.

No. 17-cv-02532-JGK

---

**THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Dated: October 12, 2018

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Luke Nikas
Maaren A. Shah
Daniel Koffmann
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
Fax: (212) 849-7100
lukenikas@quinnemanuel.com
maarenshah@quinnemanuel.com
danielkoffmann@quinnemanuel.com

*Attorneys for Plaintiff The Andy Warhol
Foundation for the Visual Arts, Inc.*

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND ...................................................................................... 4

I.   WARHOL'S TRANSFORMATIVE CAREER, ARTISTIC PROCESS, AND MESSAGE ..................... 4

II.  GOLDSMITH'S ARTISTIC INTENT AND MARKET AS A COMMERCIAL PHOTOGRAPHER ................. 12

III. GOLDSMITH TOOK THE PRINCE PHOTOGRAPH AS A PUBLICITY SHOT FOR NEWSWEEK ................ 14

IV.  GOLDSMITH LICENSED THE PRINCE PHOTO TO *VANITY FAIR* ............................. 16

V.   WARHOL CREATED THE PRINCE SERIES, WHICH TRANSFORMED GOLDSMITH'S PHOTOGRAPH AND HAS BEEN EXHIBITED AND SOLD AROUND THE WORLD ................... 18

     A.   Warhol Transformed Goldsmith's Photograph ...................... 18

     B.   *Vanity Fair* Published An Image Of A Work From The Prince Series In November 1984 ................................................. 26

     C.   The Prince Series Has Been Sold And Licensed Around The World ............ 26

VI.  PRINCE DIED, CONDÉ NAST PUBLISHED ANOTHER IMAGE FROM THE PRINCE SERIES, GOLDSMITH THREATENED AWF, AND AWF FILED SUIT ................... 26

ARGUMENT ......................................................................................... 27

I.   SUMMARY JUDGMENT STANDARD ................................................. 27

II.  AWF IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE PRINCE SERIES WORKS DO NOT CONTAIN OR INFRINGE THE PROTECTABLE ELEMENTS OF GOLDSMITH'S PHOTOGRAPH ............................................................. 28

     A.   A Copyright Infringement Claim Must Fail Unless There Is Substantial Similarity Between The Defendant's Work And The Protectable Elements Of The Plaintiff's Photograph .................................. 28

     B.   There Is No Substantial Similarity Between The Protectable Elements Of Goldsmith's Photograph And The Prince Series ...................... 30

III. AWF IS ENTITLED TO SUMMARY JUDGMENT BECAUSE WARHOL MADE FAIR USE OF THE PRINCE PHOTOGRAPH ...................................................... 35

    A.    The Prince Series Constitutes Fair Use Under Any Interpretation Of The Test.................................................................................................. 35

    B.    The Second Circuit's Four-Factor Test Conclusively Favors Fair Use And Requires Summary Judgment In Favor of AWF ................................................. 38

        1.    The First Factor—Purpose And Character Of The Use—Favors Fair Use........................................................................................ 38

        2.    The Fourth Factor—Market Impact—Favors Fair Use ......................... 39

        3.    The Second Factor—Nature Of The Copyrighted Work—Carries No Weight..................................................................................... 41

        4.    The Third Factor—Amount and Substantiality of Use—Favors Fair Use........................................................................................ 42

IV.    GOLDSMITH'S COUNTERCLAIM IS BARRED BY THE STATUTE OF LIMITATIONS ................ 42

V.    THE OPINIONS OF DEFENDANTS' PURPORTED EXPERT SHOULD BE EXCLUDED................ 43

CONCLUSION.............................................................................................. 44

TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)..........................................................................28

*In re Arab Bank, PLC Alien Tort Statute Litig.*,
   808 F.3d 144 (2d Cir. 2015)..........................................................................37

*Archie MD, Inc. v. Elsevier, Inc.*,
   No. 16-cv-6614, 2017 WL 3421167 (S.D.N.Y. Mar. 13, 2017).....................31–32

*Belair v. MGA Entm't, Inc.*,
   831 F. Supp. 2d 687 (S.D.N.Y. 2011)................................................29, 30, 32

*Bill Diodato Photograph LLC v. Kate Spade, LLC*,
   388 F. Supp. 2d 382 (S.D.N.Y. 2005)..........................................29, 30, 31, 32

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
   448 F.3d 605 (2nd Cir. 2006)........................................................................43

*Blanch v. Koons*,
   467 F.3d 244 (2d Cir. 2006)...........................................................37, 39, 41, 43

*Campbell v. Acuff–Rose Music, Inc.*,
   510 U.S. 569 (1994)..............................................................................37, 43

*Cariou v. Prince*,
   714 F.3d 694 (2d Cir. 2013)..............................................37, 40, 41, 42, 43

*Crane v. Poetic Products Ltd.*,
   593 F. Supp. 2d 585 (S.D.N.Y. 2009)............................................................31

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993).....................................................................................44

*In re Fosamax Prods. Liability Litig.*,
   No. 1:06-md-1789, 2009 WL 2878439 (S.D.N.Y. Sept. 9, 2009)...................28, 44

*Fulks v. Knowles-Carter*,
   207 F. Supp. 3d 274 (S.D.N.Y. 2016)............................................................33

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997).....................................................................................28

*Kaplan v. Stock Market Photo Agency, Inc.*,
   133 F. Supp. 2d 317 (S.D.N.Y. 2001)....................................................30, 32

*Kienitz v. Sconnie Nation, LLC*,
   766 F.3d 756 (7th Cir. 2014) .......................................33, 36, 37, 39, 43

*Leibovitz v. Paramount Pictures Corp.*,
   137 F.3d 109 (2d Cir. 1998)..................................................................30, 32

*Leon v. Murphy*,
    988 F.2d 303 (2d Cir. 1993)...................................................................... 28

*Mannion v. Coors Brewing Co.*,
    377 F. Supp. 2d 444 (S.D.N.Y. 2005)...................................................... 33

*Peter F. Gaito Architecture, LLC v. Simone Development Corp.*,
    602 F.3d 57 (2d Cir. 2010)................................................................. 29, 31

*Psihoyos v. John Wiley & Sons, Inc.*,
    748 F.3d 120 (2d Cir. 2014)..................................................................... 44

*Rentmeester v. Nike, Inc.*,
    883 F.3d 1111 (9th Cir. 2018) .................................................... 30, 32, 33

*Rogers v. Koons*,
    960 F.2d 301 (2d Cir. 1992).............................................................. 29, 30

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ........................................................ 44, 45

*Washington v. Kellwood Co.*,
    105 F. Supp. 3d 293 (S.D.N.Y. 2015)...................................................... 44

### *Statutory Authorities*

17 U.S.C. § 102(b) ....................................................................................... 29

17 U.S.C. § 107............................................................................................ 36

### *Rules and Regulations*

Fed. R. Civ. P. 56..................................................................................... 1, 28

Plaintiff and Counterclaim Defendant The Andy Warhol Foundation for the Visual Arts, Inc. ("AWF") respectfully submits this memorandum of law under Federal Rule of Civil Procedure 56 in support of its motion for summary judgment.

<u>**PRELIMINARY STATEMENT**</u>

Andy Warhol is one of the most celebrated American artists of the 20th Century. Widely known as the "god of contemporary art," he was a leading figure in the Pop Art movement of the 1950s and 1960s. He challenged the tradition of fine art by creating works about everyday items like Campbell's soup cans, Brillo pads, and images of celebrities. Although Warhol drew inspiration from everyday items and images, his works are recognized and lauded for transforming and commenting upon them. His celebrity portraits, among his most celebrated works, exemplify this effect. They are not about the individual celebrity, but about the public's idolization and consumption of branded images. They comment on consumer society and mass-media culture. They use the underlying image of celebrity to transform the person into a symbol. For these reasons, they have been displayed countless times in museums around the world, discussed in universities, analyzed by art critics and historians, and viewed by millions of people.

This case is about Andy Warhol's legacy, and protecting his transformative and innovative artistic works. In 1984, Warhol created a series of sixteen celebrity portraits of the musician Prince Rogers Nelson, commonly known as "Prince." These portraits (the "Prince Series") were apparently based on a photograph of Prince taken by Defendant Lynn Goldsmith. But the final portraits bear little resemblance to the source photograph itself. Warhol's portraits transformed the photograph of Prince. One work was published in *Vanity Fair* magazine in 1984. Another was published in 2016 on the cover of Condé Nast's *Genius of Prince* commemorative magazine.

