# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

THE ANDY WARHOL FOUNDATION )
FOR THE VISUAL ARTS, INC., )
 )
   Plaintiff, )
  -against- )
 )
LYNN GOLDSMITH AND LYNN )
GOLDSMITH, LTD., )
 )
   Defendants. )
 )
_____) Case No. 1:17-cv-02532-JGK
 )
LYNN GOLDSMITH )
 )
   Counterclaim Plaintiff, )
 )
  -against- )
 )
THE ANDY WARHOL FOUNDATION )
FOR THE VISUAL ARTS, INC., )
 )
   Counterclaim Defendant. )

**<u>Preliminary Expert Report of Professor Jeffrey Sedlik</u>**

Submitted May 3, 2018

I have been engaged by defendants and counter-claimants Lynn Goldsmith ("Goldsmith") and Lynn Goldsmith, LTD. ("LGL") in the above-referenced matter ("Matter") brought against Goldsmith by The Andy Warhol Foundation for the Visual Arts, Inc. ("AWF") and brought against AWF by Goldsmith, to provide expert testimony as set forth below.

I have been asked by Goldsmith and LGL to provide expert opinions on issues related to the respective claims and defenses proffered by the parties in the Matter. My opinions are based in part on more than 25 years of service in high-level positions in trade associations and standard-setting bodies in the photography, advertising, product marketing, technology, and design industries. I have been an internationally recognized advertising photographer for more than 30 years, working with many clients, observing and interacting with large numbers of professional photographers, advertising agencies, design firms, corporate clients, model agencies, stock agencies, product manufacturers, and others in the United States and abroad. I have served as Project Manager in projects involving development, operation, and maintenance of websites, web applications, and other applications. I have also owned and operated a publishing company, producing and selling photography-related products for more than 20 years.

In addition to my personal knowledge and experience, my opinions are based on an independent examination of the pleadings, deposition testimony, documents and materials produced in the Matter to date. Should additional relevant information become available, I respectfully reserve the right to amend or supplement my opinions as necessary.

This Preliminary Expert Report ("Report") has been prepared in connection with the above-referenced Matter. Section VI of the Report outlines my opinions.

## I.    QUALIFICATIONS

I currently serve as the President and CEO of the PLUS Coalition. "PLUS" is an acronym for "Picture Licensing Universal System." The PLUS Coalition is a non-profit, international standards body and trade association representing the shared business interests of all industries involved in the creation, licensing, and use of photography and illustration, including photographers, illustrators, advertisers, advertising agencies, graphic design studios, publishers, artists' representatives, museums, libraries, stock photo agencies, and all other image licensees and licensors. The PLUS Coalition develops, propagates, and maintains universal standards for use by licensees and licensors in transactions involving photography and illustration. I also serve as a founding member of the PLUS Board of Directors, and was personally responsible for the initial development of the core concept that ultimately resulted in the formation of the PLUS Coalition and its copyright licensing standards.

I am the past National President of the Advertising Photographers of America ("APA"), the leading trade association for commercial photographers in the United States, for which I have also served as Chief National Advisor on Licensing and Copyright. In that position, I have advised the APA on current issues related to copyright, photography, advertising, and modeling business practices, standards, contracts, and releases. I have represented the organization in discussions with the United States Copyright Office on matters related to photography and copyright, and also interacted with trade organizations in photography and other industries, discussing, developing, and maintaining industry standards for image licensing, modeling, and other matters related to the business of photography. I have also served on the Board of Directors and Legal Affairs Committee of the Los Angeles Chapter of the APA.

I currently serve on the Photo Metadata Working Group for the International Press Telecommunications Council ("IPTC") and have served on the Digital Image Submission Guidelines Working Group for Universal Digital Image Guidelines ("UPDIG"). I serve as an "Invited Expert" on the Permissions and Obligations

Working Group of the World Wide Web Consortium ("W3C"). I am also a Director of the Linked Content Coalition ("LCC"), a global non-profit organization dedicated to facilitating and expanding the legitimate use of content in the digital network through the effective use of interoperable identifiers and metadata. I have also been a partner in the Rights Data Integration initiative, focusing on the integration of technology systems to efficiently manage and trade intellectual property rights online for any and all types of usage, across any and all types of content, in any and all media. I also currently serve as a Founding Director of the American Society for Collective Rights Licensing ("ASCRL"), a collective management organization for the visual arts. I also serve on the copyright speakers bureau of the American Society of Media Photographers ("ASMP"), and authored the "Photography Licensing" chapter of "Professional Business Practices in Photography," published by that organization.

In addition to my expertise in traditional photographic methods and analysis, I have been creating and analyzing digital images since the dawn of digital photography. I serve on the Prerelease Team for Adobe Systems, and also served on the Adobe Photographers' Council, as one of 12 photographers selected by Adobe to represent the interests of all photographers worldwide, advising Adobe on matters related to professional photography, digital photographic techniques, copyright, image licensing, and software. I also served in a similar capacity for other organizations.

I sit on the Intellectual Property Committee of Art Center College of Design ("Art Center"), where I am an active faculty member, holding the title of Professor of Photography. At Art Center, I teach advanced courses on legal topics, business, photographic production, lighting, and technical issues related to photography, digital photography techniques, and advertising, including instruction on copyright law, copyright registration, copyright licensing, and photography licensing contract interpretation. I taught advanced courses on lighting people and all manner of products, including automobiles.

After more than 30 years as an award-winning commercial photographer and the President of Jeff Sedlik Photography, I continue to operate an advertising and

3

entertainment photography production company in California, with a client list that includes such companies as Nike, Federal Express, Farmers Insurance, SBC, GTE, NBC, Sony, AT&T, Blue Cross, Epson, IKEA, United Airlines, Warner Brothers, Toyota, Nestlé, Disney, Bank of America, and others.

I provide forensic image analysis and consulting services to organizations and individuals on issues related to copyright, licensing, negotiating, and business practices and procedures related to photography, advertising, and modeling. In addition, I am the President of Mason Editions, a publishing company engaged in producing and distributing fine reproductions of photographs.

In recognition of my expertise and my contributions to the photography and advertising industries, I received the 2005 Industry Leadership Award from the International Photography Council of the United Nations, the 2006 PhotoMedia Photographer of the Year award, and the 2007 APA Industry Advocacy Award. In 2008, I was awarded a Master's Degree from the Brooks Institute of Photography, recognizing lifetime achievement and mastery of the craft and business of photography.

I am a frequent speaker at copyright events hosted by the US Copyright Office, the US Patent Office, and the US Department of Commerce. At the request of the Register of Copyrights, I served as a guest instructor at Stanford Law School in conjunction with a US Copyright Office-sponsored Copyright Practicum. I have been a faculty member of the American Law Institute for Continuing Legal Education events, providing insights on licensing practices and on the practical application of copyright law in the visual arts. I have been a guest speaker on copyright law for many institutions and organizations, including Duke University Law School, New York University Law School, and the Copyright Society of the United States. In addition, I have testified before Congress on copyright law, and worked closely with legislators, stakeholder groups, and the United States Copyright Office on legislation, regulations, and policy issues related to copyright protections, registration, and remedies. I have assisted legislators and government agencies in drafting and revising copyright legislation. I am an active participant in the

4

Copyright Alliance, serving on both the Creators Advisory Board and the Academic Advisory Board.

I have testified as an expert witness in litigation involving photography, illustration, product design, copyright, metadata, advertising, branding, graphic design, right of publicity/privacy, breach of contract, criminal matters, and related topics. The cases in which I have testified at trial or by deposition within the last four years are:

Andrew Paul Leonard v Stemtech Health Sciences, Inc.
US District Court, District of Delaware
Case # 08-67-LPS-CJB Consolidated

G. Mitchell Davis v Tampa Bay Arena, Ltd
US District Court, Middle District of Florida, Tampa Division
Case # 8:12-cv-60-T-30MAP

Nouveau Model & Talent Management v JAKKS Pacific, Inc.
Superior Court of the State of California, County of Los Angeles
Case # SC111112

American Apparel v Alyssa Ferguson
JAMS Consolidated Arbitration
JAMS Reference #1220042480

EVOX Productions, LLC v Gabriels Technology Solutions, Inc.
US District Court, Central District of California, Southern Division
Case # CV 13-00846-CJC(RZx)

Tiffany Laurence v Beats Electronics, LLC
Superior Court for the State of California, County of Los Angeles
Case # BC 510035

Steven M. Gardner v Cafepress Inc.

