UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE ANDY WARHOL FOUNDATION FOR THE
VISUAL ARTS, INC.,

                    Plaintiff,

                vs.

LYNN GOLDSMITH AND LYNN GOLDSMITH,
LTD.

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LYNN GOLDSMITH,

                  Counterclaim Plaintiff,

        vs.

THE ANDY WARHOL FOUNDATION FOR THE
VISUAL ARTS, INC.,

                  Counterclaim Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.  17-cv-02532-JGK

ECF Case

## MEMORANDUM OF LAW OF DEFENDANTS AND COUNTERCLAIM PLAINTIFF LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD. IN OPPOSITION TO THE MOTION BY PLAINTIFF, THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC., FOR SUMMARY JUDGMENT PURSUANT TO RULE 56

HERRICK, FEINSTEIN LLP
Barry Werbin
Gabrielle C. Wilson
2 Park Avenue
New York, N.Y. 10016
(212) 592-1418
Email: bwerbin@herrick.com

LAW OFFICES OF JOEL L. HECKER
Joel Hecker
230 Park Avenue, Suite 660
New York, N.Y. 10169
(212) 481-1850
HeckerEsq@aol.com

*Attorneys for Defendants Lynn Goldsmith and Lynn Goldsmith, Ltd., and Counterclaim Plaintiff Lynn Goldsmith*

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................... 2

POINT I     Substantial similarity of Warhol's Prince images is evident from
            their replication of the same "look and feel" of the Goldsmith Photo ................ 2

POINT II    Warhol's images are not transformative of the Goldsmith Photo,
            especially in the context of AWF's commercial licensing business ................... 9

     A.     Crow's purported expert report on transformative use should
            be precluded or given no weight.......................................................................... 14

     B.     The Neil Printz Declaration should be precluded as a disguised
            expert report......................................................................................................... 20

     C.     Under the third fair use factor, Warhol copied core elements of the
            Goldsmith Photo .................................................................................................. 23

     D.     AWF's unfettered licensing of Warhol's Prince images will usurp
            the potential derivative licensing markets for the Goldsmith Photo
            under the fourth fair use factor ........................................................................... 23

POINT III   Sedlik qualifies as an expert and may offer opinions based
            on his experience ................................................................................................. 29

POINT IV    AWF waived a laches defense and there is no evidence that Goldsmith
            had any reasonable notice of the Warhol Prince Series prior to mid-2016 ........ 32

CONCLUSION ............................................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

**<u>Page</u>**

### <u>Federal Cases</u>

*Beastie Boys v. Monster Energy Co.*,
  983 F. Supp. 2d 354 (S.D.N.Y. 2014) ....................................................................32

*Bill Diodato Photograph LLC v. Kate Spade, LLC*,
  388 F. Supp. 2d 382 (S.D.N.Y. 2005) ....................................................................8

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605(2d Cir. 2006) ...........................................................................25, 26

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006) ...........................................................................10, 11

*Brownmark Films, LLC v. Comedy Partners*,
  682 F.3d 687 (7th Cir. 2012) ................................................................................19

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ......................................................................................11, 26

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013) ..........................................................................passim

*Castle Rock Entertainment v. Carol Pub. Group, Inc.*,
  150 F.3d 132 (2d Cir. 1998) .................................................................................19

*Computer Assocs. Int'l., Inc. v. Altai, Inc.*,
  982 F.2d 693 (2d Cir. 1992) ...................................................................................3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ...................................................................................passim

*Davis v. Carroll*,
  937 F. Supp. 2d 390 (S.D.N.Y. 2013) ...................................................................30

*Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip. Ltd.*,
  716 F. App'x 5 (2d Cir. 2017) ...............................................................................22

*Emig v. Electrolux Home Prods. Inc.*,
  2008 WL 4200988 (S.D.N.Y. 2008) .....................................................................31

*Gaylord v. United States*,
  595 F.3d 1364 (Fed. Cir. 2010) ......................................................................11, 12

*Highland Capital Mgmt., L.P. v. Schneider,*
  379 F. Supp. 2d 461 (S.D.N.Y. 2005) ................................................................... 30

*Kienitz v. Sconnie Nation,*
  766 F.3d 756 (7th Cir. 2014) ................................................................................ 23

*Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),*
  71 F.3d 996 (2d Cir. 1995) ..................................................................................... 4

*LaChapelle v. Fenty,*
  812 F. Supp. 2d 434 (S.D.N.Y. 2011) ........................................................... 3, 4, 5

*Leonard v. Stemtech Health Sciences, Inc.,*
  2013 WL 5311295 (D. Del. Sept. 13, 2013) ......................................................... 30

*Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.,*
  97 F. Supp. 3d 485 (S.D.N.Y. 2015) .................................................................... 32

*Petrella v. Metro-Goldwyn-Mayer, Inc.,*
  572 U.S. 663 (2014) ............................................................................................. 32

*PK Music Performance, Inc. v. Timberlake,*
  2018 WL 4759737 (S.D.N.Y. Sept. 30, 2018) ...................................................... 33

*Reach Music Pub., Inc. v. Warner Chappell Music, Inc.,*
  988 F. Supp. 2d 395 (S.D.N.Y. 2013) .................................................................. 31

*Rentmeester v. Nike Inc.,*
  883 F.3d 1111 (9th Cir. 2018) ................................................................................ 8

*Ringgold v. Black Entm't Television, Inc.,*
  126 F.3d 70 (2d Cir. 1997) ................................................................................... 26

*Rogers v. Koons,*
  960 F.2d 301 (2d Cir. 1992) ..................................................................... 9, 18, 26

*Salinger v. Random House, Inc.,*
  811 F.2d 90 (2d Cir. 1987) ................................................................................... 25

*Scott v. Chipotle Mexican Grill, Inc.,*
  315 F.R.D. 33 (S.D.N.Y. 2016) ...................................................................... 29, 30

*Smith v. Cash Money Records, Inc.,*
  253 F. Supp. 3d 737 - 50 (S.D.N.Y. 2017) .......................................................... 25

*United States v. Garcia,*
  413 F.3d 201 (2d. Cir. 2005) ................................................................................ 22

iii

*Washington v. Kellwood Co.*,
   105 F. Supp. 3d 293 (S.D.N.Y. 2015) ................................................................ 30

## **Statutes**

17 U.S.C. § 101 ........................................................................................................ 25

17 U.S.C. § 106(2) ................................................................................................... 25

17 U.S.C. § 107(1) ................................................................................................... 14

17 U.S.C. § 507(b) ................................................................................................... 32

Fed. R. Evid. 701 ..................................................................................................... 23

Fed. R. Evid. 702 ................................................................................................ 16, 17

Fed. R. Evid. 702(a) .......................................................................................... 16, 20

Lynn Goldsmith and Lynn Goldsmith, Ltd. respectfully submit this Memorandum of Law in opposition to the cross-motion for summary judgment of plaintiff, The Andy Warhol Foundation for the Visual Arts, Inc. ("AWF"), and in further support of their motion for summary judgment.[1]

## PRELIMINARY STATEMENT

This case has nothing to do with attacking Warhol's legacy.  To his credit, during his lifetime Warhol never sold, licensed or sought to commercialize any of his Prince images apart from the one authorized Warhol VF Image.  This likely was no coincidence, as Warhol had been sued for copyright infringement by photographer Patricia Caulfield in 1966.  He then ceased using publicity photos as the basis for his art and started taking his own Polaroids so as not to be plagued by copyright issues.  Warhol had to know that Goldsmith or some other photographer owned the copyright in the Goldsmith Photo he was given by Vanity Fair in 1984.  He did only what he was lawfully commissioned to do: create an image to be used as an illustration, as authorized by the license granted to Vanity Fair by Goldsmith's agency.

