UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE ANDY WARHOL FOUNDATION FOR THE
VISUAL ARTS, INC.,

     Plaintiff,

   vs.

LYNN GOLDSMITH AND LYNN GOLDSMITH,
LTD.

     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LYNN GOLDSMITH,

    Counterclaim Plaintiff,

 vs.

THE ANDY WARHOL FOUNDATION FOR THE
VISUAL ARTS, INC.,

    Counterclaim Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No.  17-cv-02532-JGK

ECF Case

**DEFENDANTS' AND
COUNTERCLAIM PLAINTIFF'S
RESPONSE TO PLAINTIFF'S
AND COUNTERCLAIM
DEFENDANT'S STATEMENT
PURSUANT TO LOCAL RULE
56.1**

   Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1,

Defendants and Counterclaim Plaintiff Lynn Goldsmith ("Goldsmith") and Lynn Goldsmith Ltd.

("LGL") (collectively, the "Goldsmith Parties"), respectfully submit this response to the Statement

of Material Facts of Plaintiff and Counterclaim Defendant The Andy Warhol Foundation for the

Visual Arts, Inc. ("AWF") in support of its Motion for Summary Judgment.

## I.    ANDY WARHOL IS A LEGENDARY AMERICAN ARTIST WHOSE WORK IS DEFINED BY TRANSFORMATION[1]

1.    Born in 1928 in Pittsburgh, Pennsylvania, Andy Warhol would go on to become a "prolific artist...credited with having significant achievements in, and contributions to, painting, collage, film, journalism, and a number of other media. Warhol is considered a blue chip artist and critical to be included in any serious and comprehensive private collection.... Similarly, no museum gallery on the planet could consider itself representative of Contemporary Art without a Warhol somewhere on its walls." (Expert Report of Laura Paulson at 8 (citation and quotation marks omitted) (**Ex. 1**).)[2]

      Goldsmith Parties' Response:  Not disputed.

2.    Warhol remains an "art-world colossus," the "god of contemporary art," the "most powerful contemporary art brand in existence," the "backbone of any auction of post-war contemporary art," and a "global commodity." (Paulson Expert Report at 8–9 (citations omitted) (**Ex. 1**).)

      Goldsmith Parties' Response:  Not disputed.

3.    Warhol's works can be found in the world's most important and prestigious museums, including the Tate Modern in London and the Museum of Modern Art in New York City. (Declaration of Neil Printz ¶2 (**Ex. 2**).)

      Goldsmith Parties' Response:  Not disputed factually, except the Goldsmith Parties object to the Declaration of Neil Printz ("Printz Declaration"), which should be precluded because it is a disguised expert report containing inadmissible hearsay and opinions that only a sophisticated art expert could provide, as set forth in the Goldsmith Parties' Memorandum in Opposition dated November 20, 2018, at Point II (B).

---

[1] For purposes of clarity only, the Goldsmith Parties retain the headings used in Plaintiff's Rule 56.1 Statement, without admitting the content of said headings.

[2] References to "Ex." are to the exhibits attached to the Declaration of Luke Nikas in Support of The Andy Warhol Foundation for the Visual Arts, Inc.'s Motion for Summary Judgment, dated October 12, 2018.

4.      "From the beginning of his painting career, Warhol was an avid student of media: he was acutely aware of the way images are produced, distributed, and consumed in contemporary culture, and he was fascinated by their function as vehicles of desire." (Printz Decl. ¶9 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>:  Disputed based the Goldsmith's Parties' objection to the Printz Declaration, as set forth in their above response to paragraph 3, and because Printz has no personal knowledge of Warhol's "awareness" or thoughts.

5.      Warhol created art depicting images of diverse subjects, from everyday objects like soup cans and bicycles to celebrities and other public figures. (Printz Decl. ¶9 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>:  Not disputed factually, except the Goldsmith Parties object to the Printz Declaration on the grounds set forth above in their Response to paragraph 3, and the cited testimony also does not support AWF's contention.

6.      The subject matter of Warhol's art reflects his interest in imagery. From his depictions of "money[, which] operates as a cultural sign, empty of intrinsic meaning or value, but endowed as a currency," to stars of the "movie industry[, which] was an especially powerful engine that packaged and disseminated images of intense identification and desire," the power of images and the role they play in contemporary life is one of the dominant themes of Warhol's art. (Printz Decl. ¶¶11–12 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>: Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3 and because footnote 3 at paragraph 11 of the Printz Declaration references an inadmissible third party hearsay source.  There is also no record support apart from the objectionable Printz Declaration.

7.      According to Warhol's former assistant Gerard Malanga, the images themselves, rather than the figures depicted in the images, "were the actual subject matter [Warhol] reproduced in his" art. "[I]nstead of satirizing the products [depicted in the images] themselves, he had satirized the 'artful' way they were presented." (Gerard Malanga, *A Conversation with Andy Warhol*, The Print Collector's Newsletter (Jan.–Feb. 1971) (**Ex. 3**); Deposition Transcript of Gerard Malanga 18:9–20:11 (**Ex. 4**).)

<u>Goldsmith Parties' Response</u>:  Not disputed except the testimony does not relate to the Warhol Prince Images.

8.      Warhol's *Campbell Soup Cans* paintings illustrate this principle. "[O]ften misunderstood as depictions of real. . . cans of prepared soup[, i]n fact, they were reproductions of

3

the Campbell Soup Company's logo, printed on their stationery, a purely graphic but supremely memorable sign that stood in for the product." (Printz Decl. ¶8 & figs. 2–3 (**Ex. 2**).)

   <u>Goldsmith Parties' Response</u>: Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 3.

   9.  Similarly, his 1962 silkscreen painting, *200 One Dollar Bills*, depicts 200 repetitively printed one-dollar bills. (Printz Decl. ¶10 & fig. 4 (**Ex. 2**).) According to Neil Printz, editor of the Andy Warhol Catalogue Raisonné, this work, which "literally represents the idea of printing money," underscores how "money operates as a cultural sign, empty of intrinsic meaning or value, but endowed as currency, as a medium of exchange." (*Id.* ¶¶10–11.) It displays the two-dimensional image on a flat canvas to echo the message that, like the dollar bill, there is nothing of intrinsic value behind the painting itself and that "there is nothing 'inside' the painting." (*Id.*)

   <u>Goldsmith Parties' Response</u>: Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 3 and because footnote 3 at paragraph 11 of the Printz

Declaration references an inadmissible third party hearsay source.

   10.  Warhol's silkscreen paintings from this era explore popular images *as images*, rather than searching for deeper meaning in the underlying objects themselves. (Printz Decl. ¶11 (**Ex. 2**).)

   <u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 3 and because the footnote at paragraph 10 references

an inadmissible third party hearsay source.

   11.  Among Warhol's best known works are his celebrity portraits. Creating these works of art proceeded in multiple steps. After selecting an image of his subject, Warhol would "deliver it to a professional silk-screen printer, who would produce the silk-screen based on Warhol's instructions." (Printz Decl. ¶¶16–17 (**Ex. 2**).)

   <u>Goldsmith Parties' Response</u>:  Not disputed to the extent that Printz testified to the

same with respect to the Warhol Prince Images, but otherwise object to the Printz Declaration on

the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3.  *See*

Goldsmith R. 56.1 Stmt. at ¶¶ 66 – 70.

   12.  Often Warhol would crop and resize the source image—sometimes multiple times—before arriving at the desired dimensions. (Printz Decl. ¶16 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>:  Not disputed to the extent that Neil Printz testified

to the same with respect to the Warhol Prince Images, but otherwise object to the Printz

Declaration on the same grounds set forth above in the Goldsmith Parties' Response to paragraph

3.  *See* Goldsmith R. 56.1 Stmt. at ¶¶ 66 – 70.

13.     In his portraits of Marilyn Monroe, Warhol "zoom[ed] in [] on the head and face, cropping [the image] through the collar and slightly below the shadow of the chin. This has the effect of severing the head from the shoulders and bust, producing the disembodied effect of a cinematic close-up." (Printz Decl. ¶17 & figs. 6–8 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 3 and because "figures" 6 – 8 in the Printz Declaration

were not produced by AWF in discovery.

14.     Warhol's 1962 *Marilyn Diptych* employs this technique and uses repetition to depict 50 heads of Monroe—25 in color and 25 in black and white. (Printz Decl. ¶¶13–14, 17–18 & figs. 5–6 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>:  Not disputed as to what the *Marilyn Diptych* depicts

visually, but otherwise object on the same grounds as set forth above in the Goldsmith Parties'

Response to paragraph 3.

15.     "Warhol invariably instructed the silk-screen maker to produce a high-contrast image." (Printz Decl. ¶19 (**Ex. 2**).) Unlike "[b]lack-and-white photographs[, which] record a continuous range of tones from the deepest blacks in the shadows to the brightest lights," Warhol's preferred high-contrast half-tone image "reduced the gradual gray scale of the photograph to a sharp distinction between darks and lights." (Printz Decl. ¶20 (**Ex. 2**).)

<u>Goldsmith Parties' Response</u>:  Not disputed to the extent that Neil Printz testified

to the same with respect to the Warhol Prince Images, but otherwise object to the Printz

Declaration on the same grounds set forth above in the Goldsmith Parties' Response to paragraph

3.  *See* Goldsmith R. 56.1 Stmt. at ¶¶ 66 – 70.

16.     This process "entailed a drastic simplification of the original [image], a discretionary reduction of tonal gradations to a high-contrast pattern that functioned more like a heraldic emblem than any sort of rounded, particularized representation." (Expert Report of Dr.

Thomas Crow at 11 (**Ex. 5**).) The nuance, realism, and depth of the underlying image were removed. (Printz Decl. ¶13 (**Ex. 2**).)

      Goldsmith Parties' Response:  Disputed.  The Goldsmith Parties object to the Expert Report of Dr. Thomas Crow ("Crow Report") and seek its preclusion because it improperly supplants the Court's role in assessing transformative use.  *See* Goldsmith Parties' Opp. Mem. at Point II (A).  The referenced Crow statement also does not refer to the Warhol Prince Images.  The Goldsmith Parties object to the statement from the Printz Declaration on the same grounds as set forth above in the Goldsmith Parties' Response to paragraph 3.

17.    Warhol examined the half-tone images before they were made into silk-screens "so that he could indicate by means of instructions, written and drawn with china-marking crayon, any changes to be made: for example, to increase the tonal contrast by removing areas of half-tone, thereby flattening the image." (Crow Expert Report at 11 (citation omitted) (**Ex. 5**).)

      Goldsmith Parties' Response:  Disputed. The Goldsmith Parties object to the Crow Report on the same grounds as set forth above in the Goldsmith Parties' Response to paragraph 16.  Further, Dr. Crow's opinion is speculative and based on inadmissible hearsay insofar as AWF cites it for the truth of the matter asserted.

18.    "Once Warhol approved of the high-contrast image printed on the acetate," he would have a silk-screen created such "that the image would be reproduced like a photographic negative onto the screen." (Printz Decl. ¶20 (**Ex. 2**).)

      Goldsmith Parties' Response:  Not disputed to the extent that Printz testified to the same with respect to the Warhol Prince Images, but otherwise object to the Printz Declaration on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3.  See Goldsmith R. 56.1 Stmt. at ¶¶ 66 – 70.

19.    Having established the silk-screen derived from the source image, Warhol "would lay out the composition in pencil" on a linen canvas that had "been commercially prepared with a white ground layer, known as the primer." "He would then place the screen face down on the canvas, pour ink onto the back of the mesh, and use a squeegee to pull the ink through the weave and onto the canvas." (Printz Decl. ¶21 (**Ex. 2**).)

Goldsmith Parties' Response:  Not disputed to the extent that Printz testified to the same with respect to the Warhol Prince Images, but otherwise object to the Printz Declaration on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3.  See Goldsmith R. 56.1 Stmt. at ¶¶ 66 – 70.

20.    After the "high-contrast half-tone impressions [had been] printed on the primed canvas[, which] served Warhol as an overall design or 'under-drawing,'" then came the colors. Warhol painted the colors by hand over the printed impression, using the image outline as a rough guide. (Printz Decl. ¶22 (**Ex. 2**).) "He used Liquetex acrylic paints, which. .mixed with water and dried quickly, and. .had a flat, even consistency and an industrial appearance. With the half-tone to guide him, he could work quickly, as he liked to, laying in unmodulated applications of the acrylic paint...." (Printz Decl. ¶22 (**Ex. 2**).)

Goldsmith Parties' Response:  Not disputed to the extent that Printz testified to the same with respect to the Warhol Prince Images, but otherwise object to the Printz Declaration on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3.  See Goldsmith R. 56.1 Stmt. at ¶¶ 66 – 70.

21.    Warhol often used exotic or unnaturally colored paints. (Crow Expert Report at 20 (**Ex. 5**).)

Goldsmith Parties' Response:   Not disputed factually as to Warhol's works generally, without waiving the Goldsmith Parties' objection to the Crow Report as set forth above in the Goldsmith Parties' Response to paragraph 16.

22.    The 1989 MoMA catalogue included a description of Warhol's techniques, by reference to how Warhol's Marilyn Monroe images were created, by the British curator and author Marco Livingstone:

> A pencil tracing was taken from the full sized [transparent] acetate prepared for the photographic screen. Either by transferring the penciled line by pressing onto the front of the acetate or sheet of paper, or by placing a sheet of carbon paper beneath the tracing and then drawing the line one section at a time, a rough guide was established for each color area, for example, the lips and the eyelids. The colors were then brushed on by hand, often with the use of masking tape to create a clean junction between them, with the eventual imposition of the black screened image also serving to

7

> obscure any unevenness in the line. The acetates were examined by
> Warhol before they were made into screens, so that he could indicate
> by means of instructions, written and drawn with china-marking
> crayon, any changes to be made: for example, to increase the tonal
> contrast by removing areas of half-tone, thereby flattening the
> image. The position of the image would be established by taping the
> four corners of the acetate to the canvas and then tearing off the tape
> along the corner edges of the acetate; the fragments of tape
> remaining on the canvas would serve as a guide in locating the
> screen on top. The position of the screen would be confirmed by eye,
> and it would then be printed.

(Crow Expert Report at 11 (**Ex. 5**) (citing Marco Livingstone, "Do It Yourself: Notes on Warhol's Technique," in Kynaston McShine ed., *Andy Warhol: A Retrospective* (New York: Museum of Modern Art, 1989), 72).)

> <u>Goldsmith Parties' Response</u>:  Not disputed as to the content of the referenced 1989 MoMA catalogue, but the Goldsmith Parties object to the Crow Report as set forth above in the Goldsmith Parties' Response to paragraph 16.  The Goldsmith Parties further object because the statements in the 1989 MOMA Catalogue are hearsay within hearsay and do not relate to the Warhol Prince Images themselves.

23.    Although he is famous for having stated, "I want to be a machine," every Warhol painting is, in fact, a nuanced calibration between repetition and difference, mechanical means and personal touch. (Printz Decl. ¶21 (**Ex. 2**).)

> <u>Goldsmith Parties' Response</u>: Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3 with respect to the Printz Declaration.

24.    Warhol used his signature silkscreen painting technique to explore themes that observers have universally perceived in his work: the reproduction of popular or everyday images in a manner that commoditizes and depersonalizes the underlying subject. (Crow Expert Report at 10–11 (**Ex. 5**).)

> <u>Goldsmith Parties' Response</u>: Disputed because the Goldsmith Parties object to the Crow Report on the same grounds set forth above in their Response to paragraph 16.

25.    According to Printz, Warhol's celebrity portraits "were not portraits in the traditional sense: they did not attempt to capture the way a sitter really looked or to reveal his or her inner character." (Printz Decl. ¶13 (**Ex. 2**).) Rather, "[t]he photographs that Warhol selected" as the reference for his celebrity portraits "were, in fact, already images." (*Id.*) For example, "[l]ike

a soup can, Marilyn Monroe's face in the studio still he selected for his paintings...was already a commodity; and like a dollar bill, her face already functioned as a sign." (*Id.*)

       <u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3 with respect to the Printz Declaration.

26.    According to Printz, Warhol's celebrity portraits took an existing image, such as a headshot of Marilyn Monroe, and "distilled its most referential attributes, so that the subject (Marilyn Monroe) and the medium (photography) remained identifiable, but only as trace." (Printz Decl. ¶13 (**Ex. 2**).) "Warhol's work is visibly a portrait of Marilyn Monroe, but his real subject is not the private person but the public image, a 'persona' named 'Marilyn.'" (*Id.* ¶14.)

       <u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3 with respect to the Printz Declaration.

27.    According to Dr. Thomas Crow, a renowned art historian, teacher, and scholar of Warhol and his work, the strategic cropping of images to a discrete portion—often a symbolic body part—transformed the person into a symbol. (Crow Expert Report at 10–11 (**Ex. 5**).)