1

Thirty years after its creation, Defendants asserted for the first time that Warhol's Prince Series infringes Goldsmith's copyright.  Defendants are wrong.  Warhol's works are new, transformative, and important artistic creations that are *protected*—not prohibited—under the copyright laws.

*First*, Warhol's Prince Series does not infringe Goldsmith's copyright as a matter of law. To count as an infringing derivative work, "substantial similarity" must exist between the second work and the protectable artistic elements of the photograph, which include the photographer's selection of lighting, shading, lens, angle, depth of field, composition, and other choices that have an aesthetic effect on the photo.  They do not extend to the photograph's underlying subject:  here, Prince himself.

The Prince Series does not contain any of the protectable elements of Goldsmith's photograph.  Warhol's signature silk-screen technique (and, in some cases, freehand drawings) deliberately stripped away every protectable element of the underlying photograph.  It eliminated any evidence of lighting, shading, or color balance. It altered the angle, depth, and ratio of the image.  It then added, in many cases, a bold and unnatural color palette to the subject's face and background.  The result, as Goldsmith herself has admitted, is that the only commonality remaining between Warhol's Prince Series and her photograph is the rough outline of Prince's face—which cannot be copyrighted as a matter of law.  Because there is no substantial similarity between the Prince Series and the protectable elements of Goldsmith's photograph, AWF is entitled to summary judgment.

*Second*, even if Warhol's Prince Series contains derivative works, Warhol made fair use of Goldsmith's photograph.  Transformation is the heart of the fair-use inquiry.  If, when looking at the works side-by-side, the secondary use has a different character and new expression, and

employs new aesthetics with creative and communicative results distinct from the original, then it is transformative as a matter of law.

The Prince Series unquestionably transforms Goldsmith's photograph.   Warhol completely altered the aesthetic of the photograph in his paintings and prints:   among other artistic choices, Warhol deliberately cropped Prince's head so that it appears disembodied, reinforcing its symbolic, mask-like appearance; stripped away the range of tones and texture apparent in Goldsmith's photograph; painted many of the works with multiple layers of bright and exotic acrylic paints; and superimposed a floating, freehand sketch of the outline of Prince's head.  With his drawings, Warhol likewise eliminated all elements of color, lighting, shading, texture, and realism that exist in the photograph.  The end result of Warhol's choices is that the realistic image of Prince *the person* is gone.

Warhol transformed the message, as well.  According to Goldsmith, her photograph is intended to convey the "humanism" and individuality of Prince.   Warhol's portraits communicate exactly the opposite:  Warhol created an image of Prince as an icon, not a person, to comment on the impact of celebrity and contemporary conditions of life.  The Second Circuit itself has recognized that "[m]uch of Andy Warhol's work, including work incorporating appropriated images…comments on consumer culture and explores the relationship between celebrity culture and advertising."

Warhol's art market is also distinct from Goldsmith's market.  Warhol's works sell through the finest galleries and auction houses to sophisticated collectors of fine art.  His works are worth significant sums of money:  one of his Prince paintings is estimated at nearly $200,000, and his works are considered to be a bellwether for the contemporary art market.  By contrast, Goldsmith is a rock-and-roll photographer who sells through galleries focused on rock-

and-roll photographs and memorabilia.  Her collectors are primarily interested in rock-and-roll photography and concert photographs.  She sells her works for low single-digit thousands, and she has *never* sold the photograph of Prince at issue in this case.  There is no evidence, and no reason to believe, that Warhol's creation of the Prince Series usurped opportunities for the sale of Goldsmith's works.  The transformative nature of the Prince Series and the distinct market in which it is promoted and sold require a finding of fair use as a matter of law.

Andy Warhol's work is part of a long and living tradition of art that uses appropriation techniques to communicate new and different messages—from political agendas to commentary about consumerism and popular media.  A ruling against Andy Warhol in this case would undermine the shared goals of copyright and the First Amendment by calling into question established modes of artistic expression and chilling future creativity.  It would defy history.  It would create a torrent of doubt and dispute over artists long considered to be transformative and crucial contributors to ongoing social debates, such as Robert Rauschenberg, Marcel Duchamp, Sherrie Levine, Pablo Picasso, and many other household names.  The Court should stay on the right side of history.  It should reject Defendants' effort to trample on the First Amendment and stifle artistic creativity.  It should grant AWF's motion for summary judgment.

<u>**BACKGROUND**</u>

## I.  WARHOL'S TRANSFORMATIVE CAREER, ARTISTIC PROCESS, AND MESSAGE

Andy Warhol is one of the most celebrated artists of the 20th Century.  He is known as the "god of contemporary art."  (Plaintiff's Rule 56.1 Statement of Undisputed Facts ("R56.1") ¶2.)  He created art depicting images of diverse subjects, from everyday objects like soup cans and dollar bills to movie stars and other celebrities.  (*Id*. ¶5.)

Warhol had an avid interest in imagery and media.  (*Id*. ¶¶4, 6.)  He observed how images are produced, distributed, and consumed in contemporary culture.  (*Id*. ¶4.)  He was fascinated

with their function as "vehicles of desire." (*Id.*) This observation permeates Warhol's art. Critics have argued that imagery is "the actual subject matter reproduced in his" art. (*Id.* ¶7.) For example, Warhol's famous Campbell's Soup silkscreens (fig. 1) are not "depictions of real…cans of prepared soup," but "reproductions of the Campbell Soup Company's *logo*…a purely graphic but supremely memorable sign that stood in for the product." (*See* R56.1 ¶8.)

**Figure 1**



Warhol's paintings from this era explore popular images *as images*, rather than searching for meaning in the underlying objects themselves. (*Id.* ¶10.) His 1962 silkscreen painting *200 One Dollar Bills* (fig. 2) depicts 200 one-dollar bills. (R56.1 ¶9.) It represents how a flat piece of paper devoid of intrinsic value has nonetheless been imbued with cultural meaning as a medium of exchange. (*Id.*) It displays the two-dimensional image on a flat canvas to echo the message that, like the dollar bill, there is nothing of intrinsic value behind the painting itself. (*Id.*) Warhol's 1962 *Marilyn Diptych* (fig. 3) also uses repetition, this time with an image of Marilyn Monroe's face. (R56.1 ¶14.) The message is similar: while the work depicts Marilyn

Monroe, the real subject is not the private person; it is a two-dimensional public image, a commoditized "persona" named "Marilyn."  (*Id.* ¶26.)

**Figure 2**

**Figure 3**



Warhol's interest in the power of media and imagery is evident in his choice of subjects and his transformation of them through his silkscreen painting technique.   Warhol used this technique to explore themes that observers have universally perceived in his work:   the reproduction of popular or everyday images in a manner that commoditizes and depersonalizes the underlying subject.   (*Id*. ¶24.)   Warhol's celebrity portraits illustrate the point.   After

choosing an image of his subject, Warhol deliberately, and often heavily, cropped and resized the source image.  (*Id*. ¶¶12–13, 113.)  For example, in his portraits of Marilyn Monroe (figs. 3, 5), Warhol closely cropped (and recropped) the image around her head (fig. 4), "severing the head from the shoulders and bust, producing the disembodied effect of a cinematic close-up."  (R56.1 ¶13.)

**Figure 4**
(Warhol's own markings)

**Figure 5**



The strategic cropping of images to a discrete portion transformed the person into a symbol.  (*Id*. ¶27.)  Warhol's communication of these themes is also evident in his portraits of Muhammed Ali.  (*See id.* ¶28.)  Starting with an underlying photograph (fig. 6), Warhol focused on Ali's most recognizable and symbolic asset:  his fist (fig. 7).  (R56.1 ¶25, 28.)  The end result was a portrait of an icon, not a man.  (*Id*. ¶¶25–26, 28–30.)

**Figure 6**



**Figure 7**



Warhol's transformation of photographic images extended to colors and tones.  (*Id.* ¶¶15, 20–21, 121, 128, 130, 132–36.)  The photographs Warhol used recorded the full range of color tones.  (*Id.* ¶15.)  Warhol eliminated this color spectrum:  he created high-contrast images for his silkscreens, reducing the gray scale of the source photograph to a sharp contrast between black and white.  (*Id.* ¶¶15–16.)  The result was a "drastic simplification" of the source image that flattened the appearance of the underlying subject and removed all realism and depth.  (*Id.* ¶16.)  Warhol directed this creative process, often making these changes by drawing or writing his instructions on the half-tone image (fig. 8).  (*See* R56.1 ¶16–20.)