United States District Court, Southern District of California

Case # 13CV1108 GPC JMA

Joseph Tomelleri v Zazzle, Inc.

United States District Court, District of Kansas

Case # 13-CV-2576 EFM/DJM

Stephen Kennedy v Gish Sherwood & Friends, Inc.

United States District Court, Eastern District of Missouri, Eastern Division

Case # 4:13-cv-02236-JAR

In Re: Multiple Listing Service Real Estate Photo Litigation

United States District Court, Southern District of California

Case # 3:14-cv-01158-BAS-JLB

Brian Harness v Forever 21 Retail, Inc.

United States District Court, Northern District of Texas, Dallas Division

Civil Action # 3:14-cv-01316

EVOX Productions, LLC v California Rent-A-Car, Inc.

United States District Court, Central District of California, Western Division

Case # 15-CV-08046 MWF (RAOx)

Timed Out, LLC v 13359 Corp

Superior Court of the State of California, County of Los Angeles

Case # BC583739

Jerome Turner v Metals USA, Inc.

24th Judicial District Court for the Parish of Jefferson, State of Louisiana

Case # 751-431

TC Reiner v Ryon Nishimori et al.

United States District Court, Middle District of Tennessee, Nashville Division

Case # 3:15-cv-00241

David McNeese v Access Midstream Partners, L.P.
United States District Court, Western District of Oklahoma
Case # CIV-14-503-D

VHT, Inc. v Zillow Group, Inc.
United States District Court, Western District of Washington, at Seattle
Case # 2:15-cv-1096-JLR

EVOX Productions, LLC v KAYAK Software Corporation
United States District Court, Central District of California, Western Division
Case # CV15-05053-PSG (AGR)

Under-A-Foot Plant, Co. v Exterior Design, Inc.
United States District Court, District of Maryland
Case # BPG-15-871

Sustainable Sourcing, LLC v Brandstorm, Inc. et al.
United States District Court, District of Massachusetts, Western Division
Case # 12-CV-30093

Dana Ruth Lixenberg v Bioworld Merchandising, Inc. et al.
United States District Court, Central District of California
Case # 2:15-cv-07242 MWF-MRW

Capri Krakana, Johan Krakana
Arizona Superior Court, Maricopa County
Case #JSS18301

Osram Sylvania v Photographic Illustrator Corporation v Brooks Electrical, et al.
American Arbitration Association
Case # 01-16-0000-2652

Capri Krakana, Johan Krakana

United States Superior Court of the State of Arizona, County of Maricopa

Case # FC2016-050246

Nelson Araujo, et al. v City of San Jacinto, et al.

Superior Court of California, Riverside County

Case # RIC1411590

Laspata Decaro Studio Corporation v Rimowa GmbH et al.

United States District Court, Southern District of New York

Case # 16-cv-00934-LGS

Glen Craig v UMG Recordings, Inc. et al.

United States District Court, Southern District of New York

Case # 16 Civ. 5439 (JPO)

Brittney Gobble Photography, LLC v WENN Limited et al.

United States District Court, Eastern District of Tennessee, Knoxville Division

Case # 3:16-cv-00306

My publication list is included in my curriculum vitae, a copy of which is attached to the Report as Exhibit A.

## II.   COMPENSATION

My work on the Matter is being billed at my standard rate of $650.00 per hour. My compensation is not contingent upon, dependent upon, or related in any way to the outcome of the Matter.

### III.   MATERIALS CONSIDERED

In preparation for the Report and for the expert testimony that I may be called on to provide, I have considered the materials listed in Exhibit B.

### IV.   ASSUMPTIONS

Retaining counsel instructed that I rely on the following factual assumptions in forming my opinions in the Matter. As the scope of my engagement does not currently include verification of the accuracy of the assumptions, my reliance on the below listed assumptions does not reflect a lack of rigor in the formation of my opinions. If any assumption is determined to be incorrect, I may revise my opinions. If later asked to verify the accuracy of the assumptions, I will do so where possible. I have been instructed to assume that:

A. Goldsmith is the sole copyright owner in photographic portraits of the recording artist Prince Rogers Nelson ("Prince") created by Goldsmith in 1981 on assignment from Newsweek ("Goldsmith Prince Series"), inclusive of a certain black and white photographic portrait of Prince ("Goldsmith Prince Work").[1]

B. In 1984, Vanity Fair paid Lynn Goldsmith Incorporated ("LGI," the name of which was subsequently changed to LGL) for a copyright license under which LGI granted to Vanity Fair the limited, non-exclusive right to use a copy of the Goldsmith Prince Work as an artist's reference in creating an illustrated derivative likeness of Prince, for one-time publication, only in the November 1984 issue of Vanity Fair.

C. At the time it entered into the license with LGI in 1984, Vanity Fair did not disclose the identity of the artist from whom Vanity Fair intended to commission the derivative work.

D. In 1984, Vanity Fair commissioned the artist Andy Warhol ("Warhol") to create an illustrated likeness of Prince based on the Goldsmith Prince Work, which Warhol then used as visual reference in the creation of that likeness.

---

[1] Amended Counterclaim of Lynn Goldsmith ("Goldsmith Counterclaim") at para. 1, 2, 16 and 19; Deposition testimony of Lynn Goldsmith ("Goldsmith Depo.") at pp. 77 - 82.

E.  Under commission by Vanity Fair, Warhol created a likeness of Prince ("Warhol Prince Work") based on the Goldsmith Prince Work.

F.  Vanity Fair published the Warhol Prince Work in the November 1984 issue of Vanity Fair.

G.  Until 2016, neither Goldsmith nor LGL were aware that (i) Vanity Fair had commissioned the Warhol Prince Work from Warhol in 1984, (ii) the Warhol Prince Work was published in the November 1984 issue of Vanity Fair, (iii) Warhol created at least 15 additional variations on the Warhol Prince Work (collectively with the Warhol Prince Work, the "Warhol Prince Series"), and (iv) following Warhol's death in 1987 until the present, AWF reproduced, distributed, displayed, sold, licensed and/or made available for licensing the original Prince Series works and reproductions thereof.

H.  The Warhol Prince Series is substantially similar to the Goldsmith Prince Work.

## V.    BACKGROUND

The AWF is a New York not-for-profit corporation. Established in 1987 after pop art artist Andy Warhol's death, the AWF engages in licensing Warhol's work for commercial, educational, and other purposes.[2] The AWF is also a grant-making organization, funded in part by its licensing activities.

LGL is a privately held New York corporation, with a principal place of business in Colorado.[3]

---

[2] http://warholfoundation.org/foundation/index.html
[3] https://appext20.dos.ny.gov/corp_public/corpsearch.entity_search_entry [database of New York Department of State, Division of Corporations]; Amended Answer of Goldsmith and LGL at para. 21; Amended Counterclaim para. 20.

Lynn Goldsmith is a celebrity portrait, documentary, and fine art photographer based in Colorado.[4] Goldsmith is the owner of LGL and was the owner of LGI before it changed its name to LGL.[5]

In 1981, Goldsmith was commissioned by Newsweek to create photographs of Prince, initially for publication in Newsweek magazine.[6] Under that 1981 commission, Goldsmith photographed Prince at a concert and in Goldsmith's photography studio in New York City, creating the Goldsmith Prince Series, including the Goldsmith Prince Work.[7]

In 1984, Vanity Fair purchased a license from LGI to make "artists reference" use of the Goldsmith Prince Work, created by Goldsmith in the 1981 studio photo session. The written license granted by LGI to Vanity Fair permitted Vanity Fair to create a derivative work based on the Goldsmith Prince Work, and constrained publication of that derivative work to the November 1984 issue of Vanity Fair magazine.[8]

Vanity Fair commissioned Warhol to create a derivative illustrated likeness of Prince, based on the Goldsmith Prince Work; under that commission, Warhol created the Warhol Prince Work, based on the Goldsmith Prince Work.[9] Vanity Fair published the Warhol Prince Work in association with an article entitled "Purple Fame: An Appreciation of Prince at the Height of His Powers," appearing in the November 1984 issue of Vanity Fair magazine.[10] In that issue, Vanity Fair credited the underlying photograph to Goldsmith and included a copyright notice in Goldsmith's name, while crediting the derivative illustration to Warhol.[11]

---

[4] Amended Counterclaim at para. 9, 18; https://lynngoldsmith.com/wordpress/bio-cv/
[5] Amended Counterclaim at para. 20; Goldsmith Depo. at pp. 113-15.
[6] Amended Counterclaim at para. 19; Goldsmith Depo. at p. 77.
[7] Goldsmith Depo. at pp. 81-82.
[8] Amended Counterclaim para. 21 and Exh. "B" thereto.
[9] Amended Counterclaim para. 23 -27; Deposition of Chris Donnellan (for Conde Nast) ("Donnellan Depo.") at pp. 27 - 28, 38-39; Deposition of Michael Hermann (for AWF) ("Hermann Depo.") at p. 128..
[10] Complaint at para. 41; Amended Counterclaim at para. 23 - 25.
[11] Amended Counterclaim at para. 23 - 25; Donnellan Depo. at pp. 25 - 28; 91 - 92.