Only after his death did AWF privately sell off the 16 original Warhol Prince Series works and transition into a commercial licensing venture.  Lost in the highbrow vernacular of the art world, AWF's arguments all but ignore this wholly commercial purpose and the focus of Goldsmith's counterclaim for infringement tied to AWF's commercial licensing of the CN Warhol Image to Condé Nast for publication in a consumer magazine – Goldsmith's core market.  As plaintiff in its declaratory judgment action, AWF's legal standing is tied solely to its ownership of the copyrights in Warhol's images, but not to the original artworks themselves that

---

[1] Abbreviations are the same as those in the Goldsmith Parties' Memorandum of Law dated October 12, 2018 ("Goldsmith Mem.").

it had sold off by 2004.  Therefore, AWF's standing is that of a commercial licensor of those copyrights and that is the "use" that is being directly challenged in this case.

AWF would improperly supplant this Court's role in assessing substantial similarity and "transformative" use with erudite expert opinions that are far removed from the reasonable and ordinary observer standards established by the Second Circuit.  Under those standards, the Warhol images capture the core "look and feel" of the Goldsmith Photo and cannot be transformative because AWF's "use" is as a commercial licensor targeting markets similar to those historically marketed by Goldsmith.  AWF fails to rebut the harm that will befall Goldsmith in those licensing markets over the life of her copyright.

Accordingly, Goldsmith is entitled to judgment, finding that the Warhol Prince Series images, as used by AWF, are not entitled to a fair use defense and infringe the copyright in the Goldsmith Photo.

## ARGUMENT

## POINT I

### Substantial similarity of Warhol's Prince images is evident from their replication of the same "look and feel" of the Goldsmith Photo

In arguing against substantially similarity, AWF ignores the overall "look and feel" of the Warhol images compared to the unique, unpublished, Goldsmith Photo.  Making that assessment is the domain of the Court based on a straightforward comparison of the images, irrespective of any subjective descriptions imparted by AWF.  AWF's reliance at page 24 of its Memorandum of Law dated October 12, 2018 ("AWF Mem."), on the purported expert opinion of Dr. Thomas Crow to explain facial differences between the Goldsmith Photo and Warhol Prince Series, is an improper intrusion on the exclusive province of this Court.  Crow's statement of purported "fact" that "Warhol deliberately made these changes" (AWF Mem. p. 24) is not based on personal

2

knowledge but only after-the-fact conjecture.

The test for illicit copying was solidified in *Computer Assocs. Int'l., Inc. v. Altai, Inc.*, 982 F.2d 693, 713 (2d Cir. 1992) as "based upon the response of ordinary lay observers," such that "expert testimony is thus 'irrelevant' and not permitted." (Citation omitted.) This approach is particularly suited to "art forms readily comprehensible and generally familiar to the average lay person." *Computer Assocs.*, 982 F.2d at 713 (citation omitted). The Court emphasized that "we do not intend to disturb the traditional role of lay observers in judging substantial similarity in copyright cases that involve the aesthetic arts, such as music, visual works or literature." *Id.* at 713 - 14.

AWF seeks to improperly dissect the individual elements of Warhol's images in comparison to the Goldsmith Photo by arguing that Warhol's works were in "different media," "flattened" Prince's face, made the portrait appear "entirely forward-facing," cropped the Goldsmith Photo, added colors or an "absence of color,"[2] removed the lighting and added hand-drawn lines. AWF Mem. at p. 32. As emphasized in *LaChapelle v. Fenty*, 812 F. Supp. 2d 434, 441 (S.D.N.Y. 2011), "we have disavowed any notion that 'we are required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable.'" A lay observer viewing the Goldsmith Photo and the Warhol images side by side would readily perceive them as coming from one creative source. *See Knitwaves, Inc. v.*

---

[2] AWF's references to adding colors or an absence of color are based on the wrong color portrait of Prince that Goldsmith's agency did not license to Vanity Fair and which Warhol never saw. *See* AWF Mem. at p. 32. The licensed black and white Goldsmith Photo had gradations of black, grey and white; thus, any "absence" of color in the Warhol images was closer to the black and white Goldsmith image than the wrongly referenced color photo.

*Lollytogs Ltd.*, 71 F.3d 996, 1004 (2d Cir. 1995) (despite many small details of a design

diverging from an original image, "[t]hese differences in detail, while requiring considerable ink

to describe, do little to lessen a viewer's overwhelming impression that the two Lollytogs

sweaters are appropriations of the Knitwaves sweaters.").

AWF ignores the substantially similar look and feel of the Goldsmith Photo and the

Warhol images.  A change in "media" does not obviate substantial similarity.  *LaChapelle*, 812

F. Supp. 2d at 442 ("substantial similarity may be found even where the protected work and the

accused work exist in entirely different media").  AWF's "forward facing" comment conflicts

with AWF's other argument that the Goldsmith Photo portrays Prince looking directly at the

camera, which is obvious from looking the images.  *See* AWF Mem. p. 31.  As discussed below,

other "forward facing" portraits of Prince bear little resemblance to the Goldsmith Photo and the

Warhol Prince Series.   Warhol's "cropping" from the neck up was *de minimis* because the focus

of the Goldsmith Photo is squarely on Prince's face as a portrait; indeed, Goldsmith testified that

Prince's clothing did not contribute to an understanding of who Prince was and it was Prince's

eyes that she remembered most.  Goldsmith 56.1 Stmt. ¶¶31, 34.

In *LaChapelle*, the court examined whether defendants' Rihanna music video contained

imagery that was substantially similar to plaintiff's photos.  Despite various differences in

specific elements of the photos and video, the court noted that "'copying need not be of every

detail so long as the copy is substantially similar to the copyrighted work.'"  *LaChapelle*, 812 F.

Supp. 2d at 446.  Judge Scheindlin emphasized that "'although the protectibility and

nonprotectibility of individual components of the copyrighted photograph must be considered by

the Court, ultimately originality may be determined by the 'total concept and feel' of the

photograph."  Both plaintiff's photos and the video "share the frantic and surreal mood of

4

women dominating men in a hyper-saturated, claustrophobic domestic space." *Id*.  As a result,

despite the addition of other elements, plaintiff's "Striped Face" photo and the "Pink Room

Scene" clip from defendant's video were held to be substantially similar because "an ordinary

observer may well overlook any differences and regard the aesthetic appeal of [the two images]

as the same." *Id*. at 446-47.  The same was found as to two other photos used in the video, with

the court observing that "'adding on' to a copy of protected expression does not, in itself, negate

the plausibility of substantial similarity." *Id*. at 447.  These are the images:



*Id*. at Exhbit B.

Unlike photographs of a celebrity taken in public, where any number of alternative

photos could be made at that moment, the unpublished Goldsmith Photo was the unique product

of a controlled studio environment that was closed to the public.  Vanity Fair commissioned

Warhol to create an image based upon the Goldsmith Photo.  Vanity Fair could have provided

Warhol with any number of alternative photographs of Prince, but did not, in obvious recognition

of the specific image of Prince and his particular expression that was captured in time in the

Goldsmith Photo.  Even AWF's purported expert Dr. Crow acknowledged that, under these circumstances, Warhol "would not have drastically changed the [Goldsmith Photo] in terms of turning it into something else."  Supplemental Declaration of Barry Werbin, Esq., dated November 20, 2018 ("Werbin Supp.") Exh. RRR [Transcript of Dr. Thomas Crow Deposition dated June 27, 2018 ("Crow Tr.") at 165:15 – 166:17].