       <u>Goldsmith Parties' Response</u>: Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report.  Further, to the extent AWF asserts that Warhol's cropping of images effected a transformation under the first fair use factor in 17 U.S.C. ¶  107(1), such assertion is a legal conclusion and not a statement of undisputed material fact, and the Goldsmith Parties dispute this legal conclusion.

28.    In Warhol's portraits of the boxer Muhammed Ali, Warhol started with an underlying Polaroid photograph that he had taken of Ali. (Printz Decl. ¶31 (**Ex. 2**).) Warhol focused on the most recognizable and symbolic emblem of Ali's celebrity: his fist. (*Id.* ¶32.) According to Printz, "[i]n the end, the portrait depicted the most recognizable and symbolic emblem of Ali's celebrity—his fist—making the finished work a portrait of an icon, not a man." (*Id.*)

       <u>Goldsmith Parties' Response</u>:  Undisputed as to Warhol starting with his own Polaroid photo, but otherwise disputed on the same grounds forth above in the Goldsmith Parties' Response to paragraph 3 with respect to the Printz Declaration.

29.    Dr. Crow testified that Warhol's "celebrity portraits are much less, if at all, about the figure he represents" but instead "about the way that their images work on the spectator in advance of the spectator and counting Warhol's particular transformation of those public images."

(Deposition Transcript of Dr. Thomas Crow 52:1–54:13 (**Ex. 6**).) "They are about the way that people who become celebrities and circulate via their images among people and for people who never encountered them personally function as masks, function in terms of a cultural language rather than the actual individual in any kind of depth. That's why they flatten out. That's why they are, in fact, very reduced and simplified in their mode of representation or where they encode the face." (*Id.*)

> Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the
> Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report.  Further, to the
> extent AWF alleges "transformation" under the first fair use factor in 17 U.S.C. ¶ 107(1), such
> assertion is a legal conclusion and not a statement of undisputed material fact, and the Goldsmith
> Parties dispute this legal conclusion.

30.     Printz explains that, in this respect, Warhol's celebrity portraits were not about the individual celebrity, but how the public idolizes and consumes branded images. (Printz Decl. ¶15 (**Ex. 2**).) His portraits comment on the cultural phenomenon embodied by the "publicity machine," a powerful engine that packages and disseminates commoditized images of intense identification and desire. (*Id.*)

> Goldsmith Parties' Response: Disputed on the same grounds as those set forth
> above in the Goldsmith Parties' Response to paragraph 3 with respect to the Printz Declaration.

31.     Dr. Crow opines that "[a] Warhol painting is thus far from any unreflective replica of a photographic source, but rather the outcome of a complicated, highly considered interplay of disparate elements." (Crow Expert Report at 11–12 (**Ex. 5**).)

> Goldsmith Parties' Response: Disputed on the same grounds as those set forth
> above in the Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.

32.     Dr. Crow further states that "the significant character and artistic value" of Warhol's celebrity portraits "inheres in the extent and character" of the transformation that results from his alterations and additions. (Crow Expert Report at 3 (**Ex. 5**).)

> Goldsmith Parties' Response:  Disputed on the same grounds as those set forth
> above in the Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.  Further,
> to the extent AWF asserts that a "transformation" results from Warhol's alterations and additions

under the first fair use factor in 17 U.S.C. ¶ 107(1), such assertion is a legal conclusion and not a statement of undisputed material fact, and the Goldsmith Parties dispute this legal conclusion.

33.    Critics, historians, and lay observers have adopted this understanding of Warhol's artistic process and the significance of his artistic choices. For example, a 1989 essay by Benjamin Buchloh, an art historian then on the faculty of M.I.T. and now at Harvard, discusses Warhol's selection of celebrity images as a consumer of such images: "Although Warhol constructed images of Marilyn Monroe, Liz Taylor, and Elvis Presley in the tragicomical conditions of their glamour, the paintings' lasting fascination does not derive from the continuing myth of these figures but from the fact that Warhol constructed their image from the perspective of the tragic condition of those who consume the stars' images...." (Crow Expert Report at 6 (citation omitted) (**Ex. 5**).)

Goldsmith Parties' Response:  Disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.    The referenced sources are also hearsay that do not relate to the Warhol Prince Images.

34.    Similarly, in 2002, curator Heiner Bastian argued that Warhol's celebrity portraits contain an "aura of utterly affirmative idolization [that] already stands as a stereotype of a 'consumer-goods style' expression of an American way of life and of the mass-media culture of a nation." (Crow Expert Report at 8 (citation omitted) (**Ex. 5**).)

Goldsmith Parties' Response:  Disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.  The referenced sources are also hearsay that do not relate to the Warhol Prince Images.

35.    By this time, the consensus among specialists was that Warhol's celebrity portraits "entail a[n] apprehension of major characteristics of recent consumer society and the way it works in people's subjective imagination." (Crow Dep. Tr. 64:18–65:23 (**Ex. 6**).)

Goldsmith Parties' Response:  Disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.

36.    Members of the general public routinely respond to Warhol's work with the emotion and recognition of the deeper implications of his work articulated by Crow, Buchloh, Bastian, and other figures in the art world. (Crow Dep. Tr. 88:10–91:8 (**Ex. 6**).)

Goldsmith Parties' Response:  Disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.  There is also no evidentiary support to support the assertion of how "members of the public" respond.

11

## II.    LYNN GOLDSMITH IS A ROCK-AND-ROLL PHOTOGRAPHER.

37.    "One of the most expressive chroniclers of the rock 'n' roll era," Goldsmith "has captured some of the finest rock, jazz, and R&B performers of our time in brilliant, often surprising images that reveal a great deal about her subject." (Lynn Goldsmith, *PhotoDiary*, About the Book (**Ex. 7**).)

      Goldsmith Parties' Response:  Not disputed.

38.    Among many others, Goldsmith has photographed Bruce Springsteen, Michael Jackson, Patti Smith, Bob Dylan, and Tom Petty. (Goldsmith Counterclaim ¶9 (Dkt. 20) (**Ex. 8**); Morrison Hotel Gallery: Lynn Goldsmith (**Ex. 9**).)

      Goldsmith Parties' Response:  Not disputed.

39.    Goldsmith "proudly proclaim[s], 'Yes, I am a rock and roll photographer.'" (LG-151 (**Ex. 10**).)

      Goldsmith Parties' Response:  Not disputed.

40.    She "has been capturing music legends since the early 1970's." (Analogue Gallery, Lynn Goldsmith Book Signing: Friday, May 23rd (**Ex. 11**).)

      Goldsmith Parties' Response:  Not disputed.

41.    Goldsmith's philosophy about making photographs "revolve[s] around helping others formulate their identities." (LG-151 (**Ex. 10**)).

      Goldsmith Parties' Response:  Not disputed.

42.    Where her "subjects want[] or need[] to be seen in a certain way," she views it as her job "to project that face to the world." (Deposition Transcript of Lynn Goldsmith 7:23–8:3, 20:12–21:13 (**Ex. 12**).)

      Goldsmith Parties' Response:  Not disputed.

43.    Goldsmith aims in her photographs to capture and reveal something about her subject's human identity. (Goldsmith Dep. Tr. 62:17–23, 244:18–245:2 (**Ex. 12**).)

      Goldsmith Parties' Response:  Not disputed.

44.    In order to accomplish these goals, Goldsmith undertakes to create conditions that will encourage her subjects to display their inner selves. For example, in advance of a photo shoot, she not only listens to her subjects' music, but she listens to music that was popular when her subjects were in their formative teenage years. "[T]hat really genuinely [a]ffects them" and taps into "an innocence and openness that we have from our childhood." (Goldsmith Dep. Tr. 9:9–23, 13:17–15:3, 24:9–19 (**Ex. 12**)).

_Goldsmith Parties' Response_:  Not disputed.

45.    Goldsmith believes this enables her to connect with her subjects. (Goldsmith Dep. Tr. 14:21–15:3 (**Ex. 12**).)

_Goldsmith Parties' Response_:  Not disputed.

46.    Goldsmith also endeavors to establish a rapport and put her subjects at ease when they arrive in her studio. Getting subjects comfortable is "the main thing first." (Goldsmith Dep. Tr. 95:21–22 (**Ex. 12**).)

_Goldsmith Parties' Response_:  Not disputed.

47.    In order for Goldsmith to make the kind of photographs she desires to make, her subject "has got to have a good time.... You are just trying to establish rapport and mutual respect and connection." (Goldsmith Dep. Tr. 97:6–18 (**Ex. 12**).)

_Goldsmith Parties' Response_:  Not disputed.

48.    Among other things, "at the very beginning, when [Goldsmith is] just forming a relationship, [she] like[s] to put makeup on people because...it connects [her and the subject] physically." Indeed, "sometimes [the makeup] is not that necessary and then [she] wipe[s] it off. It's more about the relationship of [Goldsmith] talking and touching at the same time." (Goldsmith Dep. Tr. 91:22–92:8 (**Ex. 12**).)

_Goldsmith Parties' Response_:  Not disputed.

49.    Goldsmith also suggests clothing or other accessories for her subjects to wear for the shoot. (Goldsmith Dep. Tr. 45:20–46:7 (**Ex. 12**).)

_Goldsmith Parties' Response_:  Not disputed.

50.    Gestures like these "make[ her subjects] feel like [she] care[s] about" them. (Goldsmith Dep. Tr. 45:20–46:7 (**Ex. 12**).)

_Goldsmith Parties' Response_:  Not disputed.

51.    For example, Goldsmith might employ this tactic when photographing a drummer, because "[d]rummers are always like in the background, you know, so it makes him feel like [she] care[s] about him and he is not left out because he is the drummer and not the lead singer. It's the psychology of connecting with people." (Goldsmith Dep. Tr. 46:2–7 (**Ex. 12**).)

_Goldsmith Parties' Response_:  Not disputed.

52.    Goldsmith often "stand[s] in different body positions" so that she can avoid asking her subjects to stand in uncomfortable positions. (Goldsmith Dep. Tr. 32:6–14 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

53.     Goldsmith also endeavors throughout a shoot to "keep [her subjects] so that they are having a good time, they are entertained, they're learning something, they enjoy the environment." (Goldsmith Dep. Tr. 98:10–13 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

54.     The goal of these techniques is to "get [Goldsmith's subjects] to express their true selves in th[e] photograph[s] so [she can] portray that." (Goldsmith Dep. Tr. 46:8–11 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

55.     "The first thing is getting [a subject] comfortable before getting him to reveal anything." (Goldsmith Dep. Tr. 97:6–9 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

56.     Goldsmith testified that "[y]ou can't have a situation where you ask a person to put themselves -- you could, but I tend to ask people to be physically comfortable, their face relaxes." (Goldsmith Dep. Tr. 32:4–18 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

57.     Another important aspect of Goldsmith's photography is lighting. For example, when asked how the lighting of a particular photograph "contributed to what you were trying to project in this photograph," Goldsmith responded, "Photography is light. I mean, I can't even -- you know, that's part of it." After a brief pause, she clarified, "Not part of it. That is it." (Goldsmith Dep. Tr. 41:1–8 (**Ex. 12**); *see also id.* 54:4–5 ("As I said, photography is about light."), 55:13–16 (Q: "[L]ighting is just as much an object as lit candles?" A: "Photography is light.").)

<u>Goldsmith Parties' Response</u>:  Not disputed.

58.     She positions her subjects in certain ways, sets up lights and umbrellas in certain places, and chooses the right camera for her mission. (Goldsmith Dep. Tr. 35:9–23, 42:2–8, 53:25–54:7, 104:13–14 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

59.     When asked why she positioned a subject "slightly offset in the photograph," Goldsmith testified "[b]ecause of the light and the shadows, and also leaning against a wall is more comfortable than, let's say, her not leaning against a wall." (Goldsmith Dep. Tr. 42:2–8 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

60.     Goldsmith's photography is part of her effort to discover her own identity, which she can only do by imagining what life is like for the subjects of her photography. Goldsmith

explained that when she photographs a subject, "I put myself in the shoes of who is in front of the camera. I mean, I feel like I'm them, like when I talked about how I want the body to be comfortable, I just have this, you are me and I am you.... I actually feel like I'm standing there" in the place of the subject. According to Goldsmith then, when looking at one of her photographs, one sees the subject "and his identity and his story, but through [Goldsmith's] eyes, because [Goldsmith is] in his shoes in that moment as she [made] that photograph." (Goldsmith Dep. Tr. 67:17–22 (**Ex. 12**).)

> Goldsmith Parties' Response:  Not disputed.

61.     Goldsmith testified further:

> Q. So there is an important element of the photography in the book that you are trying to humanize, both the subjects and yourself in what you are portraying, is that right?

> A. I'm just trying to find out who I am and that journey only takes place by also trying to find out who other people are.

> Q. There is a real effort to communicate the uniqueness of the people and their identities in these photographs?

> A. Right. Because they're all part of me, they are all part of all of us.

> Q. And when you are connecting who you are with the identity of the people in your photographs, you are trying to do that as accurately as you possibly can, as it relates to their personality?

> A. I don't know about accurate. I mean, that word, I'm trying to be as empathetic.

(Goldsmith Dep. Tr. 74:18–75:14 (**Ex. 12**); *see also id.* 11:25–12:5 ("[I]n my opinion, when you are able to reach outside of yourself and be yourself, but also be in other person's shoes, you[] not only expand your experience of yourself, but of the universe. It's a way to feel connected to other people."); Description of Lynn Goldsmith, *PhotoDiary* (Musicians "mirror our self-projection. My work is that reflection. On outward appearances PhotoDiary [a collection of Goldsmith's photographs] appears to be a collection of rock celebrity photos, but it is in fact, my story.") (**Ex. 13**).)

> Goldsmith Parties' Response:  Not disputed.

62.     Through this approach to making photographs, Goldsmith has "had the opportunity to make her passion of a quest into the nature of identity and the human spirit into her living." (LG-142 (**Ex. 14**)); Goldsmith Dep. Tr. 7:23–8:2 ("Q. Do you agree that your photography has provided you an opportunity to make your passion of a quest into the nature of identity in the human spirit? A. Yes, I do.") (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

63.    Myra Kreiman, a long-time photography editor at Newsweek, explained, "[W]hen Lynn Goldsmith took somebody into the studio, you generally expected to get something that was -- let me find the right word. That was exceptional. That was creative. That was very well-lit, very polished and brought out a feel for the person themselves." (Deposition Transcript of Myra Kreiman 83:14–20 (**Ex. 15**).)

Goldsmith Parties' Response:  Not disputed.

64.    Goldsmith has explained that her motivation for litigating this dispute is "to get every photographer, every photo organization, and photo magazine to help in the protection of that which we create." (Lynn Goldsmith, GoFundMe (**Ex. 16**).)

Goldsmith  Parties'  Response:  Disputed  because  the  statement  is  a mischaracterization of cited document, which does not support AWF's contention. Goldsmith explained that her motivation for litigating this dispute is that "in her opinion if 'artists' can just take the work of photographers, make minimal changes and sell it commercially as theirs, as well as license the work…what is the point of copyright law?" (Lynn Goldsmith, GoFundMe (**Ex. 16**).)

65.    She has expressed this sentiment in private conversations, as well. As Kreiman testified, paraphrasing Goldsmith, "the point she made to me was that she thinks it is important to stand up for copyright law, as it applies to her and as it applies to...the industry or to photographers in general...so that the people who come after [her] will also be protected." (Kreiman Dep. Tr. 44:2–11 (**Ex. 15**).)

Goldsmith Parties' Response: The first sentence is disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 64. The second sentence is not disputed.

66.    Goldsmith repeatedly has criticized the Second Circuit Court of Appeals decision in *Cariou v. Prince*, stating that "due to the latest ruling in the R[i]chard Prince case," copyright law is "broadening" and "not changing in [photographers'] favor," (Compl., Ex. B (**Ex. 17**); Goldsmith Dep. Tr. 328:6–329:2 (**Ex. 12**)) and that "[i]t is a crime that so many 'artists' can get away with" reliance on the fair use doctrine (Compl., Ex. C (**Ex. 18**)).

Goldsmith Parties' Response:  Not disputed.

67.    Goldsmith has asserted in reference to this case specifically that "[i]f what Warhol did [with her photograph of Price] is okay, then there might as well not be a copyright law" (Goldsmith Dep. Tr. 317:12–15 (**Ex. 12**)), and that "[t]he issue at stake in this matter concerns

whether a copyright owner's rights can be trampled on in the name of fine art. I believe there is a limit to this type of taking and that Warhol overstepped the boundaries in this situation." (Lynn Goldsmith Facebook Post (Apr. 9, 2017) (**Ex. 19**)).

   Goldsmith Parties' Response:  Not disputed.

## III. GOLDSMITH PHOTOGRAPHED PRINCE IN 1981.

  68. On December 2, 1981, Goldsmith photographed the musician Prince Rogers Nelson in concert at the Palladium in New York City. (Goldsmith Dep. Tr. 81:23–82:11, 109:21–24 (**Ex. 12**); LG-29 (**Ex. 20**).)

   Goldsmith Parties' Response:  Not disputed.