**Figure 8**



Warhol then turned his attention to the canvas.  (*Id.* ¶18.)  Warhol traced the outline of the cropped final image onto the canvas.  (*Id.* ¶¶19, 22.)  Using the image outline as a guide, he

then painted the canvas using bright, unnatural, and exotic-colored acrylic paints that had a flat consistency and industrial appearance.  (*Id*. ¶¶20–22.)  Warhol had a silkscreen created of the high-contrast image and screened the image onto the painted canvas.  (*Id*. ¶¶18, 22.)

Warhol was not attempting to capture the true appearance or deeper meaning of his subjects.  (*Id.* ¶10.)  His works communicated images of heraldic emblems, rather than an unreflective replica of the photographic source.  (*Id*. ¶¶16, 31.)  His celebrity portraits were not about the individual celebrity, but how the public idolizes and consumes branded images.  (*Id*. ¶¶24–31.)

Scholars and critics have recognized Warhol's transformative process and message.  (*Id*. ¶¶33–36.)  Benjamin Buchloh, an art historian at Harvard, remarked, "[a]lthough Warhol constructed images of Marilyn Monroe, Liz Taylor, and Elvis Presley in the tragicomical conditions of their glamour, the paintings' lasting fascination does not derive from the continuing myth of these figures but from the fact that Warhol constructed their image from the perspective of the tragic condition of those who consume the stars' images[.]"  (*Id*. ¶33.)  Others have observed that his celebrity portraits exhibit an "aura of utterly affirmative idolization [that] already stands as a stereotype of a 'consumer-goods style' expression of an American way of life and of the mass-media culture of a nation."  (*Id*. ¶34.)

Warhol's global impact is undeniable.  He's been called the "most powerful contemporary art brand in existence," and his market has been described as "the bellwether of post-war and contemporary art."  (*Id*. ¶¶2–3, 154–55.)  His work is regularly on display at leading museums and galleries across the world.  (*Id*. ¶3.)  Warhol expert Laura Paulson, the former Global Chairman, Americas, of Christie's, opined that "no museum or gallery on the

planet could consider itself representative of Contemporary Art without a Warhol somewhere on its walls." (*Id.* ¶1.)

Warhol's place atop the art market results in sky-high prices for significant works. (*Id.* ¶¶154–59.) It also creates particular distribution channels for the sale and acquisition of his works. (*Id.* ¶¶184–87.) His works are sold primarily through high-end galleries and major auction houses. (*Id.*) In May 2017, at least 29 Warhol works were being auctioned across Christie's, Sotheby's, and Phillips in a single three-day period. (*Id.*) In 2014, Warhol works collectively sold at public auction for $653 million, and in 2013, a single work sold for more than $105 million. (*Id.*) Buyers of his work are often wealthy and sophisticated collectors of fine art. (*Id.* ¶217.)

Warhol's appeal derives from the transformative nature of his work. (*Id.* ¶¶202–04.) Auction houses and galleries routinely market Warhol works by referencing their expressive content and transformative nature. (*Id.*) And collectors often decide to buy based on these considerations. (*Id.*) A Christie's auction catalogue essay about a Warhol portrait of Elizabeth Taylor illustrates the perception of Warhol's works: "As a canonization of the actress and as a comment on the manufactured nature of fame, Warhol achieved his desired aesthetic effect in the iconic *Silver Liz* by employing silkscreen. As a process that he had begun on an experimental basis in 1962, Warhol recognized both the instant electricity and underlying artificiality it generated; indeed, the inky superimpositions of photo-derived screens on the bright hand-painted hues epitomized Pop in their brand-like distinctness and recognizability." (*Id.* ¶202.)

## II. GOLDSMITH'S ARTISTIC INTENT AND MARKET AS A COMMERCIAL PHOTOGRAPHER

Defendant Lynn Goldsmith is a self-proclaimed "rock and roll photographer," who "has been capturing music legends since the early 1970s." (R56.1 ¶¶37–40.) She has made

photographs of famous musicians, both in concert and in her studio, including Bruce Springsteen, Michael Jackson, Patti Smith, Bob Dylan, and Tom Petty. (*Id*. ¶38.)

Goldsmith's artistic process and intent differ markedly from Warhol's. Her underlying goal is to help her subjects "formulate their identities" and "to project that face to the world." (*Id*. ¶¶41–42.) Rather than objectify and depersonalize her subjects, as Warhol did, Goldsmith seeks to humanize them. (*Id*. ¶43.) Goldsmith's process is personal and intimate. Before a photo shoot she listens to her subject's music in an effort to connect with their identities. (*Id*. ¶44.) During the shoot, she creates conditions that will encourage her subjects to reveal their inner selves, such as playing music from their childhood. (*Id*. ¶44.) She uses techniques to "connect" directly with her subjects, such as applying their makeup with her hands or suggesting clothing and accessories to make her subjects feel "care[d] for." (*Id*. ¶¶48–51.)

Goldsmith's artistic goal is to accurately portray the individual's identity. (*Id*. ¶43.) To do so, lighting is everything. As Goldsmith testified, "[p]hotography is light." (*Id*. ¶57.) She positions her subjects in certain ways, sets up lights and umbrellas in certain places, and chooses the right camera for her mission. (*Id*. ¶¶57–59.) The result of Goldsmith's choices is a photographic image that brings "out a feel for the person themselves." (*Id*. ¶63.) Goldsmith believes that a person observing her photographs sees the subject "and his identity and his story, but through my eyes…." (*Id*. ¶¶60–61.)

Goldsmith's photographs typically sell for low, single-digit thousands. (*Id*. ¶¶160–63.) Her work is sold at galleries that focus on rock-and-roll photography, such as the Morrison Hotel Gallery ("the world leader in fine art music photography"), the Analogue Gallery ("specializ[ing] in exhibiting over 50 years of vintage and contemporary Rock & Roll photography"), and Blender Gallery ("speciali[izing] in Fine Art Music Photography and Limited Edition Rock 'n

Roll Prints"). (*Id*. ¶¶188–96.) Goldsmith's work is rarely sold at public auction: Christie's, Sotheby's, and Phillips are not currently offering her work, and there is no evidence that they ever have. (*Id*. ¶198.) When Goldsmith's work has appeared at public auction, it was at smaller auction houses that focus more on memorabilia and artifacts than fine art. (*Id*. ¶199.) For example, in the past eight years, only four Goldsmith photographs have appeared at auction. (*Id*.) Three were offered at estimates of $2,500–$3,500 and went unsold. (*Id*.) Two of the unsold photographs appeared at Guernsey's auction house, which is notable for auctions of Elvis memorabilia and Jerry Garcia's guitar collection. (*Id*. ¶¶199–200.) The one Goldsmith photograph that did sell at auction (of singer Patti Smith) sold in 2013 for $2,945. (*Id.* ¶199.)

Goldsmith markets herself as an "iconic American photographer [who] has been capturing music legends since the early 1970's." (*Id*. ¶205.) Photography dealers emphasize Goldsmith's "artistic vision," which involves her ability to connect with her subjects and portray their true identities. (*Id*. ¶¶209–10.) Goldsmith has identified two types of people who collect her work: those interested in studio photographs of musicians, and those who attended an artist's concert and want a picture of the performance. (*Id*. ¶¶212–13.)

## III.   GOLDSMITH TOOK THE PRINCE PHOTOGRAPH AS A PUBLICITY SHOT FOR NEWSWEEK

In December 1981, Goldsmith photographed musician Prince Rogers Nelson ("Prince"), first at a concert in New York City and the next day at her studio on West 36th Street. (R56.1 ¶¶68–69.) She took the photographs on assignment for Newsweek magazine. (*Id.* ¶70.)

Prince arrived at Goldsmith's studio dressed in the same clothes and with the same hair style depicted in Goldsmith's photographs. (*Id*. ¶¶78–80.) He made those choices, not Goldsmith. (*Id*.) Prince also arrived wearing makeup. (*Id*. ¶74.) Goldsmith immediately sought to make a physical connection with Prince. (*Id*.) She gave him lip gloss because his lips were dry and she wanted him to know she was "looking after him." (*Id*.) She applied his eyeshadow

in recognition of her "feeling Prince was in touch with the female part of himself."  (*Id*. ¶75.) Goldsmith made no other changes to Prince's appearance (although Prince borrowed a black sash from Goldsmith's dressing room).  (*Id*. ¶81.)