In addition to the Warhol Prince Work, Warhol created at least 15 variations on the Warhol Prince Work that collectively comprise the Warhol Prince Series, all derivatives of the Goldsmith Prince Work.[12] Warhol's successor, the AWF, created copies of the 16 works in the Warhol Prince Series to facilitate  the licensing of those reproductions of Warhol's works to third parties. AWF (through ARS) issued at least nine such licenses between 1999 and 2017.[13] AWF made the reproductions of the Warhol Prince Series available for licensing for commercial and non-commercial uses, including but not limited to publication, merchandising, and promotion.[14] AWF contracts with agents and representatives such as the Artists Rights Society (ARS) to offer, negotiate, and administer licenses granted by AWF.[15]

Goldsmith first learned of the Warhol Prince Series and the Warhol Prince Work when, after the death of Prince in 2016, Conde Nast featured one of the Warhol Prince Series images on the cover of a special tribute issue, "*The Genius of Prince,*" [16] under a license granted by ARS on behalf of AWF.[17] After then seeing a Warhol Prince image online (which she later learned was one of the Warhol Prince Series images used on the cover of the 2016 Conde Nast publication), Goldsmith recognized that the Warhol image was a derivative of the black and white Goldsmith Prince Work created by Goldsmith in 1981.[18] Goldsmith then investigated the 2016 Conde Nast cover image, and soon learned that Warhol had first created the Warhol Prince Work in 1984, under commission from Vanity Fair.[19]

Upon learning of the 2016 Conde Nast "*The Genius of Prince*" tribute issue, Goldsmith contacted the AWF and asserted that the Warhol Prince Series infringed on her copyright in the Goldsmith Prince Work.[20] The parties engaged in settlement

---

[12] AWF Complaint, pp. 9-13.
[13] LG-31; Deposition testimony of Adrienne Fields for ARS ("Fields Depo.") at pp. 29 - 30.
[14] LG-31; Hermann Depo. at pp. 187 -89; 191; 203-04; LG 19 at Schedule A at AWF16689 - 90.
[15] Fields Depo. at pp. 19 - 20; Hermann Depo. at p. 27.
[16] Amended Counterclaim, para. 27- 30; Complaint para. 51 - 53.
[17] LG-52; Fields Depo. at pp. 98 - 100; Hermann Depo. at pp. 89 - 90, 101 -02; Amended Counterclaim at para. 28 - 30.
[18] Amended Counterclaim at para. 27; Goldsmith Depo. at pp. 151 - 54.
[19] Goldsmith Depo. at pp. 151 -54.
[20] Goldsmith Depo. at p. 149 - 50; Hermann Depo. at pp. 123 - 24, 130 - 32; Warhol Exh. 28.

discussions.[21] On April 7, 2017, AWF filed a Complaint seeking declaratory relief and other relief, naming Goldsmith and LGL as defendants.[22] Goldsmith and LGL filed an Amended Answer and Counterclaim on July 10, 2017, seeking injunctive relief and damages for copyright infringement.[23]

## VI. DISCUSSION

### A.      Photographer Lynn Goldsmith

Goldsmith is a well-known professional photographer. Having photographed luminaries of the literary, political, and entertainment communities during her 50 year career, Goldsmith's works have been exhibited in museums and galleries in the US and abroad.[24]

---

[21] As advised by counsel to Goldsmith; Goldsmith Depo. at pp. 150, 154. Telephonic interview with Lynn Goldsmith, April 30, 2018.
[22] LG-1 (Complaint with stamped Court filing date).
[23] AWF Exh. 1 (Amended Counterclaim with stamped Court filing date).
[24] See exhibition list https://lynngoldsmith.com/wordpress/bio-cv/

Examples of Goldsmith's portrait photographs:[25]



Examples of Goldsmith's album covers, magazine covers, and book covers:[26]



In addition to creating photographs for fine art projects and for commercial and editorial clients, Goldsmith actively licenses her existing photography for secondary, derivative uses. In 1978, Goldsmith founded LGI, a photography stock agency offering licenses of celebrity photographs created by Goldsmith and other contributing photographers.[27] LGI's name was changed to LGL in 1997.[28]

Goldsmith actively exhibits her photographs, offering fine art prints to collectors directly and through gallerists.[29] Below are examples of Goldsmith's museum and gallery exhibitions:[30]

  

Goldsmith has also published and sold several books of her works.[31] Below are examples of Goldsmith's books:[32]

    

Goldsmith relies on revenue generated from assignments and secondary/derivative markets, such as stock licensing, fine art print sales,

[27] https://appext20.dos.ny.gov/corp_public/corpsearch.entity_search_entry
[28] https://appext20.dos.ny.gov/corp_public/corpsearch.entity_search_entry
[29] See exhibition list https://lynngoldsmith.com/wordpress/bio-cv/
[30] www.lynngoldsmith.com
[31] See https://lynngoldsmith.com/wordpress/books-2/
[32] www.lynngoldsmith.com

and book publishing, to support herself and her family. Goldsmith intends to further monetize her works (and derivatives thereof) in prospective and developing derivative markets, including derivative markets in which she has not yet participated.[33]

## B.    Exploitation of Derivatives and Derivative Markets in Photography

Based on my knowledge and experience, photographers, like other creators, typically rely on both primary and derivative markets for their works. The creation of a photograph is often only the first event in a long series of events throughout the copyright life of that photograph. Revenue (if any) initially generated by the photographer upon the creation of the photograph is often insufficient to provide an incentive for the photographer to create new works. Instead, photographers and their heirs expect, plan for, and depend upon myriad opportunities to monetize their works in the diverse, global, derivative markets for photographs.

As a result, the purpose for which a photograph is initially created often has no similarity to the many purposes for which the photograph may serve during its copyright life, when repeatedly licensed and sold in the derivative markets. For example, a photograph initially created for an editorial feature in a particular magazine article may, at any point during the copyright life of the work, be licensed by the photographer for use in other magazine editorials, as well as book covers, advertisements, product packages, powerpoint presentations, web banner ads, direct mail promotions, billboards, websites, brochures, documentary films, and all manner of similar uses. The same photograph, initially created for editorial purposes, may at any point during the copyright life of the work be licensed for merchandising use on coffee mugs, t-shirts, baby bibs, hats, keychains, drink coolers, furniture, bedsheets, night lights, tote bags, magnets, mouse pads, greeting cards, posters, watches, bumper stickers, tapestries, bow ties, and all

---

[33] Telephonic interview with Lynn Goldsmith, April 30, 2018

manner of other products. At any point during the copyright life of the work, the photographer who created the editorial photograph may elect to exhibit the photograph in fine art galleries, offer and sell fine art prints of the photograph to collectors, and pursue other derivative uses.

A photograph that has seldom or never been monetized may be monetized at any time, at the discretion of the photographer. A photographer may elect against the licensing or sale of the work, for any period of time determined by the photographer, in an effort to protect, maintain, or enhance the value of the work in the derivative marketplace.

A photographer may focus on a particular derivative market for a period of time, and then shift to another derivative market. The photographer may at any time adopt a new or different strategy for monetizing the work in the derivative marketplace, and in so doing, significantly increase (or decrease) the revenue stream generated by the photograph. For example, a photographer may at any time submit the photograph to another party and authorize that party to develop and exploit new or different derivative markets for the photograph. Examples include submission of the photograph to a stock photography agency, gallerist, or licensing agent.

The monetization opportunities for a photograph are dynamic, in that the perceived value of the photograph may vary with time. For example, licensing revenue generated by a photograph of a public figure may temporarily increase exponentially if that person is involved in a scandal or passes away. The value of a photographer's works on the fine art market may increase significantly as the result of a new project, positive review, effective promotional campaign, high-dollar auction sale, significant exhibition, or other event. Of course, the photographer may assign or transfer copyright ownership to another party, who may then monetize the photograph in the same or different derivative markets, in the same or different manners.