On page 34 of its Memorandum, AWF displays five photographs of Prince that were never produced in discovery.  *See* Exhibits 33 – 34 to Declaration of Luke Nikas, Esq. dated October 12, 2018 ("Nikas Decl.").  These images are inadmissible hearsay, without evidentiary foundation, and should therefore be ignored.  Regardless, AWF's argument that Warhol's Prince images captured nothing more than the "general idea or concept of celebrities staring at a camera" (AWF Mem. at 33) is without merit.  A simple comparison of the images shows far more than just a person "staring at a camera."  The CN Magazine, which was produced in discovery, contained the following black and white front-facing studio portraits of Prince taken by other photographers (two are dated 1983 based on the credits); each is dramatically different from the other and from the Goldsmith Photo [Werbin Supp. Exh. WWW [at pp. 4, 31, 45, 50, 79 and 95 (credits)]:



p.4  (1983)    p.31    p.45

 

p.50 (1983)                                      p.79

Comparing these to the Goldsmith Photo, VF Warhol Image and Warhol CN Image shows a significant disparity:

  

Even the inadmissible images displayed in AWF's Memorandum are sharply different from each other and the Goldsmith Photo.  Warhol's images look nothing like them or the above CN Magazine photos.  AWF's statement that these images "would have resulted in a Warhol portrait nearly identical to the photos in the Prince Series" (AWF Mem. at p. 34) is, apart from pure speculation, belied by simply looking at the images.

Crow even acknowledged that the Goldsmith Photo captured a "moment" in Prince's life, including his expression.  Werbin Supp. Exh. RRR [Crow Tr. 118:11 – 22].  Prince's expression captured at that moment is not replicated in any of the above photographic portraits, but is replicated in Warhol's Prince images.  It makes no sense that Vanity Fair would have licensed

7

the Goldsmith Photo for use as an artist's reference only to have Warhol create an image with an entirely different expression that was divorced from the look and feel of that photo, for which Goldsmith received credits in the VF Article.

Crow testified that Warhol never interacted with Prince and acknowledged that "but for the Vanity Fair commission," it was "unlikely" that Warhol "would have created a portrait of Prince prior to [Warhol's] death."  Werbin Supp. Exh. RRR [Crow Tr. 113:18 – 21; 174:4 – 8]. Thus, but for the Goldsmith Photo and Vanity Fair commission, the Warhol Prince Series would not exist.

AWF's reference to *Rentmeester v. Nike Inc.*, 883 F.3d 1111 (9th Cir. 2018) is misplaced because Nike did not copy plaintiff's photo of a young Michael Jordan taking a high dunk shot against a specific landscape background.  (*See* AWF Mem. at pp. 32 – 33.)  Nike used only the general concept of that photo and "hired a photographer to produce its own photograph of Jordan, one obviously inspired by Rentmeester's."  *Rentmeester*, 883 F.3d at 1116.  Nike's photo changed every creative aspect: noticeably different landscape, basketball netting, clothing, sneakers, limb positions, lighting and color.  *Id*. at 1121-22.  This is evident from just comparing the two photos, as the Ninth Circuit did.  In contrast, Warhol purposefully copied the Goldsmith Photo to create his Prince Series.  [Goldsmith Mem. at pp. 10 - 11.]

AWF cites *Bill Diodato Photograph LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382 (S.D.N.Y. 2005) in arguing that Warhol's images copied only unprotectable elements of the Goldsmith Photo.  That case also is inapposite.  Again, the plaintiff's photo was not copied and defendant only used the idea of a "depiction of a woman's feet as she sits on the toilet, used as a striking device to highlight fashion accessories."  *Id.* at 392.  The resulting independently created image differed in every respect from the original, including its look and feel.

In comparison to the Goldsmith Photo, Warhol's Prince images capture the same pose and head angle; many of the same shadow areas created by Goldsmith's lighting; facial hair details; intensity of eyes with dual flash lights reflected in each pupil; detailed shape and fall of hair (including prominent "tendrils"); light reflected off Prince's lower lip to accentuate that feature as orchestrated by Goldsmith; Prince's chiseled bone structure highlighted due to Goldsmith's intentional lighting; and the sensuality of Prince's mouth accentuated by lip gloss that Goldsmith applied – all of which when viewed as a whole reflect the look and feel of the Goldsmith Photo and none other.  *See* Goldsmith Mem. at pp. 3, 24.

"[N]o copier may defend the act of plagiarism by pointing out how much of the copy he has not pirated."  *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992).  Despite AWF citing to elements of the Goldsmith Photo that were not pirated by Warhol, AWF fails to overcome the conclusion of substantial similarity flowing from a side-by-side comparison of the images that reflects the same overall look and feel.

## POINT II

### Warhol's images are not transformative of the Goldsmith Photo, especially in the context of AWF's commercial licensing business

The first fair use factor focuses on the "use" made of the original work.  The Warhol VF Image, used as an illustration commissioned by Vanity Fair, served the same essential purpose as the Goldsmith Photo that was licensed as an artist reference to create that illustration.  The CN Warhol Image was also used, without Goldsmith's authorization, on the CN Magazine cover.  AWF's "uses" now and into the future of Warhol's Prince images are for editorial and commercial licensing, and merchandising purposes, the same markets reserved to Goldsmith for her photo.  Warhol's images have been and remain available for commercial licensing and merchandising purposes by AWF.  Goldsmith 56.1 Stmt. ¶¶ 128 - 137; Goldsmith Mem. pp. 16 –

17.

   In its *amicus* brief to the Second Circuit in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013),

AWF acknowledged this critical distinction between the creation and display of a single work of

art based on another's copyrighted image, and the use of that art for commercial or

merchandising purposes:

> This is not a case involving the reproduction of copyrighted images
>
> in retail goods … or the promotion of other products or services.
>
> Those uses could present very different questions of market harm,
>
> especially where a defendant's goods are plausible substitutes for
>
> the plaintiff's work, or a defendant uses the copyrighted work to
>
> advertise, sell or promote goods or services. The use of an image in
>
> these contexts might also implicate trademark or copyright
>
> protection, or publicity rights.  None of those concerns is present
>
> here, where [Richard] Prince's use was confined to his art.

Werbin Supp. Exh. QQQ [AWF Amicus Brief at p. 36].

   Here, AWF's "use" weighs heavily against the application of the fair use defense.

Because AWF's sole standing to bring its declaratory judgment action is premised on its

ownership and licensing of the copyrights in the Warhol imagery, it cannot rest its fair use

defense on *Cariou*, where there was no licensing or other overtly commercial uses made of

Richard Prince's works.

   Warhol's Prince images also differ starkly from the image found entitled to a fair use

defense in *Blanch v. Koons*, 467 F.3d 244 (2d Cir. 2006), relied upon by AWF.  There, Jeff

Koons took a portion of the plaintiff's fashion magazine photo, depicting a woman's feet and

legs draped across a man's lap, and incorporated only the feet and lower legs into his work, which added additional sets of women's legs against a backdrop of sweet foods and a landscape. *Id.* at 247-48; 260-61.  Only a portion of the photo was used along with substantially new and original additional content.

Koons' art was not commercialized through licensing or other exploitation, *id*. at 249, as AWF does with the Warhol images.  The Second Circuit noted that when, as with Koons' work, "copyrighted work is used as 'raw material' … in the furtherance of distinct creative or communicative objectives, the use is transformative."  *Id*. at 253 (citation omitted.)  In contrast, Warhol's Prince images do not convey "distinct or communicative objectives" apart from the essence of Prince conveyed by the Goldsmith Photo itself.  "For a use to be fair, it 'must be productive and must employ the quoted matter in a different manner or for a different purpose from the original.'"  *Cariou*, 714 F.3d at 706 (*quoting* Hon. Pierre Leval).

Merely changing the "expressive character" of a copyrighted photograph cannot be transformative use.  *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577-80 (1994). Otherwise the exception for fair use would swallow the copyright itself and deprive it of much, if not all, of its value, including the copyright owner's right to create derivative works.  In *Gaylord v. United States*, 595 F.3d 1364, 1372–73 (Fed. Cir. 2010), the portrayal of a Korean War sculpture in a photograph that was then used on a postage stamp was held not to be fair use despite the photo having "transformed the three-dimensional sculpture … by 'creating a surrealistic environment with snow and subdued lighting where the viewer is left unsure whether he is viewing a photograph of statues or actual human beings,'" and by making the sculpture "'even grayer, creating a nearly monochromatic image'" and "colder."  *Gaylord*, 595 F.3d at 1372-73.  "[T]he inquiry must focus on the purpose and character of the stamp, rather than that

11

of [the] photograph.  The stamp does not reflect any 'further purpose' than [the sculpture]…
[and] both the stamp and [the sculpture] share a common purpose: to honor veterans of the
Korean War."  *Id*. at 1373.