  69. The next day, she photographed him at her studio at 241 West 36th Street in New York City. (Goldsmith Dep. Tr. 81:23–82:11, 109:21–24 (**Ex. 12**); LG-29 (**Ex. 20**).)

   Goldsmith Parties' Response:  Not disputed.

  70. Goldsmith made the photographs on assignment for the magazine Newsweek. (Goldsmith Dep. Tr. 77:8–16 (**Ex. 12**); LG-29 (**Ex. 20**).)

   Goldsmith Parties' Response:  Not disputed.

  71. Goldsmith says she recognized Prince as an up-and-coming star and suggested the shoot to Newsweek. (Goldsmith Dep. Tr. 77:17–79:9 (**Ex. 12**).)

   Goldsmith Parties' Response:  Not disputed.

  72. Prior to photographing Prince, Goldsmith conducted the kind of research and other preparation discussed above at paragraphs 42–57. For example, Goldsmith listened to Prince's music and observed him perform in concert. This impressed upon her Prince's "capab[ility] of physically really expressing himself, carrying his body in very graceful ways" and informed "how [Goldsmith wanted] to make a photograph of" Prince. (Goldsmith Dep. Tr. 83:12–86:7 (**Ex. 12**).)

   Goldsmith Parties' Response:  Not disputed.

  73. Similarly, when Prince arrived at her studio to be photographed, Goldsmith already had compiled "a playlist of music" that she thought would "connect" her and Prince "to get [him] to open up for [her]" "without speaking." (Goldsmith Dep. Tr. 85:3–86:7 (**Ex. 12**).) She chose songs from "the roots of rock and roll," including "Robert Johnson, James Brown, [and] Howling Wolf," and arranged the sequence of songs in an order designed to manipulate Prince's energy during the shoot. (*Id.*)

   Goldsmith Parties' Response:  Not disputed.

74.     Goldsmith also applied makeup to Prince prior to the shoot. *See supra* ¶48. Although Prince arrived with some makeup already applied, Goldsmith suggested that he apply some lip gloss "[p]robably because [his lips] were dry and also [she] wanted him to be aware that [she] noticed that his lips were dry, that [she] care[d] about what he looks like in pictures and that [she was] looking after him." Moreover, Goldsmith wanted to "draw attention to [Prince's] mouth," because "[t]he mouth is a very sensual part of a person, especially someone like [Prince]," who "is sensual." (Goldsmith Dep. Tr. 94:9–95:12 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

75.     Goldsmith personally applied eyeshadow to Prince's face. (Goldsmith Dep. Tr. 91:16–19, 93:5–16 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

76.     Goldsmith did this both to connect with Prince physically and in recognition of her "feeling [that] Prince was in touch with the female part of himself, but he is also very much male." (Goldsmith Dep. Tr. 91:22–92:8, 93:8–93:16 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

77.     Goldsmith's perception of Prince's being "in touch with the female and male part of himself" derived in part from "what he had on," which she described as "male" but with "a touch of female," particularly "the silver sparkle in his suspenders." (Goldsmith Dep. Tr. 93:17–93:24 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

78.     Those clothes—including the suspenders—were Prince's own clothes that he had worn to Goldsmith's studio. (Goldsmith Dep. Tr. 89:21–90:5 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

79.     The only item of clothing visible in the photographs that Prince did not bring with him to the studio was the black sash around his neck. He chose that of his own volition when Goldsmith took him to the clothing room at her studio. (Goldsmith Dep. Tr. 89:21–91:6 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

80.     Similarly, Prince arrived with his hair (including facial hair) appearing as it does in the photographs. Goldsmith made no changes to his hair. (Goldsmith Dep. Tr. 91:7–13, 93:25–94:3 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

81.     Aside from the changes identified in paragraphs 74, 75, and 79, Goldsmith did not make any other changes to Prince's appearance. (*See* Goldsmith Dep. Tr. 89:21–96:3 (**Ex. 12**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

82.     For her photographs of Prince, Goldsmith "wanted to light him in a way that showed his chiseled bone structure." (Goldsmith Dep. Tr. 97:3–5 (**Ex. 12**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

83.     Goldsmith used a Nikon 35 millimeter camera. "Nikon lenses are important" to Goldsmith, and because of her long familiarity with them, she is "very good at making [choices] quickly" about how to make her subjects appear. (Goldsmith Dep. Tr. 106:16–108:22 (**Ex. 12**).) She testified that she chose this lens for "making portraits." (*Id.* 108:7–10.)

      <u>Goldsmith Parties' Response</u>: Not disputed, except with respect to the last sentence

where Goldsmith testified she chose "the lens" she used for making portraits, referring to an 85 or

105 millimeter size lens.  (Goldsmith Dep. Tr. 107:19 – 108:10.)

84.     She testified that she shot the photographs against a white background, which is the "hardest to light." (Goldsmith Dep. Tr. 104:3 (**Ex. 12**).) Goldsmith testified that it takes "more time to light white, for me, than it does for other options, so I like to get that done before the person steps on set." (*Id.* 104:7–9.)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

85.     She testified that she "might have moved an umbrella an inch or two" to alter the lighting throughout the photographs. (Goldsmith Dep. Tr. 104:13–14 (**Ex. 12**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

86.     "[G]etting [Prince] to get comfortable" was at the forefront of Goldsmith's mind. (Goldsmith Dep. Tr. 105:8–11 (**Ex. 12**).) Goldsmith explained: "I just wanted to get him comfortable before I -- that's the main thing first." (*Id.* 95:20–22.) "The first thing is getting someone like him comfortable before I'm getting him to reveal anything. He has got to have a good time.... You are just trying to establish a rapport and mutual respect and connection." (*Id.* 97:6–17.)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

87.     Notwithstanding these efforts, Prince remained "really uncomfortable." (Goldsmith Dep. Tr. 98:22–23 (**Ex. 12**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

88.     Shortly after the shoot began, Prince "very quietly and nicely said, I need to go back in the makeup room...and he went back in there." After 20 minutes, Goldsmith "knock[ed] on the door and there [was] no answer, and [Goldsmith] said, I know you're in there because there is no

door out of there, so [she] said, are you there," and Prince responded "just a few minutes." After another five minutes, Goldsmith let herself into the makeup room, where Prince was "sitting on a corner of the couch." Prince would not look at Goldsmith and would not respond to her. After several more attempts to engage him, Goldsmith said, "I'm going to leave the room and what I'm going to do is wait on the other side of the wall. If you want to just leave, you can do that." After that, Prince "disappeared." (Goldsmith Dep. Tr. 97:22–100:14 (**Ex. 12**).)

> Goldsmith Parties' Response:  Not disputed.

89.     Goldsmith made at least 11 photographs of Prince during the December 3, 1981 shoot in her studio. (LG-160 to -170 (**Exs. 21– 31**).)

> Goldsmith Parties' Response:  Disputed. The studio photographs Goldsmith made of Prince included a total of 12 black and white film images and 11 color transparency film images. (*See* Goldsmith 56.1 Statement ¶37.)

90.     The photographs of Prince from this shoot, according to Goldsmith, show that he "is not a comfortable person" and that he "is a really vulnerable human being." (Goldsmith Dep. Tr. 101:20–22 (**Ex. 12**).)

> Goldsmith Parties' Response:  Not disputed.

91.     According to Goldsmith, the photographs convey "someone who could be so expressive and really was willing to bust through what must be their own immense fears to make the work that they wanted to do, which kind of required a different part of themselves, but at the heart of it all, they're frightened." (Goldsmith Dep. Tr. 105:15–106:4 (**Ex. 12**).) She testified that "he was so fragile." (*Id.* 100:2–3.)

> Goldsmith Parties' Response:  Not disputed.

92.     The figure of Prince as frightened and vulnerable is what Goldsmith sees in the photographs. The photographs make Goldsmith "really sad"—so much so that she does not "even like looking at" them. (Goldsmith Dep. Tr. 105:15–106:7 (**Ex. 12**).)

> Goldsmith Parties' Response:  Not disputed.

93.     And although the aim of her photography is to portray her subjects' "identity and [their] story, but through [Goldsmith's] eyes," (Goldsmith Dep. Tr. 67:17–22 (**Ex. 12**)), she has mixed feelings about the success of the Prince photographs in achieving that purpose:

> Q. Do you think we can see sort of your story and your empathy when looking at the photographs that captures that?
>
> A. In some ways, I hope so, but in other ways, I really hope nobody does.

(*Id.* 106:11–15.)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

94.    A few weeks after Goldsmith's concert and studio shoots with Prince, Newsweek published a photograph from the December 2, 1981 concert shoot. (Newsweek-1 (**Ex. 32**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

95.    Newsweek did not publish any of the photographs from Goldsmith's December 3, 1981 shoot at her studio. (Goldsmith Dep. Tr. 164:11–165:6 (**Ex. 12**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

96.    Goldsmith is not the only photographer to have photographed Prince staring directly at a camera. The following photographs of Prince staring directly at the camera are attributed as having been taken by Allen Beaulieu and Paul Nitkin, as noted below:







(Photographs by Allen Beaulieu (**Ex. 33**); Photograph by Paul Nitkin (**Ex. 34**).)

      <u>Goldsmith Parties' Response</u>: The first sentence of paragraph 96 is not disputed.

The second sentence of paragraph 96 is disputed because the referenced images were not produced

in discovery by AWF and are inadmissible hearsay without any evidentiary foundation insofar as

AWF cites to them for the truth of the matter asserted.

## IV.  *VANITY FAIR* LICENSED ONE OF GOLDSMITH'S PHOTOGRAPHS IN 1984 FOR "USE AS AN ARTIST REFERENCE."

97.     In 1984, *Vanity Fair* licensed one of Goldsmith's photographs from her December 3, 1981 photoshoot of Prince for $400. (Goldsmith Counterclaim ¶¶20–21 (Dkt. 20) (**Ex. 8**); LGI Invoice to *Vanity Fair* (**Ex. 35**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

98.     An approval form, dated September 25, 1984, sent on behalf of Lynn Goldsmith to Esin Goknar at *Vanity Fair* states as follows:



(LG-64 (**Ex. 36**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

99.     Neither Andy Warhol nor The Andy Warhol Foundation for the Visual Arts, Inc. is mentioned in this approval form. (LG-64 (**Ex. 36**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

100.    The invoice reflecting the license to *Vanity Fair*, dated October 29, 1984, states:

FEE FOR THE USE OF ONE PHOTOGRAPH OF PRINCE, COPYRIGHT 1981 LYNN GOLDSMITH FOR USE AS ARTIST REFERENCE FOR AN ILLUSTRATION TO BE PUBLISHED IN VANITY FAIR NOVEMBER 1984 ISSUE. IT CAN APPEAR ONE TIME FULL PAGE AND ONE TIME UNDER ONE QUARTER PAGE. NO OTHER USAGE RIGHT GRANTED.

(LGI Invoice to *Vanity Fair* (**Ex. 35**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed, except the invoice further expressly

provided:

> License is granted to use the above-described photograph(s) on condition that total amount shown hereon is paid.  The credit line – LYNN GOLDSMITH – must not be omitted, abbreviated or altered under penalty of double charge. Released, on rental basis only, and in accordance with terms and conditions of submission. License, for

one reproduction only, is granted to reproduce above described photograph(s) in

IN VANITY FAIR NOVEMBER 1984 ISSUE

The invoice also noted "PAID DATE DEPOSITED CHECK. NO. 2/8/85." The license fee was

$400. (*See* Goldsmith 56.1 Statement ¶¶45 - 46.)

101.　The October 29, 1984 invoice does not state whether the licensed photo was in color or in black and white. It does not state the dimensions of the licensed photograph. (LGI Invoice to *Vanity Fair* (**Ex. 35**).)

　　Goldsmith Parties' Response:　Not disputed.

102.　Neither Andy Warhol nor The Andy Warhol Foundation for the Visual Arts, Inc. is mentioned on the October 29, 1984 invoice, as a party to the license agreement or otherwise. (LGI Invoice to *Vanity Fair* (**Ex. 35**).)

　　Goldsmith Parties' Response:　Not disputed.

103.　When Goldsmith initially contacted The Andy Warhol Foundation in July 2016, she claimed that Warhol infringed an almost full-body, color photograph of Prince. (LG-4 (**Ex. 37**); *see also* Goldsmith Dep. Tr. 123:19–124:18 (**Ex. 12**).):



　　Goldsmith Parties' Response:　Not disputed.

104.　Goldsmith subsequently has asserted that the photograph that she alleges Warhol infringed was a bust-only black and white photograph (the "Prince Photograph") (LG-7 (**Ex. 38**)):



<u>Goldsmith Parties' Response</u>:  Not disputed, except the Goldsmith Parties object to

AWF's characterization and refer to their own detailed recitation of the facts, which show that

Goldsmith advised AWF that her black and white portrait was used later on the same day.  *See*

Goldsmith 56.1 Statement ¶¶122 - 126.

105.    It is not known which photograph Goldsmith licensed to *Vanity Fair*. No specific photograph is identified in the September 25, 1984 approval form or in the October 29, 1984 invoice. (LG-64 (**Ex. 36**); LGI Invoice to *Vanity Fair* (**Ex. 35**).) Goldsmith herself testified that she does not know which of her photographs was provided to *Vanity Fair* in relation to this license. (Goldsmith Dep. Tr. 119:4–7 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  The first sentence is disputed as the material relied

upon by AWF does not support its contention. The second sentence is not disputed, except the

approval form dated September 25, 1984, sent on behalf of Lynn Goldsmith to Esin Goknar at

*Vanity Fair* specified use of a "11x14 B&W STUDIO PORTRAIT OF PRINCE BY © 1981."

(*See* AWF 56.1 Statement ¶98; Goldsmith 56.1 Statement ¶41.)  Undisputed that the LGI Invoice

to *Vanity Fair* did not specify the specific licensed photo.  The third sentence is disputed because

Goldsmith's actual testimony as cited was that she doesn't know which of her "black and white

studio portraits" were sent Vanity Fair in 1984. (Goldsmith Dep. Tr. 119:4–7 (AWF (Ex. 12).)

Goldsmith also testified that the photo approval form sent to Vanity Fair specified a "black and

white studio portrait."  (Goldsmith Dep. Tr. 119:25 – 120:6 (AWF (Ex. 12).)

106.    Goldsmith does not know which photograph of Prince was provided to *Vanity Fair*, because she had no personal involvement "in selecting...a photo of Prince that was sent to *Vanity Fair*." (Goldsmith Dep. Tr. 113:25–114:7 (**Ex. 12**).)

Goldsmith Parties' Response:  The first clause of the sentence is disputed as the testimony cited by AWF does not support its contention.  The second clause of the sentence after "because" is not disputed as to Goldsmith having no personal involvement in selecting the photo that was sent to Vanity Fair.  Goldsmith ascertained in 2016 that her black and white Goldsmith Photo was the photo that had been licensed to Vanity Fair.  (Goldsmith R. 56.1 Statement ¶¶124 – 126.)

107.    Only her staff was involved in selecting the photograph that was sent to *Vanity Fair*. (Goldsmith Dep. Tr. 115:10–117:15, 119:4–11 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

108.    Goldsmith "ha[s] no personal knowledge of what happened in 1984 with respect to the photograph that was sent." (Goldsmith Dep. Tr. 120:13–18 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

109.    Goldsmith asserts that she never looked at the November 1984 issue of *Vanity Fair* to see whether and how her photograph had been used. (Goldsmith Counterclaim ¶27 (Dkt. 20) (**Ex. 8**).)

Goldsmith Parties' Response:  Not disputed.

110.    Goldsmith testified that she did not know that she had licensed a photograph of Prince to *Vanity Fair* until recently. (Goldsmith Dep. Tr. 120:21–25 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

111.    Goldsmith has stated that she did not know that Warhol created the Prince Series until after Prince died in April 2016. (Goldsmith Dep. Tr. 127:5–13 (**Ex. 12**); Lynn Goldsmith Facebook Post (Apr. 9, 2017) (**Ex. 19**).)

Goldsmith Parties' Response:  Not disputed.

## V. ANDY WARHOL CREATED 16 WORKS OF ART USING THE GOLDSMITH PHOTOGRAPH AS A REFERENCE, AND *VANITY FAIR* PUBLISHED AN IMAGE OF ONE OF THE WORKS.

112.    Referring to one of the photographs from the December 3, 1981 photoshoot at Goldsmith's studio, Andy Warhol created 12 paintings, two screen prints on paper, and two drawings (the "Prince Series") depicting an image of Prince's head. (AWF-1992 to -2007 (**Exs. 39 – 54**); Pl.'s Response to Request for Admission 4 (**Ex. 55**).)