The shoot then began.  Although Goldsmith had tried to make Prince feel comfortable, she recalled that he appeared "really uncomfortable" and stayed for only a short while.  (*Id*. ¶¶86–88.)  Goldsmith took eleven photographs of him against a white background on a Nikon 35mm camera, which she chose because the lens was well-suited for portraiture.  (*Id*. ¶¶83, 89.)  Because a white background is the "hardest to light," Goldsmith set up the lighting before Prince arrived.  (*Id*. ¶84.)  Between shots, she "might have moved an umbrella an inch or two" to alter the lighting.  (*Id*. ¶85.)  She employed these lighting techniques to "show[] his chiseled bone structure."  (*Id*. ¶82.)   According to Goldsmith, the photographs she took reflected that Prince was "fragile."  (*Id*. ¶¶90–91.)  She testified that the photographs make her "really sad," so much so that she does not "even like looking at them."  (*Id*. ¶92.)

Newsweek published one of Goldsmith's photographs from Prince's concert; it did not publish any of the studio photographs.  (*Id*. ¶94.)  Since then, Goldsmith has never sold or even attempted to sell one of the photographs from the December 1981 studio shoot.  (*Id*. ¶170.) There is no evidence that these photographs have been exhibited at a gallery or museum.  It is therefore "essentially impossible to assess the market for [the Prince] photos."  (*Id*. ¶171.) Goldsmith nonetheless testified that she would use her standard pricing chart if she tries to sell the Prince photographs, implying a price range from $1,900 to $4,200.  (*Id*. ¶¶173–74.)

Goldsmith has taken other photographs of Prince, at different times and in different locations.  (*Id*. ¶175.)  None has sold for more than $2,500.  (*Id*.)  Goldsmith has licensed these other Prince photographs nine times, for an average licensing fee of $606.  (*Id*. ¶178.)  She has

licensed only a single photograph from the December 1981 studio shoot on a single occasion: she licensed the photograph at issue in this case once, in 1984 to *Vanity Fair*.  (*Id.* ¶¶182–83.) Other than this one photograph, on that one occasion 34 years ago, Goldsmith has never licensed a photograph for use as an artist's reference.  (*Id.*)

## IV.   GOLDSMITH LICENSED THE PRINCE PHOTO TO *VANITY FAIR*

In 1984, *Vanity Fair* licensed a photograph from Lynn Goldsmith Ltd.  (*Id.* ¶97.)  The invoice for the license, dated October 29, 1984, refers to "the use of one photograph of Prince, copyright 1981 Lynn Goldsmith for use as an artist reference for an illustration to be published in *Vanity Fair* November 1984 issue."  (*Id.* ¶100.)  *Vanity Fair* sent Goldsmith an approval form acknowledging that it received from Goldsmith an "11x14 inch B&W studio portrait of Prince by (c) 1981 Lynn Goldsmith for possible use as an artist reference."  (*Id.* ¶98.)  The license cost $400.  (*Id.* ¶97.)

Goldsmith admits that she did not personally handle this transaction.  (*Id.* ¶106.)  Her staff did.  (*Id.* ¶107.)  She did not select the photograph that was sent to *Vanity Fair*.  (*Id.* ¶¶106–08.)  She did not decide that the photograph would be used as artist reference material and has "no personal knowledge" of which photograph was chosen.  (*Id.*)  She was not even aware that her company licensed a photograph to *Vanity Fair* until recently.  (*Id.* ¶110.)  Unsurprisingly, Goldsmith has been unable to consistently identify which photograph was provided to *Vanity Fair*: first asserting in 2016 that it was an almost full-body, color photograph of Prince (fig. 9), but later claiming that it was a bust-only black-and-white photograph of Prince (fig. 10; the "Prince Photograph") (R56.1 ¶¶101, 103–04):

**Figure 9**                                             **Figure 10**




Goldsmith has asserted that it does not matter which photograph Warhol might have referenced, because, she admits, her entire case is based on her complaint that Warhol reproduced "the outline of" Prince's head from her photo.  (*Id.* ¶115.)  Goldsmith claims that she never looked at the November 1984 issue of *Vanity Fair*.  (*Id.* ¶¶109, 153.)

Neither Andy Warhol nor AWF (which was not created until after Warhol's death) is mentioned in Goldsmith's October 1984 license invoice.  (*Id.* ¶102.)   Neither Andy Warhol nor AWF was a party to this license agreement.  (*Id.*)   There is no evidence that Andy Warhol was aware of the existence of this license.

17

V.   WARHOL CREATED THE PRINCE SERIES, WHICH TRANSFORMED GOLDSMITH'S PHOTOGRAPH AND HAS BEEN EXHIBITED AND SOLD AROUND THE WORLD

A.   Warhol Transformed Goldsmith's Photograph

There is no evidence about Warhol's interactions with *Vanity Fair*.  There is no evidence that he was given the photograph itself.  But somehow, Warhol created 12 paintings, two drawings, and two unpublished prints (the "Prince Series") depicting an image of Prince's head. (*Id.* ¶112.)  The image of Prince's head in Warhol's works has a shape that is similar to the image of Prince's head in Goldsmith's photograph.  (*Id.*)

The Prince Series reflects Warhol's transformative approach to celebrity portraiture.  He cropped and resized the image that appears in Goldsmith's photograph so that Prince's head appears disembodied "as if magically suspended in space."  (*Id.* ¶116.)  For the paintings, Warhol had a printer create an enlarged, high-contrast, half-tone silkscreen image of Prince's head.  (*Id.* ¶118.)  Warhol's silkscreen removed the lighting and shading that are present in the photograph, making the image appear flat and exaggerating the prominent features of the face. (*Id.* ¶119.)

Warhol also created a second silkscreen derived from his hand-drawn outline of Prince's face.  (*Id.* ¶¶126–27.)  Warhol's line drawing and the resulting screen deliberately diverge from the faithful depiction of Prince's face in the photograph.  (*Id.* ¶129.)  It, too, drained the underlying image of natural color and created the appearance of a disembodied head.  (*Id.* ¶¶139–40.)

As with his other celebrity portraits, Warhol created multi-layered paintings with exotic and unnatural colors.  (*Id.* ¶¶126, 132.)  Warhol experimented with different color choices and combinations:  several of the works have multiple colors near Prince's facial features (*e.g.*, figs. 11, 19, 20, 22), others have multiple colors placed in deliberate disregard of the facial features

(*e.g.*, figs. 12, 15, 18, 21), and some works have a single flat color behind Prince's face (*e.g.*, figs. 13, 14, 16, 17, 23–26).  (*See* R56.1 ¶¶134–36.)  Warhol also explored varying renditions of the screens: certain works show only the hand-drawn outline of Prince's face (*e.g.*, figs. 15, 16, 21, 23, 24), and others use both the high-contrast screen and the line screen layered over one another in different colors and to differing effects (*e.g.*, figs. 11–14, 17–20, 22, 25, 26).  (R56.1 ¶¶137–38.)  Warhol created two line drawings by hand in pencil, one of the outline of Prince's disembodied head and one of the disembodied head with disembodied suspenders (*e.g.*, figs. 23, 24)—which imbues the subject with an eerie, empty, and ghostly effect.   (R56.1 ¶¶139–40.) The end result of Warhol's artistic study across the Prince Series, as Goldsmith herself admitted, is that the only commonality that remained between the Prince Series and the Prince Photograph is "the outline of" Prince's head.  (*Id.* ¶115.)