The photographer may, at any time during the copyright life of the work, elect to create and monetize variations of the photograph – new derivative

18

works in the same or different media. The photographer may colorize a previously black and white photograph, or create a black and white version of a color photograph. The photographer may add visual elements to the photograph using paint, pencil, pen, digital tools, or other techniques. The photographer may create derivatives at different sizes, or may recompose the photograph by cropping or otherwise manipulating the photograph. The photographer may elect to render the photograph as a charcoal sketch, pencil sketch, painting, woodcut, line drawing, mosaic, embroidered work, sculpture, engraving, screened print, lithograph, or in any other medium. The photographer, as the copyright owner, has the discretion to create derivative works in any, all, or none of the above manners, and has the discretion to determine the point in time at which derivatives will be made, at any time during the copyright life of the photograph.

When the photographer eventually dies, the photographer's heirs may, at any point during the remaining seventy years of the copyright life of the work,[34] elect to make derivatives or to monetize the photograph in the same or different markets.

For the aforementioned reasons, the history of a photograph – its past licenses, sales, derivative markets, and the quantity and character of the variations derived – is an inaccurate, misleading, and otherwise unreliable indicator in determining the future purposes for/methods by which that photograph may be exploited throughout its copyright life, in any and all derivative versions, in any and all derivative markets, by the photographer and the photographer's successors and assigns.

---

[34] In general, copyright endures for a term consisting of the life of the author and 70 years after the author's death. For works made for hire and anonymous and pseudonymous works, the duration of copyright is 95 years from first publication or 120 years from creation, whichever is shorter (unless the author's identity is later revealed in Copyright Office records, in which case the term becomes the author's life plus 70 years). 17 U.S.C.§ 302.

**C.      General Background Regarding Image Copyright Licensing**

In the photography licensing industries, clients seeking to make use of photographs may either commission new photographs ("assignment photographs"), or acquire rights to existing photographs ("stock photographs").

1. Assignment Photographs

Photographers create assignment photographs (also known as "commissioned photographs") when clients contract with photographers or their agents to create new works. Photographers typically retain copyright ownership of the photographs that they create. Photographers often grant limited licenses to their clients in exchange for a license fee based in great measure on the scope of the rights granted. Photographers often later engage in re-licensing such photographs for additional or extended uses, and also licensing such photographs to parties other than the commissioning client, throughout the copyright life of the photographs. In the alternative, photographers may agree to assign copyright ownership to their clients, or may agree to create photographs under work-made-for-hire terms, whereby copyright ownership vests with the commissioning client upon creation.

2. Stock Photographs

Photographers often create stock photographs independently and speculatively, and then offer these existing photographs for licensed usage by clients. This offering is typically made on stock photography websites, either by the photographer or by a "stock agency" acting as an authorized licensor for the photographer's photographs.

Clients seeking stock photographs typically visit stock photography websites, search for photographs meeting their requirements, and

20

then purchase licenses and download the photographs for usage. Such purchases may be made via an automated process, or by communicating with sales staff at the stock agencies or a photographer's office.

Clients may acquire rights to stock photographs under various "licensing models." While some vendors specialize in certain licensing models, many vendors offer photographs under several licensing models. Common licensing models include:

(a) Royalty Free ("RF"): This model allows a client to pay a single, one-time fee based on the size of the digital photograph file desired by the client. The client receives a license allowing broad usage of the photograph—typically in unlimited media, for unlimited time, at any size, in any quantities, worldwide, for nearly any purpose, including but not limited to the promotion of products and services. For example, such a license may allow a client to use a photograph on any number of websites in any and all countries, worldwide, forever. There may be any number of detailed restrictions on RF licenses, but in general, the licenses allow broad usage. RF photographs are often professionally produced, and are typically less unique than many photographs offered under the Rights Managed model (see below).

(b) Microstock: A variant of RF licensing, microstock is typically a less expensive alternative. Like RF, microstock licenses provide broad rights for a low price, based on the size of the digital photograph file desired by the client. Like RF, microstock licenses include restrictions but typically permit usage in unlimited media, unlimited quantities, unlimited sizes, unlimited countries, for an unlimited time. Whereas RF photographs are typically provided by professional photographers and semi-pros, microstock photographs are provided by amateurs as well.

(c) Subscription models: Many licensors now offer subscription-based licensing schemes. Subscription licensing is a variant of RF licensing, under which clients pay a monthly or annual license subscription fee and receive a broad license permitting the downloading of a quantity of photographs during each subscription period— typically per year, per month, or per day. Such licensors nearly always employ a system of graduated pricing tiers under which clients pay an amount commensurate with a maximum quantity of photographs available for downloading during each subscription period. There are many variants on subscription licensing schemes, driven by competitive pressures.

(d) Rights Managed ("RM"): A longstanding licensing model, rights managed licensing remains a common form of stock photograph licensing. In RM licensing, usage fees are based not on file size, but upon the scope of usage desired by the client. In general, the greater the scope of usage desired, the greater the licensing fee required of the client. Scope is defined broadly by the general category of the use, whether commercial or editorial, and is defined more specifically by the type of media, the size and quantity of reproductions, the placement(s) of the photograph, geographic regions in which the reproductions will be distributed, the duration of use, exclusivity desired, and other factors. The scope of use permitted under RM licenses spans the full spectrum, from very narrow to very broad. RM photographs are primarily created by professional photographers. Fees associated with RM licenses are often (but not always) greater than fees for RF licenses.

Seeking to maximize profitability and sales, stock agencies have been experimenting with new, hybrid models, such as licenses requiring payment based on the quantity of viewers of photographs published online, or payment for advertising placement in or on a photograph published online. The market continues to evolve, and photographers

continue to rely on revenue generated by licensing their commissioned and stock photographs.

Based on my review of the documents and testimony produced in this Matter, Goldsmith is engaged in Rights Managed Assignment Photography and Rights Managed Stock Photography. Based on my knowledge and experience, the license granted by Goldsmith to Vanity Fair in 1984[35] was a Rights Managed Stock Photography license.

## D.    The Goldsmith Prince Series

In 1981, Newsweek commissioned Goldsmith to create photographs of Prince, in response to Goldsmith's suggestion that Newsweek feature Prince in their publication. Goldsmith created a series of photographs of Prince, including concert and studio photographs, in both color and black and white. Goldsmith received no creative direction from Newsweek, and exercised creative direction and original expression in making the photographs. Goldsmith retained copyright in the photographs.[36]

Consistent with standard practice in the photography industry, Goldsmith intended (and continues to intend) to monetize the Goldsmith Prince Series in all manner of derivative markets, throughout the copyright life of the photographs. Goldsmith intends to make derivative variations of the photographs, and to monetize those derivatives in derivative markets. Goldsmith further intends to make and offer editions of fine art prints from the Goldsmith Prince Series, and to feature the Goldsmith Prince Series in future books and other publications. Goldsmith intends to make use of the Goldsmith Prince Series in promoting Goldsmith and LGL, for the purpose of further monetizing Goldsmith's other works.[37]

---

[35] Amended Counterclaim Exh. B [same as Bates No. LG000063]
[36] Amended Counterclaim para. 19; Goldsmith Depo. at pp. 77 - 82; 89; 109 - 111; AWF Exhs. 11 - 21.
[37] Telephonic interview of Lynn Goldsmith, April 30, 2018; AWF Exh. 92; Goldsmith Depo. Tr. at 315-16.