Warhol created his Prince images using the Goldsmith Photo as reference, knowing that
one of them would be used for commercial publication in Vanity Fair – the same purpose
authorized by the license granted by Goldsmith's agency to Vanity Fair.  As a consumer
publication, Vanity Fair was within the same genre of publications in which many of
Goldsmith's photos have been published under license.  *See* Goldsmith 56.1 Stmt. ¶138; Werbin
Decl. Exhs. AAA - NNN.

In contrast to the widespread publicity photos that Warhol relied upon in the 1960s of
Marilyn Monroe and others, the Goldsmith Photo was never published.  Warhol's Marilyn
paintings were based on a publicity photo used to advertise a film and would have been
distributed by the film studio to the press.  Werbin Supp. Exh. SSS [Transcript of Laura Paulson
Deposition dated June 21, 2018 ("Paulson Tr.") at 82:3 – 18].  Paulson, as AWF's market expert,
acknowledged that if the Goldsmith Photo "had not been published or distributed to the press, it
would not be a publicity photo."  *Id*. at 85:2 – 19.

Paulson also noted that Warhol used his own Polaroids as reference for his silkscreen
portraits of celebrities and ordinary people.  Werbin Supp. Exh. SSS [Paulson Tr. 106:3 – 15].
Crow testified that Polaroids became the "standard basis for [Warhol's] art making when he
began to do the commissioned portraits" in the mid-1970s and that Warhol used his Polaroids "as
his own artist reference to create those commissioned portraits."  Werbin Supp. Exh. RRR [Crow
Tr. 56:9 -21].  These commissions became a significant source of revenue for Warhol starting in
the 1970s.  *Id*. at 131:2 -22.  The commissioned portraits did not rely on publicly disseminated

publicity photos that Warhol previously had used in the 1960s.  In contrast to those earlier works, the Warhol Prince Series used the unpublished Goldsmith Photo as an artist reference.

Warhol was clearly aware of copyright issues after being sued by Patricia Caulfield for infringement in 1966, as was AWF after being sued by Dauman and Time Inc. for infringement in 1996.  Goldsmith 56.1 Stmt. ¶¶ 156 - 158.  In a Warhol Diaries entry dated January 13, 1981,[3] about creating new works that would include images of Mother Goose, Warhol said: "I looked for ideas on the new Myth series, also looked for Mother Goose pictures.  But I think the best thing we decided to do is have people come and dress up in the costumes.  And we'll take the pictures ourselves *because that way, there's no copyright to worry about*."  Werbin Supp. Exh. UUU [Paulson Exh. 5; (emphasis added)].  Unlike Warhol, AWF has not been constrained in licensing Warhol's images, despite the red flag that Goldsmith owned the copyright in the underlying photo based on the VF Article being referenced in its records and internal AWF emails referencing the VF Article.  Goldsmith 56.1 Stmt. ¶¶ 65, 94, 112.

The passing reference in *Cariou* about "much of" Warhol's work commenting on consumer culture was a general comment that cited Warhol's early 1960s images of multiple Campbell's soup cans and Marilyn Monroe, which were never challenged on copyright or other grounds.  Those works are divorced from the Warhol Prince Series created in 1984 that were based on the Goldsmith Photo and arose out of the Vanity Fair commission.  The *Cariou* Court certainly did not find, nor could it without a justiciable case before it, that all Warhol works, which were not before the Court, were entitled to a blanket fair use defense merely because Warhol's name is attached to them.

---

[3] Crow characterized the Warhol Diaries as "a very foundational resource for the study of Warhol…."  Werbin Supp. Exh. RRR [Crow Tr. 127:7 - 9].

The "purpose and character" of AWF's licensing "use" of the Warhol images for commercial purposes undercuts its transformative use defense. Otherwise, any artist could misappropriate a photographer's work, easily make some superficial changes digitally, and commercially license those images. That is not a result the fair use doctrine was ever intended to foster.

A. Crow's purported expert report on transformative use should be precluded or given no weight

In an effort to usurp this Court's role in assessing the first fair use factor under 17 U.S.C. § 107(1), AWF proffers a purported expert report of Dr. Crow (the "Crow Report"), who is presented as an "expert on the art and career of Andy Warhol," to "offer an opinion about whether Warhol's portraits of Prince effected a significant transformation of the photograph on which they were based." Nikas. Decl. Exh. 5 [Crow Report at p. 1]. Crow was never told what "transformative" means, he never read any articles discussing transformative use, and he admitted that the "meaning of transformative" in a copyright case was not within the scope of his assignment. Werbin Supp. Exh. RRR [Crow Tr. 11:12 – 25]. This admission alone is sufficient grounds to strike or ignore Crow's report, which also focused on a "transformation" of the wrong Goldsmith Photo.

Crow's report is based not on anything Warhol said during his lifetime about his Prince Series works, but on opinions about Warhol's art generally. Yet, as Crow acknowledged in one of his own books on modern art and Warhol: "It was the artist himself who told the world that he had no real point to make. That he intended no larger meaning in the choice of this or that subject and that his assistants did most of the physical work of producing his art." Werbin Supp. Exh. RRR [Crow Tr. 49:3 – 50:15]. In 1987, Crow wrote that Warhol wanted to be "like a machine" and that "he and his art were all surface," paraphrasing Warhol himself. *Id*. 36:24 –

14

37:6; 41:10 – 21.  Crow had no idea what Warhol meant by "surface."  *Id*. 43:8 – 16.  Any opinions about "transformative" use therefore contradict Warhol's own view of his art as having "no real point" and "no larger meaning."

The use of an art expert to "help the trier of fact to understand" whether or not Warhol's Prince images, as commercialized by AWF, are "transformative" is improper and would supplant this Court's role in making that assessment from the required perspective of the "reasonable observer."  As underscored in *Cariou*, 714 F.3d at 707: "What is critical is how the work in question appears to the reasonable observer, not simply what an artist might say about a particular piece or body of work."  The Court observed: "It is not surprising that, when transformative use is at issue, the alleged infringer would go to great lengths to explain and defend his use as transformative."  *Id*.  As a result, the Court emphasized that instead of "confining our inquiry to Prince's explanations of his artworks, we instead examine how the artworks may 'reasonably be perceived' in order to assess their transformative nature."  *Id.*; citations omitted).

While the Court noted that what an artist might say about meaning in his or her own work has some relevance, the paramount focus under the first fair use factor is how the images appear to a reasonable observer.  If what an artist, as an alleged infringer, says about his own work is of minimal relevance, then certainly what Crow opines long after Warhol's death is far removed from the artist himself and is improper.  AWF's Complaint even alleges that what is "plain to any reasonable observer" is the appropriate standard for assessing transformative use.  Complaint at ¶24.  Goldsmith agrees that what is "plain to any reasonable observer" is the correct test, devoid of any need for expert testimony and consistent with Second Circuit precedent.

 Indeed, contradicting its current argument on the legal standard for assessing the first

fair use factor, AWF previously argued in its *amicus* brief to the Second Circuit in *Cariou*, that

the District Court erred when it "assessed the meaning of [Richard] Prince's work based entirely

on Prince's testimony, <u>not the reasonable perceptions of the viewer</u>."  Werbin Opp. Exh. QQQ at

p. 26 (emphasis added).  Pointedly, AWF asserted:

> But transformative meaning must be assessed first and foremost <u>by</u>
> <u>observation of the work itself</u>, and whether new meaning and
> expression may be reasonably perceived from it.  *See Campbell*,
> 510 U.S. at 582-83.   In *Campbell*, the Court did not demand
> testimony from 2 Live Crew, or speculate about their subjective
> intentions.  It concluded that elements of parody could reasonably
> be perceived <u>from the work itself</u>, and that was enough to establish
> its new meaning and expression….