AWF-2001 (Ex. 48)
Andy Warhol, Prince, 1984, acrylic and silkscreen ink on linen, 20 x 16 inches

AWF-1992 (Ex. 39)
Andy Warhol, Prince, 1984, acrylic and silkscreen ink on linen, 20 x 16 inches

AWF-1993 (Ex. 40)
Andy Warhol, Prince, 1984, acrylic and silkscreen ink on linen, 20 x 16 inches

AWF-1995 (Ex. 42)
Andy Warhol, Prince, 1984, acrylic and silkscreen ink on linen, 20 x 16 inches

AWF-2002 (Ex. 49)
Andy Warhol, Prince, 1984, acrylic and silkscreen ink on linen, 20 x 16 inches

AWF-1994 (Ex. 41)
Andy Warhol, Prince, 1984, acrylic and silkscreen ink on linen, 20 x 16 inches

AWF-2003 (Ex. 50)
Andy Warhol, Prince, 1984, acrylic and silkscreen ink on linen, 20 x 16 inches

AWF-1997 (Ex. 44)
Andy Warhol, Prince, 1984, acrylic and silkscreen ink on linen, 20 x 16 inches

26



Goldsmith Parties' Response:  Not disputed, except dispute all the images were only of "Prince's head" because Prince's neckline and shirt collar is visible in all of the Prince Series Images (AWF Exs. 39-54) and his suspenders are visible in one (AWF Ex. 52).

113.    In the Prince Series, Warhol appears to have cropped and resized the image of Prince from Goldsmith's photograph to remove everything but Prince's head. (AWF-1992 to -2007 (**Exs. 39 – 54**); Crow Expert Report at 17 (**Ex. 5**); Crow Dep. Tr. 102:3–24 (**Ex. 6**).)

Goldsmith Parties' Response:  Not disputed that "Warhol appears to have cropped and resized the image of Prince from Goldsmith's photograph." Disputed that he removed "everything but Prince's head" on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 112.

114.    In doing so, Warhol removed all elements of the Goldsmith photograph aside from the outline of the features of Prince's head and, in one drawing, his shirt and suspenders. (AWF-1992 to -2007 (**Exs. 39 – 54**).); Crow Expert Report at 20–21 (**Ex. 5**); Crow Dep. Tr. 102:3–24, 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 112.  Further, the Goldsmith Parties object to the

reference to the Crow Report on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 16.   As set forth in Goldsmith's Opposition Memorandum of Law, it is the province of this Court to assess substantial similarity and transformative use.

115.   Goldsmith testified that the Prince Series works retain only "the outline of [Prince's] face, his face, his hair, his features, [and] where his neck is" from the photograph Goldsmith took during the December 3, 1981 shoot. (Goldsmith Dep. Tr. 157:24–158:9 (**Ex. 12**).)

Goldsmith Parties' Response:   Disputed. The testimony cited by AWF does not support its contention. Goldsmith testified as follows:

Q. I'm showing you another document produced by The Foundation. It's a picture of one of the Warhol works. Did you see this document – excuse me. Did you see this image before you filed the counterclaims we looked at as Exhibit 1?

A. Yes.

Q. And just as with Warhol 29, your view is that this is identical to the black and white photograph you took?

A. Yes.

Q. And by identical, you mean the outline of Prince's face is identical to the photograph that you took?

A. Not just the outline of his face, his face, his hair, his features, where his neck is. It's the photograph.

Q. And as with this photo, the infringement is, in your view, as you are referring to in your Facebook post, that outline of his features?

A. Say that once more.

Q. Just like you said with Warhol 29—

A. It's the same thing.

Q. -- the infringement you are referring to on your Facebook page is the outline of the features identical to the photograph you took, is that right?

A. I don't know if you are trying to trick me.

Q. I'm not trying to trick anybody.

A. It's my photograph.

Q. Understood.

(Goldsmith Dep. Tr. 157:17–159:2 (**Ex. 12**).)

116.    As Printz explains, the cropping of the underlying image in the Prince Series caused "the head [to] become[] disembodied, separated from the support of the neck and shoulders, as if magically suspended in space, and filling the composition in [the] painting." (Printz Decl. ¶33 (**Ex. 2**).)

Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 3 with respect to the Printz Declaration.

117.    According to Printz, Warhol's cropping also "draws the lower part of the face down to a narrow point, on which the isolated head as a whole seems to balance itself." (Crow Expert Report at 17 (**Ex. 5**).)

Goldsmith Parties' Response:  Disputed. The assertion says "According to Printz"

but the record citation refers to the Crow Report.  Further disputed on the same grounds as those

set forth above in the Goldsmith Parties' Response to paragraphs 3 and 16 respecting the Printz

Declaration and Crow Report.

118.    Warhol had a printer create an enlarged, high-contrast, half-tone silk-screen reproduction of the photograph. (Printz Decl. ¶34 (**Ex. 2**).)

Goldsmith Parties' Response:  Not disputed, except Plaintiff's object to the Printz

Declaration on the same grounds set forth above in the Goldsmith Parties' Response to paragraph

3.

119.    Dr. Crow explained that the high-contrast half-tone, by "draining the inner tone and texture out of what was left" after the cropping, removed almost all the light and shading that were present in the photograph and had "the effect of isolating and exaggerating only the darkest details: the hair, moustache, eyes, and brows." (Crow Expert Report at 17 (**Ex. 5**).)

Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report.

29

120.    Dr. Crow opined that "[o]ne conspicuous effect of these changes was to make the subject appear to face fully towards the front as a detachable mask, negating the more natural, angled position of the figure in the source photograph." (Crow Expert Report at 17 (**Ex. 5**).)

    Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report.

121.    Dr. Crow further stated that unlike in Goldsmith's photo, where "the forehead of Prince obviously recedes under the crown of hair[, a]nd the crown of hair projects over it, [reflecting] a sort of natural shape of the skull," the high-contrast half-tone leaves "the hair and the forehead" in "the same flat [plane]," "differentiated [only] by color." (Crow Dep. Tr. 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

    Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report and because Crow's

testimony supplants the Court's role in assessing substantial similarity and transformative use.

122.    According to Dr. Crow, this "goes along with the transformation of Prince into this mask-like simulacrum of his actual existence." (Crow Dep. Tr. 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

    Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report and because Crow's

testimony supplants the Court's role in assessing substantial similarity and transformative use.  To

the extent AWF asserts there was a "transformation" of Prince's image, such assertion is a legal

conclusion in the context of 17 U.S.C. ¶ 107(1) and not a statement of undisputed material fact,

and the Goldsmith Parties dispute this legal conclusion.

123.    Similarly, in the Prince Series, "[e]ven the slight shadow that you see around the bottom of the chin as a whole, which is important for seeing the way it projects and what shape it is, Warhol has taken that out too." (Crow Dep. Tr. 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

    Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report and because Crow's

testimony supplants the Court's role in assessing substantial similarity and transformative use.

Further disputed because a visual comparison reflects a shadow area around the bottom chin in

both the Warhol Prince Images and the Goldsmith Photo.  *See also* Goldsmith Parties' Response to paragraph 112 above.

124.    According to Dr. Crow, this likewise contributes to "creat[ing] this sort of flat emblem that stands in for Prince without being a naturalistic equivalent to the appearance of his head." (Crow Dep. Tr. 187:24–188:14, 201:20–202:10 (**Ex. 6**).)

Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report and because Crow's testimony supplants the Court's role in assessing substantial similarity and transformative use..

125.    Although Dr. Crow's expert report focused on the color photograph of Prince that Goldsmith initially identified as the basis for her claim, he testified that "having learned...that Ms. Goldsmith was claiming infringement of her black and white headshot photo" changed "nothing" with respect to his opinion and analysis. (Crow Dep. Tr. 94:12–19 (**Ex. 6**).)

Goldsmith Parties' Response:  Not disputed that Crow so testified.

126.    Warhol created the paintings in the Prince Series in multiple layers, including a layer using the silk-screen reproduction of the photograph, a layer he painted by hand, and, in some, layers using additional screens created based on Warhol's own freehand drawing of the photograph. (Crow Expert Report at 15–18 (**Ex. 5**).)

Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report.

127.    The "second screen" used in some of the paintings in the Prince Series, "which was created from Warhol's freehand lines drawn around and over the photographically derived layer beneath," provide the features with "vibrancy and definition." (Crow Expert Report at 18 (**Ex. 5**).)

Goldsmith Parties' Response:  Disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 16 with respect to the Crow Report.

128.    Printz stated that "[p]rinted slightly off register from the half-tone impression, the line screen highlights the face; it has the effect of lip or eye liner, emphasizing the features and enhancing their impact. Moreover, the line screens were printed not only in different colors but in multi-colored inks so that the line gradually changes color from top to bottom. In two paintings, Warhol heightened the optical dynamic by superimposing two line-screen impressions over the half-tone." (Printz Decl. ¶40 (**Ex. 2**).)

    <u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 3 with respect to the Printz Declaration, except to the extent Printz testified to the creation of the Warhol Prince Series.  (*See* Goldsmith Parties R. 56.1 Statement at ¶¶ 66 – 70.)

    129.   Dr. Crow opined that "[t]hese lines represent Warhol's own free invention, by means of which he made a point of diverging from the given facts of the photographic impression to provide his portrayal of Prince with a confrontational presence and intensity absent in his source." (Crow Expert Report at 18 (**Ex. 5**).)

    <u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.

    130.   Dr. Crow testified that "bringing everything towards the surface into a much more unified pla[ne] or block of black pigment emphasized by various colors both underlying and overlaying" was "directed towards" creating a "confrontational" image. (Crow Dep. Tr. 204:21–205:10 (**Ex. 6**).)

    <u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 124.

    131.   Dr. Crow testified that, by "bringing all the features of Prince up to the surface across the same pla[ne], so he's occupying a kind of barrier between you as a viewer and whatever his inner life might be," Warhol's painting transforms Goldsmith's "retiring" image of Prince into one of "Prince confronting you as his admirer, his fan, a curious onlooker with a kind of uncompromising implacable character which is not present in the Goldsmith." (Crow Dep. Tr. 204:21–24, 207:13–208:2 (**Ex. 6**).)

    <u>Goldsmith Parties' Response</u>:  Disputed on the same grounds set forth above in the Goldsmith Parties' Response to paragraph 124.   To the extent AWF asserts that Warhol "transforms" Goldsmith's image, such assertion is a legal conclusion in the context of 17 U.S.C. ¶ 107(1) and not a statement of undisputed material fact, and the Goldsmith Parties dispute this legal conclusion.

    132.   In the Prince Series, Warhol applied exotic, unnatural colors of paint to the canvas, such as green, pink, and red. (AWF-1992 to -2007 (**Exs. 39 - 54**).)

<u>Goldsmith Parties' Response</u>:  Not disputed, except object to the characterization of "exotic, unnatural colors" because the material relied upon by AWF does not support this contention.  The Court is respectfully referred to the referenced images to make its own assessment of colors that appear in the Warhol Prince images.

133.    In some of the works in the Prince Series, the colors correspond to the features of Prince's face and head, and in others they do not. (AWF-1992 to -2007 (**Exs. 39 - 54**).)

<u>Goldsmith Parties' Response</u>:  Disputed as vague.  The Court is respectfully referred to the referenced images to make its own assessment.

134.    Several of the works in the Prince Series have multiple colors applied near Prince's facial features. (AWF-1996 (**Ex. 43**); AWF-1999 (**Ex. 46**); AWF-2000 (**Ex. 47**); AWF-2001 (**Ex. 48**).)

<u>Goldsmith Parties' Response</u>:  Disputed as vague.  The Court is respectfully referred to the referenced images to make its own assessment.

135.    Several of the works in the Prince Series have multiple colors placed in deliberate disregard of the facial features. (AWF-1992 (**Ex. 39**); AWF-1993 (**Ex. 40**); AWF-1997 (**Ex. 44**); AWR-1998 (**Ex. 45**).)

<u>Goldsmith Parties' Response</u>:  Disputed as vague.  The Court is respectfully referred to the referenced images to make its own assessment.

136.    Some of the works in the Prince Series have a single flat color behind Prince's face. (AWF-1994 (**Ex. 41**); AWF-1995 (**Ex. 42**); AWF-2002 (**Ex. 49**); AWF-2003 (**Ex. 50**); AWF-2004 (**Ex. 51**); AWF-2005 (**Ex. 52**); AWF-2006 (**Ex. 53**); AWF-2007 (**Ex. 54**).)

<u>Goldsmith Parties' Response</u>:  Not disputed that certain of the Prince Series images have single color backgrounds, but otherwise dispute the characterization and respectfully refer the Court to the referenced images to make its own assessment.

137.    Warhol also explored varying renditions of the screens in the Prince Series. Certain works in the Prince Series show only the hand-drawn outline of Prince's face. (AWF-1993 (**Ex. 40**); AWF-1995 (**Ex. 42**); AWF-1998 (**Ex. 45**); AWF-2004 (**Ex. 51**); AWF-2005 (**Ex. 52**).)

Goldsmith Parties' Response:  Disputed as vague.  The Court is respectfully

referred to the referenced images to make its own assessment.

138.    Other works in the Prince Series use both the high-contrast and hand-drawn screens layered over one another in different colors and to differing effects. (AWF-1992 (**Ex. 39**); AWF-1994 (**Ex. 41**); AWF-1996 (**Ex. 43**); AWF-1997 (**Ex. 44**); AWF-1999 (**Ex. 46**); AWF-2000 (**Ex. 47**); AWF-2001 (**Ex. 48**); AWF-2002 (**Ex. 49**); AWF-2003 (**Ex. 50**); AWF-2006 (**Ex. 53**); AWF-2007 (**Ex. 54**).)

Goldsmith Parties' Response:  Disputed as vague.  The Court is respectfully

referred to the referenced images to make its own assessment.

139.    Warhol created two line drawings by hand in pencil, one of the outline of Prince's head and one of the outline of Prince's head and suspenders (AWF-2004 (**Ex. 51**); AWF-2005 (**Ex. 52**)).

Goldsmith Parties' Response:  Not disputed that Warhol created two drawings, but

disputed as to the "outline" characterization and because there is no record support cited for a

pencil drawing.  The Court is respectfully referred to the referenced images to make its own

assessment.

140.    Printz explains that these line drawings imbue the subject with a particularly eerie, empty, and inhuman effect. (Printz Decl. ¶38 (**Ex. 2**).)

Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 3 respecting the Printz Declaration.

141.    Dr. Crow opined that, beyond the composition of the Prince Series works, the use of a photograph from "1981, when Prince had just broken through to widespread recognition" but "remained far from the celebrity" he had attained by 1984, echoes Warhol's use of a 1953 photograph of Marilyn Monroe for his *Marilyn* works in the 1960s: "The fame that is Warhol's subject in the Prince portraits was thus of a different magnitude than Prince would have been experiencing three years before, as the Marilyn Monroe mourned and remembered in 1962 had been far from the ingénue captured by photographer Gene Kornman in 1953." (Crow Expert Report at 17 (**Ex. 5**).)

Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16 respecting the Crow Report.

142.    Dr. Crow testified that the "larger than life character" Prince had become by 1984 "definitely was not carried in those early photographs of '81, and...Warhol saw that, at least he responded by creating an image of Prince as a kind of icon or totem of something rather than just being the actual human being that made the music." (Crow Dep. Tr. 211:8–212:5 (**Ex. 6**).)

Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 124.

143.    Dr. Crow opined that the Prince Series works also parallel the *Marilyn* works in that "Prince was," like Monroe, "a distant figure known to Warhol only via publicity images and his charismatic appearance on the cinema screen." (Crow Expert Report at 16 (**Ex. 5**); *see also* Printz Decl. ¶33 (**Ex. 2**).)

Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Responses to paragraph 16 respecting the Crow Report and paragraph 3

respecting the Printz Declaration.

144.    *Vanity Fair* ultimately published AWF-1996 (**Ex. 43**) alongside an article titled "Purple Fame," attributed to Tristan Vox.  The article discussed Prince's surging and omnipresent popularity, asserting that "escape from Prince is no longer possible." (*Vanity Fair* (Nov. 1984) at 66 (**Ex. 56**).)

Goldsmith Parties' Response:  Not disputed.

145.    The magazine attributes the artwork accompanying the photograph to Warhol and credits Goldsmith for a copyright only in the photograph. (*Vanity Fair* (Nov. 1984) at 66, 121 (**Ex. 56**).)

Goldsmith Parties' Response:  Not disputed.

146.    Dr. Crow opined that the juxtaposition of a Warhol portrait next to an article titled "Purple Fame" and discussing a celebrity's ubiquity is especially apt given that "Warhol was known, more than any other artist, to have made fame his defining subject." (Crow Expert Report at 15 (**Ex. 5**).)

Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16.

147.    Dr. Crow opined that the cumulative impact of Warhol's visual alterations in transforming Goldsmith's photograph into the Prince Series works was to create portraits that "are materially distinct in their meaning and message. Unlike Goldsmith's focus on the individual subjects' unique human identity," her personal journey in life, and her emotional connection with her subjects, "Warhol's portraits of Prince, as with his celebrity portraits generally, sought to use

the flattened, cropped, exotically colored, and unnatural depiction of Prince's disembodied head to communicate a message about the impact of celebrity and defining the contemporary conditions of life. This approach transforms the character, message, and historic and artistic value of Warhol's portrait of Prince compared to Goldsmith's photograph." (Crow Expert Report at 20 (citation omitted) (**Ex. 5**).)