Warhol's artistic process in creating the Prince Series transformed Goldsmith's photograph:

**<u>Figure 11</u>**



**<u>Figure 12</u>**



**<u>Figure 13</u>**



**<u>Figure 14</u>**



**Figure 15**



**Figure 16**



**Figure 17**



**Figure 18**



**Figure 19**



**Figure 20**



**Figure 21**



**Figure 22**



**Figure 23**



**Figure 24**



**Figure 25**



**Figure 26**



The Prince Photograph is a dynamic, photorealistic, three-dimensional representation of the singer as he appeared in life.  The Prince Series is anything but.  It depicts a flat, two-dimensional and unnatural rendition of the salient features of his face.  (*Id.* ¶¶119–24.)  AWF's expert, Dr. Thomas Crow, a renowned scholar of Warhol's work, testified that Warhol exaggerated the darkest details of Prince's hair, moustache, eyes, and eyebrows by draining the tonality and texture from the Prince Photograph.[1]  (*Id.*)  Dr. Crow explained that although Prince had a "more natural, angled position" in Goldsmith's photograph, Warhol shaded one side of Prince's face to make it "appear to face fully towards the front as a detachable mask."  (*Id.* ¶120.)  This "negat[ed]" the more natural effect in Goldsmith's work.  (*Id.*)  Unlike Goldsmith's photograph, Warhol's use of the high-contrast half-tone image flattens the hair and the forehead into the same plane.  (*Id.* ¶121.)  Warhol's removal of the "slight shadow…around the bottom of the chin as a whole" also contributed to the mask-like effect of the image.  (*Id.* ¶123.)  Dr. Crow explains that Warhol deliberately made these changes to "create this sort of flat emblem that stands in for Prince without being a naturalistic equivalent to the appearance of his head."  (*Id.* ¶124.)

Warhol's application of the second free-hand screen to some of the Prince Series provides "vibrancy and definition."  (*Id.* ¶127)  Neil Printz, editor of the Andy Warhol Catalogue Raisonné, explains further that this line screen, printed "slightly off-register," highlights the

---

[1]   Although Dr. Crow's deposition testimony focused primarily on the color photograph that Goldsmith initially identified as the basis for her claim, he testified that his opinion and analysis applies equally to the black-and-white photograph that Goldsmith now claims was infringed. (R56.1 ¶125.)

features of Prince's face and "enhanc[es] their impact."  (*Id*. ¶128.)  The line screens were printed in multi-color "so that the line gradually changes color from top to bottom" of the portrait.  (*Id*.)  Dr. Crow opines that "[t]hese lines represent Warhol's own free invention, by means of which he made a point of diverging from the given facts of the photographic impression to provide his portrayal of Prince with a confrontational presence and intensity absent in his source."  (*Id*. ¶129.)

Dr. Crow testified that by "bringing all the features of Prince up to the surface across the same pla[ne]," Warhol transformed Goldsmith's "retiring" image of Prince into one of "Prince confronting you as his admirer, his fan, a curious onlooker with a kind of uncompromising implacable character which is not present in the Goldsmith."  (*Id*. ¶¶130–31.)  In contrast to the realism of the Prince Photograph, Dr. Crow testified that Warhol "creat[ed] an image of Prince as a kind of icon or totem of something other than just being the actual human being that made the music."  (*Id*. ¶142.)  "Unlike Goldsmith's focus on the individual subjects' unique human identity," Warhol's portraits "sought to use the flattened, cropped, exotically colored, and unnatural depiction of Prince's disembodied head to communicate a message about the impact of celebrity and defining the contemporary conditions of life."  (*Id*. ¶147.)  According to Dr. Crow, "[t]his approach transforms the character, message, and historic and artistic value of Warhol's portrait of Prince compared to Goldsmith's photograph."  (*Id*.)

Warhol's messages—and artistic choices—reflect Warhol's astute observations about the commercialization of celebrity.  It is no surprise, then, that *Vanity Fair* expressed no interest in publishing Goldsmith's photograph of a "sad" Prince to accompany its magazine article—which was entitled "Purple Fame" and discussed Prince's surging and omnipresent popularity.  (*Id*. ¶144.)  As Dr. Crow explained, "Warhol was known, more than any other artist, to have made

25

fame his defining subject," (*id*. ¶146), which was a perfect fit for a *Vanity Fair* article about this very topic (*id*. ¶142).

### B.   *Vanity Fair* Published An Image Of A Work From The Prince Series In November 1984

*Vanity Fair* published an image from the Prince Series in the November 1984 edition of its magazine.  (*Id*. ¶144.)  The magazine attributes the artwork to Warhol and credits Goldsmith only for her copyright in the photograph.  (*Id*. ¶145.)

### C.   The Prince Series Has Been Sold And Licensed Around The World

Since Warhol's death in 1987, portraits from the Prince Series have been sold or auctioned more than two dozen times.  (*Id*. ¶¶148–49, 151.)  AWF transferred four works from the Prince Series to the Andy Warhol Museum in Pittsburgh.  (*Id*. ¶150.)  The Prince Series has been displayed in museums, fine art galleries, books, and magazines more than 30 times since the November 1984 *Vanity Fair* issue, including at the Andy Warhol Museum, the Montreal Museum of Fine Arts, the de Young Museum in San Francisco, and the Centro Cultural la Moneda in Santiago, Chile.  (*Id*. ¶152.)  Laura Paulson, who has appraised more than 750 of Warhol's works, testified that a painting from the Prince Series would sell today for approximately $173,664.  (*Id*. ¶166.)

In addition, AWF has an established licensing market.  (*Id*. ¶179.)  The two licenses for which specific fee information is available are (1) a 2013 license to Condé Nast/*Vanity Fair* for inclusion in *Vanity Fair 100 Years*, for $1,125, and (2) a 2016 license to Condé Nast for inclusion on the cover of *Genius of Prince* for $10,000.  (*Id*. ¶180.)

### VI.   PRINCE DIED, CONDÉ NAST PUBLISHED ANOTHER IMAGE FROM THE PRINCE SERIES, GOLDSMITH THREATENED AWF, AND AWF FILED SUIT

Prince died in 2016, and Condé Nast decided to publish a magazine entitled *Genius of Prince* to commemorate Prince's life and career.  (*Id*. ¶222.)  Condé Nast obtained a license from

AWF to publish the image of another work from the Prince Series (fig. 14) on the cover of the magazine.  (R56.1 ¶152.)  Condé Nast never contacted Goldsmith about the publication because it (correctly) believes that AWF—not Goldsmith—owns the rights to the Prince Series.  (*Id.* ¶¶224–25.)

In July 2016, Goldsmith contacted AWF.  (*Id.* ¶103.)  She complained that Warhol's Prince Series infringed her copyright in a photograph from the December 1981 photo shoot.  (*Id.* ¶¶103–04.)  She identified the color photograph of Prince in figure 9, *supra*, as the photograph Warhol referenced in his works.   (R56.1 ¶103.)   She later changed her view, asserting that her infringement claim is based on the black-and-white photograph shown in figure 10, *supra*. (R56.1 ¶104.)  Goldsmith said she had no idea Warhol created the Prince Series until after Prince died in April 2016.  (*Id.* ¶111.)

On April 7, 2017, AWF filed this action, requesting declaratory judgments that (1) none of Warhol's portraits in the Prince Series infringes Defendants' copyright in the Prince Photograph; (2) the portraits are transformative and otherwise protected by fair use; and (3) Defendants' claims pre-dating 2014 are barred by the statute of limitations and laches.  (Dkt. 6.)  Goldsmith counterclaimed for copyright infringement.  (Dkt. 20.)  AWF now moves for summary judgment on each of its claims, and on Goldsmith's counterclaim.

<u>**ARGUMENT**</u>

## I.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment should be granted when, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party."  *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993).

On a motion for summary judgment, "the question of admissibility of expert testimony is not…an issue of fact." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997). "If proffered expert testimony is found inadmissible, the district court must make the summary judgment determination on a record that does not include that evidence." *In re Fosamax Prods. Liability Litig.*, No. 1:06-md-1789, 2009 WL 2878439, at *4 (S.D.N.Y. Sept. 9, 2009) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 268 (2d Cir. 2002)).

## II.    AWF IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THE PRINCE SERIES WORKS DO NOT CONTAIN OR INFRINGE THE PROTECTABLE ELEMENTS OF GOLDSMITH'S PHOTOGRAPH

AWF seeks a declaratory judgment that the Prince Series does not infringe the Prince Photograph.  Goldsmith has counterclaimed for copyright infringement, alleging that the work AWF licensed to Condé Nast in 2016 infringed her copyright.  AWF is entitled to summary judgment on both claims, because the Prince Series works do not contain or infringe the protectable elements of Goldsmith's photograph and, therefore, are not derivative works.

### A.    A Copyright Infringement Claim Must Fail Unless There Is Substantial Similarity Between The Defendant's Work And The Protectable Elements Of The Plaintiff's Photograph

To prove copyright infringement, "a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the *protectable* elements of plaintiff's [work]."  *Belair v. MGA Entm't, Inc.*, 831 F. Supp. 2d 687, 691–92 (S.D.N.Y. 2011) (emphasis added).  "[T]hat a whole work is copyrighted does not mean that every element of it is copyrighted; copyright protection extends only to those components of the work that are original to the creator."  *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992).