In an effort to protect, maintain, and enhance the value of the works, Goldsmith has not yet elected to fully monetize the Goldsmith Prince Series.[38] As the copyright owner, Goldsmith has sole discretion in determining what to monetize, when to monetize it, how to monetize it, and where to monetize it. [39]

### E.     Goldsmith's 1984 License to Vanity Fair

In 1984, Vanity Fair purchased a license from LGI, permitting Vanity Fair to make use of the Goldsmith Prince Work. The license agreement was memorialized in writing on an invoice for the license fee, dated September 25, 1984. The document is stamped "Paid", with a paid/deposited date of February 8, 1985.[40]

The terms of the license as written in all caps provide that Vanity Fair may use only:

*"ONE PHOTOGRAPH OF PRINCE COPYRIGHT LYNN GOLDSMITH"*

only

*"FOR USE AS ARTIST REFERENCE"*

only

*"FOR AN ILLUSTRATION"*

only

*"TO BE PUBLISHED IN VANITY FAIR NOVEMBER 1984 ISSUE"*

---

[38] Telephonic interview of Lynn Goldsmith, April 30, 2018
[39] Certain uses of the photograph in certain states or countries may require publicity rights clearance from Prince's estate. Based on my knowledge and experience, such a requirement rarely inhibits monetization opportunities.
[40] Amended Counterclaim Exh. B [same as Bates No. LG000063]

only to

*"APPEAR ONE TIME FULL PAGE AND ONE TIME UNDER ONE QUARTER PAGE"*

limited to

*"ONE TIME ENGLISH LANGUAGE ONLY"*

and further limited to

*"NORTH AMERICAN DISTRIBUTION ONLY"*

In the pre-printed terms appearing below the license-specific terms, LGI struck out the words "or reproduce" in the statement:

 *"License is granted to use ~~or reproduce~~ above described photograph(s)."*

Based on my knowledge and experience, the words "or reproduce" were struck out for consistency with the "artist reference" license.

The license includes an express requirement that Vanity Fair pay a "separate reproduction fee" for "each subsequent edition, revised edition, new edition, paperback edition, book club edition, foreign edition and/or foreign language edition of the aforesaid book containing the above-described photograph(s)."

The license expressly excludes reproduction *"in United States or foreign newspapers or magazines…"*

The license also specifies a duty under which Vanity Fair was required to provide a credit line: *"This credit line - Lynn Goldsmith - must not be omitted, abbreviated or altered…"*

Lastly, the license expressly excludes reproduction of the photograph *"…for other purposes without prior permission in writing from and payment to Lynn Goldsmith."*

25

In addition to the invoice, a separate "Approval Form" dated September 25, 1984.[41] indicates that "Lynn Goldsmith" sent a single black and white print of the Goldsmith Prince Work to "Esin Goknar" at Vanity Fair's New York office on the same date that LGI granted the license to Vanity Fair. The Approval Form indicates that LGI sent Vanity Fair:

*"1 11"x14" B+W STUDIO PORTRAIT OF PRINCE BY (C) 1981 LYNN GOLDSMITH FOR POSSIBLE USE AS AN ARTIST REFERENCE."*

Terms on the reverse of the Approval Form provide that:

*"All rights not specifically granted on invoice are reserved by Lynn Goldsmith."*

The non-profit PLUS Coalition, an image licensing industry standards body,[42] defines the term "Artist's Reference," Term #10580000 0100 in the PLUS Picture Licensing Glossary, as follows:[43]

> Definition:
> *A licensed image, typically a photograph, from which an artist may extract visual information for use in creating an illustration.*
>
> Additional Info:
> *A license to use a work as an artist's reference does not grant the right to reproduce, display, distribute or make any other use of a work, unless such rights are separately granted.*
>
> Term in Use:
> *"To draw the beak correctly, the illustrator worked from an artist's reference photograph of a parrot."*

---

[41] AWF Exh. 23 [LG000064-65]; Goldsmith Depo. at pp. 116 -17.
[42] I serve as the President and CEO of the PLUS Coalition, and was the Executive Editor of the PLUS Glossary, supervising over 1500 volunteer editors from 34 countries in developing the PLUS Glossary.
[43] http://www.useplus.com/useplus/glossary_term.asp?pggl=1&tmid=10580000

Based on my personal knowledge and experience, the license issued by LGI to Vanity Fair permitted Vanity Fair to provide one copy of one black and white photograph to an illustrator, and permitted that illustrator, working under the equivalent of an implied sublicense from LGI, to create a single derivative illustration based on the photograph provided by LGI. By standard practice in the photography industry, only the specific rights enjoyed by a licensee can be granted by that licensee to a licensee's sublicensee or independent contractor, and any license constraints specified by the licensor apply to both the licensee and any of the licensee's sublicensees and independent contractors.

By standard practice in the photography industry, including in 1984, both Vanity Fair and its contractor Warhol were constrained by the terms of the license granted to Vanity Fair, which prohibited (and continues to prohibit) all reproduction and use of Warhol's derivative illustration, other than in the November 1984 issue of Vanity Fair, and which requires credit to Goldsmith on all reproductions. By standard practice in the photography industry, Vanity Fair had a duty to ensure that Vanity Fair's contractor Warhol was informed of the permissions, constraints, and duties applicable to the license under which Warhol made use of the Goldsmith Prince Work.

Even if Vanity Fair failed to fulfill its duty to inform Warhol of the terms of the license, the copyright and attribution notices to Goldsmith appearing in the 1984 Vanity Fair issue (in conjunction with the Warhol Prince Work) served to put Warhol on notice of Goldsmith's claim to copyright in the photograph underlying that work.

Based on my knowledge and experience, and with a reasonable degree of professional certainty, the primary purpose of a credit line requirement in a photography license is to ensure that the photographer and/or copyright owner is identified in or on any reproduction/s or derivative/s of the licensed photograph, so as to permit the copyright owner and its agents to develop opportunities for additional licenses in derivative markets.

27

The license issued by LGI, granting narrowly defined permissions and applying tight, express constraints, reserving all rights, requiring payment for additional uses, and requiring a credit line is entirely consistent with an intent by Goldsmith to exploit and monetize the Goldsmith Prince Work in any and all derivative markets. Vanity Fair's approval of and payment for the 1984 license is an acknowledgement that derivative markets for the Warhol Prince Work exist, and that Goldsmith intends to exploit those markets.

## F.   Warhol and AWF's Use of Goldsmith's Prince Works

Warhol used the Goldsmith Prince Work as visual reference in creating a derivative work, the Warhol Prince Work, for publication in a single issue of Vanity Fair in 1984. By standard practice in the photography industry, this use of the Goldsmith Prince Work fell within the license terms, provided that Warhol did not make reproductions of the Goldsmith Prince Work in the course of creating the Warhol Prince Work.

All other use by Warhol, AWF, their agents, subsidiaries, and assigns falls outside of the scope of the 1984 license granted by LGI to Vanity Fair (and by extension, to Vanity Fair's sublicensee Warhol). Additional versions, sales of originals and reproductions, licensing for publication and merchandising, any use without credit to Goldsmith, and any and all other uses fall outside of the scope of the license granted by LGI, and are prohibited by that license.

AWF has sold originals and licensed reproductions of the works in the Warhol Prince Series.[44] AWF makes available the images in the Warhol Prince Series for licensed merchandising and for licensed commercial and non-commercial uses directly and via AWF's licensing agents.[45] For example, AWF makes Warhol Prince Series images available for licensing as posters and T-shirts.[46] Warhol Prince Series images previously were made available by AWF for

---

[44] LG-31; LG-104; Deposition of Adrienne Fields (for ARS) ("Fields Depo.") at pp. 19 - 20.
[45] Hermann Depo. at pp. 188-189; 191; 204; 207.
[46] Hermann Depo. at pp. 191; 204.

licensing by Gibson Guitars.[47] AWF has received revenue and other benefits from the exploitation of the Warhol Prince Series.[48] For example, AWF received a $10,000 license fee (less any sales commission retained by its agent ARS) in exchange for a license granted by AWF to Conde Nast in 2016, granting Conde Nast the right to reproduce the Warhol Prince Work on the cover of a special tribute issue, "*The Genius of Prince.*"[49] In 2013, AWF, through ARS, licensed the Warhol Prince Work to Conde Nast for editorial use in a Vanity Fair 100th anniversary book for a $1,125 license fee.[50]

### G.    AWF and Goldsmith Offer Their Respective Works in the Same Derivative Markets

1. Photography and illustration are interchangeable in many derivative markets. Magazines, books, and advertisements all feature a mix of photographs and illustrations. Warhol's work regularly appears on book and magazine covers. Goldsmith's work regularly appears on book and magazine covers. Had the Warhol Prince Series been unavailable in 2016, Conde Nast may have licensed the Goldsmith Prince Work for the cover of their special tribute issue. The Warhol Prince Series competes with the Goldsmith Prince Work for opportunities in this derivative marketplace. Below are examples of recent Time magazine covers featuring photography and illustration.

   

---

[47] Id. at 207.
[48] LG-31; LG-104.
[49] LG-31, LG-33, LG-52; Fields Depo. at pp. 99 - 100.
[50] Fields Depo. at pp. 75 - 77; LG-31, LG-32.