*Id*. at p. 32 (emphasis added).  AWF further emphasized that an artist's failure to provide an

explanation of his art "cannot be fatal" because "then every artist who works within this tradition

will be forced to concoct a narrative that appeals to legal sensibilities, and the law will succeed in

protecting only those artists who are scripted by counsel."  *Id*. at p. 33.  Yet this is exactly what

AWF seeks to do through the Crow Report.

Use of an expert is permitted only where "the expert's scientific, technical, or other

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact

in issue."  Fed. R. Evid. 702(a).  The Notes of Advisory Committee on Rule 702 emphasized that

the applicable test for admissibility is "the common sense inquiry whether the untrained layman

would be qualified to determine intelligently and to the best possible degree the particular issue

without enlightenment from those having a specialized understanding of the subject involved in

the dispute."  Admission of a proffered expert's report focuses on whether the particular issue to

be opined on is too technical or otherwise unsuited for a hypothetical "untrained layman," who

could not "determine intelligently and to the best possible degree the particular issue without

enlightenment." *Id*.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993), the

Court emphasized that Rule 702 contemplates that district courts will serve as gatekeepers in

determining whether expert testimony is admissible by determining "whether the expert is

proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand

or determine a fact in issue."  The Court further instructed that "[t]his entails a preliminary

assessment of whether the reasoning or methodology underlying the testimony is scientifically

valid and of whether that reasoning or methodology properly can be applied to the facts in

issue."  *Id*.

The *Cariou* Court visually compared the challenged Richard Prince images with Cariou's

photographs and reached its conclusion as to 25 of the works based only on its "observation of

Prince's artworks themselves."  *Cariou*, 714 F.3d at 706.  With respect to the remaining five

images, the Court said the district court was "best situated to determine, in the first instance,

whether such relatively minimal alterations render [the five images] fair uses (including whether

the artworks are transformative) or whether any impermissibly infringes on Cariou's copyrights

in his original photographs…."  *Id* at 711.  Nothing in the remand directive suggested a need for

expert testimony as opposed to a comparison of the respective images by the trier of fact,

consistent with the Circuit's revised standard that an infringing work need not "comment" on the

original.  *Id*. at 706.

AWF's attempt to interject the opinion of an erudite art expert on transformative use is

17

far removed from the Second Circuit's "reasonable observer" test, which requires only a visual comparison.  It would contradict Warhol's statements about his own art having "no real point" and "no larger meaning."  AWF's approach would effectively remove the court from assessing alleged transformative use from the perspective of the reasonable observer.

This is particularly true here where the specific act of infringement is AWF's licensing of the CN Warhol Image to Condé Nast for use on the cover of the CN Magazine, a consumer publication sold on newsstands.  Purchasers of that magazine were not sophisticated art experts but ordinary consumers and, as Crow himself noted, fans of Prince.  Werbin Supp. Exh. RRR [Crow Tr. 85:12 – 16].  Crow even testified that what counts is how Warhol's work "connects with its viewers."  *Id*. Tr. 44:21 – 46:6.  "The purpose and character of the use," apart from being commercial, was plainly targeted to lay consumers, and it is from that hypothetical consumer's perspective that any "transformative" use must be assessed.

AWF seeks to interject the subjective opinion of an art expert to provide after-the-fact rationalizations of Warhol' images  as alleged "transformative" works, which are otherwise plainly visible on their face and readily comparable to the Goldsmith Photo.  This conflicts with the Second Circuit's admonition that "[w]hat is critical is how the work in question appears to the reasonable observer, not simply what an artist might say about a particular piece or body of work."  *Cariou*, 714 F.3d at 707.

In *Rogers v. Koons*, 960 F.2d 301, 310 (2d Cir. 1992), the Second Circuit rejected a finding of fair use as to a work of "appropriation art," emphasizing that "[i]f an infringement of copyrightable expression could be justified as fair use solely on the basis of the infringer's claim to a higher or different artistic use . . . there would be no practicable boundary to the fair use defense."  Similarly, Crow's opinions about higher and different artistic uses and meanings tied

to Warhol's art are a *post hoc* attempt to justify what otherwise would be copyright infringement. Permitting this type of expert testimony would similarly eliminate any "practicable boundary to the fair use defense."

In this case, the "context" of the particularly infringing CN Warhol Image is the magazine in which it was published.  The Court can readily make a visual comparison of the respective images against the factual backdrop of the case, which is not materially contested. Similarly, the Court can make such comparisons between the Goldsmith Photo and the other 15 Warhol Prince images, particularly where the Warhol VF Image was commissioned by Vanity Fair to illustrate a consumer magazine article.  Crow even acknowledged that Warhol's celebrity portraits were not intended only for "educated individuals." Werbin Supp. Exh. RRR [Crow Tr. 81:9-12].

*Cariou* is not alone in limiting the fair use assessment to a comparison of the works in issue.  The Seventh Circuit's decision in *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687 (7th Cir. 2012), is instructive and was cited favorably in *Cariou*.  Considering whether an episode of the animated television show "South Park" presented a parody (and therefore a protected fair use) of a viral Internet video, the court concluded that "[w]hen the two works ... are viewed side-by-side, the *South Park* episode is clearly a parody of the original ... video." *Id.* at 692.  For that reason, "the only two pieces of evidence needed to decide the question of fair use in [*Brownmark* were] the original version of [the video] and the episode at issue." *Id.* at 690. *See also Castle Rock Entertainment v. Carol Pub. Group, Inc.*, 150 F.3d 132, 142 (2d Cir. 1998), where the Court rejected an expert's opinion about a "Seinfeld Aptitude Test," emphasizing that the "purpose" of that work was "evidenced definitively by the statements of the book's creators and by the book itself…."

Finally, Crow's opinion rests on subjective assessments of Warhol's Prince images that are themselves subject to debate. Crow admitted there exist "many art historians and critical interpreters" of Warhol's work who reflect a "whole range of responses and opinion across many walks of life" respecting Warhol, and that some of those interpretations go in different directions, that being "the nature of critical interpretation" and "scholarly debate." Werbin Supp. Exh. RRR [Crow Tr. 58:22 – 60:13]. Being subject to debate, Crow's opinion as to transformative use does not survive scrutiny under *Daubert*.

Accordingly, the Crow Report would supplant this Court's role in assessing how the Warhol Prince Series appear to the "reasonable observer" when compared to the Goldsmith Photo and should be precluded or given no weight under Fed. R. Evid. 702(a).

B. <u>The Neil Printz Declaration should be precluded as a disguised expert report</u>

AWF submits a declaration from Neil Printz (Nikas Decl. Exh. 2), the editor of the Andy Warhol Catalogue Raisonné, who was proffered during discovery as a fact witness testifying on behalf of AWF. The declaration is a disguised expert report that should be precluded because it is replete with opinions that only a sophisticated art expert could provide. Printz offers "observations about Andy Warhol's background, artistic process, and the Prince works that are the subject of this lawsuit." Printz Decl. ¶5. "Observations" is a disguise for "opinions." Paragraphs 2 through 5 recite expert-like background references. The declaration is replete with inadmissible hearsay references to sources that were never produced by AWF in discovery, but are similar to those that would appear in an expert report, and have nothing to do with the specific Warhol Prince Series and Goldsmith Photo, including these:

- Footnotes 1, 2, 3, 5, 6 and 7 cite to numerous hearsay reference materials.

- Figure 1 (p. 4) displays a 1961 Daily News advertisement.

- Figures 2 and 3 (p. 5) displays Campbell's soup can images.

- Figure 4 (p. 6) displays a 1962 Warhol image ("200 One Dollar Bills").

- Figure 5 (p. 8) shows crop marks on a Marilyn Monroe photo.

- Footnote 4 (p. 12) refers to how a certain 1962 "Marilyn heads" work was created.