> Goldsmith Parties' Response:  Disputed on the same grounds set forth above in the

Goldsmith Parties' Response to paragraph 16.

## VI.  WARHOL'S PRINCE SERIES WORKS WERE SOLD, LICENSED, AND EXHIBITED PUBLICLY FOR 32 YEARS BEFORE GOLDSMITH CONTENDED THAT THEY INFRINGE THE COPYRIGHT IN HER PHOTOGRAPH OF PRINCE.

148.    After Warhol died in 1987, The Andy Warhol Foundation for the Visual Arts, Inc. eventually obtained ownership of the Prince Series from Warhol's estate. (Deposition Transcript of KC Maurer 17:22–18:14 (**Ex. 57**).)

> Goldsmith Parties' Response:  Not disputed.

149.    Since that time, the works from the Prince Series have been sold or auctioned more than two dozen times. Between 1993 and 2004, the Warhol Foundation sold 12 of the Prince Series works, as summarized below.

| Sales of Warhol Prince Series Works by The Andy Warhol Foundation | | | |
|---|---|---|---|
| | **Date** | **Purchaser** | **Citation** |
| **AWF-1992 (Ex. 39)** | Oct. 28, 1993 | Anthony d'Offay Gallery | AWF-1784 (**Ex. 58**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2000 (Ex. 47)** | Oct. 28, 1993 | Anthony d'Offay Gallery | AWF-1784 (**Ex. 58**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2007 (Ex. 54)** | Mar. 30, 1998 | R. Feldman Fine Arts | AWF-1841 (**Ex. 60**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2001 (Ex. 48)** | Feb. 8, 2000 | Bjorn Wetterling (Sweden) | AWF-1794 (**Ex. 61**) |
| **AWF-2006 (Ex. 53)** | July 12, 2001 | R. Feldman Fine Arts | AWF-1819 (**Ex. 62**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |

| Sales of Warhol Prince Series Works by The Andy Warhol Foundation | | | |
|---|---|---|---|
| | **Date** | **Purchaser** | **Citation** |
| **AWF-2005 (Ex. 52)** | Feb. 20, 2002 | Jablonka Galerie | AWF-1807 (**Ex. 63**); AWF-1918 (**Ex. 64**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2004 (Ex. 51)** | Jan. 9, 2003 | J. Kern Fine Arts | AWF-1805 (**Ex. 65**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1994 (Ex. 41)** | Oct. 7, 2003 | Coskun & Co. Ltd. | AWF-1798 (**Ex. 66**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1997 (Ex. 44)** | Oct. 7, 2003 | Coskun & Co. Ltd. | AWF-1798 (**Ex. 66**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1993 (Ex. 40)** | Feb. 6, 2004 | Coskun & Co. Ltd. | AWF-1802 (**Ex. 67**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1995 (Ex. 42)** | Feb. 6, 2004 | Coskun & Co. Ltd. | AWF-1802 (**Ex. 67**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1998 (Ex. 45)** | Oct. 12, 2004 | Stellan Holm Gallery | AWF-1843 (**Ex. 68**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |

   Goldsmith Parties' Response: Not disputed, except the Goldsmith Parties assert

that the following listed Purchasers were located outside the United States as follows:

     Anthony d'Offay Gallery – London.  AWF Ex. 58.

     Bjorn Wetterling – Sweden.  AWF Ex. 61.

     Jablonka Galerie – Germany.  AWF Ex. 63.

     J. Kern Fine Arts – London.  AWF Ex. 65.

Coskun & Co. Ltd. – London.  AWF Ex. 66.

150.    The Warhol Foundation transferred custody of the remaining four works—AWF-1996 (**Ex. 43**), AWF-1999 (**Ex. 46**), AWF-2002 (**Ex. 49**), and AWF-2003 (**Ex. 50**)—to the Andy Warhol Museum in Pittsburgh, Pennsylvania. (Pl.'s Response to Request to Admit 18 (**Ex. 55**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

151.    In addition to the Warhol Foundation's sales, Prince Series works have been offered at auction at least 13 times since 1999, as summarized below:

| Public Auctions of Warhol Prince Series Works | | | |
|---|---|---|---|
| | **Date** | **Auction House** | **Citation** |
| **AWF-2000 (Ex. 47)** | Nov. 10, 1999 | Christie's New York | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Dec. 11, 1999 | Cornette de Saint-Cyr | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Mar. 30, 2000 | Sotheby's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-2000 (Ex. 47)** | Aug. 2, 2000 | Tajan | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Oct. 7, 2000 | De Vuyst | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-2000 (Ex. 47)** | Dec. 9, 2000 | Cornette de Saint-Cyr | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Jan. 29, 2001 | Cornette de Saint-Cyr | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | June 28, 2002 | Christie's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1998 (Ex. 45)** | Feb. 10, 2005 | Christie's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1993 (Ex. 40)** | Oct. 25, 2005 | Sotheby's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1995 (Ex. 42)** | May 12, 2006 | Phillips de Pury & Co. | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992 (Ex. 39)** | Oct. 16, 2015 | Sotheby's London | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1998 (Ex. 45)** | May 28, 2017 | Seoul Auction | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |

Goldsmith Parties' Response:  Not disputed, except the Goldsmith Parties assert that of the above listed auction houses, all but two (Phillips de Pury & Co. and Christie's New York) were located outside the United States.  *See* AWF Exh. 69.

152.    In addition to these public auctions and private sales, the Prince Series works have been displayed in museums, galleries, books, magazines, promotional materials, and other public locations more than 30 times since the November 1984 issue of *Vanity Fair*, as summarized below:

| Public Displays of Warhol Prince Series Works | | | |
|---|---|---|---|
| | **Date** | **Exhibition or Publication** | **Citation** |
| **AWF-1992 (Ex. 39)** | 1993 | *Andy Warhol: Portraits of the Seventies and Eighties* (Sydney) | AWF-5 (**Ex. 70**); AWF-1943 (**Ex. 71**); AWF-1680 (**Ex. 72**) |
| | 1993 | *Andy Warhol Portraits* catalogue | |
| | 1999 | Anthony d'Offay (London) | |
| **AWF-1994 (Ex. 41)** | 2016 | *Genius of Prince* | ARS: Warhol/'Prince' Report (**Ex. 73**); Pl.'s Response to Request to Admit 12 (**Ex. 55**) |
| **AWF-1996 (Ex. 43)** | 2008 | *Warhol Live* | AWF-16 (**Ex. 70**); ARS: Warhol/'Prince' Report (**Ex. 73**); Pl.'s Response to Request to Admit 12 (**Ex. 55**); *Andy Warhol: The Complete Commissioned Magazine Work* (**Ex. 74**); Email to Janet Hicks (**Ex. 75**); |
| | 2009-11 | *Warhol Live* (Montreal Museum of Fine Arts) | |
| | | *Warhol Live* (Andy Warhol Museum (Pittsburgh)) | |
| | | *Warhol Live* (Frist Center (Nashville)) (and promotional materials) | |
| | | *Warhol Live* (de Young Museum (San Francisco)) | |
| | 2012 | Virginia Beach | |
| | 2012 | Zaragoza | |
| | 2013 | *Vanity Fair 100 Years: From The Jazz Age to Our Age* | |
| | 2013 | Museum of New Zealand Te Papa Tongarewa (and promotional | ARS Invoice to Frist Center for the Visual Arts (**Ex. 76**) |
| | 2014 | *Andy Warhol: The Complete Commissioned Magazine Work* | |
| | 2015 | Phoenix Art Museum (and promotional materials) | |
| | 2016 | *Andy Warhol Portraits*, Crocker Art Museum (Sacramento) | |

| Public Displays of Warhol Prince Series Works | | | |
|---|---|---|---|
| | Date | Exhibition or Publication | Citation |
| **AWF-1999 (Ex. 46)** | 1999 | *The Essential Andy Warhol* | AWF-18 (**Ex. 70**); ARS Invoice to Frist Center for the Visual Arts (**Ex. 76**) |
| | 2005 | Tony Shafrazi Gallery (NYC) | |
| | 2007 | *Andy Warhol Portraits* | |
| | 2008 | *Warhol Live* | |
| | 2009 | *Andy Warhol Treasures* | |
| | 2009-11 | *Warhol Live* (Montreal Museum of Fine Arts) | |
| | | *Warhol Live* (Andy Warhol Museum (Pittsburgh)) | |
| | | *Warhol Live* (Frist Center (Nashville)) (and promotional materials) | |
| | | *Warhol Live* (de Young Museum (San Francisco)) | |
| | 2017 | Centro Cultural la Moneda (Santiago) | |
| **AWF-2000 (Ex. 47)** | 1993 | *Andy Warhol: Portraits of the Seventies and Eighties* (Sydney) | AWF-1 (**Ex. 70**); AWF-1943 (**Ex. 71**); AWF-1680 (**Ex. 72**) |
| | 1993 | *Andy Warhol Portraits* catalogue | |
| | 1999 | Anthony d'Offay (London) | |
| **AWF-2003 (Ex. 50)** | 2017 | Centro Cultural la Moneda (Santiago) | AWF-15 (**Ex. 70**) |
| **AWF-2004 (Ex. 51)** | 2017 | *Andy Warhol Drawings* (Galeria Starmach) | ARS: Warhol/'Prince' Report (**Ex. 73**); ARS Invoice to Galeria Starmach (**Ex. 77**) |
| **AWF-2006 (Ex. 53)** | 2003 | *Andy Warhol Prints: A Catalogue Raisonné 1962-1987* | AWF-1058 (**Ex. 78**); *Andy Warhol Prints: A Catalogue Raisonné* (**Ex. 79**) |
| **AWF-2007 (Ex. 54)** | 2003 | *Andy Warhol Prints: A Catalogue Raisonné 1962-1987* | AWF-1058 (**Ex. 78**); *Andy Warhol Prints: A Catalogue Raisonné* (**Ex. 79**) |

Goldsmith Parties' Response:  Not disputed, except the Goldsmith Parties assert

that of the above listed "displays," at least nine occurred outside the United States based on the

above descriptions.

153.    Neither Goldsmith nor her company enforced compliance with the terms of the
1984 license she gave to *Vanity Fair* nor monitored for any use or derivative use of the photograph
of Prince that was the subject of that license. Goldsmith explained in a 2017 Facebook post that
"It was not until Prince died and I saw on Instagram an image that looked so much like mine that
I goggled [sic] it and discovered not only the *Vanity Fair* 1984 article with the image, but numerous
additional versions of the illustration all by Warhol. I had not known up to that moment that Warhol
was the artist who *Vanity Fair* had given it to for a reference for the illustration that he would
create for their article.... I also did not know until further research into all this that Warhol and/or
The Warhol Foundation had in addition to making paintings and screen prints, licensed the use of
the illustrations to others, all without my knowledge or consent." (Lynn Goldsmith Facebook Post
(Apr. 9, 2017) (**Ex. 19**).)

Goldsmith Parties' Response: The first sentence is disputed as it assumes facts that

do not exist, such assertion is not supported by the terms of the 1984 license and further constitutes

a legal conclusion that the Goldsmith Parties dispute. The second sentence is not disputed, except

AWF omits Goldsmith's important statement in the same Facebook post that "[b]ack in 1984 I did

not see every publication that my images appeared in as I was busy shooting, as well as promoting

my Will Power album in Europe."  (AWF Ex. 19).


## VII.    THE MARKET FOR WARHOL'S PRINCE SERIES WORKS DIFFERS MATERIALLY FROM THE MARKET FOR GOLDSMITH'S PRINCE PHOTOGRAPH.

### A.    The Economics Of The Warhol Market Differ From The Economics Of The Goldsmith Market.

#### 1.    *Price Points Generally*

154.    Warhol's artistic achievements, historical and cultural significance, and outsize
popularity have contributed to making him "a blue chip artist." (Paulson Expert Report at 8 (**Ex. 1**).)

Goldsmith Parties' Response:  Not disputed.

155.    Others have described Warhol and his art in similar terms:

- Warhol is the "most powerful contemporary art brand in existence," and "[n]o museum gallery on the planet could consider itself representative of Contemporary Art without a Warhol somewhere on its walls." (Paulson Expert Report at 8 (quoting Duncan Ballantyne-Way, *The Long-Lost Art of Andy Warhol and its Ever-Growing Market*, fineartmultiple Magazine (Jan. 2018), https://fineartmultiple.com/blog/andy-warhol-art-market-growth/.) (**Ex. 1**));

- "The Warhol market is considered the bellwether of post-war and contemporary art." (*Id.* (quoting The *Pop master's highs and lows*, The Economist (Nov. 26, 2009), https://www.economist.com/node/14941229));

- Warhol is an "art-world colossus," the "god of contemporary art," the "most powerful contemporary art brand in existence," the "backbone of any auction of post-war contemporary art," and a "global commodity." (*Id.* (quoting Bryan Appleyard, *A One-Man Art Market*, 1843 Magazine (Nov./Dec. 2011), https://www.1843magazine.com/content/arts/a-one-man-market)).

    Goldsmith Parties' Response:  Not disputed, but also not relevant to the Warhol

Prince Series that were based on the Goldsmith Photo.

156.    In 2014, Warhol works collectively sold at public auction for $653 million, representing nearly 5% of the entire global art market that year, and in 2013, a single work (*Silver Car Crash (Double Disaster)*) sold for more than $105 million. (Paulson Expert Report at 8 (**Ex. 1**).)

    Goldsmith Parties' Response:  Not disputed.

157.    From 2004 through 2014, Warhol auction sales exceeded $3 billion. (Paulson Expert Report at 8 (**Ex. 1**).)

    Goldsmith Parties' Response:  Not disputed.

158.    Since 2007, there have been seven auction sales of Warhol works of more than $63 million per work. (Paulson Expert Report at 8 (**Ex. 1**).)

    Goldsmith Parties' Response:  Not disputed.

159.    In late 2017, it was rumored in a leading art industry newsletter, Baer Faxt, that Warhol's *Orange Marilyn* sold in a private transaction for $250 million. (Paulson Expert Report at 8 (**Ex. 1**).)

    Goldsmith Parties' Response:  Disputed. The reference relied upon by AWF is

"rumor" and inadmissible hearsay insofar as AWF cites to it for the truth of the matter asserted.

160.    Goldsmith's portrait photographs similar to her 1981 photograph of Prince typically sell for between $1,500 and $13,250. Goldsmith's standard pricing matrix for these photographs is:

| Size | Edition #1-5 | Edition #6-10 | Edition #11-15 | Edition #16-17 | Edition #18-19 | Edition #20 |
|---|---|---|---|---|---|---|
| 11 x 14 | $1700 | $2300 | $2700 | $3500 | $4200 | on request |
| 16 x 20 | $1900 | $2300 | $2700 | $3500 | $4200 | on request |
| 20 x 24 | $2500 | $2900 | $3300 | $4000 | $4800 | on request |
| 22 x 30 | $2800 | $3300 | $3900 | $4500 | $5400 | on request |
| 30 x 40 | $3100 | $3600 | $4200 | $5000 | $6000 | on request |
| 35 x 48 | $3600 | $4000 | $4500 | $5500 | $6500 | on request |
| 40 x 60 | $4250 | $4600 | $5000 | $6000 | $7000 | on request |
| 56" and larger | $8000 | $9,000 | $10,000 | $11,000 | $12,000 | on request |

(LG-3 (**Ex. 80**).)

Goldsmith Parties' Response:  Not disputed.

161.    The price that Goldsmith charges depends only on (1) the size of the print and (2) how many prints of that particular photograph Goldsmith already has sold. The subject of the photograph and the popularity of the photograph do not affect the price Goldsmith charges. (Goldsmith Dep. Tr. 213:19–215:9 (**Ex. 12**).)

Goldsmith Parties' Response:  Disputed in part because Goldsmith also testified that the pricing of her prints also depends on whether the print is a platinum print, silver print or archival digital print.  Goldsmith Dep. Tr. 214:8 - 12 (AWF Ex. 12).)

162.    1stdibs.com lists 41 Goldsmith works in a price range of $1,500 to $13,250. (1stdibs: 41 results for "lynn goldsmith" (**Ex. 81**).)

Goldsmith Parties' Response:  Not disputed as of the date of the listing printout.

163.    No Goldsmith photograph available on Artsy.net is listed at a price higher than $2,500. (Artsy: Lynn Goldsmith (**Ex. 82**).)

Goldsmith Parties' Response:  Not disputed as to the information available on Artsy.net as of June 7, 2018, the date of the printout from the website.