"The standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and

regard the aesthetic appeal as the same." *Peter F. Gaito Architecture, LLC v. Simone Development Corp.*, 602 F.3d 57, 66 (2d Cir. 2010) (quotation marks omitted). "[I]n looking at…two works of art to determine whether they are substantially similar, focus must be on the similarity of the *expression* of an idea or fact, not on the similarity of the facts, ideas or concepts themselves." *Rogers*, 960 F.2d at 308 (emphasis in original); 17 U.S.C. 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea…[or] concept…."). Accordingly, when works "have both protectable and unprotectable elements," "the usual ordinary observer test becomes more discerning," *Belair*, 831 F. Supp. 2d at 693, and "[c]areful scrutiny is necessary when the protected work contains unprotectable elements," *Bill Diodato Photography LLC v. Kate Spade*, 388 F. Supp. 382, 390 (S.D.N.Y. 2005). The "protectable elements" may include "the photographer's selection of lighting, shade, lens, angle, depth of field, composition, and other choices, such as manipulation of color balances, saturation, or contrast, that have an aesthetic effect on the final work." *Belair*, 831 F. Supp. 2d at 692; *see also Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 116 (2d Cir. 1998) ("the particular lighting, the resulting skin tone of the subject, and the camera angle" are protectable).

"A photograph may also be original in the creation of its subject," but only "when a photographer orchestrates the situation that is photographed, rather than simply photographing a ready-made scene or thing." *Belair*, at 692–93; *cf. Kaplan v. Stock Market Photo Agency, Inc.*, 133 F. Supp. 2d 317, 323 (S.D.N.Y. 2001) ("Copyright derives from 'the photographer's original conception of his subject, not the subject itself.'" (citation omitted)); *Leibovitz*, 137 F.3d at 115–16. Courts therefore consistently reject copyright claims when they are based on alleged copying of a photograph's subject or of the subject's pose. *See, e.g.*, *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1122–23 (9th Cir. 2018); *Rogers,* 960 F.2d at 310; *Leibovitz*, 137 F.3d at 115–16.

In *Bill Diodato Photograph LLC v. Kate Spade, LLC,* the plaintiff took a picture through the bottom of a bathroom stall depicting "a woman's feet, astride a toilet, in stylish, colorful shoes, her underwear hanging above her ankles, and a handbag resting on the floor." 388 F. Supp. 2d 382*, 384* (S.D.N.Y. 2005).  The defendant released an advertisement showing a similar scene, with a different aesthetic.  *Id.* at 384–85.

    

*Plaintiff's Photograph*                    *Defendant's Advertisement*

Judge Chin granted summary judgment for the defendant, because the protectable elements of the photograph—the lighting, shading, colors, depth and focus of objects in the frame, and cropping of the image—were not substantially similar to these elements in the advertisement.  *Id.* at 393.  The court further explained that "the depiction of a woman's feet as she sits on a toilet, used as a striking device to highlight fashion accessories" was not protectable. *Id.* at 392.

**B.      There Is No Substantial Similarity Between The Protectable Elements Of Goldsmith's Photograph And The Prince Series**

To evaluate whether substantial similarity exists between the protectable elements of Goldsmith's Prince Photograph and Warhol's Prince Series, "the Court need only compare the two works themselves," *Crane v. Poetic Products Ltd.*, 593 F. Supp. 2d 585, 591 (S.D.N.Y.

2009), "because what is required is only a visual comparison of the works" "as instructed by our good eyes and common sense," *Peter F. Gaito*, 602 F.3d at 64, 66.  A visual comparison of the works reveals that "the differences between [the works] so overwhelm any similarities that the 'total concept and overall feel'" are entirely distinct.  *Archie MD, Inc. v. Elsevier, Inc.*, No. 16-cv-6614, 2017 WL 3421167, at *8 (S.D.N.Y. Mar. 13, 2017).  The Court should therefore enter summary judgment for AWF.

The Court's evaluation of substantial similarity must focus on the protectable elements of the Prince Photograph.  *E.g.*, *Belair*, 831 F. Supp. 2d at 691–92.  Prince himself is not a protectable element.  *Id.* at 692; *Kaplan*, 133 F. Supp. 2d at 323.  Nor is Prince's pose.  There is nothing original in the "creation" or "rendition" of the scene that imbues the pose with copyright protection:  Goldsmith cannot copyright the idea of a man facing forward and looking at a camera while being photographed.  *Id.*; *Rentmeester*, 883 F.3d at 1111.  The protectable elements in the Prince Photograph include the lighting and shading, the angle of the shot, the composition, the depth of field, the color choices, and the selection of camera and film.  *See Belair*, at 692; *Leibovitz*, 137 F.3d at 116.

Comparing Goldsmith's and Warhol's works, there is *no* similarity between the protectable elements of the Prince Photograph and the Prince Series.  To name just a few differences:

- Warhol's portraits are in different media, which convey a drastically different aesthetic from that of Goldsmith's photograph, shot on a Nikon 35mm and printed in black and white (R56.1 ¶¶83, 112);
- Warhol flattened Prince's face by removing the gradual, tonal shading of the Prince Photograph and depicting the image in extreme high contrast (*id.* ¶119);
- Prince's face in the Prince Series appears entirely forward-facing, rather than the more natural, angled pose in the Prince Photograph (*id.* ¶¶120–21);

- Warhol cropped the Prince Photograph so that Prince's head appears completely disembodied in the Prince Series (*id*. ¶¶116–17);

- instead of the gradual shading of skin tone and coloration present in Goldsmith's photograph, Warhol used bold and unnatural colors or an absence of color in the Prince Series (*id*. ¶132);

- absent from the Prince Series is the lighting that reflects from Prince's face in Goldsmith's photograph (*id*. ¶121); and

- Warhol's use of multi-colored, hand-drawn lines adds a creative element missing from Goldsmith's photograph (*id*. ¶¶126–27).

No reasonable observer would find the "total concept and overall feel" of the Prince Series and the Prince Photograph to be substantially similar. *Fulks v. Knowles-Carter*, 207 F. Supp. 3d 274, 290 (S.D.N.Y. 2016). They are entirely different, except the underlying subject: Prince. The works are so fundamentally dissimilar that Goldsmith herself had difficulty determining which of her photographs Warhol referenced. (R56.1 ¶¶103–04.) As Goldsmith admitted, the only common element between the two bodies of work is the outline of Prince's face (*id*. ¶115), which cannot be copyrighted. *Kienitz v. Sconnie Nation, LLC*, 766 F.3d 756, 759 (7th Cir. 2014) ("What is left behind…is the outline of [the subject's] face, which cannot be copyrighted."); *see also Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444, 463 (S.D.N.Y. 2005) ("If the points of dissimilarity not only exceed the points of similarity, but indicate that the remaining points of similarity are, within the context of plaintiff's work, of minimal importance…then no infringement results.").

In *Rentmeester v. Nike*, the plaintiff photographed Michael Jordan dunking a basketball in a highly stylized pose. 883 F.3d 1111 (9th Cir. 2018). Nike subsequently photographed Michael Jordan dunking.




*Plaintiff's Photograph*                    *Defendant's Photograph*

The Ninth Circuit affirmed dismissal of the plaintiff's copyright claim because the two photographs contained "disparities that no ordinary observer of the two works would be disposed to overlook." *Id.* at 1122. The disparities resulted from artistic "choices regarding selection and arrangement that produced an image unmistakably different from [plaintiff]'s photo in material details." *Id.* at 1122. Although the photographs were "similar in general ideas or concepts," such as "Michael Jordan attempting to dunk," "[p]ermitting [plaintiff] to claim [an exclusive] right [to depict these ideas] would withdraw those ideas or concepts from the stock of materials available to other artists…thereby thwarting copyright's fundamental objective of fostering creativity." *Id.* at 1122–23 (quotations marks and citations omitted).

The same reasoning applies here. The disparities between Goldsmith's and Warhol's works overwhelm any immaterial similarities. Ruling otherwise would enable photographers to copyright the general idea or concept of celebrities staring at a camera. This point crystalizes if we imagine what would have happened if the following photographs of Prince—*not* taken by Goldsmith—were made available to Warhol before creating the Prince Series.