2. Collectors of photography often also collect illustrated works. Collectors of pop art often also collect photography, and vice versa. For example, at least one prominent wealthy collector has purchased both Warhol's works and multiple Goldsmith works.[51] The Warhol Prince Series competes with the Goldsmith Prince Work for opportunities in this derivative marketplace.

3. In the fine art market, many collectors of photography and illustrated works purchase works for their collections at a broad range of prices. Works from all price ranges compete for collectors' attention. The Warhol Prince Series competes with the Goldsmith Prince Work for opportunities in this derivative marketplace, albeit at different price points.

4. Photography and illustration compete in the merchandising marketplace. Photographs and illustrations both appear on products offered for sale. The Warhol Prince Work competes with the Goldsmith Prince Work for opportunities in this derivative marketplace.

In addition, AWF and Goldsmith both exhibit their fine art works, both publish retrospective books, both colorize their works, and both have offered their works via agent intermediaries charged with developing derivative markets for the works. Below are examples of Goldsmith's hand-colored black and white photographs:[52]

   

---

[51] Goldsmith Depo. at pp. 175-76; Bates Nos. LG0000201 and 0000202.
[52] http://lynngoldsmith.com

**H.     AWF's Exploitation of the Warhol Prince Work Usurps the Market for the Goldsmith Prince Work**

For the aforementioned reasons, AWF's commercial and non-commercial exploitation of the Warhol Prince Series positions those works as plausible substitutes for the Goldsmith Prince Work, displaces the Goldsmith Prince Work in traditional, reasonable, and likely to be developed derivative markets, deprives Goldsmith of revenue, and usurps the actual and potential markets for the Goldsmith Prince Work, including markets that Goldsmith might license others to develop. Left unchecked, AWF's licensing of the Warhol Prince Series will influence others and thereby cause harm resulting from widespread and unrestricted conduct of the same sort.

**I.     AWF's Fair Use Cloak**

This Matter is readily distinguishable from recent matters in which the fair use defense has been invoked in relation to appropriated photographic works. In the instant Matter, Warhol obtained a copy of a photograph not by appropriation, but pursuant to a limited-use license granted by LGI to Vanity Fair. Warhol's derivative work was made under a license from Goldsmith's company LGI and issued to Vanity Fair, the party that commissioned Warhol to create the derivative work. Warhol created the derivative as the result of Goldsmith's grant of license to Vanity Fair permitting the creation of that derivative, subject to constraints and duties stated in the license. Had Goldsmith not licensed the Goldsmith Prince Work to Vanity Fair, the Warhol Prince Series would not exist.

In AWF's alternate copyright universe, Warhol and AWF would not be constrained by the terms of the license granted to Vanity Fair and would be free to exceed the scope of the license simply by cloaking themselves in the fair use defense, after gaining access to a protected work under the guise of a license. AWF's incorrect re-interpretation of fair use as an affirmative right is convenient for AWF under the circumstances, but is both prejudicial and inequitable to Goldsmith and all copyright owners, and if left unchecked

31

would significantly damage the copyright licensing marketplace, depleting or removing the incentive for photographers and other artists to create new works.

## VII. RIGHT TO SUPPLEMENT

I understand that AWF may offer expert testimony to support AWF's claims in the Matter, and I expect that additional information and documents may come to light subsequent to my submission of the Report. If requested by Goldsmith, I may offer supplemental reports and/or rebuttal testimony to the opinions expressed by AWF and AWF's experts.

I declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Respectfully Submitted,

_____ May 3, 2018

      Professor Jeffrey Sedlik

Index to Exhibits

A          Professor Jeffrey Sedlik Curriculum Vitae

B          List of Materials Considered

**EXHIBIT A**

**PROFESSOR JEFFREY SEDLIK**
**Curriculum Vitae**

## Contact Information

Mailing Address   145 North Sierra Madre Boulevard, Suite 4, Pasadena, California 91107 USA
Telephone         626.808.0000 (LA)   212.447.1255 (NYC)   213.716.6627 (Cell)
Email             expert@sedlik.com

## About Professor Sedlik

President & CEO of the PLUS Coalition, the international standards body for the licensing of visual works. Professional photographer, educator, publisher, forensic analyst, graphic designer, product designer, expert witness, fundraiser, negotiator and consultant. Past National President of the Advertising Photographers of America (APA), a leading trade association in the commercial photography industry. Past APA Chief Advisor on Licensing and Copyright. 2005 Photography Industry Leadership Award, International Photography Council. 2006 Photography Person of the Year, Photo Media Magazine. 2007 Industry Leadership Award, Advertising Photographers of America.

Advises clients on industry trends, business practices, copyright and contract issues, digital asset management, asset identification systems, metadata standards, rights languages, valuation of photographs/photography and other visual artworks and related services, licensing, rights of publicity/privacy, social media, investment and acquisition opportunities, strategic partnerships, photographic history, digital and traditional photographic design techniques and workflows, forensic photographic analysis, graphic design, product design, publishing, and product manufacture. Provides expert witness and consulting services on these and other matters related to photography, advertising, design and the modeling industry.  Provides expert testimony on damages and other liability arising from breach of contract, infringement of copyright, trade dress, removal/alteration of copyright management information, DMCA violations, rights of publicity/privacy, loss/damage/theft of artworks, image manipulation, creative expression, original authorship, employment status, sale tax and other issues. Provides photogrammetric services and forensic analysis of images and video.  Serves as a Professor at the Art Center College of Design.  An accomplished and experienced educator, conducts advanced seminars and workshops for professionals, and teaches college-level courses on copyright, licensing, advertising, design and related business practices.

## Professional Experience

**PLUS Coalition, Inc.**, 2005 – Present.  Serves as President and CEO for the global standards body for the image licensing industries. A non-profit organization, Picture Licensing Universal System ("PLUS") is dedicated to the development and maintenance of international licensing standards and systems in the photography, illustration, publishing, advertising, graphic design, museum, library and education communities in 120 countries. Directed recruitment of trade organizations and other interested parties worldwide and supervised development and implementation of licensing standards, and development of a global rights registry.

**PLUS Coalition, LTD.**, 2005 – Present.  Serves as President, CEO and Director of the London-based subsidiary of the PLUS Coalition, Inc..

**Sedlik Productions/Sedlik Design,** 1986 – Present. Serves as President of a leading commercial photography, design, and film production company.  Also serves as Producer, Director, Photographer, and Director of Photography, creating photography, film and video productions for advertising agencies, graphic design studios, the entertainment industry, and other clients. Operates SedlikStock, a subsidiary dedicated to licensing existing Sedlik images for advertising, editorial and merchandizing usage via affiliates including stock photography agencies and publishers. Maintains relationships with major photography industry manufacturers, testing and demonstrating analog and digital equipment and software. Provides graphic design, advertising design and product design and manufacturing services.

## Partial Client List- Sedlik Productions/Sedlik Design

**Clients:** 3m; 20th Century Fox; A&E Television Network; ABR Information Services; Alpo; AmSouth Bank; Andazia, Inc; Arista Records; Association of Tennis Professionals; AT&T; Avery Dennison; Bank of America; Barrington Music Products; BBC;  Blue Cross; BMG/RCA Records; Bristol Myers Squibb; Buena Vista Pictures; Bureau of Census; CareAmerica; Chesebrough-Ponds; CBS/Sony Music; Cedars Sinai; Century 21; Cherokee; Columbia Pictures; Computer Associates; Concord Records; Conroy's Florist; Direct TV; Disney; Doubleday; Dreyfus; Epson; Essilor; Farmer's Insurance; Federal Express; Fitzgerald-Hartley Co.; Ford; Gannon/Hartley; Geffen Records; Georgia Pacific; Great Performances; Great Western Bank; GRP Records; GTE; Guinness Museum; Hanna-Barbera; Harcourt Publishers; Hopper Papers; Ikea; Infiniti Automobiles; Island Records; Janssen Pharmaceuticals; JVC Musical Industries; Kraft Food Products; Korg, Inc.; LaFace Records; Laura Ashley; Levi Strauss; Mark Taper Forum; Missouri Historical Society; MCA Records; MCA International; Metro Goldwyn Mayer; Microsoft; Motion Picture & TV Fund; Movieland; MSN; MTM Entertainment; MTV Networks; Navisite; NBC Television; Neenah Paper; Nestle'; New World Pictures; Nike; Pacific Bell; Palm Press; Paramount Pictures; Phillip Morris; Polygram Records; Pomegranate Books; Potlatch; Prentice-Hall; San Diego Zoo; Schering Plough; SBC; Signature Eyewear; Smithsonian Institution; Sony Inc.; Southern Natural Gas; Spanish Tourism Office; Sugar Hill Records; Taco Bell; Telarc International; Toyota; Turner Broadcasting; U. C. Press; United Airlines; United Way; Universal Studios; VH-1; Warner Brothers Records; Web TV; Windham Hill Records; Word Records; World Savings; Yamaha; Zellerbach; Ziff-Davis; Zildjian