- Figure 9 (p. 13) shows a 1963 "mechanical for portrait" for "Ethel Scull."

- Figures 10, 11, 12 and 13 (pp. 19 - 21) show 1970's images of Muhammed Ali's hand and fist.

Only paragraphs 37 through 42 address certain facts relating to the Warhol Prince images and their creation, which Printz also testified to in his deposition.  *See* Goldsmith 56.1 Stmt. ¶¶ 66 - 70.  But even these paragraphs contain improper expert opinions impacting core legal issues of substantial similarity and transformative use, and should be precluded for the same reasons as the Crow Report.  These paragraphs contain hearsay and speculation.  For example, Printz says in paragraph 40 that "Warhol clearly knew in advance precisely what was required of his drawing."  How would Printz know this from his own personal knowledge?  In paragraph 42 he states: "In all sixteen of these works, it is striking how Warhol mobilizes line coloristically, using it to create pictorial effects." This again is expert-speak, intruding on the province of this Court to assess transformative use based on a comparison of the images from the perspective of an ordinary observer.

This expert cloak is further highlighted in paragraphs 43 and 44 of the Printz Declaration by references to "Warhol's acute grasp of the effects of celebrity…." and that Warhol's Prince Series "are conspicuously not concerned with the person 'all by himself,' not with the young man in Goldsmith's photograph, but with a charismatic performer who is 'on.'"  This again is

expert testimony echoing Crow.

In *Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip. Ltd.*, 716 F. App'x 5, at *10 (2d Cir. 2017), the Court precluded expert testimony in lay witness declarations, holding:

> [I]in considering the third pre-requisite to admissibility under [Federal Rule of Evidence] 701 … "a court must focus on 'the reasoning process' by which a witness reached his proffered opinion," and that, to constitute lay opinion, an opinion must be the product of "reasoning processes familiar to the average person in everyday life," rather than "scientific, technical, or other specialized knowledge."… The purpose of these pre-requisites to admissibility under Rule 701 "is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements [for expert testimony]" in Federal Rule of Civil Procedure 26. (Citations omitted.)

The Court stated that the District Court had "no obligation … to 'parse out every phrase contained in the declaration[s] to determine which constitute[d] lay versus expert [testimony]'" because it was the submitting party's "'responsibility to ensure that the evidence on which they s[ought] to rely [was] introduced properly.'" *Id*. at *13.

The Printz Declaration fails this test because it is not based on "reasoning processes familiar to the average person in everyday life," but rather highly "specialized knowledge" and it therefore should be precluded. *See also United States v. Garcia*, 413 F.3d 201, 215 (2d. Cir.

2005) ("Rule 701 was amended to provide that testimony cannot be received as lay opinion if it is based on scientific, technical, or other specialized knowledge…. Rather, a lay opinion must be the product of reasoning processes familiar to the average person in everyday life").

C. Under the third fair use factor, Warhol copied core elements of the Goldsmith Photo

AWF relies heavily on *Kienitz v. Sconnie Nation*, 766 F.3d 756 (7th Cir. 2014) — which rejected *Cariou's* transformative use theory — in arguing that only an "outline" of the Goldsmith Photo was used in the Warhol Prince Series.  As discussed in Point I, a visual comparison of those images belies this conclusion.  The Seventh Circuit's comment that the image printed on T-shirts captured only an unprotected "outline" of the Soglin photograph appears inconsistent with a comparison of that photo and the altered image.  It is respectfully submitted that the court's "outline" comment was misplaced.  The process of making the photo into a high-contrast image with colors stripped out did not eliminate the photo's original elements.  Left over in the new version was the angle, shading and lighting of the original photo, which represented the photographer's art, rather than Soglin's wrinkles and other detailed facial features that were removed in the revision process.

Insofar as fair use is a defense to infringement, if the *Kienitz* court believed the T-shirt image used only uncopyrightable expression, why did it go to great length to reject "transformative use" yet still find fair use because the T-shirt was commenting on and criticizing Soglin's past behavior?

Warhol could not have achieved the same effect by a random snapshot and certainly not without referencing the Goldsmith Photo, in contrast to the low resolution website-posted snapshot in *Kienitz*.   Unlike *Kienitz*, where a public figure like Soglin could have been photographed in public by many people and any copyright in each resulting photo would be thin,

23

the Goldsmith Photo was created under controlled studio conditions, was never published and was not capable of replication by Warhol absent his actual copying of that photo, which Vanity Fair provided to him.

In an attempt to back into the Seventh Circuit's "outline" characterization, AWF incorrectly argues that Goldsmith acknowledged at her deposition that Warhol's Prince images captured only an "outline" of her Goldsmith Photo. *See* AWF Mem. at pp. 2, 17, 32, 36. Goldsmith's testimony, however, reveals just the opposite, which is apparent when AWF's counsel attempted to "trick" her [Nikas Decl. Exh. 12 (Goldsmith Tr. 158:4 – 25)]:

> Q. And by identical, you mean the outline of Prince's face is identical to the photograph that you took?
>
> A. Not just the outline of his face, his face, his hair, his features, where his neck is. It's the photograph.
>
> Q. And as with this photo, the infringement is, in your view, as you are referring to in your Facebook post, that outline of his features?
>
> A. Say that once more.
>
> Q. Just like you said with Warhol 29 --
>
> A. It's the same thing.
>
> Q. -- the infringement you are referring to on your Facebook page is the outline of the features identical to the photograph you took, is that right?
>
> A. I don't know if you are trying to trick me.
>
> Q. I'm not trying to trick anybody.
>
> A. It's my photograph.

Goldsmith clearly asserted that the essence of her entire photograph was copied by Warhol and not just an "outline" of Prince's face, but also his "hair, his features, where his neck is…. It's my photograph."

D. AWF's unfettered licensing of Warhol's Prince images will usurp derivative
   licensing markets for the Goldsmith Photo under the fourth fair use factor

AWF offers no meaningful contest to the market harm Goldsmith and her successors will suffer if AWF's licensing of the Warhol Prince Series imagery continues unabated.  The fourth factor weighs heavily in favor of Goldsmith because if that licensing activity should "become widespread, it would adversely affect the potential market for the copyrighted work." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) (citation omitted).  This includes Goldsmith's exclusive right to license and create derivative works from her Goldsmith Photo.  Goldsmith's decision to forbear from selling or further licensing her Goldsmith Photo does not undermine the market harm that will result from AWF's licensing activity because "the need to assess the effect on the market for [her photo] is not lessened by the fact that their author has disavowed any intention to publish them during [her] life-time." *Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987).

A copyright owner owns the exclusive right "to prepare derivative works based upon the copyrighted work."  17 U.S.C. § 106(2).  A "derivative work" is "based upon one or more preexisting works" and includes any "form in which a work may be recast, transformed, or adapted."  17 U.S.C. § 101.  The only section of the Copyright Act where "transform" appears is in this definition of derivative works, "which of course require a license and are not protected by the fair use doctrine."  *Smith v. Cash Money Records, Inc.*, 253 F. Supp. 3d 737, 749-50 (S.D.N.Y. 2017) ("Thus, when a new work transforms a copyrighted work but uses it for 'the same [ ] purpose for which the [original] is sold,' the new work is a derivative work rather than

25

fair use.  *Ringgold v. Black Entm't Television, Inc*., 126 F.3d 70, 79 (2d Cir. 1997)."  The

original Warhol VF Image and the CN Warhol Image were used for the same purposes for which

the Goldsmith Photo was licensed and for which Goldsmith's photography in general is used.

"[T]he enquiry 'must take account not only of harm to the original but also of harm to the

market for derivative works.'"  *Campbell*, 510 U.S. at 590.  *See also Rogers*, 960 F.2d at 312

("Hence the inquiry considers not only harm to the market for the original photograph, but also

harm to the market for derivative works."); *Bill Graham Archives*, 448 F.3d at 614 (fourth factor

looks to the effect on the potential market for the copyrighted work in "traditional, reasonable, or

likely to be developed markets.").