2. *Price Points Of Warhol's Prince Series Works And Goldsmith's 1981 Studio Photograph Of Prince*

164.    Since 1993, there have been at least 22 sales of the Prince Series works—12 by the Warhol Foundation and 10 at public auction. The results of the sales by The Andy Warhol Foundation are summarized below:

| Sales of Warhol Prince Series Works by The Andy Warhol Foundation | | | | |
|---|---|---|---|---|
| | **Date** | **Purchaser** | **Sale Price** | **Citation** |
| **AWF-1992 (Ex. 39)** | Oct. 28, 1993 | Anthony d'Offay Gallery | $13,000 | AWF-1784 (**Ex. 58**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2000 (Ex. 47)** | Oct. 28, 1993 | Anthony d'Offay Gallery | $13,000 | AWF-1784 (**Ex. 58**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2007 (Ex. 54)** | Mar. 30, 1998 | R. Feldman Fine Arts | $4,000 | AWF-1841 (**Ex. 60**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2001 (Ex. 48)** | Feb. 8, 2000 | Bjorn Wetterling (Sweden) | $25,000 | AWF-1794 (**Ex. 61**) |
| **AWF-2006 (Ex. 53)** | July 12, 2001 | R. Feldman Fine Arts | $2,960 | AWF-1819 (**Ex. 62**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2005 (Ex. 52)** | Feb. 20, 2002 | Jablonka Galerie | $16,250 | AWF-1807 (**Ex. 63**); AWF-1918 (**Ex. 64**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-2004 (Ex. 51)** | Jan. 9, 2003 | J. Kern Fine Arts | $16,250 | AWF-1805 (**Ex. 65**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |

| Sales of Warhol Prince Series Works by The Andy Warhol Foundation | | | | |
|---|---|---|---|---|
| | **Date** | **Purchaser** | **Sale Price** | **Citation** |
| **AWF-1994** (**Ex. 41**) | Oct. 7, 2003 | Coskun & Co. Ltd. | $28,000 | AWF-1798 (**Ex. 66**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1997** (**Ex. 44**) | Oct. 7, 2003 | Coskun & Co. Ltd. | $28,000 | AWF-1798 (**Ex. 66**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1993** (**Ex. 40**) | Feb. 6, 2004 | Coskun & Co. Ltd. | $27,500 | AWF-1802 (**Ex. 67**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1995** (**Ex. 42**) | Feb. 6, 2004 | Coskun & Co. Ltd. | $27,500 | AWF-1802 (**Ex. 67**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |
| **AWF-1998** (**Ex. 45**) | Oct. 12, 2004 | Stellan Holm Gallery | $28,000 | AWF-1843 (**Ex. 68**); AWF-2232 (**Ex. 59**); Pl.'s Response to Request to Admit 19 (**Ex. 55**) |

Goldsmith Parties' Response:  Not disputed but see Goldsmith's above response to AWF 56.1 ¶149.

165.    The results of the sales at public auction are summarized below:

| Sales of Warhol Prince Series Works at Public Auction | | | | |
|---|---|---|---|---|
| | **Date** | **Auction House** | **Sale Price** | **Citation** |
| **AWF-2000** (**Ex. 47**) | Nov. 10, 1999 | Christie's New York | $40,250 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-1992** (**Ex. 39**) | Dec. 11, 1999 | Cornette de Saint- Cyr | $26,028 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |
| **AWF-2000** (**Ex. 47**) | Dec. 9, 2000 | Cornette de Saint- Cyr | $28,132 | Artnet: Andy Warhol, *Prince* (**Ex. 69**) |

| AWF-1992 (Ex. 39) | Jan. 29, 2001 | Cornette de Saint- Cyr | $28,262 | Artnet: Andy Warhol, *Prince* (Ex. 69) |
|---|---|---|---|---|
| AWF-1992 (Ex. 39) | June 28, 2002 | Christie's London | $54,824 | Artnet: Andy Warhol, *Prince* (Ex. 69) |
| AWF-1998 (Ex. 45) | Feb. 10, 2005 | Christie's London | $44,568 | Artnet: Andy Warhol, *Prince* (Ex. 69) |
| AWF-1993 (Ex. 40) | Oct. 25, 2005 | Sotheby's London | $96,390 | Artnet: Andy Warhol, *Prince* (Ex. 69) |
| AWF-1995 (Ex. 42) | May 12, 2006 | Phillips de Pury & Co. | $42,000 | Artnet: Andy Warhol, *Prince* (Ex. 69) |
| AWF-1992 (Ex. 39) | Oct. 16, 2015 | Sotheby's London | $173,664 | Artnet: Andy Warhol, *Prince* (Ex. 69) |

<u>Goldsmith Parties' Response</u>:  Not disputed, but see Goldsmith's above response

to AWF 56.1 ¶151.

166.    According to Laura Paulson, former Global Chairman, Americas at Christie's and an expert on the Warhol market who has appraised more than 750 Warhol works, a work from the Warhol Prince Series likely would sell today for approximately $173,664. (Paulson Expert Report at 10–11 (**Ex. 1**).)

<u>Goldsmith Parties' Response</u>:  Not disputed that this is Paulson's opinion, but

disputed that this opinion extends to all 16 Warhol Prince Series original works because Paulson

testified that the $173,664, in her opinion, applied only to the silkscreen canvases.  With respect

to the two Warhol Prince drawings, she testified she could not find any record of one being sold

at auction but her "feeling" was they would sell in the range of $50,000 – 70,000.  She further

testified that she did not research or have an opinion with respect to the two Warhol screen prints.

Werbin Supplemental Decl. Exh. SSS [Paulson Tr. at 65:2 – 71:16].

167.    A number of factors affect Paulson's opinion that a work from the Warhol Prince Series likely would sell today for approximately $173,664. *First*, this value corresponds to the October 2015 auction sale at Sotheby's London, which appears to have been the first auction of a Prince Series work in more than nine years. (Paulson Expert Report at 10–11 (**Ex. 1**).) Although the work had been estimated at approximately $46,310 to $61,747, it ultimately sold for nearly three times the upper end of the estimate. This result demonstrates "strong competition and active interest" in the Prince Series, even before Prince's death in 2016. (Paulson Expert Report at 10–11 (**Ex. 1**).)

<u>Goldsmith Parties' Response</u>:  Not disputed that the statements in paragraph 167 are the opinions of Laura Paulson as stated in her expert report, except disputed that the estimated price applies to all Warhol's Prince works for the reasons set forth above in response to ¶166.

168.    Another factor affecting Paulson's opinion that a Warhol Prince Series work likely would sell today for approximately $173,664 is that following Prince's death, an auction in Hong Kong of a Prince Series work that was estimated at $295,151 to $449,144 did not result in a sale. (Paulson Expert Report at 10–11 (**Ex. 1**).) This likely resulted from the "aggressive estimate" and the fact that "the subject painting was very graphic, without the same level of painterly intervention as the work sold in October 2015." (*Id.* at 10–11.)

<u>Goldsmith Parties' Response</u>:  Not disputed that the statements in paragraph 167 are the opinions of Laura Paulson as stated in her expert report, except disputed that the estimated price applies to all Warhol's Prince works for the reasons set forth above in response to ¶166.

169.    "Taken together, it is [Paulson's] opinion that the result at Sotheby's London in October 2015 accurately reflects the position of the market...and represents a reasonable estimate of what a Warhol *Prince* painting would sell for today." (Paulson Expert Report at 10–11 (**Ex. 1**).)

<u>Goldsmith Parties' Response</u>:  Not disputed that this is Paulson's opinion as stated in her expert report.

170.    Goldsmith has never sold nor attempted to sell a photograph from her December 3, 1981 shoot of Prince. (Goldsmith Dep. Tr. 315:6–12 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

171.    There is no evidence the Prince Photograph has been shown publicly in galleries or museum exhibitions.

<u>Goldsmith Parties' Response</u>:  Not disputed.

172.    Paulson opined that the fact that Goldsmith has not sold or offered to sell any of these photographs "makes it essentially impossible to assess the market for these photos," because "there is *no* quantifiable market for" them. This "necessarily implies that the market for these photographs does not overlap at all with the market for Andy Warhol's *Prince* portraits." (Paulson Expert Report at 13 (**Ex. 1**).)

<u>Goldsmith Parties' Response</u>:  Not disputed that the statements in paragraph 167 are the opinions of Laura Paulson as stated in her expert report, except the statement that "there is

*no* quantifiable market" for Goldsmith's photographs is disputed to the extent it opines on market harm to Goldsmith as that is a legal conclusion to be decided to the Court under the fourth fair use factor, which assesses harm to actual or potential markets.

173.    Notwithstanding her decision not to offer these photographs for sale, Goldsmith testified that her standard pricing chart (reproduced above at paragraph 160) would apply to her photograph of Prince. (Goldsmith Dep. Tr. 314:16–20 (**Ex. 12**).)

> Goldsmith Parties' Response:  Not disputed.

174.    This would imply a range of $1,900 to $4,200 for photographs the same size as the paintings in the Prince Series, that is, 16 inches by 20 inches. (LG-3 (**Ex. 80**).)

> Goldsmith Parties' Response:  Not disputed with respect to Goldsmith's prints measuring 16 inches by 20 inches and numbered 1 through 19 out of an edition of 20, but the price would be higher than $4,200 for the last print in the edition which is priced "on request." (LG-3 (AWF Ex. 80).)

175.    Goldsmith photographed Prince a number of times after the December 3, 1981 shoot, and sales of those photographs by Goldsmith's company since 2003 have ranged from $475 to $2,500, as summarized below:

| Sales of Goldsmith Prince Photographs by Lynn Goldsmith Ltd. | | | |
|---|---|---|---|
| **Date** | **Purchaser** | **Sale Price** | **Citation** |
| Apr. 5, 2004 | Michael Zilkha | $825 | LG-98 (**Ex. 84**); LG-201 (**Ex. 85**) |
| June 6, 2006 | Russeck Fine Art Group | $475 | LG-104 (**Ex. 86**); LG-204 (**Ex. 87**) |
| Sept. 2, 2009 | Hard Rock Hotels | $2000 | LG-115 (**Ex. 88**); LG-207 (**Ex. 89**) |
| June 11, 2010 | San Francisco Art Exchange, LLC | $1900 | LG-118 (**Ex. 90**); LG-208 (**Ex. 91**) |
| Apr. 11, 2012 | Analogue Gallery | $2250 | LG-124 (**Ex. 92**); LG-211 (**Ex. 93**) |
| Nov. 14, 2012 | Jimmy Iovine | $950 | LG-124 (**Ex. 92**); LG-212 (**Ex. 94**) |
| May 27, 2014 | Morrison Hotel Gallery | $1900 | LG-131 (**Ex. 95**); LG-215 (**Ex. 96**) |
| Nov. 30, 2015 | Morrison Hotel Gallery | $1900 | LG-134 (**Ex. 97**); LG-217 (**Ex. 98**) |

| Sales of Goldsmith Prince Photographs by Lynn Goldsmith Ltd. | | | |
|---|---|---|---|
| **Date** | **Purchaser** | **Sale Price** | **Citation** |
| Apr. 21, 2016 | Morrison Hotel Gallery | $1900 | LG-137 (**Ex. 99**); LG-219 (**Ex. 100**) |
| Apr. 26, 2016 | Morrison Hotel Gallery | $2500 | LG-137 (**Ex. 99**); LG-220 (**Ex. 101**) |
| June 21, 2016 | San Francisco Art Exchange | $1900 | LG-137 (**Ex. 99**); LG-221 (**Ex. 102**) |
| July 13, 2016 | Morrison Hotel Gallery | $1700 | LG-137 (**Ex. 99**); LG-222 (**Ex. 103**) |
| Oct. 30, 2016 | Russeck Fine Art Group | $1900 | LG-137 (**Ex. 99**); LG-223 (**Ex. 104**) |
| Nov. 8, 2016 | San Francisco Art Exchange | $1900 | LG-137 (**Ex. 99**); LG-224 (**Ex. 105**) |
| Nov. 16, 2016 | Paddle 8 | $1500 | LG-137 (**Ex. 99**); LG-226 (**Ex. 106**) |
| Dec. 10, 2016 | Brian Liss Gallery | $1900 | LG-137 (**Ex. 99**); LG-225 (**Ex. 107**) |
| | **AVERAGE** | **$1,713** | |

Goldsmith Parties' Response:  Not disputed.

176.    There are four Goldsmith photographs of Prince offered by online retailers 1stdibs and Artsy. Two are listed at $2,300, and two do not have any price listed. (1stdibs: 41 results for "lynn goldsmith" (**Ex. 81**); Artsy: Lynn Goldsmith (**Ex. 82**).)

Goldsmith Parties' Response:  Not disputed as to the information available on Artsy.net and 1stdibs.com as of June 7, 2018, the date of the printouts from the websites.

177.    The range derived from Goldsmith's standard pricing list ($1,900 to $4,200) is 1.09% to 2.42% of the $173,664 approximate value of work from the Prince Series; the average sale price of Goldsmith Prince photographs since 2003 ($1,713) is 0.99%; and the price quotes from 1stdibs and Artsy ($2,300) are 1.32%.

Goldsmith Parties' Response:  Disputed with respect to the Warhol Prince Series other than the silkscreen canvases for the reasons set forth in response to ¶166.  Also disputed because the referenced pricing of Goldsmith's editioned prints can be as high as $12,000 for the 19th print in its largest available size.  See ¶160 above.  Not disputed as to Goldsmith's standard pricing list information for prints 1 through 19 in an edition in the 16 x 20 inch size, but the 20th

print in an edition would be sold by Goldsmith at a higher price.  *See* ¶160 above and Goldsmith

Response to ¶174.  Not disputed that the percentages are derived from Paulson's expert report

based on her opinion of what an original Warhol Prince Series silkscreen canvas would sell for in

today's market.  Also disputed because the value to Goldsmith of an edition of 20 prints in a 16 x

20 inch size would be $20,000 for total sales of the first 19 prints, and $95,250 for the first 19

prints sold in a 40 x 60 inch size, as derived from  LG-3 (AWF Ex. 80) at ¶160.

178.    Since 2005, Goldsmith's company has licensed her photographs of Prince nine
times, as summarized below:

| Licenses of Goldsmith Prince Photographs by Lynn Goldsmith Ltd. | | | |
|---|---|---|---|
| **Date** | **Licensee** | **License Fee** | **Citation** |
| Sept. 16, 2005 | Dennis Pub/Blender Mag | $350 | LG-101 (**Ex. 108**); LG-203 (**Ex. 109**) |
| Oct. 29, 2007 | People Magazine | $250 | LG-108 (**Ex. 110**); LG-205 (**Ex. 111**) |
| Oct. 27, 2009 | Trois Couleurs | $100 | LG-115 (**Ex. 88**); LG-206 (**Ex. 112**) |
| July 22, 2010 | Rittor Music Inc | $400 | LG-118 (**Ex. 90**); LG-209 (**Ex. 113**) |
| May 24, 2013 | Smithsonian Institution | $400 | LG-128 (**Ex. 114**); LG-213 (**Ex. 115**) |
| Nov. 7, 2013 | Reader's Digest | $150 | LG-128 (**Ex. 114**); LG-214 (**Ex. 117**) |
| May 28, 2015 | Camera Press/Earthportfx | $500 | LG-134 (**Ex. 99**); LG-218 (**Ex. 118**) |
| May 2, 2016 | People Magazine | $1,000 | LG-137 (**Ex. 99**); LG-227 (**Ex. 119**) |
| June 23, 2016 | New Bay Media – Guitar World, etc. | $2,300 | LG-137 (**Ex. 99**); LG-228 (**Ex. 120**) |
| | | **AVERAGE** | **$606** |

Goldsmith Parties' Response:  Not disputed as to the listed licenses, except disputed

because 11 licenses were issued, including a second May 2, 2016 license to People Magazine for

$1,000 and a September 2, 2009 license to Hard Rock Hotels for "Lightening Bolts" for $2,000.

Goldsmith 56.1 Stmt. at ¶¶144 -154.  Based on these 11 licenses totaling $8,050 in fees, the average license fee was about $732.

179.    In the same period, the Andy Warhol Foundation has licensed images of works from the Prince Series at least seven times. Of these seven, five have included Prince Series images as part of a larger group of images, and as a result, it is not possible to determine what fees applied to the Prince Series images specifically. (ARS: Warhol/'Prince' Report (**Ex. 73**).)

Goldsmith Parties' Response:  Not disputed, except that AWF has also "rented" the underlying photos for additional fees in connection with certain of these licenses. Goldsmith 56.1 Stmt. ¶136.

180.    The two licenses for which specific fee information is available are (1) a 2013 license to Condé Nast/*Vanity Fair* for inclusion in *Vanity Fair 100 Years: From The Jazz Age to Our Age*; and (2) a 2016 license to Condé Nast for inclusion on the cover of *Genius of Prince*. (ARS: Warhol/'Prince' Report (**Ex. 73**); ARS Invoice to Condé Nast, Apr. 22, 2013 (**Ex. 121**); ARS Invoice to Condé Nast, June 15, 2016 (**Ex. 122**).) The cost for each license was $1,125 and $10,000, respectively. (*Id.*)

Goldsmith Parties' Response:  Not disputed, except AWF also licensed Warhol Prince Series images to Phoenix Art Museum on December 29, 2014, for $25; to First Center for The Visual Arts on May 19, 2011, for $15; and to Wonderland Press on September 13, 1999, for $181.25.  Goldsmith 56.1 Stmt. ¶¶136 (v), (x) and (xi).