33



*Photograph by Paul Nitkin*



*Photograph by Allen Beaulieu*



*Photograph by Allen Beaulieu*



*Photograph by Allen Beaulieu*



*Photograph by Allen Beaulieu*

(R56.1 ¶96.)

Each photograph depicts Prince staring forward, with a hairstyle and facial hair that would have resulted in a Warhol portrait nearly identical to those in the Prince Series. It cannot be—and is not—the law that a work of art infringes the copyright in a photograph when the artist "could have achieved the same effect by starting with" virtually any image of the subject. *Kienitz*, 766 F.3d at 759.

### III.     AWF Is Entitled To Summary Judgment Because Warhol Made Fair Use Of The Prince Photograph

The Court should also grant AWF's motion for summary judgment on the independent ground that Warhol made fair use of Goldsmith's photograph.

Courts consider four factors when evaluating a fair-use defense: (1) purpose and character of the use, including whether the use is of a commercial nature or is for nonprofit educational purposes; (2) nature of the copyrighted work; (3) amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) effect of the use upon the potential market for or value of the copyrighted work.  17 U.S.C. §107.  Although these specific factors are "weighed together, in light of the purposes of copyright," *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 578 (1994), "[t]he ultimate test of fair use…is whether the copyright law's goal of promoting the Progress of Science and useful Arts…would be better served by allowing the use than by preventing it," *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) (citations omitted).

### A.     The Prince Series Constitutes Fair Use Under Any Interpretation Of The Test

The Second Circuit's decision in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013), as explained below in Section III.B., requires the entry of summary judgment for AWF.  Goldsmith and some courts, however, have criticized *Cariou*'s emphasis on the transformative nature of a work when resolving questions of fair use.  These criticisms are unwarranted and, regardless, cannot be acted on in this Court.  *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 148 (2d Cir. 2015) ("A decision by a panel of the Second Circuit is binding unless and until it is overruled by the Court en banc or by the Supreme Court.").  But AWF's position is so strong that summary judgment is required under even the most restrictive reading of fair use.

Goldsmith admits her copyright infringement claim is based on her contention that Warhol copied the "outline" of Prince's head from her Prince Photograph.  (R56.1 ¶115.)  The Seventh Circuit rejected this exact argument in a similar case, even though it simultaneously criticized the breadth of the Second Circuit's *Cariou* decision.  In *Kienitz v. Sconnie Nation LLC*, the plaintiff photographed a man named Paul Soglin, a public figure at the time.  766 F.3d 756, 757 (7th Cir. 2014) (Easterbrook, J.).  The defendants used the photograph to create a distinct work of art, which depicted the outline of Soglin's head and face from the photograph in flat, unnatural colors against a black background.  *Id.*  "The photograph was posterized, the background was removed, and Soglin's face was turned lime green and surrounded by multi-colored writing":



*Plaintiff's Photograph*                *Defendants' Art*

*Id.*

The Seventh Circuit affirmed summary judgment for the defendants, concluding that the third factor of the fair-use test, the amount of the original used, favored a finding of fair use.  The

court stated that the defendants' work preserved only the outline of the subject's head and face from the plaintiff's photograph.  As the court explained,

> Defendants removed so much of the original that, as with the Cheshire Cat, only the smile remains.  Defendants started with a low-resolution version posted on the City's website, so much of the original's detail never had a chance to reach the copy; the original's background is gone; its colors and shading are gone; the expression in [the subject's] eyes can no longer be read; after the posterization (and reproduction by silk-screening), the effect of the lighting in the original is almost extinguished.  What is left, besides a hint of [the subject's] smile, is the outline of his face, which can't be copyrighted.  Defendants could have achieved the same effect by starting with a snapshot taken on the street.

*Id.* at 759.

The court also held that the fourth factor, the market impact of the second work, favored a finding of fair use.  The photograph was sold as a photograph, and the defendant's image was printed on t-shirts and other clothing items.  *Id.*  While the court recognized that the plaintiff might suffer long-term financial harm because of defendants' appropriation, the court concluded that this consideration would not be enough to "offset the fact that, by the time defendants were done, almost none of the copyrighted work remained."  *Id.* at 759–60.

*Kienitz* is directly on point.  When Warhol finished the Prince Series, "almost none of the copyrighted work remained."  *Id.*  And Goldsmith concedes her case is based on Warhol's alleged copying of the outline of Prince's head and face, which the Seventh Circuit held insufficient for copyright infringement.  *Id.* at 759.  Warhol, like the *Kienitz* defendants, "could have achieved the same effect by starting with a snap-shot taken on the street."  *Id*.  Similarly, the Prince Photograph and the Prince Series are not sold in the same markets:  they are sold for different prices by different types of dealers, acquired for different reasons, and perceived in different ways by reasonable observers.  (R56.1 ¶¶164–227.)  Goldsmith has never even sold the Prince Photograph.  (R56.1 ¶170.)

The Court should therefore grant AWF's motion for summary judgment regardless of how broadly or narrowly it interprets and applies the fair-use test.

**B.    The Second Circuit's Four-Factor Test Conclusively Favors Fair Use And Requires Summary Judgment In Favor of AWF**

**1.    *The First Factor—Purpose And Character Of The Use—Favors Fair Use***

Transformation is the "heart of the fair use inquiry"; the test is whether the secondary work "merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Blanch*, 467 F.3d at 251, 253 (citation omitted). If the original work "is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings—this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Cariou*, 714 F.3d at 706 (quotation marks omitted). If "looking at the [works] side-by-side," the secondary use "ha[s] a different character…new expression, and employs new aesthetics with creative and communicative results distinct" from the original, the work is "transformative as a matter of law." *Id.* at 707–08.

The Prince Series "manifest[s] an entirely different aesthetic" from the Prince Photograph. *Id.* Warhol stripped away the photorealism and individuality that characterize the Prince Photograph, leaving a flat, two-dimensional, and high-contrast symbolic head. *See supra* 18–25. Warhol cropped and flattened the original image, making it appear disembodied and mask-like, and changed the artistic medium altogether. *Id.* He painted the works with multiple layers of bright and exotic colors and, in some, superimposed a floating outline of Prince's head. *Id.* Warhol's drawings outline only the shape of Prince's disembodied head and facial features (and in one drawing, a set of floating, disembodied suspenders). *Id.* When Warhol completed his transformative process, the realistic image of Prince *the person* was gone. He "diverg[ed]

from the given facts of the photographic impression to provide his portrayal of Prince with a confrontational presence and intensity absent in his source." *Id.*

Warhol's Prince Series also delivers "new…communicative results distinct" from the Prince Photograph. *Cariou*, 714 F.3d at 708. Goldsmith intended to convey the humanism and individuality of Prince the person. *See supra* 14–15. She attempted to connect with Prince so that she could show him as a vulnerable, "fragile" human. *Id.*

Warhol's Prince Series communicates exactly the opposite message. Warhol "creat[ed] an image of Prince as a kind of icon or totem of something other than just being the actual human being that made the music." (R56.1 ¶142.) The Prince Series "communicate[s] a message about the impact of celebrity and defining the contemporary conditions of life." (*Id.* ¶147.) The Second Circuit itself has recognized that "[m]uch of Andy Warhol's work, including work incorporating appropriated images of Campbell's soup cans or of Marilyn Monroe, comments on consumer culture and explores the relationship between celebrity culture and advertising." *Cariou*, 714 F.3d at 706.

Warhol's Prince Series does not "merely supersede[] the object of the original creation." *Blanch*, 467 F.3d at 251. His works transform it. *Id.* at 253.

### 2.    *The Fourth Factor—Market Impact—Favors Fair Use*

The fourth factor of the fair-use analysis concerns "whether the secondary use usurps the market of the original work." *Cariou*, 714 F.3d at 708 (citing *Blanch*, 467 F.3d at 258). An alleged infringer "has usurped the market for copyrighted works, including the derivative market, where the infringer's target audience and the nature of the infringing content is the same as the original." *Id.* at 709. The markets for the Prince Series and the Prince Photograph could hardly be more distinct, strongly favoring a finding of fair use.