**Advertising Agencies & Design Firms:** Alan Sekuler & Associates; Asher Gould; BBDO;  Bozell, Brierley & Partners; Brooks-Gruman Advertising; Campbell, Mithun, Esty; Cline, Davis, & Mann; Cross & Associates Design; Dailey & Associates; Davis, Elen; Daymark; DDB Needham, Worldwide; Deutsch; Douglas Oliver Design; DVC Marketing; DZN; The Design Group; East/West Network; Fitzgerald & Associates; FKQ Advertising; FP Horak Advertising; Foote, Cone, & Belding; GBF Ayer; Goodby Silverstein; Grey Advertising; Hill & Knowlton; Huerta Design; Ikkanda Design; Interbrand; J. Walter Thompson; Kang & Lee; Kaufman/Stewart; Ketchum Advertising; Klemtner Advertising; Kovel Kresser; Kuester Group; Lehman Millet, Inc; Lintas Campbell Ewald; Mangos; Mediatrix; Melia Design Group; Ogilvy & Mather; OZ Advertising; Phillips Ramsey; Poppe-Tyson; Potter Katz & Partners; John Ryan Company; Saatchi & Saatchi; Seineger Advertising; Slaughter Hanson; SmithKlein Beecham; Strike Group; Team One Advertising; Team Creatif; Torre Lazur; Tracy-Locke; Tribe Design; Vrontikis Design; White Rhino Advertising; Young & Rubicam

**Editorial:** American Film; Arts & Entertainment; CD Review; Cosmopolitan; Details; Downbeat; Elle; Entertainment Weekly; Glamour; GuestInformant; Imperial Press; In Focus; Interiors & Sources; Jazziz; Jazz Times; Life; Los Angeles Magazine; Los Angeles Times Magazine; Mirabella; Music Connection; Newsweek; Photo District News; People; Premiere; Pulse; Q Magazine; Rolling Stone; Select; Spin; Time-Life

## Other Professional Experience

**Linked Content Coalition, (LCC)** 2013 – Present.  Serves as a Founding Director of the Linked Content Coalition (LCC), a UK-based, not-for-profit global consortium of standards bodies and registries. LCC members are organizations engaged in creating and managing data standards associated with content of one or more types, particularly for identifiers, metadata and messaging. The purpose of the LCC is to facilitate and expand the legitimate use of content in the digital network through the effective use of interoperable identifiers and metadata.

**American Society of Collective Rights Licensing (ASCRL),** 2014 – Present. Serves as Founding Director of ASCRL, a non-profit collecting society engaged in collecting and distributing  foreign and domestic royalties to authors and copyright owners in visual works in the United States.

**Copyright Alliance (CA),** 2016 – Present. Serves as Board member on the Copyright Alliance Creators Advisory Board and Academic Advisory Board, collaborating with leading organizations and experts in the creative industries on copyright-related issues including education, legislation, advocacy and other efforts.

**Advertising Photographers of America (APA)**. Served as National President , 2000 – 2002. Served as Chief Advisor on Licensing & Copyright, 2002 – 2012. Directed and supervised all operations of the largest trade organization representing advertising photographers, leading more than seventy volunteer board members located in all areas of the country. Advised federal and state legislators, and senior officials at the Small Business Administration and US Copyright Office. Also served on the Board of Directors of the APA Los Angeles Chapter, and on that chapter's Legal and Legislative Committee, Advocacy Committee and Sales Tax Committee.

**Beijing Intellectual Property Expertise Center of Judicature (JZSC)**, 2007 – Present. Advisor to Chinese governmental agency and the People's Court of China on intellectual property issues in China.

**IPTC Photo Metadata Working Group,** 2006 – Present. Active participant in the International Press Telecommunications Council (IPTC) standards body. Member of the IPTC Photo Metadata Working Group, charged with establishing and maintaining standards for embedded metadata in digital photographs. Co-authored the IPTC Photo Metadata White Paper 2007 and the IPTC-PLUS Photo Metadata Toolkit.

**Universal Photographic Digital Imaging Guidelines (UPDIG),** 2004 – Present.  Active participant in working group charged with developing worldwide standards in the commercial application of digital imaging technologies. Participant in Model Release Working Group, charged with developing international standards for model releases and model release workflow.

**Consultant and Expert Witness,** 2000 – Present. Provide consulting services, forensic analysis and expert testimony on legal, business and technical matters related to digital and traditional photography, illustration, marketing and other topics.

**United States Copyright Office**, 2008 – Present. Advises senior staff members on topics including copyright registration, regulatory, re-engineering and professional workflow issues. Alpha test consultant for online electronic copyright registration system.

**Adobe Photographer's Council,** 2004 – 2010. Advised Adobe Systems on matters related to Adobe products and services, including digital photography technologies, stock photography, and industry standards.

**Adobe Pre-release Testing,** 2004 – Present. Provides pre-release testing services to Adobe, both alpha and BETA testing of Adobe products and services.

**Founder, Digital Technology Advisory Council**, 2002. Founded advisory council comprised of high level representatives from each of the leading photography industry manufacturers.

**Advisory Board Member, WorkbookStock,** 2000 – 2006. Served on the advisory board of WorkbookStock, a leading stock photography agency. Consulted on the development of a vendor contract, copyright registration procedures, and web interface.

**Advisory Board Member, Exactly Vertical**, 1998 – 2000. Served on the advisory board of Exactly Vertical, a company offering interactive business management solutions for photographers. Consulted on issues including web interface, software design, copyright registration, merchandizing, stock licensing, photographers' workflows, and branding.

**Other, 1996 – Present:** Numerous additional consulting engagements under NDA, including the identification and analysis of investment opportunities, strategic partnerships, acquisition targets, product development and launch strategies, advisory council recruitment, fundraising, negotiations, mediation and deal brokering.

## Awards & Recognition

**APA Photography Industry Leadership Award,** 2007. Presented by Advertising Photographers of America.

**Photography Person of the Year,** 2006. Presented by Photo Media Magazine.

**ICP Photography Industry Leadership Award,** 2005. Presented by the International Photography Council, a non-governmental organization of the United Nations.

**Mamiya Award of Excellence in Photo Education**, 1999. Recognized as a leading arts educator. Selected from all college-level photography instructors, nationwide.

**The Clio Awards. Silver Clio, Director of Photography, Rich Media Advertising**, 1999;

### Selected Additional Awards and Recognition

Print's Regional Design Annual. Award of Excellence, 1999; Ozzie Awards. Silver Ozzie for Best Photography, 1999; Art Directors Club. Excellence in Photography, 1999; Art Directors Club. Excellence in Photography, 1999; PDN/Nikon Award of Excellence in Self Promotion, 1998; Advertising Photographers of America. Best in Show, 1998; Communication Arts Award of Excellence in Editorial Photography, 1998; The One Show Award for Excellence in Advertising, 1997; Communication Arts Award of Excellence, Unpublished Work, 1997; Communication Arts Award of Excellence in Self Promotion, 1996; Communication Arts Award of Excellence in Advertising Photography, 1994; Communication Arts Award of Excellence, Book Series, 1993; Art Direction Magazine Creativity Award, 1992; Communication Arts Award of Excellence in Editorial Photography, 1992; Communication Arts Award of Excellence in Advertising Photography, 1991; Communication Arts Award of Excellence in Editorial Photography, 1990; Art Direction Magazine. Creativity Award, 1990

## Selected Articles Authored

**ASMP Professional Business Practices in Photography, 2008.** Contributing author.

**United States House Judiciary Committee.** "The Orphan Works Dilemma: Challenges & Recommendations," 2006. Treatise submitted to the House Judiciary Committee by invitation of the General Counsel, in relation to the U.S. Copyright Office "Report on Orphan Works."