Goldsmith's market expert, Jeff Sedlik, emphasized that a "photographer may create

derivatives at different sizes, or may recompose the photograph by cropping or otherwise

manipulating the photograph" and may also "elect to render the photograph as a charcoal sketch,

pencil sketch, painting, woodcut, line drawing, mosaic, embroidered work, sculpture, engraving,

screened print, lithograph, or in any other medium."  Werbin Decl. Exh. E [Sedlik Report p. 19].

It is the photographer's discretion to create derivative works "in any, all, or none of the above

manners," including "the point in time at which derivatives will be made, at any time during the

copyright life of the photograph."  *Id*.  Ongoing commercial licensing by AWF of the Warhol

Prince images can reasonably be expected to usurp Goldsmith's ability to license her Goldsmith

Photo for future publication and use in derivative works.

AWF offers no expert opinion addressing Goldsmith's current and future *potential*

licensing markets.  Its market expert, Paulson, only opined on high-end art auction and private

sales for *original* Warhol works.  Paulson admitted that she has no experience in the licensing of

works of art or photography, and that she does not consider herself an expert in licensing.

Werbin Supp. Exh. SSS [Paulson Tr. 47:12 – 24; 131:14 - 16].

   While Paulson noted the $10,000 license fee AWF charged for use of the CN Warhol Image, she also acknowledged the $1,125 license fee charged by AWF to Condé Nast for the Vanity Fair 100 Years book, and that this fee was lower than the range of license fees that Goldsmith's agency has received for licensing other Goldsmith photos of Prince over time.  This and other much lower license fees collected for AWF since 1999 are not referenced in Paulson's report and she was not aware of them.  *Id*. [Paulson Tr. 127:3 – 21; 132:13 – 21; 134:12 – 135:15]; s*ee* Goldsmith 56.1 Stmt. ¶138.

   The one-off $10,000 Condé Nast fee was specifically negotiated by AWF based on the prominent use of the CN Warhol Image on the cover of the CN Magazine, which was rushed to a consumer market on the heels of Prince's death.  Goldsmith 56.1 Stmt. ¶¶ 96, 97, 104.[4]  Over the past 15 years, Goldsmith's licensing fees for her photography generally have ranged as high as $70,000, and her images have been licensed to numerous consumer magazines, such as People, Oprah, Esquire, Time/Life, The New Yorker, GQ, Rolling Stone and others.  *Id*. ¶¶138; Werbin Decl. Exhs. AAA - NNN.

   Warhol's original art may often be at the pinnacle of the art market in terms of price,

---

[4] AWF's comment that Goldsmith never "came to mind" to Condé Nast (AWF 56.1 Stmt. ¶224), wrongly implies that Condé Nast made some conscious decision not to contact her.  In fact, Condé Nast's database, upon which Condé Nast relied incorrectly, omitted reference to Goldsmith as a copyright owner with respect to the Warhol VF Image.  Werbin Supp. Exh. TTT [Donnellan Tr. 28:6 – 30:15]; Goldsmith 56.1 Stmt. ¶117.  Yet, Donnellan acknowledged the VF Article gave Goldsmith a copyright credit for the "source photo," which meant Goldsmith's "underlying image … was used to create the artwork."  *Id*. at Tr. 26:17 – 28:5.

driven by many factors.  But price alone does not give an infringer a free pass under the fair use doctrine.  Sales of original Warhol art are only one of two core markets for Warhol imagery.  In her report, Paulson relied upon an article from *The Economist*, dated November 26, 2009, which addressed Warhol markets:

> "Warhol really consists of two markets," explains Brett Gorvy, co-head of Christie's contemporary-art department.   "One market chases ultra-rare art historically relevant paintings from the 1960s. The other is a perfect volume market where 24-inch flowers and single Jackies trade like any other commodity.  Behind Warhol's fine-art market lies an active trade in limited edition prints and beyond that, a range of consumer goods that are licensed to use Warhol images.

Werbin Supp. Exh. SSS [Paulson Tr. 61:15 – 25; 111:20 – 112:18]; Werbin Supp. Exh. TTT [Paulson 2].   While Paulson did not fully agree with the above comment about "24-inch flowers and single Jackies," she was unable to dispute the observation about the "active trade in limited edition prints" and "consumer goods that are licensed to use Warhol images."  Instead, she admitted she was not an expert in licensing.  Werbin Supp. Exh. SSS [Paulson Tr.112:22 - 114:16].

Paulson did acknowledge that, like many of Goldsmith's photos generally, Warhol's art has adorned the covers of many rock and pop music albums and he worked consistently in that medium throughout his career.  *Id*. [Paulson Tr. 159:2 – 23].  Paulson agreed that the album covers were commercial items for which images were licensed or created by Warhol, and that Goldsmith's photos appearing on album covers were also licensed or created by Goldsmith.  *Id*.

[Paulson Tr. 165:20 – 166:5].

AWF fails to meaningfully rebut Goldsmith's testimony and Sedlik's expert opinion that ongoing licensing by AWF of Warhol's Prince images will adversely affect actual and potential licensing markets for the Goldsmith Photo over the life of its copyright.

### POINT III

### Sedlik qualifies as an expert and may offer opinions based on his experience

AWF challenges Goldsmith's expert on market harm, Jeffrey Sedlik, based on conclusions and general statements of law not relevant to his qualifications.  Sedlik's qualifications to act as an expert witness are undeniable.  As stated in his Preliminary Expert Report, his opinions are based in part on more than 25 years of service in high-level positions in trade associations and standards-setting bodies in the photography, advertising, product marketing, technology and design industries, as well as being a frequent speaker at events hosted by the Copyright Office, Patent Office and Department of Commerce.  Werbin Decl. Exh. E at pp. 1-4.  He has been qualified, and has served, as an expert witness in litigation involving photography, illustration, copyright and related topics 28 times within the last four years, including two cases in the Southern District of New York.  *Id*. at pp. 5-8.

AWF makes two unsupportable contentions in support of its argument.  The first is that Sedlik may not opine on Goldsmith's intent or motive to license her works in the future, citing to *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45-46 (S.D.N.Y. 2016).  Such contention is factually inaccurate and unsupported.  In fact, Goldsmith testified to her intent, which is consistent with standard practice in the photography industry, to edition and monetize her Prince photos as she gets older when her prices will go up.  Werbin Decl. Exh. J [Goldsmith Tr. 315:6 - 316:10; Werbin Decl. Exh. E [Sedlik Report at p.23, footnote 37].

Courts within the Second Circuit liberally construe expert qualification requirements in consideration of the "thrust" of the Federal Rules.  *See Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 305 (S.D.N.Y. 2015), citing to multiple cases.  AWF's citation to *Scott*, 315 F.R.D. 33, does not support AWF's contention because its actual holding was that "[e]xperts may, however, offer testimony discussing 'ordinary practices and usages' in a particular industry."  *Scott*, 315 F.R.D. at 46 (*citing Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 471 (S.D.N.Y. 2005) (courts have permitted expert testimony respecting customs and practices in the securities industry based upon the expert's knowledge of standard trading practices).

Sedlik's report is based upon his 25 plus years of personal knowledge of the "practices and usages" in the photography industry in connection with derivative and licensing markets available to photography copyright owners.  Accordingly, he is permitted to opine on the effect AWF's uncontrolled licensing of Warhol's Prince images has or will have on actual and potential licensing markets for the Goldsmith Photo.  *See Davis v. Carroll*, 937 F. Supp. 2d 390, 412 (S.D.N.Y. 2013) ("[W]here a proposed expert witness bases her testimony on practical experience rather than scientific analysis, courts recognize that '[e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from... specialized experience."'" (Citations omitted.)  *See also Leonard v. Stemtech Health Sciences, Inc.*, 2013 WL 5311295, at *5 (D. Del. Sept. 13, 2013), which rejected a *Daubert* challenge to Sedlik in another case, highlighting his photo licensing expertise:

> Here, Professor Sedlik's *curriculum vitae* makes clear that he has
> extensive experience in the area of photography licensing…. For
> instance, Professor Sedlik is the current President and CEO of the

> PLUS Coalition, which is the international photography industry licensing metadata standards body…. He operates a company dedicated to licensing his own photographic images for various usages, and has served on advisory boards in which he was consulted on issues including stock photography licensing. Professor Sedlik has written articles on licensing that have been published in various photography publications and has taught classes on the subject.