181.    A comparison of the 2013 and 2016 licenses of Warhol Prince Series images and 2013 and 2016 licenses of Goldsmith Prince photographs demonstrates the extent to which the price points differ:

| Comparison of 2013 and 2016 License Fees for Images of Warhol Prince Series Works and Goldsmith Prince Photographs | | | | | |
|---|---|---|---|---|---|
| | **Warhol Prince Series Works** | | **Goldsmith Prince Photographs** | | |
| **Year** | **Licensee** | **Fee** | **Licensee** | **Fee** | **Percentage Difference** |
| 2013 | *Vanity Fair* | $1,125 | Smithsonian Institution | $400 | 121.4% |
| | | | Reader's Digest | $150 | |
| 2016 | Condé Nast | $10,000 | People Magazine | $1,000 | 143.3% |
| | | | New Bay Media – Guitar World, etc | $2,300 | |

Put another way, the average license fee for a Goldsmith photograph of Prince in 2013 ($275) was 24.4% of the license fee for a work from the Prince Series that year ($1,125), and the average license fee for a Goldsmith Prince photograph in 2016 ($1,650) was 16.5% of the license fee for a work from the Prince Series that year ($10,000).

      <u>Goldsmith Parties' Response</u>:  Disputed as the math itself is not comparable based on all the licenses issued to date by AWF of Warhol Prince Series images, the applicable licensing pricing schedules included in AWF's Artist Rights Society agency agreement, and the licensing history of both Goldsmith's other Prince images and her music celebrity photo portraits generally, which reflect average license fees equal to or greater than the license fees charged by AWF. Goldsmith 56.1 Stmt. ¶¶129; 138, 144.

182.    Goldsmith testified that she did not know whether, aside from the license to *Vanity Fair* in 1984, she or her company ever (1) licensed any of the photographs from her December 3, 1981 studio shoot; (2) licensed any of those photographs for use as an artist reference; or (3) licensed any other photograph she has made of Prince for use as an artist reference. (Goldsmith Dep. Tr. 164:11–166:6 (**Ex. 12**).)

      <u>Goldsmith Parties' Response</u>:  Disputed because Goldsmith testified at the cited transcript pages that (1) she did not know if her agency, LGI, licensed any of her Prince photographs from the December 3, 1981 studio shoot; (2) she did not have knowledge of LGI licensing any of those photographs for use as an artist reference; and (3) she did not know if her agency, LGI, licensed any of her other photos for use as an artist reference because she didn't see every license.

183.    Goldsmith could not recall any other instance "in which one of [her] photographs was licensed for use as a possible artist reference, other than the 1984 *Vanity Fair* license." (Goldsmith Dep. Tr. 164:11–166:6 (**Ex. 12**).)

      <u>Goldsmith Parties' Response</u>:  Not disputed.

**B.**    <u>**The Distribution Channels That Deliver Warhol Works To The Market Differ From Those That Deliver Goldsmith Works.**</u>

184.    Warhol's artworks are often shown "in leading museums and gallery exhibitions" and "appear[] regularly at major auction houses." (Paulson Expert Report 20–21 (**Ex. 1**).) "Warhol's works are sold by primarily high-end galleries and auction houses." (*Id.* 21.)

      Goldsmith Parties' Response:  Not disputed this is Paulson' opinion with respect to

the market for Warhol's original artworks generally.

185.    "[N]o museum gallery on the planet could consider itself representative of Contemporary Art without a Warhol somewhere on its walls," and Warhol remains an "art-world colossus," the "god of contemporary art," the "most powerful contemporary art brand in existence," the "backbone of any auction of post-war contemporary art," and a "global commodity." (Paulson Expert Report at 8–9 (citations omitted) (**Ex. 1**).)

      Goldsmith Parties' Response:  Not disputed this is Paulson' opinion with respect to

the market for Warhol's original artworks generally.

186.    In May 2017 alone, "at least 29 unique Warhol works [were] being auctioned in a single three-day period at Christie's, Sotheby's, and Phillips," the three most prestigious auction houses in the world. (Paulson Expert Report at 21 (**Ex. 1**); Post-War and Contemporary Art Evening Sale, Christie's, May 17, 2018 (**Ex. 123**); Post-War and Contemporary Art Morning Sale, Christie's, May 18, 2018 (**Ex. 124**); Contemporary Art Evening Auction, Sotheby's, May 16, 2018 (**Ex. 125**); Contemporary Art Day Auction, Sotheby's, May 17, 2018 (**Ex. 126**); 20th Century & Contemporary Art & Design Evening Sale, Phillips, May 17, 2018 (**Ex. 127**); 20th Century & Contemporary Art & Design Morning Sale, Phillips, May 16, 2018 (**Ex. 128**).)

      Goldsmith Parties' Response:  Not disputed as to these secondary market auctions

of Warhol's original artworks generally apart from his Prince Series.

187.    The average price of the Warhol works that were sold at these auctions was $3.595 million. (*See* Paulson Expert Report at 21–22 (**Ex. 1**); Post-War and Contemporary Art Evening Sale, Christie's, May 17, 2018 (**Ex. 123**); Post-War and Contemporary Art Morning Sale, Christie's, May 18, 2018 (**Ex. 124**); Contemporary Art Evening Auction, Sotheby's, May 16, 2018 (**Ex. 127**); Contemporary Art Day Auction, Sotheby's, May 17, 2018 (**Ex. 126**); 20th Century & Contemporary Art & Design Evening Sale, Phillips, May 17, 2018 (**Ex. 127**); 20th Century & Contemporary Art & Design Morning Sale, Phillips, May 16, 2018 (**Ex. 128**).)

      Goldsmith Parties' Response:  Not disputed as to these secondary market auction

prices for specific Warhol works apart from his Prince Series.

188.    The galleries that sell or previously have sold Goldsmith's photographs include the Morrison Hotel Gallery, the Analogue Gallery, Blender Gallery, and the Richard Goodall Gallery. (Goldsmith Dep. Tr. 286:7–305:12 (**Ex. 12**).)

      Goldsmith Parties' Response:  Not disputed.

189.    The Morrison Hotel Gallery website states that it "is the world leader in fine art music photography representing over 100 of the most highly acclaimed music photographers --

those who made, and continue to make, an indelible mark on music culture with photographic portrayals of the industry's most influential artists." (Morrison Hotel Gallery: About Us (**Ex. 9**).)

       Goldsmith Parties' Response:  Not disputed.

190.    Goldsmith "select[ed] Morrison Hotel Gallery to represent [her] work, in part, because of [this] reputation." (Goldsmith Dep. Tr. 286:24–287:5 (**Ex. 12**).)

       Goldsmith Parties' Response:  Not disputed.

191.    The Analogue Gallery Twitter page states that: "Analogue Gallery specializes in exhibiting over 50 years of vintage and contemporary Rock & Roll photography." (Analogue Gallery Twitter (**Ex. 129**).)

       Goldsmith Parties' Response:  Not disputed.

192.    "At the time Analogue Gallery represented [Goldsmith's] work, [she] believe[d] Analogue Gallery had a reputation of specializing in exhibiting over 50 years of vintage and contemporary rock and roll photography." (Goldsmith Dep. Tr. 300:11–21 (**Ex. 12**).)

       Goldsmith Parties' Response:  Not disputed.

193.    The Richard Goodall Gallery website states that: "Richard Goodall Gallery is the leading gallery for Contemporary Art and Fine Art Photography, and rock art in the UK." (Richard Goodall Gallery Contemporary Art: About Us (**Ex. 130**).)

       Goldsmith Parties' Response:  Not disputed.

194.    Goldsmith "understand[s]" this to be Goodall Gallery's reputation. (Goldsmith Dep. Tr. 302:9–13. (**Ex. 12**).)

       Goldsmith Parties' Response:  Not disputed.

195.    The Blender Gallery website states that: "Blender Gallery specialises in Fine Art Music Photography and Limited Edition Rock 'n Roll Prints." (Blender Gallery – About (**Ex. 131**).)

       Goldsmith Parties' Response:  Not disputed.

196.    Goldsmith understands the reputation of Blender Gallery to be that it "specializes in fine art music photograph[y] and limited edition rock and roll prints" and that "that it offers the opportunity to view and purchase some of the most inspiring and iconic images of music and musicians photographed over the last 50 plus years." (Goldsmith Dep. Tr. 304:6–20 (**Ex. 12**).)

       Goldsmith Parties' Response:  Not disputed.

197.    When selecting a gallery to sell her works, Goldsmith considers "the reputation of the galleries' specialization," "the client service the gallery provides to its photographers," and "the level of honesty." (Goldsmith Dep. Tr. 305:8–12 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

198.    The Christie's, Sotheby's, and Phillips' websites "do not indicate that current or planned auctions will include any Goldsmith photographs." (Paulson Expert Report at 24 (**Ex. 1**).)

Goldsmith Parties' Response:  Not disputed as of the date of Paulson's Report, which does not otherwise specify the time periods referenced on the cited auction websites.

199.    According to Artnet, "which is a source relied upon by experts in [Paulson's] field," "only four Goldsmith photographs have been auctioned in the last several years, three of which went unsold" (Paulson Expert Report at 24 (**Ex. 1**)), as summarized below:

| Sales of Goldsmith Works at Public Auction | | | | |
|---|---|---|---|---|
| **Title** | **Date** | **Auction House** | **Sale Price** | **Citation** |
| *Bruce Springsteen* | Dec. 2, 2016 | Guernsey's | Unsold (est. $2,500–$3,500) | Artnet: Lynn Goldsmith (**Ex. 83**) |
| *The Rolling Stones* | Dec. 2, 2016 | Guernsey's | Unsold (est. $2,500–$3,500) | Artnet: Lynn Goldsmith (**Ex. 83**) |
| *Patti Smith* | Nov. 7, 2013 | Artcurial | $2,945 | Artnet: Lynn Goldsmith (**Ex. 83**) |
| *Untitled* | Dec. 8, 2010 | Van Ham Kunstauktionen | Unsold (est. $1,588) | Artnet: Lynn Goldsmith (**Ex. 83**) |

Goldsmith Parties' Response:  Not disputed as to what Artnet reflects, but disputed because AWF's own Neil Printz testified that the AWF database was "[n]ot necessarily" considered reliable and that "all data is unreliable until we confirm it."  Werbin Supp. Decl. Exh. XXX [Printz Tr. 136:8 – 137:3].

200.    Guernsey's website lists its auctions of Elvis memorabilia and Jerry Garcia's guitar collection as among its notable auctions. (Guernsey's Auction House, The History of Guernsey's (**Ex. 132**).)

Goldsmith Parties' Response:  Disputed because the statement is taken out of context and is therefore misleading.  Guernsey's website actually states (AWF Exh. 132):

> For four decades Guernsey's has built a reputation as an auction house known for the presentation of extraordinary properties. From the largest auction in history (the contents of the ocean liner S.S. United States) to vintage racing cars on to pre-Castro Cuban cigars and the $3 million McGwire baseball, we have few rivals when it comes to the presentation of wildly diverse art and artifacts. Guernsey's also has brought some of the most famous and intriguing personalities of the 20th Century to auction – from the official Elvis auction featuring items from the Graceland archives to documents and artifacts relating to the life and career of John F. Kennedy and from record setting sales of Jerry Garcia's guitars and items from the family of Mickey Mantle.

## C.   The Marketing Of Warhol Works Differs From The Marketing Of Goldsmith Works.

201.    Galleries, auction houses, and other sellers of Warhol works emphasize a number of features of the art itself, as well as features of Warhol and the Warhol market when trying to market and sell Warhol works. Warhol's "vast" impact, "both as an artist and his influence on future generations"; the way in which "[h]is work remains a record of the social, political, and economic life in America between 1952 and 1987"; and the extent to which it remains an "enduring commercial force in art" "are commonly described during efforts to convince potential buyers to acquire Warhol's art." (Paulson Expert Report at 16 (**Ex. 1**).)

Goldsmith Parties' Response:  Not disputed that the statements in paragraph 201 are Paulson's opinions as stated in her expert report as to the market for Warhol's original artworks, as opposed to licensing market for his artworks.  Disputed to the extent Paulson is attempting to opine improperly on any transformative use respecting the Warhol Prince Series images, for the same reasons the Goldsmith Parties are seeking in their Opposing Memorandum of Law to preclude the expert report of Dr. Crowe.

202.    The underlying meaning and message of Warhol's work is also an important aspect of how it is marketed. For example, in 2010, when Christie's auctioned one of Warhol's portraits of Elizabeth Taylor, the auction catalogue included an essay describing Warhol's artistic process and the implications of his artistic choices:

> The magnificent, double-paneled *Silver Liz* from 1963...contains many of Warhol's key ideas and themes.... As a canonization of the actress and as a comment on the manufactured nature of fame, Warhol achieved his desired aesthetic effect in the iconic Silver Liz by employing silkscreen. As a process that he had begun on an experimental basis in 1962, Warhol recognized both the instant electricity and underlying artificiality it generated; indeed, the inky superimpositions of photo-derived screens on the bright hand-painted hues epitomized Pop in their brand-like distinctness and recognizability.... [H]e created *Silver Liz* using a publicity image of the actress, later cropping the bust-length image just below the chin, and sizing the screen to an enlargement of this detail.

(Paulson Expert Report at 16–17 (quoting Christie's Post-War and Contemporary Art Evening Sale Catalogue at 80–81 (May 11, 2010)) (**Ex. 1**).)

       <u>Goldsmith Parties' Response</u>:  Not disputed that the statements in paragraph 202 were published in the referenced catalogue respecting an original Warhol work unrelated to the Warhol Prince Series but disputed they have any relevance to assessing fair use in this case as a matter of law.

       203.    Auction houses and galleries routinely market Warhol works by referencing their expressive content and transformative nature. (Paulson Expert Report at 16 (**Ex. 1**).)

       <u>Goldsmith Parties' Response</u>:  Not disputed that the statement in paragraph 203 is Paulson's stated opinion in her expert report, but disputed because she is not qualified to render any opinion as to "transformative fair use" for Warhol's original artworks.  This is further disputed to the extent Paulson is attempting to opine improperly on any transformative use respecting the Warhol Prince Series images, for the same reasons the Goldsmith Parties are seeking in their Opposing Memorandum of Law to preclude the expert report of Dr. Crowe.  Also disputed because there is no evidentiary foundation or support for the statement.

       204.    "This approach to selling Warhol's celebrity portraits illustrates an important feature of Warhol's market: sellers, collectors, and buyers find expressive meaning in Warhol's art that is relevant to their decision to purchase the works.... Collectors identify this transformative process as defining Warhol's work, and it is the basis for his critical and commercial success." (Paulson Expert Report at 17 (**Ex. 1**).)

<u>Goldsmith Parties' Response</u>:  Disputed on the same grounds as those set forth in

the Goldsmith Parties' Response to paragraph 203.

205.    Galleries promoting Goldsmith and her photographs describe her as an "iconic American photographer [who] has been capturing music legends since the early 1970's" (Analogue Gallery, Lynn Goldsmith Book Signing: Friday, May 23rd (**Ex. 135**)) and as being "[k]nown for...[h]er celebrity and music portraiture" (A Gallery for Fine Photography: Lynn Goldsmith (**Ex. 133**)).

<u>Goldsmith Parties' Response</u>:  Not disputed.

206.    Goldsmith's books "often act like catalogues" for prospective collectors of her photographs. (Goldsmith Dep. Tr. 232:8–10, 295:23–296:2 (**Ex. 12**)). Those books also identify her as a rock-and-roll photographer. (Lynn Goldsmith *PhotoDiary*, About the Book (**Ex. 7**); LG-151 (**Ex. 10**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

207.    The description on Goldsmith's website of her book *PhotoDiary* describes her as "[o]ne of the most expressive chroniclers of the rock 'n' roll era," having "captured some of the finest rock, jazz, and R&B performers of our time in brilliant, often surprising images that reveal a great deal about her subject." (Lynn Goldsmith *PhotoDiary*, About the Book (**Ex. 7**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

208.    In the introduction to her book *Rock and Roll Stories*, Goldsmith explains that she "proudly proclaim[s], 'Yes, I am a rock and roll photographer.'" (LG-151 (**Ex. 10**); Goldsmith Dep. Tr. 18:17–21 (**Ex. 12**).)

<u>Goldsmith Parties' Response</u>:  Not disputed.

209.    In describing Goldsmith's art to potential buyers, the focus is on her underlying philosophy and approach to photography, such as "find[ing] out who [she is]...by also trying to find out who other people are," "communicat[ing] the uniqueness of [her subjects] and their identities in [her] photographs," empathizing with her subjects, and portraying the human connection between herself and her subjects that occurs when she photographs them. (Goldsmith Dep. Tr. 74:18–75:14, 66:25–67:22 (**Ex. 12**); *see also supra* ¶¶60–62.)