The Prince Series has been exhibited in the finest museums and galleries in the world. *See supra* 26.  The works have been sold and auctioned more than two dozen times, for prices upwards of $150,000.  *Id*.  A painting from the Prince Series would sell for approximately $173,664 in today's market.  *Id*.  They are sold in high-end galleries and top auction houses and appeal to wealthy collectors of fine art.  *Id*.  Dealers sell Warhol's works by reference to their transformative aesthetic and their commentary about consumerism and pop culture.  *See supra* 12.

In sharp contrast, Goldsmith's Prince Photograph has never been shown publicly.  *See supra* 15–16.  She has never sold or even attempted to sell one of the photographs from her December 1981 Prince photoshoot.  *Id*.  This "mak[es] it essentially impossible to assess the market for these photos."  *Id*.  Goldsmith's other photographs of Prince have never sold for more than $2,500.  *Id*.  Goldsmith sells her photographs through different dealers, who market her works to different collectors and in different ways.  Goldsmith sells her photographs through rock-and-roll photography galleries, which target buyers interested in photographs of musicians or who want a photograph of a musician at a concert they attended.  *See supra* 13–14.

Nor does the Prince Series usurp Goldsmith's alleged market for derivative works.  *See Cariou*, 714 F.3d at 709.  The portraits from the Prince Series have been licensed at least seven times, and for as much as $10,000.  (R56.1 ¶179.)  Goldsmith licensed the Prince Photograph just once, and she generally charges a few hundred dollars or less to license her works.  (*Id*. ¶¶178, 182.)  There is no evidence that the same clients license Warhol's and Goldsmith's works based on the same reasons.  And Goldsmith presented no evidence that the value of her photograph has declined as a result of Warhol's Prince Series.  Further, aside from Goldsmith's

one license to *Vanity Fair* in 1984, she has never licensed any of her works for use as an artist reference.  (*Id*. ¶¶182–83.)

The fourth factor therefore strongly favors a finding of fair use.  *Koons*, 467 F.3d at 258 258 (finding that Koons' work had "no deleterious effect upon the potential market for or value of the copyrighted work where plaintiff admitted that she had never published or licensed her work again, that Koons did not harm her career, and that the value of her photograph value did not decrease); *Cariou*, 714 F.3d at 709 ("[The artist Richard] Prince's audience is very different from Cariou's, and there is no evidence that [Richard] Prince's work ever touched—much less usurped—either the primary or derivative market for Cariou's work.  There is nothing in the record to suggest that Cariou would ever develop or license secondary uses of his work in the vein of [Richard] Prince's artworks.  Nor does anything in the record suggest that [Richard] Prince's artworks had any impact on the marketing of the photographs.").

### 3. *The Second Factor—Nature Of The Copyrighted Work—Carries No Weight*

The second factor, which concerns the nature of the copyrighted work, considers whether the Prince Photograph is expressive or creative and whether it is published or unpublished. *Cariou*, 714 F.3d at 709–10.  This factor is of limited relevance here, because "the creative work of art is being used for a transformative purpose."  *Campbell*, 510 U.S. at 586; *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir 2006).  Specifically, "rather than exploit…[any] creative virtues" in the Prince Photograph, the Prince Series uses the photograph "in a transformative manner."  *Blanch*, 467 F.3d at 257.  The second factor should not weigh heavily in the Court's analysis.

### 4.     *The Third Factor—Amount and Substantiality of Use—Favors Fair Use*

The third factor concerns whether "the quantity and value of the materials used, are reasonable in relation to the purpose of the copying." *Blanch*, 467 F.3d at 257 (quoting *Campbell,* 510 U.S. at 586).

The Prince Series uses virtually *none* of the Prince Photograph.  Warhol used only the outline of Prince's head and suspenders (in one of the drawings) in the Prince Series, which is *de minimis* and therefore favors fair use.  *See Kate Spade*, 338 F. Supp. 2d at 390; *Kienitz*, 766 F.3d at 759.

Warhol's transformative use of the Prince Photograph also weighs heavily in favor of fair use under the third factor.  *See Cariou*, 714 F.3d at 711 ("[Richard] Prince transformed those photographs into something new and different and, as a result, this factor weighs heavily in [Richard] Prince's favor").

## IV.    GOLDSMITH'S COUNTERCLAIM IS BARRED BY THE STATUTE OF LIMITATIONS

Copyright infringement claims are subject to a three-year statute of limitations.  *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 124 (2d Cir. 2014).  Goldsmith recently conceded that her claim can only target allegedly infringing activity that occurred in the three years before she filed her counterclaim.  (Dkt. 42.)  This concession eliminates everything from her claim except allegations related to AWF's 2016 license to Condé Nast.  AWF is entitled to summary judgment on the alleged infringements that occurred before that period.

## V.    THE OPINIONS OF DEFENDANTS' PURPORTED EXPERT SHOULD BE EXCLUDED

Defendants' purported expert, Jeffrey Sedlik, opines that Warhol's Prince Series usurps the derivative market for Goldsmith's Prince Photograph.[2]  Sedlik's opinion is baseless, and he is unqualified to offer it.  The opinion should be excluded under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and disregarded when ruling on this motion, *In re Fosamax Prods. Liability Litig.*, 2009 WL 2878439, at *4.

"Expert testimony must rest on more than subjective belief or unsupported speculation[.]" *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 307 (S.D.N.Y. 2015) (quotation marks omitted).  The "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."  *Daubert,* 509 U.S. at 595.  Moreover, "experts may not offer opinions regarding the intent or motive of parties as part of their analysis."  *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45–46 (S.D.N.Y. 2016).

Sedlik's testimony violates these principles.  Sedlik speculatively asserts that Warhol usurps Goldsmith's derivative market because Goldsmith intends to monetize her Prince photographs "in all manner of derivative markets" at some point in the future.  (R56.1 ¶232.) Sedlik may not opine on Goldsmith's intent or motive to license her works in the future, *Scott*, 315 F.R.D. at 45–46, and, regardless, Sedlik has not identified any credentials that qualify him to offer expert opinion about Goldsmith's intentions.

Sedlik also failed to articulate a methodology to support his opinion that Warhol usurped Goldsmith's potential licensing market.  For example, he testified that "it would not have [been]

---

[2]    Goldsmith has withdrawn Sedlik's inadmissible and baseless legal opinion that Warhol was contractually bound by Goldsmith's license agreement with *Vanity Fair*.  *See* July 13, 2018 H'rg Tr. 18:15–22 (Dkt. 45).  For this reason only, AWF does not address that opinion here.

necessary to conduct…research to arrive at my opinion" (R56.1 ¶235), he claimed he "did not have to find instances in which an editor put a Goldsmith photograph next to a Warhol illustration and made a decision between the two" (*id.* ¶236), and he admitted that he did not speak with, or conduct any research about, collectors of Goldsmith's work (*id.* ¶237). The only assertion he conjured to support his testimony about Goldsmith's collectors was that at least one collector owned both a Warhol and a Goldsmith, which was never supported by verifiable evidence. (*Id.*)

Sedlik's opinion was unsupported by fact and formed without a verifiable or identifiable methodology. The opinion is inadmissible and must be disregarded.

## CONCLUSION

AWF respectfully requests that the Court grant summary judgment for AWF.

DATED:   New York, New York       Respectfully submitted,
         October 12, 2018

                                QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                By: */s/ Luke Nikas*
                                _____
                                    Luke Nikas
                                    Maaren A. Shah
                                    Daniel Koffmann
                                    51 Madison Avenue, 22nd Floor
                                    New York, NY 10010
                                    Telephone:  (212) 849-7000
                                    Facsimile:  (212) 849-7100
                                    lukenikas@quinnemanuel.com
                                    maarenshah@quinnemanuel.com
                                    danielkoffmann@quinnemanuel.com

                                    *Attorneys for Plaintiff The Andy Warhol
                                    Foundation for the Visual Arts, Inc.*

## <u>CERTIFICATE OF COMPLIANCE WITH THE COURT'S INDIVIDUAL PRACTICES</u>

I certify that this brief complies with the Individual Practices of Judge John G. Koeltl and the Court's scheduling order (Dkt. 44).  This brief contains a table of contents and a table of authorities.  It is double-spaced (including footnotes); written in 12-point Times New Roman, a legible font; has reasonable (one inch) margins; and contains 9,941 words (as counted by Microsoft Word 2013), excluding the parts of the brief exempted by Individual Practice Rule 2(D).

_/s/ Luke Nikas_____
Luke Nikas

_Attorney for Plaintiff The Andy Warhol Foundation_
_for the Visual Arts, Inc._