**Photo District News.** Contributor to Photo District News, the photography industry's primary trade publication. Authored the "Ask The Expert" column, writing on subjects of business management, licensing, copyright, and creativity.

**In Focus.** Contributor to In Focus Magazine, the magazine of the Advertising Photographers of America, writing on subjects including business management, industry trends, protecting the value of photography, licensing, copyright, creativity.

**Wraparound.** Founder and regular contributor to Wraparound Magazine, writing on legal and business topics.

**APA/LA NewsMagazine.** Contributor to the news magazine published by the Advertising Photographers of America, Los Angeles Chapter.

**Photo Media.** "Get Down to Business" Fall, 2000

**IPTC Photo Metadata White Paper 2007.** Co-author.

---

**Professional Societies**

---

**PLUS Coalition, Inc. (PLUS)**

**Advertising Photographers of America (APA)**

**American Institute of Graphic Arts (AIGA)**

**American Society of Media Photographers (ASMP)**

**American Society of Picture Professionals (ASPP)**

**Pro Imaging (PI)**

**Photography Instructors Education Association (PIEA)**

---

**Selected Speaking Engagements**

---

**Miscellaneous Events and Engagements,** 1977 – Present. Invited speaker/panelist at the industry's major trade shows, speaking on topics including copyright, licensing, advertising, branding, design, publishing, product development, self promotion, stock image licensing and technical issues. Lectured on photography at LAUSD Community Adult School. Speaks before groups of photographers and creatives worldwide. Wrote and produced the APA "Real World" seminar series on topics ranging from estimating, to licensing, to producing.

Participated in the development of Digital Imaging for Photographers, a leading seminar series dedicated to cutting- edge digital techniques and equipment.  Speaker at the "PDN on the Road" seminar series, on copyright, licensing and stock photography.  Speaker at the ASMP Strictly Business Workshops, ASMP Copyright Symposiums, Copyright & Technology Conferences, Digital Asset Management Conferences, World Copyright Summits, Copyright Office Roundtables and many other events.

**United States House Judiciary Subcommittee on the Courts, Intellectual Property and the Internet**, 2014. Testimony at hearing entitled "Preservation and Reuse of Copyrighted Works."

**United States Copyright Office**, 2014. Orphan Works & Mass Digitization Round Table.

**University of California Los Angeles**, 2014. US Copyright Office Recordation Reengineering Roundtable.

**World Creators' Summit**, 2013. Orphan Works.  Balancing Access and Creator's Rights.

**IPTC Metadata Conference**, 2013. Metadata Technology. What the Future Might Bring.

**California Visual Resources Association Conference**, 2014. Image Rights: Leveraging Rights Metadata to Maximize Access and Minimize Liability.

**National Association of Recording Merchandisers (NARM) Conference, 2013**. Managing Photographic and Video Archival Assets.

**Advertising Photographers of America (APA)**, 2013. Social Media, the PLUS system, and Strategic Marketing in the Internet Age

**ICON LA Illustration Conference**, 2010.  Illustrators and Copyright

**Picture Archive Council of America, International Conference**, 2004.  Image Licensing in the 21st Century

**Createasphere/ EXPLORE Entertainment Technology Exposition**, 2010. Effective Digital Asset Management Workflows

**American Society of Media Photographers**, 2010. Copyright and the New Economy: Issues and Trends Facing Visual Artists

**Photo Plus Expo**, 2009. Strategic Estimating

**Museum Computer Network**, 2009. Copyright in the Cultural Heritage Sector

**Smithsonian Institute**, 2009. Beyond the Copyright Field: Current Trends in Rights and Licensing Metadata

**Photo Marketing Association**, 2008. Breakthroughs in Photo Archiving using Metadata

**Picture Archive Council of America (PACA), International Conference**, 2008. Copyright in the stock image industry

**Henry Stewart DAM Symposium**, 2008. Rights, Images and PLUS: Challenges & Solutions

**IDEAlliance XMP Open Content Metadata Summit**, 2008. Leveraging XMP to Advance Industry Standards

**Picture Archive Council of America (PACA)**, 2007. Searching for a Common Ground: Setting Standards in a Time of Change

**Library of Congress**, 2007. Image Preservation with PLUS

**Japan Photographer's Union**, 2007. Photography & Copyright: International Issues

**Digital Library Federation, Fall Forum**, 2007. Facilitating the Fair Licensing of Digital Images, and Determining Copyright

**Museum Computer Network, Annual Conference**, 2007. Museums and Intellectual Property: Challenges and Solutions

**IDEAlliance XMP Open Content Metadata Summit**, 2007. Advanced Photography Metadata Workflow Strategies

**American Society of Picture Professionals, Education Conference**, 2006.  Strategic Licensing: The Art & Science of Maximizing Your Profits

**International Press Telecommunications Council (IPTC) Conference**, 2006. PLUS and IPTC, a Collaboration

**Coordination of European Picture Agencies Press Congress (CEPIC) Conference**, 2006. Implementing International Standards in Image Licensing

**Oxford University**, 2006.  Digital Object Identifiers and Copyright

---

**Foundation, Community Service and Charitable Work**

---

**Warren King Foundation**, President, 2000–2002. Created foundation providing endowed photography scholarships to promising photography students. Produced a fundraising event attended by photographers, educators, government officials and media. Lobbied Los Angeles Unified School District to re-launch abandoned arts education programs in local schools. Arranged for an arts teacher to receive a lifetime achievement award at the Kennedy Center.

**Other Community Service and Charitable Work.** Conduct visiting lectures on the art and history of photography for elementary school students in the Los Angeles Unified and Pasadena Unified School Districts. Judge photography exhibitions at the high school, college, and amateur, and professional levels.  Photograph pro-bono or reduced-fee public service campaigns for charitable organizations such as the LA Times "Reading by Nine" program, Jewish Family Services, Motion Picture and Television Fund, United Way, and others. Volunteered time to leadership in the Boy Scouts and public schools. Donated original photographic prints to each of the Focus on Aids annual fundraising auctions 1987-2003, Woodcraft Rangers, Pediatric Aids Foundation and other vital charitable organizations.

**Boy Scouts of America,** Eagle Scout, 1972-1977.

## Academic

**Continuing Education,** 1986-Present. Attends workshops and seminars on business, legal and technical issues affecting photographers, illustrators, designers and other visual creators, with an emphasis on intellectual property, business management, stock photography, and digital technology courses. Consults with manufacturers and distributors in testing new equipment to stay abreast of the latest developments in digital imaging, design and manufacturing technologies.

**Brooks Institute,** 2008, MFA, HC.

**Art Center College of Design,** 1986,  BFA.

**University of California at Santa Barbara,** 1980-1983, Liberal Studies major with emphasis in Art, Art History, Economics, Business Management.

**EXHIBIT B**

**MATERIALS CONSIDERED**

| Description | Reference |
|---|---|
| Complaint | NA |
| Amended Answer of Defendants, Amended Counterclaim of Lynn Goldsmith for Copyright Infringement and Jury Demand | NA |
| Answer to Amended Counterclaim | NA |
| Lynn Goldsmith deposition transcript and its exhibits | NA |
| List of Exhibits to Goldsmith deposition transcript | NA |
| Michael Hermann deposition transcript and its exhibits | NA |
| Chris Donnellan deposition transcript and its exhibits | NA |
| Adrienne Fields deposition transcript and its exhibits | NA |
| First Amendment to Representation Agreement between Andy Warhol Foundation and ADAGP | AWF00001059-1089 |
| Representation Agreement between Andy Warhol Foundation and VEGAP | AWF00001093-1122 |
| Representation Agreement between Andy Warhol Foundation and the Design & Artists' Copyright Society | AWF00001215-1255 |
| Second Amendment to License Agreement between Andy Warhol Foundation and the Design & Artists' Copyright Society | AWF00001212-1213 |
| Cariou v. Prince | NA |
| Campbell v. Acuff-Rose Music, Inc. | NA |
| Fox News Network LLC v. TVEyes | NA |
| TCA Television Corp. v. McCollum | NA |
| Various documents produced by Goldsmith | LG000001-158 |
| Eisen Goknar deposition transcript | NA |
| LG 104. Exhibit to deposition | NA |
| www.lynngoldsmith.com | NA |
| www.time.com | NA |
| www.warholfoundation.org | NA |
| www.useplus.org | NA |
| Telephonic interview of Goldsmith April 30, 2018 | NA |
| Invoice | LG0000201 |
| Invoice | LG0000202 |