AWF's second contention, relying upon the *Daubert* factors, is that Sedlik failed to articulate a methodology to support his opinion that the Warhol images usurp Goldsmith's potential licensing market.  That contention, however, is also unsupported because courts have consistently held that "[i]t is not appropriate to invoke the *Daubert* test in cases where expert testimony is based solely on experience or training, as opposed to a methodology or technique" and that where "the expert's opinion is based on 'years of accumulated learning and insight,' the reliability of such opinion 'should be assessed without resort to the *Daubert* factors.'"  *Emig v. Electrolux Home Prods. Inc.*, 2008 WL 4200988, at *7 (S.D.N.Y. 2008) (citations omitted).  *See also Reach Music Pub., Inc. v. Warner Chappell Music, Inc.*, 988 F. Supp. 2d 395, 404 (S.D.N.Y. 2013):

> As explained in the Advisory Committee Notes to Fed.R.Evid. 702, "[s]ome types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise."  Moreover, "[i]n certain fields, experience is the

predominant, if not sole, basis for a great deal of reliable expert

testimony."

Similarly, in *Louis Vuitton Malletier S.A. v. Sunny Merchandise Corp.*, 97 F. Supp. 3d

485, 505 (S.D.N.Y. 2015), an expert's reasoning was "'based principally upon [her] experience

and research in the world of [economics], which qualify [her] to opine on such matters.'"

(Citation omitted.)  *See also Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 365

(S.D.N.Y. 2014) ("Technical … or other specialized knowledge" … may be relevant and

reliable, and therefore admissible under *Daubert*, even if the field of knowledge, be it marketing

or plumbing, does not readily lend itself to a formal or quantitative methodology.").

Accordingly, because Sedlik's qualifications to opine as an expert are not disputed and

the two grounds upon which AWF seeks his disqualification have no basis in fact or law, AWF's

application should be denied.

## POINT IV

### AWF waived a laches defense and there is no evidence that Goldsmith had any reasonable notice of the Warhol Prince Series prior to mid-2016

AWF's cross-motion for summary judgment is silent as to laches, despite pleading it as a

defense, in likely recognition of *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014),

which held that laches is not a defense to a copyright infringement claim that is otherwise timely

within the three-year statute of limitations under 17 U.S.C. § 507(b).   Nor does AWF dispute

Goldsmith's right to seek redress for acts of infringement that occurred within three years of this

action being commenced.

AWF nevertheless alleges facts to imply that Goldsmith should have known about the

existence of the Warhol works based on private auction and dealer sales over a period of many

years, and isolated exhibitions and publications of Warhol's art in the US and abroad.  *See* AWF

56.1 Stmt. ¶¶148 - 152; AWF Mem. at p. 26.  Nowhere does AWF cite any facts to support its insinuation of knowledge on Goldsmith's part; nor would it matter because the specific infringing act is AWF's 2016 license to Condé Nast, which is well within the three-year limitations period.  Moreover, Goldsmith testified that she never saw any Warhol's Prince images until after Prince's death in mid-2016.  Goldsmith 56.1 Stmt. ¶¶120-21.

Under the "discovery" rule, a copyright plaintiff is not obligated to affirmatively investigate possible unauthorized uses that are not otherwise brought to the plaintiff's attention. In *PK Music Performance, Inc. v. Timberlake*, 2018 WL 4759737 (S.D.N.Y. Sept. 30, 2018), a plaintiff sued for copyright infringement of a musical composition.  Defendants argued the claim was barred by the statute of limitations because the song was released on a popular album, was featured in an HBO Special and on tour, and had won awards.  The court held these arguments were "unpersuasive" to create actual or inquiry notice on the plaintiff's part, and that even if the song played on the radio, there was no evidence the plaintiff "had the opportunity to hear it." *Id.* at *8.  The court emphasized there was "no authority supporting the position that a diligent plaintiff is one who watches or keeps track of major awards shows every year and listens to each song on each album or television special that was nominated for or won an award." *Id*.  Just because the plaintiff could have purchased an album, attended a concert or watched the HBO Special did not mean that "a reasonable person exercising due diligence … should have done any of those things." *Id*.  "[C]opyright owners do not have a general duty to police their copyrights." *Id*. (and cases cited therein).

The same is true here.  There is no evidence that Goldsmith knew or reasonably should have known of any private sales by AWF or secondary market sales by others.  AWF's statement that Goldsmith never enforced "compliance" with the terms of her agency's license to Vanity

Fair and did not monitor uses of the Goldsmith Photo (AWF 56.1 Stmt. ¶153), is unsupported legally and factually.  Nothing in that 1984 license imposed any enforcement obligation on Goldsmith and there was nothing to "enforce" because Vanity Fair's publication of the one Warhol VF Image was fully authorized.  Even if Goldsmith had become aware in 1984 that Warhol was the artist commissioned by Vanity Fair, that was an authorized licensed use that would not have given rise to any constructive notice that Warhol privately created an additional 15 images.

Of the 12 original Warhol Prince works sold by AWF, all but three were to private dealers or galleries outside the United States.  The other four works were transferred to The Andy Warhol Museum in Pittsburgh, where Goldsmith never lived.  AWF's listing of 13 subsequent isolated auction sales over a 19-year period reflects only two auctions in New York and the rest in other countries.  AWF lists 33 isolated Warhol "displays," including at least nine in other countries, where Warhol's Prince images were displayed or printed with other works over 34 years, which is less than one per year.  AWF 56.1 Stmt. ¶¶149 – 152; Goldsmith Counter 56.1 Stmt. ¶¶ 149 - 152.  The listed 2013 Vanity Fair 100 Years book displayed only one AWF-licensed image on a single interior page.  Goldsmith 56.1 Stmt. ¶136 (vii).

Nothing points to any actual or imputed knowledge on Goldsmith's part of any of these isolated sales and uses of Warhol's Prince images.  Accordingly, AWF's laches and statute of limitations defenses should be dismissed.

## **CONCLUSION**

WHEREFORE, the Goldsmith Parties respectfully request that the Court grant judgment in their favor on Goldsmith's counterclaim and against AWF for the relief sought in its complaint, and grant such other relief as the Court deems just and proper.

Dated:  New York, New York
        November 20, 2018

Respectfully submitted,

HERRICK, FEINSTEIN LLP

By:   _s/ Barry Werbin, Esq._
      Barry Werbin
      Gabrielle C. Wilson
2 Park Avenue
New York, NY 10016
(212) 592-1418
bwerbin@herrick.com

LAW OFFICES OF JOEL L. HECKER
      Joel L. Hecker
230 Park Avenue, Suite 660
New York, NY 10169
(212) 481-1850
HeckerEsq@aol.com
*Attorneys for Lynn Goldsmith and Lynn Goldsmith, Ltd.*

Certification of Compliance with Court's Word Count and Formatting Rules

The undersigned counsel for Defendants Lynn Goldsmith and Lynn Goldsmith, Ltd., and Counterclaim Plaintiff Lynn Goldsmith, hereby certifies that the body of the within Opposition Memorandum of Law contains 9,845 words (excluding the cover page, this certification of compliance, table of contents, and table of authorities) and complies with this Court's formatting rules for memorandum of law in civil cases and the word limit set forth in the Court's Order entered July 13, 2018 [Docket #44].

*/Barry Werbin/*

Barry Werbin, Esq.

Herrick, Feinstein LLP

36