<u>Goldsmith Parties' Response</u>:  Disputed because the cited Goldsmith testimony is

out of context and does not relate to "describing Goldsmith's art to potential buyers," but on how

she views her own photography.  The accurate statements of her testimony at AWF ¶¶60–62 above

are not disputed.

210.    Goldsmith's "artistic vision" is "part of what [an art] dealer talks about" with potential purchasers of Goldsmith photographs. (Goldsmith Dep. Tr. 308:18–25 (**Ex. 12**).)

Goldsmith Parties' Response:  Disputed because Goldsmith testified that her dealers only talk about her "artistic vision" "a bit" and that this depends on who the dealer is speaking to, as some people want that kind of information before they make a purchasing decision while others "already know what they know and they're not interested in being sold or chatting it up."  (Goldsmith Dep. Tr. 307:24 – 308:25 (AWF Ex. 12).)

211.    In selecting which photographs to promote, Goldsmith considers factors that, according to Paulson, are "unique to the rock-and-roll memorabilia market and unique to collectors of rock-and-roll photographs." (Paulson Expert Report at 25 (**Ex. 1**).)

Goldsmith Parties' Response:  Disputed because the Goldsmith testimony cited for support in the Paulson Report at p. 25 does not support the statement, which is a mischaracterization of that fact testimony.  The cited Goldsmith testimony on pages 25 – 26 of the Paulson Report and additional related testimony refer to a selection of Goldsmith's photographs that Goldsmith selected to be posted on the website of the Morrison Hotel Gallery, where Goldsmith described that selection as including both studio and concert photographs, so as to appeal to people "who want to remember the moment they were at that show or how they perceived the artist."  (Goldsmith Dep. Tr. 292:6 – 293:25 (AWF Ex. 12).)  Goldsmith further testified that she selected for posting on the Morrison Hotel Gallery website one of her photos from the December 3, 1981 Prince studio shoot (not the Goldsmith Photo) that had been published in one of her books, and the reason she did that was because people often use her book like a catalogue to see if an image is available.  (*Id*. at Tr. 294:6 – 296:4.)

212.    When selecting pictures of musicians in concert to promote, Goldsmith tries to appeal to "those people who [] want to remember the moment that they were at that show or how they perceived the artist." (Goldsmith Dep. Tr. 293:12–25 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

213.    In marketing her art, Goldsmith also tries to appeal to people who read rock-and-roll photography books, because "people go to the book like a catalogue and they see something that they like and they want to know if it's available." (Goldsmith Dep. Tr. 295:23–296:2 (**Ex. 12**).)

Goldsmith Parties' Response:  Disputed because the testimony relates specifically to one of Goldsmith's own books, which she testified is often used by people as reference for something they like and they want to know if it's available.  (Goldsmith Dep. Tr. 295:17 – 296:4) (Ex. 12).)

214.    Laura Paulson opined that the themes that Goldsmith uses to market her work to potential purchasers are "completely different from Warhol's focus on celebrity culture, artificiality, and the repetition of images in society," which "are the themes art dealers use to describe Warhol's art to potential purchasers." (Paulson Expert Report at 20 (**Ex. 1**).)

Goldsmith Parties' Response:  Not disputed that this is Paulson's opinion, but disputed on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 203, and because there is no evidentiary factual support.

215.    Aside from the way in which Warhol's works are described to potential buyers, "[a]uction houses also use the graphic clarity of Andy Warhol's work to deploy a full menu of mark[et]ing initiatives that promote the works at auction." (Paulson Expert Report at 18 (**Ex. 1**).) Examples of such marketing initiatives include objects, such as lucite paperweights with an image of a Warhol work; tote bags with an image of a Warhol work; single owner catalogues for a collection; dedicated films; newspaper advertisements; and highlights tours to important cities. (*Id.* at 18.)

Goldsmith Parties' Response:  Not disputed that this is Paulson's opinion,  but disputed factually as there is no evidentiary factual support for the statements, which have no relevance to the Warhol Prince Series Images.

216.    Paulson has "never seen an auction house use a high-end marketing approach to offering Goldsmith's photographs." (Paulson Expert Report at 18 (**Ex. 1**).)

Goldsmith Parties' Response:  Not disputed.

**D.**   **Collectors Of Warhol Works Have Different Characteristics Than Collectors Of Goldsmith Works.**

217.   Collectors of Warhol's works often have one or more of the following characteristics:

- The collectors usually recognize the art historical importance of Andy Warhol and the significance of including Warhol in their collections.

- At the top of the market, there is a new generation of extremely wealthy, international, multi-generational collectors.

- Warhol's work regularly attracts new audiences, such as recently emerged markets in Asia and the Middle East.

- New collectors with significant resources often begin their collection with a Warhol work.

- The collectors are not limited to Post-War and Contemporary Art collectors. Warhol is unique in that his art often appears in collections that are focused on other categories of high-end art, such as Old Masters paintings, Antiquities, Impressionist, Modern Art, or furniture and design.

(Paulson Expert Report at 25 (**Ex. 1**).)

Goldsmith Parties' Response:  Disputed because the statements have no relevance

to the Warhol Prince Series in issue in this case.

218.   By contrast, Goldsmith has identified two categories of collectors of her photographs: those interested in studio photographs and those interested in concert photographs. (Goldsmith Dep. Tr. 293:12–294:5 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed as to sales of Goldsmith's original rock

and roll photographs, as distinct from licensing markets.

219.   Goldsmith testified that collectors in the latter category "want to remember the moment they were at that show or how they perceived the artist," or they want "to have a relationship with the moment that they saw [the artist] in performance." (Goldsmith Dep. Tr. 293:12–294:5 (**Ex. 12**).)

Goldsmith Parties' Response:  Not disputed.

220.   Paulson opined that "[t]hese attributes of Goldsmith's collectors—concertgoers and readers of photography books—are not defining characteristics of the people who collect Warhol's art." (Paulson Expert Report at 26 (**Ex. 1**).)

Goldsmith Parties' Response:  Disputed in part because the statement relates only to sales of concert photos and not studio portraits made by Goldsmith.  Also disputed because Goldsmith sold a 1993 photo she made of Prince to a billionaire private collector who also owned three original Warhol works.  Goldsmith 56.1 Stmt. ¶155.

221.    According to Paulson, "Warhol's collectors cannot consistently be defined by any of the attributes commonly associated with the collectors Goldsmith targets in the market for her photographs." (Paulson Expert Report at 26 (**Ex. 1**).)

Goldsmith Parties' Response:  Disputed in part on the same grounds as those set forth above in the Goldsmith Parties' Response to paragraph 220.  Moreover, Paulson acknowledged that it was a "common overlap" for collectors to own one or more Warhol canvases and original photographs, and that it is a collector's personal subjective decision as to what to include in their own collection.  Werbin Supp. Exh. SSS [Paulson Tr. 52:8 - 55:8].

222.    In identifying and selecting an image for the cover of its commemorative publication *Genius of Prince*, Condé Nast considered a number of potential images. (CN-23 (referencing multiple "cover options," including "the Warhol one" (**Ex. 134**).)

Goldsmith Parties' Response:  Not disputed, except the referenced Condé Nast exhibit does not identify the referenced "cover options."

223.    As part of that search, the Condé Nast staff became aware of the November 1984 *Vanity Fair* and the Warhol portrait included in that issue. (CN-27 (**Ex. 135**).) That issue referenced Lynn Goldsmith. (*Vanity Fair*, Nov. 1984, at 66, 121 (**Ex. 56**).)

Goldsmith Parties' Response:  Not disputed.

224.    Condé Nast never "contacted [Goldsmith] with respect to" *Genius of Prince* and never sought "to put Goldsmith's photograph on the cover," there is no evidence "that would suggest that Lynn Goldsmith came to mind as someone whose work should be in" *Genius of Prince*, and in fact "there is no work of Lynn Goldsmith...in" *Genius of Prince* at all. (Deposition Transcript of Chris Donnellan 118:5–121:22, 125:20–126:8 (**Ex. 136**); *Genius of Prince* (**Ex. 137**).)

Goldsmith Parties' Response:  Not disputed that Condé Nast never contacted Goldsmith, but disputed as to the reason. Condé Nast failed to reference Goldsmith in its database

listing and solely relied on that database to clear usage rights for the *Genius of Prince* publication, despite having a copy of the original November 1984 Vanity Fair publication in its library that it also did not research.  Goldsmith 56.1 Stmt. ¶¶116 – 117.

225.    Condé Nast believed that the Warhol Foundation owned all rights to the Prince Series. (Donnellan Dep. Tr. 122:6–123:9 (**Ex. 136**).)

> Goldsmith Parties' Response:  Disputed because Chris Donnellan testified at the cited pages that Condé Nast believed AWF owned the rights only with respect to the Warhol VF Image that was published in the November 1984 *Vanity Fair* issue, not the Warhol Prince Series itself.

226.    A representative for the Artists Rights Society, which is the Warhol Foundation's licensing agent, testified that she was not aware of any potential licensee "being confused about whether they wished to license an image by Warhol as opposed to an image by Lynn Goldsmith," nor was she aware of any potential licensee "debating between licensing an image by Andy Warhol or an image by Lynn Goldsmith." (Deposition Transcript of Adrienne Fields 136:25–137:16 (**Ex. 138**).)

> Goldsmith Parties' Response:  Not disputed.

227.    The Artist Rights Society representative testified that Warhol's work has been licensed to museums, galleries, magazines, book publishers, newspapers, ad agencies, filmmakers, universities, hospitals, and education testing services. (Fields Dep. Tr. 135:7–136:24 (**Ex. 138**).)

> Goldsmith Parties' Response:  Disputed.  Adrienne Fields testified that "the kinds of [ARS] clients who seek to license" Warhol images include museums, galleries, magazines, book publishers, newspapers, ad agencies, filmmakers, universities, hospitals, and education testing services. (Fields Dep. Tr. 135:7–136:24 (**Ex. 138**).)

## VIII.    DEFENDANTS' PURPORTED EXPERT JEFFREY SEDLIK PROVIDED UNSUPPORTED OPINIONS THAT HE IS UNQUALIFIED TO OFFER.

228.    Defendants have engaged Jeffrey Sedlik as a purported expert in this action. (Expert Report of Jeffrey Sedlik at 1 (**Ex. 139**).)

> Goldsmith Parties' Response:  Not disputed, except as to the use of the term "purported."

229.    Sedlik is the President and CEO of the Picture Licensing Universal System Coalition, a non-profit trade association representing the shared business interests of photographers and other image licensors, and a photographer for over 30 years. (Sedlik Expert Report at 1, 3 (**Ex. 139**).)

Goldsmith Parties' Response:  Not disputed, except Sedlik's additional

qualifications are listed in his CV. (Sedlik Expert Report Exhibit A (CV) (AWF Ex. 139).)

230.    Sedlik "provide[s] forensic image analysis and consulting services to organizations and individuals on issues related to copyright, licensing, negotiating, and business practices and procedures related to photography, advertising, and modeling." (Sedlik Expert Report at 4 (**Ex. 139**).)

Goldsmith Parties' Response:   Not disputed, except Sedlik's additional

qualifications are listed in his CV. (Sedlik Expert Report Exhibit A (CV) (AWF Ex. 139).)

231.    Sedlik purports to opine that Warhol's Prince Series usurps the derivative market for Goldsmith's Prince Photograph. (Sedlik Expert Report at 31 (**Ex. 139**).)

Goldsmith Parties' Response: Not disputed, except as to the use of the term

"purports."

232.    Sedlik purports to opine that Goldsmith "intend[s]" to monetize her Prince photographs "in all manner of derivative markets" at some point in the future. (Sedlik Expert Report at 23 (**Ex. 139**).)

Goldsmith Parties' Response:  Not disputed as to what Goldsmith "intends" but

disputed that Sedlik "opines" on her intent.  Also disputed as to the use of the term "purports."

AWF mischaracterizes Sedlik's report, which states the factual basis for his opinion, including

Goldsmith's deposition testimony and a telephonic interview with Goldsmith.  (Werbin Decl. Exh.

E (Sedlik Expert Report at 23).)

233.    This opinion apparently is based only on a conversation Sedlik claims to have had with Goldsmith after he "didn't see that testimony" in Goldsmith's "deposition transcript and its exhibits" or the other pleadings, transcripts, and documents he considered in preparing his expert report. (Sedlik Dep. Tr. 190:11–24 (**Ex. 140**); *see also* Sedlik Expert Report Exhibit B (listing documents relied upon) (**Ex. 139**).)

Goldsmith Parties' Response:   Disputed because Sedlik's report also cites Goldsmith's deposition testimony for support generally and Sedlik reviewed that testimony in preparing his report.   Goldsmith also testified that she doesn't display all her images currently because she may "want to possibly use something in, maybe edition it in the future, like to introduce a new edition, a new image being offered, so I will not put everything up, you know, and another reason would be because I'm thinking, in my mind, that I might use it for something else." (Nikas Decl. Exh. 12 [Goldsmith Tr. 294:15 – 22]; Werbin Decl. Exh. E (Exhibit B to Sedlik Report).)

234.   Sedlik testified that he did not speak with, or conduct any research about, collectors of Goldsmith's work in arriving at his opinions. (Sedlik Dep. Tr. 251:18–25, 252:22–253:4 (**Ex. 140**).)

Goldsmith Parties' Response:  Not disputed.

235.   Sedlik testified "it would [not have been] necessary to conduct [] research to arrive at [his] opinion" that "the Warhol Prince [S]eries competes with the Warhol Prince work for opportunities" for derivative uses. (Sedlik Dep. Tr. 250:16–22 (**Ex. 140**).)

Goldsmith Parties' Response:  Disputed because the statements are incomplete and taken out of context.  Sedlik testified as follows:

> Q. You write on page 29, The Warhol Prince series competes with the Goldsmith Prince work for opportunities in the derivative marketplace, correct?
>
> A. Yes.
>
> Q. What is the basis for that opinion, when you haven't researched why editors select Warhol works or Goldsmith works and haven't researched whether they appear -- have appeared in the past in the same magazines or books?
>
> A.  I don't find that it would be necessary to conduct that research to arrive at my opinion based on my decades of experience, photographing hundreds of magazine covers for publications all over the world and understanding how covers are selected, in general. I did not have to find instances in which an editor put a

> Goldsmith photograph next to a Warhol illustration and made a decision between the two. I know that in the absence of Warhol's work, there would have been Goldsmith's work from that period as a head shot that is appropriate for cover use.

(Sedlik Dep. Tr. 250:5–251:5 (AWF Ex. 140).)

236.    Sedlik stated he "did not have to find instances in which an editor put a Goldsmith photograph next to a Warhol illustration and made a decision between the two" to support his opinion that the Prince Series competes with Goldsmith's Prince Photograph for opportunities in the derivative marketplace. (Sedlik Dep. Tr. 250:5–25 (**Ex. 140**).)

> Goldsmith Parties' Response:  Not disputed, except as clarified by the testimony quoted in the Goldsmith Parties' Response to paragraph 235.

237.    Sedlik testified that among the bases for his opinion that AWF and Goldsmith offer their respective works in the same derivative marketplace is that "at least one prominent wealthy collector has purchased both Warhol's works and multiple Goldsmith works." (Sedlik Expert Report at 30 (**Ex. 139**); *see also* Sedlik Dep. Tr. 254:7–9 (**Ex. 140**).) Sedlik did not provide further details on this topic. He did not identify any source as the basis for this statement. He did not identify which collector this statement refers to. He did not identify which Warhol works or Goldsmith works this statement refers to. (Sedlik Expert Report at 30 (**Ex. 139**); *see also* Sedlik Dep. Tr. 254:7-9 (**Ex. 140**).)

> Goldsmith Parties' Response:  Disputed. Sedlik, in his report, did provide support for his statement that "at least one prominent wealthy collector has purchased both Warhol's works and multiple Goldsmith works" with cites to the record. (Sedlik Expert Report at 30 n. 51 (AWF Ex. 139). Sedlik also testified that the collector to which he referred to in his report was Michael Zilkha. (Sedlik Dep. Tr. 253:23-254:9 (AWF Ex. 140).)

Dated: New York, New York
        November 20, 2018

Respectfully submitted,

HERRICK, FEINSTEIN LLP

By:    s/ Barry Werbin, Esq.
       Barry Werbin
       Gabrielle C. Wilson
2 Park Avenue
New York, NY 10016

(212) 592-1418
bwerbin@herrick.com

LAW OFFICES OF JOEL L. HECKER
By:   s/ Joel L. Hecker, Esq.
        Joel L. Hecker
230 Park Avenue, Suite 660
New York, NY 10169
(212) 481-1850
HeckerEsq@aol.com

*Attorneys for Lynn Goldsmith and Lynn Goldsmith, Ltd.*