UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC., <br><br> Plaintiff, <br><br> -against- <br><br><br> LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD., <br><br> Defendants. | No. 17-cv-02532-JGK |
| LYNN GOLDSMITH, <br><br> Counterclaim Plaintiff, <br><br> -against- <br><br><br> THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC., <br><br> Counterclaim Defendant. | |

**THE ANDY WARHOL FOUNDATION FOR THE VISUAL ARTS, INC.'S
MEMORANDUM OF LAW IN OPPOSITION
TO LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD.'S MOTION FOR SUMMARY JUDGMENT**

Dated: November 20, 2018

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Luke Nikas
Maaren A. Shah
Daniel Koffmann
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
Fax: (212) 849-7100
lukenikas@quinnemanuel.com
maarenshah@quinnemanuel.com
danielkoffmann@quinnemanuel.com

*Attorneys for Plaintiff The Andy Warhol
Foundation for the Visual Arts, Inc.*

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ............................................................................. 1

COUNTER-STATEMENT OF FACTS ................................................................... 3

I.   GOLDSMITH IS A ROCK-AND-ROLL PHOTOGRAPHER WITH A ROCK-AND-ROLL
     MARKET ..................................................................................................... 3

II.  GOLDSMITH TOOK THE PRINCE PHOTOGRAPH IN 1981, AND LICENSED IT TO
     VANITY FAIR IN 1984 ................................................................................ 4

III. WARHOL TRANSFORMED GOLDSMITH'S PHOTOGRAPH TO CREATE THE PRINCE
     SERIES ....................................................................................................... 6

     A.   Warhol's Transformative Artistic Process And Message ...................... 6

     B.   Warhol's Prince Series Transformed Goldsmith's Photograph ............. 9

     C.   The Prince Series Was Published In *Vanity Fair*, And Sold And Licensed
          Around The World ............................................................................ 16

IV.  AFTER WARHOL'S DEATH, AWF WAS FORMED TO PROMOTE THE VISUAL ARTS ........... 17

ARGUMENT ..................................................................................................... 17

I.   THE COURT SHOULD  DENY GOLDSMITH'S MOTION AND GRANT SUMMARY
     JUDGMENT TO AWF .................................................................................. 17

II.  THE PRINCE SERIES DOES NOT INFRINGE GOLDSMITH'S COPYRIGHT IN THE PRINCE
     PHOTOGRAPH ............................................................................................ 17

III. THE WARHOL PRINCE SERIES MAKES FAIR USE OF THE GOLDSMITH PRINCE
     PHOTOGRAPH ............................................................................................ 27

     A.   The Prince Series Is Fair Use Under Any Interpretation Of The Test ......... 27

     B.   The Second Circuit Test Requires A Finding Of Fair Use .................... 29

          1.   The Prince Series Is "Transformative" Under Cariou and Other
               Cases ....................................................................................... 29

          2.   The Nature of the Copyrighted Work Is Not Dispositive .......... 36

          3.   The Amount and Substantiality of Use Favors Fair Use .......... 36

          4.   The Absence of Market Impact Favors Fair Use ..................... 37

IV.  GOLDSMITH'S COUNTERCLAIM IS BARRED BY THE STATUTE OF LIMITATIONS ......... 42

CONCLUSION..................................................................................................................... 42

# TABLE OF AUTHORITIES

*Page(s)*

<u>CASES</u>

*In re Arab Bank, PLC Alien Tort Statute Litig.*,
  808 F.3d 144 (2d Cir. 2015)..........................................................................27, 31

*Authors Guild, Inc. v. HathiTrust*,
  755 F.3d 87 (2d Cir. 2014)............................................................................38, 41

*Belair v. MGA Entm't, Inc.*,
  831 F. Supp. 2d 687 (S.D.N.Y. 2011)..............................................17, 18, 21, 23

*Bill Diodato Photograph LLC v. Kate Spade, LLC*,
  388 F. Supp. 2d 382 (S.D.N.Y. 2005)..........................................17, 18, 21, 23, 37

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
  448 F.3d 605 (2d Cir. 2006)......................................................................31, 36, 41

*Blanch v. Koons*,
  467 F.3d 244 (2d Cir. 2006).......................................29, 30, 31, 32, 33, 36, 37

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994)..................................................................................29, 36, 38

*Cariou v. Prince*,
  784 F. Supp. 2d 337 (S.D.N.Y. 2011)....................................................................31

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013)........................27, 29, 30, 32, 33, 34, 35, 36, 37, 38, 41

*Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*,
  150 F.3d 132 (2d Cir. 1994)......................................................................31, 41

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)..............................................................................................41

*Estate of Smith v. Cash Money Records, Inc.*,
  253 F. Supp. 3d 737 (S.D.N.Y. 2017)..................................................................40

*In re Fosamax Prods. Liability Litig.*,
  2009 WL 2878439 (S.D.N.Y. Sept. 9, 2009)......................................................41

*Friedman v. Guetta*,
  2011 WL 3510890 (C.D. Cal. May 27, 2011) ..............................23, 24, 26, 35

*Fulks v. Knowles-Carter*,
  207 F. Supp. 3d 274 (S.D.N.Y. 2016)..............................................................20, 22

*Graham v. Prince*,
  265 F. Supp. 3d 366 (S.D.N.Y. 2017)..................................................................31

*Hosseinzadeh v. Klein*,
  276 F. Supp. 3d 34 (S.D.N.Y. 2017)..............................................................41, 42

iii

*Kaplan v. Stock Market Photo Agency, Inc.*,
    133 F. Supp. 2d 317 (S.D.N.Y. 2001) ............................................................. 18, 23

*Kienitz v. Sconnie Nation LLC*,
    766 F.3d 756 (7th Cir. 2014) .......................................................... 27, 28, 31, 37

*Knitwaves, Inc. v. Lollytogs Ltd.*,
    71 F.3d 996 (2d Cir. 1995) ........................................................................... 18

*LaChapelle v. Fenty*,
    812 F. Supp. 2d 434 (S.D.N.Y. 2011) .......................................................... 19, 21

*Leibovitz v. Paramount Pictures Corp.*,
    137 F.3d 109 (2d Cir. 1998) ................................................................ 17, 18, 21, 23

*Mannion v. Coors Brewing Co.*,
    377 F. Supp. 2d 444 (S.D.N.Y. 2005) ............................................................ 20

*Morris v. Guetta*,
    2013 WL 440127 (C.D. Cal. Feb. 4, 2013) ..................................... 23, 24, 25, 26, 35

*Oyewole v. Ora*,
    291 F. Supp. 3d 422 (S.D.N.Y. 2018) ........................................................... 42

*Peter F. Gaito Architecture, LLC v. Simone Development Corp.*,
    602 F.3d 57 (2d Cir. 2010) ............................................................. 18, 19, 20, 21

*Rentmeester v. Nike, Inc.*,
    883 F.3d 1111 (9th Cir. 2018) ............................................ 18, 21, 23, 24, 26, 27

*Rogers v. Koons*,
    960 F.2d 301 (2d Cir. 1992) ......................................................................... 21

*TCA Television Corp. v. McCollum*,
    839 F.3d 168 (2d Cir. 2016) ...................................................................... 29, 31

*Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*,
    338 F.3d 127 (2d Cir. 2003) ................................................................ 19, 20, 21

<u>STATUTORY AUTHORITIES</u>

17 U.S.C. §107 ............................................................................................. 27

## PRELIMINARY STATEMENT

The opening paragraph of Goldsmith's brief proves precisely why her motion must fail, and why summary judgment should instead be granted to The Andy Warhol Foundation for the Visual Arts, Inc. ("AWF").  Her point is that the sixteen portraits that renowned artist Andy Warhol created in 1984, referencing her photograph of the recording artist "Prince," are not distinctive or transformative, because anyone with a computer can do what Andy Warhol did— i.e., anyone can make a Warhol.  The fundamental premise of Goldsmith's entire brief is absurd and false.  Warhols are not flip digital alterations of a photo, done in a nanosecond with a few aimless keystrokes and clicks of a mouse.  Warhol conceived and created art through an intensely creative and hands-on process.  And just saying the name "Warhol" produces a vivid image of his powerful and original works, often his celebrity portraits—a testament to how fundamentally his art transformed not only the objects of his works, but the very concept of art itself.

As a result, the term "Warhol" has come to embody its own specific meaning.  Andy Warhol's works are not regarded by critics, scholars, collectors, or the public as simple portraits of the subjects of his art.  They are, quite simply, Warhols.  The name itself conjures up the distinctive aesthetic to which he laid claim: common objects or faces, printed in stark relief, against a splash of bright colors and pigments that lend the subject an unnatural and garishly beautiful appearance.  That is a Warhol.  And that is what Warhol did in his portraits of Prince that are the subject of this case (the "Prince Series").  As he transformed all of his subjects with his works, as he transformed the nature and meaning of art itself, so too he transformed Goldsmith's photograph of Prince into sixteen utterly distinct "Warhols."

Goldsmith ignores this entrenched world history.  She contends that she is entitled to summary judgment for copyright infringement because an "ordinary observer" would find her

photograph and the Prince Series to be "substantially similar."  But even to an ordinary observer, it is patently obvious that there is *nothing* similar about the Prince Series and Goldsmith's photograph.  The medium, scale, and cropping of the image, angle, colors, contrast, shading, and general appearance of the works are entirely different.  The only similarity is the underlying subject—Prince—which is not copyrightable.

Goldsmith's argument also overlooks the critical aspect of the substantial-similarity test.  For a secondary work to be infringing, it must exhibit a substantial similarity to the *protected elements* of the original work.  These are elements that exhibit the artist's unique *expression* of an idea, rather than the idea itself.  They include a photographer's selection of lighting, shading, lens, angle, depth of field, composition, and other aesthetic choices.  They do not include the photograph's subject.  Warhol's artistic process removed all protectable elements of lighting, shading, depth of field, focus, and camera angle that were present in the photograph.  It then added, in many cases, a bold and unnatural color palette.  The only similarity that remained, as Goldsmith herself concedes, was the "outline" of Prince's face and head.

While Goldsmith attempts to identify several other points of similarity between her photograph and the Prince Series—including his "hair curls, "pursed lips," "facial hair," "deep-set eyes," and "mole on his cheek"—none of these are protectable.  They are, instead, endemic to the man himself.  And elements, such as these, that flow naturally and necessarily from the choice of the subject are not protected.  Because there is no substantial similarity between the Prince Series and the protected elements of Goldsmith's photograph, her summary judgment motion must fail.

Goldsmith also argues that she is entitled to summary judgment on AWF's defense that Warhol made fair use of her photograph.  Second Circuit law is clear: the "heart" of the fair use

inquiry is transformation.  Where a secondary work transforms the original in appearance or meaning, it constitutes fair use.  The Prince Series does both.  Warhol completely altered the aesthetic of the photograph.  The end result of Warhol's aesthetic choices is that the realistic image of Prince *the person* is gone.  And these aesthetic changes echo the works' transformative message.  Whereas Goldsmith intended her photograph to convey the "humanism" and individuality of Prince, Warhol's portraits communicate exactly the opposite:  an image of Prince as an icon, not a person, to comment on the impact of celebrity and contemporary conditions of life.  This is the very essence of transformation, as the Second Circuit has recognized.

Goldsmith criticizes Second Circuit law, but she cannot evade it.  The law of the Second Circuit is binding on her claims, and requires denial of her motion.  Even were this Court to disregard Second Circuit precedent (which it may not), the Prince Series constitutes fair use under any application of the statutory test—including the more stringent standards imposed outside the Second Circuit.  Because Goldsmith cannot meet her burden under any application of the statutory fair-use test, her motion for summary judgment must be denied.

<u>COUNTER-STATEMENT OF FACTS</u>

## I.    GOLDSMITH IS A ROCK-AND-ROLL PHOTOGRAPHER WITH A ROCK-AND-ROLL MARKET

Defendant Lynn Goldsmith is a "rock and roll photographer" who "has been capturing music legends since the early 1970's."  (AWF Rule 56.1 Counter-Statement of Material Facts ("AWF Counterstmt.") ¶¶37–40, 205–06; *see also* Goldsmith Rule 56.1 Statement of Material Facts ("Goldsmith R56.1") ¶¶11, 14.)  She sells her photographs primarily through galleries that focus on rock-and-roll photography and to collectors interested in photographs of musicians or who want a picture of a concert they attended.  (AWF Counterstmt. ¶¶188–96, 212–13, 218–19.)  Her photographs typically sell for low, single-digit thousands.  (*Id*. ¶¶160–63; Goldsmith R56.1

¶139.)  Her work is rarely sold at public auction, and when it is, it is through smaller auction houses that focus more on memorabilia and artifacts than fine art.  (AWF Counterstmt. ¶¶198-200.)

Goldsmith's artistic process is best described as personal and intimate.  She tries to "connect" with her subjects so they reveal their inner selves.  (*Id*. ¶¶44–45, 48–51.)  Her goal is to accurately portray the individual's identity and create a photograph that brings "out a feel for the person themselves."  (*Id*. ¶¶43, 63.)  She seeks to humanize her subjects.  (*Id.* ¶43.)  To do so, she makes deliberate lighting choices to animate her photographs.  (*Id*. ¶¶57–59.)  She believes that "[p]hotography is light."  (*Id.*)

## II.   GOLDSMITH TOOK THE PRINCE PHOTOGRAPH IN 1981, AND LICENSED IT TO VANITY FAIR IN 1984

In December 1981, Goldsmith photographed musician Prince Rogers Nelson ("Prince"), first at a concert in New York City and the next day at her studio.  (AWF Counterstmt. ¶¶68–69; Goldsmith R56.1 ¶24.)  Prince arrived at Goldsmith's studio dressed in the same clothes and with the same hair style depicted in Goldsmith's photographs.  (AWF Counterstmt. ¶¶78–80.)  He made those choices, not Goldsmith.  (*Id*.)  Prince also arrived wearing makeup.  (*Id*. ¶74.)  Goldsmith gave him lip gloss and applied extra eyeshadow.  (*Id*. ¶¶74–75; Goldsmith R56.1 ¶¶25–26.)  She made no other changes to Prince's appearance.  (AWF Counterstmt. ¶81.)

During the studio shoot, Prince appeared "really uncomfortable."  (*Id.* ¶¶86–88; Goldsmith R56.1 ¶29.)  To Goldsmith, he was a "vulnerable human being."  (AWF Counterstmt. ¶90; Goldsmith R56.1 ¶31.)  Goldsmith began by shooting black-and-white photographs that were not for publication, but were instead shot for herself, before switching to color film.  (Goldsmith R56.1 ¶28.)  She shot against a white background with a lens she chose as well-suited for portraiture.  (AWF Counterstmt. ¶¶83–84.)  Because a white background is the

"hardest to light," Goldsmith set up the lighting before Prince arrived. (*Id*. ¶84.) She might have altered the lighting between the shots. (*Id*. ¶85.) Goldsmith intended to capture a man who was expressive and creative, but frightened. (*Id*. ¶91; Goldsmith R56.1 ¶33.) According to Goldsmith, her photographs reflected that Prince was "fragile," and make her "really sad." (AWF Counterstmt. ¶¶91-92; Goldsmith R56.1 ¶29.)

Newsweek published one of Goldsmith's photographs from Prince's concert, and none of the studio photographs. (*Id*. ¶¶94–95.) Since then, Goldsmith has never sold or even attempted to sell one of the photographs from the December 1981 studio shoot. (*Id*. ¶170; Goldsmith R56.1 ¶143.) There is no evidence that these photographs have been exhibited at a gallery or museum. (AWF Counterstmt. ¶171.) It is therefore "essentially impossible to assess the market for [the Prince] photos." (*Id*. ¶172.) Goldsmith nonetheless testified that she would use her standard pricing chart if she tries to sell the Prince photographs, implying a price range from $1,900 to $4,200. (*Id*. ¶¶173–74.)

Goldsmith has taken other photographs of Prince. (AWF Counterstmt. ¶175; Goldsmith R56.1 ¶¶144, 147–55.) None has sold for more than $2,500. (AWF Counterstmt. ¶175.) Goldsmith has licensed these other Prince photographs ten times, for an average licensing fee of $645. (*Id*. ¶178; Goldsmith R56.1 ¶¶144–45, 147–54.) She licensed these photographs primarily to music and photography publications, or to generalist publications seeking to publish a photorealistic portrait of Prince. (Goldsmith R56.1 ¶¶144–54.) She has licensed only a single photograph from the December 1981 studio shoot: the photograph at issue in this case, once in 1984 to *Vanity Fair*, as an artist's reference. (AWF Counterstmt. ¶¶182–83; Goldsmith R56.1 ¶40.) Goldsmith has never licensed another photograph as an artist's reference. (AWF Counterstmt. ¶¶182–83.)

5

This is the photograph of Prince that Goldsmith alleges is at issue in this case (*Id.* ¶104; Goldsmith R56.1 ¶38):



Neither Andy Warhol nor AWF is mentioned in the Vanity Fair October 1984 license invoice.  (AWF Counterstmt. ¶102; Goldsmith R56.1 ¶¶44–46.)  Neither Andy Warhol nor AWF was a party to this license agreement.  (*Id.*)  There is no evidence that Andy Warhol was aware of the existence of this license.

III.   WARHOL TRANSFORMED GOLDSMITH'S PHOTOGRAPH TO CREATE THE PRINCE SERIES

A.   Warhol's Transformative Artistic Process And Message

Andy Warhol is known as the "god of contemporary art."   (AWF Counterstmt. ¶2.) Warhol is as much remembered for his distinctive visual aesthetic as he is for his commentary on contemporary culture, celebrity, and consumerism.   (*Id.* ¶¶6, 29.)   In stark contrast to

Goldsmith's photography, which portrayed her subject's actual appearance and sought to capture their inner identities, Warhol never intended to capture his subject's true form or identity.  (*Id.* ¶10.)   Instead, Warhol used his characteristic silkscreen process to portray his subjects as flattened, two-dimensional images—thereby depersonalizing and commoditizing the subject and depicting them as they are consumed by society.  (*Id.* ¶¶24, 27.)

Warhol's portraits of Marilyn Monroe clearly illustrate how Warhol achieved this effect (figs. 3, 5).  Starting with the black and white photorealistic image, Warhol first cropped Monroe from the neckline up (fig. 4), essentially "severing the head from the shoulders and bust, producing the disembodied effect of a cinematic close-up."  (AWF Counterstmt. ¶13.)

**<u>Figure 4</u>**                    **<u>Figure 5</u>**
(Warhol's own markings)

This cropping gave Marilyn a symbolic, totem-like appearance.  (*Id.* ¶27.)   Warhol also transformed the colors and tones present in his source image.  (*Id.* ¶¶15, 20–21, 130, 132–36.) Whereas the source photographs recorded the full range of color tones, Warhol eliminated this

color spectrum:  he created high-contrast images for his silkscreens, reducing the gray scale of the source photograph to a sharp contrast between black and white.  (*Id.* ¶¶15–16.)  This process had the effect of "drastic simplification" of the source image, flattening the appearance of the underlying subject and removing all realism and depth.  (*Id.* ¶16.)  Warhol then traced the outline of the cropped final image onto a canvas (*id.* ¶¶19, 22), and painted over this outline using bright, unnatural, and exotic-colored acrylic paints that had a flat consistency and industrial appearance.  (*Id.* ¶¶20–22.)  He then used the high-contrast silkscreen he had created to screen the image onto the painted canvas.  (*Id.* ¶¶18, 22.)

Warhol was not attempting to capture the true appearance of his subjects.  (*Id.* ¶10.)  His works communicated images of heraldic emblems, rather than an unreflective replica of the photographic source.  (*Id.* ¶¶16, 31.)  His celebrity portraits were not about the individual celebrity, but how the public idolizes and consumes branded images.  (*Id.* ¶¶24–36.)  This can be seen in another portrait of Marilyn Monroe, Warhol's 1962 *Marilyn Diptych* (fig. 3):  while the work depicts Marilyn Monroe, the real subject is not the private person; it is a two-dimensional public image, a commoditized "persona" named "Marilyn."  (*Id.* ¶26.)

**<u>Figure 3</u>**



Scholars and critics have recognized Warhol's transformative process and message.  (*Id.* ¶¶33–36.)  Benjamin Buchloh, an art historian at Harvard, remarked, "[a]lthough Warhol constructed images of Marilyn Monroe, Liz Taylor, and Elvis Presley in the tragicomical conditions of their glamour, the paintings' lasting fascination does not derive from the continuing myth of these figures but from the fact that Warhol constructed their image from the perspective of the tragic condition of those who consume the stars' images[.]"  (*Id.* ¶33.)  Others have observed that his celebrity portraits exhibit an "aura of utterly affirmative idolization [that] already stands as a stereotype of a 'consumer-goods style' expression of an American way of life and of the mass-media culture of a nation."  (*Id.* ¶34.)

Warhol's importance is reflected in his reputation: he has been called the "most powerful contemporary art brand in existence," and his market has been described as "the bellwether of post-war and contemporary art."  (*Id.* ¶¶2–3, 154–55.)  His work is shown at leading museums and galleries across the world, and sold through high-end galleries and major auction houses, often for millions of dollars.  (*Id.* ¶¶3, 184–87.)  Collectors of Warhol's works are typically wealthy and sophisticated collectors of fine art, who seek out these works because of their transformative nature.  (*Id.* ¶¶202–04, 217.)  When auction houses and galleries market Warhol works, they emphasize the works' expressive content and transformative nature.  (*Id.*)

**B.**     **Warhol's Prince Series Transformed Goldsmith's Photograph**

In 1984, Warhol created 12 paintings, two drawings, and two unpublished prints (the "Prince Series") depicting an image of Prince's head.  (*Id.* ¶112.)  While there is no evidence of Warhol's interactions with *Vanity Fair*, the image of Prince's head in Warhol's works has a shape that is similar to that in Goldsmith's photograph.  (*Id.*)  Other than this similarity, however, the works could hardly be more different.  The sixteen works are as follows:

**Figure 11**



**Figure 12**



**Figure 13**



**Figure 14**



**Figure 15**



**Figure 16**



**Figure 17**



**Figure 18**



**Figure 19**



**Figure 20**



**Figure 21**



**Figure 22**



**Figure 23**



**Figure 24**



**Figure 25**



**Figure 26**



(*Id.*)

The Prince Series reflects Warhol's transformative approach to celebrity portraiture.  He cropped and resized the image that appears in Goldsmith's photograph so that Prince's head appears disembodied "as if magically suspended in space."  (*Id*. ¶116.)  Warhol created an enlarged, high-contrast, half-tone silkscreen image of Prince's head.  (*Id*. ¶118.)  Warhol's silkscreen removed the lighting and shading that are present in the photograph, making the image appear flat and exaggerating the prominent features of the face.  (*Id*. ¶119.)  Warhol also created a second silkscreen derived from his hand-drawn outline of Prince's face.  (*Id*. ¶¶126–27.)  Warhol's line drawing and the resulting screen deliberately diverge from the faithful depiction of Prince's face in the photograph.  (*Id*. ¶129.)  It drained the underlying image of natural color and reinforced the appearance of a disembodied head.  (*Id.* ¶¶119, 139–40.)

The Prince Series includes multi-layered paintings with exotic and unnatural colors used in different arrangement and combinations.  (*Id*. ¶¶126, 132–36.)  Warhol also explored varying renditions of the high-contrast and hand-drawn screens to differing effects.  (*Id.* ¶¶137-38.)  Warhol created two line drawings by hand in pencil, one of the outline of Prince's disembodied head and one of the disembodied head with disembodied suspenders (*e.g*., figs. 23, 24)—which imbues the subject with an eerie, empty, and ghostly effect.  (AWF Counterstmt. ¶¶139–40.)  The end result of Warhol's artistic study across the Prince Series, as Goldsmith herself admitted, is that the only commonality that remained between the Prince Series and the Prince Photograph is "the outline of" Prince's head.  (*Id*. ¶115.)

The Prince Photograph is a photorealistic, three-dimensional representation of the singer as he appeared in life.  The Prince Series is anything but.  It depicts a flat, two-dimensional and unnatural rendition of the salient features of his face.  (*Id*. ¶¶119–24.)  AWF's expert, Dr.

Thomas Crow, testified that Warhol exaggerated the darkest details of Prince's features by draining the tonality and texture from the Prince Photograph.[1]  (*Id.*)  Dr. Crow explained that although Prince had a "more natural, angled position" in Goldsmith's photograph, Warhol shaded one side of Prince's face to make it "appear to face fully towards the front as a detachable mask."  (*Id.* ¶120.)  This "negat[ed]" the more natural effect in Goldsmith's work.  (*Id.*)  Unlike Goldsmith's photograph, Warhol's use of the high-contrast half-tone image flattens the hair and the forehead into the same plane.  (*Id.* ¶121.)  Warhol's removal of the "slight shadow…around the bottom of the chin as a whole" also contributed to the mask-like effect.  (*Id.* ¶123.)  Dr. Crow explains that Warhol deliberately made these changes to "create this sort of flat emblem that stands in for Prince without being a naturalistic equivalent to the appearance of his head."  (*Id.* ¶124.)

Warhol's application of the second free-hand screen to some of the Prince Series provides "vibrancy and definition."  (*Id.* ¶127.)  The line screen, printed "slightly off-register," highlights the features of Prince's face and "enhanc[es] their impact."  (*Id.* ¶128.)  Dr. Crow opines that "[t]hese lines represent Warhol's own free invention, by means of which he made a point of diverging from the given facts of the photographic impression to provide his portrayal of Prince with a confrontational presence and intensity absent in his source."  (*Id.* ¶129.)

Dr. Crow testified that by "bringing all the features of Prince up to the surface across the same pla[ne]," Warhol transformed Goldsmith's "retiring" image of Prince into one of "Prince

---

[1]    While Dr. Crow's testimony also referenced Goldsmith's color photograph of Prince, he testified his opinion applies equally to the black-and-white photograph that Goldsmith now claims was infringed.  (AWF Counterstmt. ¶125.)

confronting you as his admirer, his fan, a curious onlooker with a kind of uncompromising implacable character which is not present in the Goldsmith." (*Id*. ¶¶131.)  In contrast to the realism of the Prince Photograph, Dr. Crow testified that Warhol "creat[ed] an image of Prince as a kind of icon or totem of something rather than just being the actual human being that made the music." (*Id*. ¶142.)  "Unlike Goldsmith's focus on the individual subjects' unique human identity," Warhol's portraits "sought to use the flattened, cropped, exotically colored, and unnatural depiction of Prince's disembodied head to communicate a message about the impact of celebrity and defining the contemporary conditions of life." (*Id*. ¶147.)  According to Dr. Crow, "[t]his approach transforms the character, message, and historic and artistic value of Warhol's portrait of Prince compared to Goldsmith's photograph." (*Id*.)

### C.   The Prince Series Was Published In *Vanity Fair*, And Sold And Licensed Around The World

*Vanity Fair* published an image from the Prince Series in the November 1984 edition of its magazine.  (AWF Counterstmt. ¶144; Goldsmith R56.1 ¶¶48–49.)  Since then, portraits from the Prince Series have been sold or auctioned more than two dozen times.  (*AWF Counterstmt. ¶¶148–49, 151.)  AWF transferred four works from the Prince Series to the Andy Warhol Museum in Pittsburgh.  (*Id.* ¶150.)  The Prince Series has been displayed in museums, fine art galleries, books, and magazines more than 30 times since 1984.  (*Id*. ¶152.)  Laura Paulson, who has appraised more than 750 of Warhol's works, testified that a painting from the Prince Series would sell today for approximately $173,664.  (*Id*. ¶166.)

In addition, these works have an established licensing market.  (*Id*. ¶179.)  The two licenses for which specific fee information is available are (1) a 2013 license to Condé Nast/*Vanity Fair* for inclusion in *Vanity Fair 100 Years*, for $1,125, and (2) a 2016 license to Condé Nast for inclusion on the cover of *Genius of Prince* for $10,000.  (*Id*. ¶180.)

## IV.   AFTER WARHOL'S DEATH, AWF WAS FORMED TO PROMOTE THE VISUAL ARTS

After Warhol's death in 1987, AWF was formed as a not-for-profit corporation to promote the visual arts.  (*Id.* ¶238; Goldsmith R56.1 ¶¶4, 72.)  Among several other charitable activities, AWF uses revenue generated by its licensing of Warhol's work to give significant grants "to support the creation, presentation and documentation of contemporary visual art, particularly work that is experimental, under-recognized, or challenging in nature."  (AWF Counterstmt. ¶238.)

## ARGUMENT

## I.   THE COURT SHOULD  DENY GOLDSMITH'S MOTION AND GRANT SUMMARY JUDGMENT TO AWF

Goldsmith admits that the parties do not dispute the material facts.  (Br. 20.)  But the undisputed material facts require summary judgment to be granted in AWF's favor, and Goldsmith's motion should be denied.

## II.   THE PRINCE SERIES DOES NOT INFRINGE GOLDSMITH'S COPYRIGHT IN THE PRINCE PHOTOGRAPH

To prove copyright infringement, Goldsmith must show that any alleged copying "is illegal because a substantial similarity exists between the defendant's work and the *protectable elements* of plaintiff's [work]."  *Belair v. MGA Entm't, Inc.*, 831 F. Supp. 2d 687, 691–92 (S.D.N.Y. 2011) (emphasis added).  When evaluating substantial similarity, "it is essential that the similarity relate to the copyrightable material.'"  *See Bill Diodato Photograph LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382, 389–90 (S.D.N.Y. 2005).  Only the "original" elements of the photograph are copyrightable.  (Br. 21.)  The "original" protectable elements include "the photographer's selection of lighting, shade, lens, angle, depth of field, composition, and other choices, such as manipulation of color balances, saturation, or contrast, that have an aesthetic effect on the final work."  *Belair*, 831 F. Supp. 2d at 692; *see also Leibovitz v. Paramount*

*Pictures Corp.*, 137 F.3d 109, 116 (2d Cir. 1998). While "[a] photograph may also be original in the creation of its subject," that is only "when a photographer orchestrates the situation that is photographed, rather than simply photographing a ready-made scene or thing." *Belair*, 831 F. Supp. 2d at 692–93; *cf. Kaplan v. Stock Market Photo Agency, Inc.*, 133 F. Supp. 2d 317, 323 (S.D.N.Y. 2001) ("Copyright derives from 'the photographer's original conception of his subject, not the subject itself.'"); *Leibovitz*, 137 F.3d at 115–16. For this reason, courts consistently reject copyright claims when they are based on alleged copying of a photograph's subject or the subject's pose. *See, e.g.*, *Kate Spade*, 388 F. Supp. 2d at 392–93; *Leibovitz*, 137 F.3d at 115–16; *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1122–23 (9th Cir. 2018).

Goldsmith argues that this is not the law, citing *Peter F. Gaito Architecture, LLC v. Simone Development Corp.*, 602 F.3d 57 (2d Cir. 2010), for the proposition that "the Second Circuit has 'disavowed any notion that we are required to dissect [the works] into their separate components, and compare only those elements which are in themselves copyrightable.'" (Br. 23.) But *Gaito* actually *undercuts* Goldsmith's position. *Gaito* stated that "when faced with works that have both protectable and unprotectable elements," the court must conduct a "more discerning analysis" than the ordinary observer test in which Goldsmith seeks refuge. *Gaito*, 602 F.3d at 66. This "discerning analysis" requires the court to "extract the unprotectible elements from our consideration and ask whether the protectible elements, *standing alone*, are substantially similar." *Id*. (emphasis added) (quoting *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995)); *see also Belair*, 831 F. Supp. 2d at 693 (when works "have both protectable and unprotectible elements," "the usual ordinary observer test becomes more discerning"); *Kate Spade*, 388 F. Supp. 2d at 390 (requiring "[c]areful scrutiny . . . when the protected work contains unprotectible elements"). In *Gaito*, the Second Circuit then did the

*opposite* of what Goldsmith asks the Court to do here:  it identified and it separated the protectable elements of the allegedly infringed work and, after comparing those elements, held that "it cannot be said that defendants misappropriated plaintiffs' specific 'personal expression' of the project, but instead merely used the *unprotectible concepts and ideas* contained in plaintiffs' designs."  602 F.3d at 69 (emphasis added) (citation omitted).

Goldsmith cites other cases, but they don't help her either.  (Br. 23.)  For example, in *LaChapelle v. Fenty*, 812 F. Supp. 2d 434 (S.D.N.Y. 2011), the court noted that "the protectability and nonprotectibility of individual components of the copyrighted photograph must be considered," and separated the unprotected elements from the "particular original expressions of these subjects" to evaluate whether the protectable elements were substantially similar.  *Id*. at 445–46; *see also Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 135 (2d Cir. 2003) (the district court was "correct" to factor out unprotected elements from the substantial similarity analysis).  Goldsmith cannot escape the key inquiry of the substantial-similarity test.

Goldsmith tries so desperately to avoid this critical inquiry because Warhol's Prince Series contains none of the protectable original elements of Goldsmith's Prince Photograph. Warhol's artistic process removed the protectable elements of lighting, shading, depth of field, focus, and camera angle that were present in the photograph.  He drastically cropped and flattened the image of Prince into a high-contrast, two-dimensional rendition that is "mask-like" in appearance.  *Supra* 14–16.  Warhol changed the medium.  *Id.*  He replaced the black-and-white color scheme with exotic and unnatural colors that were discordant in appearance.  *Id.*  His changes altered the perceived angle of Prince's face.  *Id.*  In short, he erased the original protectable elements present in Goldsmith's photograph and replaced them with his own

transformative artistic choices, until the only similarity that remained (as Goldsmith admitted) was the "outline of" Prince's head.  *Id.*

Despite Goldsmith's unequivocal admission, her lawyers now argue that other similarities exist between the Prince Photograph and the Prince Series, including the "overall composition," the "pose and angle of Prince's head," and "Prince's intense stare into the eye of the camera."  (Br. 24.)  They also identify other supposedly similar features of Prince's appearance, such as "detailed hair curls, long gall of hair down the left side of his face, deep-set intensity of his eyes, pursed lips, facial hair details, [and] the mole on his cheek," as well as "dual reflections in each pupil, reflection on the lower lip, [and] deep shadows under his eyes that were accentuated by makeup."  (*Id.*)  None of these elements are protectable, if even similar.

*First*, the "overall composition" of the Prince Series is not remotely similar to that of the Goldsmith Photograph.  The medium, scale, and cropping of the image, angle, colors, contrast, shading, and general appearance of the works are entirely different.  *Supra* 14–16.  These dissimilarities far outweigh any possible similarities between the works—which Goldsmith herself conceded are limited to the "outline" of Prince's head.  (AWF Counterstmt. ¶115.)  *See also Mannion v. Coors Brewing Co*., 377 F. Supp. 2d 444, 463 (S.D.N.Y. 2005) ("If the points of dissimilarity not only exceed the points of similarity, but indicate that the remaining points of similarity are, within the context of plaintiff's work, of minimal importance…then no infringement results.").  As a result, no reasonable observer would find the "total concept and overall feel" of the Prince Series and the Prince Photograph to be substantially similar.  *Fulks v. Knowles-Carter*, 207 F. Supp. 3d 274, 290 (S.D.N.Y. 2016); *see also Gaito*, 602 F.3d at 67 (no substantial similarity existed where "it is patent that the overall visual impressions of the two

designs are entirely different" even though "both designs set forth similar ideas and concepts relating to" the subject).

*Second*, none of the remaining elements identified by Goldsmith constitute "original" protectable elements of her photograph.  The Second Circuit adheres to the rule that "[i]n a copyright action, … the similarity between two works must concern the *expression* of ideas, not the ideas themselves."  *Gaito*, 602 F.3d at 67 (emphasis added); *see also Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992).  And "[w]here, as here, [Goldsmith] point[s] to a variety of alleged similarities between [the] two works," the court is "required to determine whether any alleged 'similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking.'"  *Gaito*, 602 F.3d at 67 (quoting *Tufenkian*, 338 F.3d at 134–35).  The purportedly similar elements identified by Goldsmith all inhere in the *idea* reflected in her photograph—a portrait of the man, Prince—and not her original *expression* of that idea.

Prince himself is not a protectable element.  *See Leibovitz*, 137 F.3d at 115–16; *Kaplan*, 133 F. Supp. 2d at 323.  Nor is Prince's pose:  neutral and forward-facing, looking into the camera.  *Kate Spade*, 388 F. Supp. 2d at 392–93; *Rentmeester*, 883 F.3d at 1121.  The characteristics of Prince's facial appearance that Goldsmith identifies—*e.g.,* his "hair curls," "pursed lips," "facial hair," "deep-set eyes," and "mole on his cheek"—are endemic to the subject himself.  They are not the result of Goldsmith's choices.  (AWF Counterstmt. ¶¶78–81).  They would be apparent in any photograph of him, and are therefore not entitled to protection. *Kate Spade*, 388 F. Supp. 2d at 392; *Belair*, 831 F. Supp. 2d at 694; *LaChapelle*, 812 F. Supp. 2d at 445.  The reflection of light on his pupils and lower lip are no different.  They are the natural consequence of any light source being reflected on a human face, and would be reflected in any

21

portrait of Prince (unless shot entirely in the dark).  Further, Goldsmith cannot flyspeck the photograph and a painting, claim to see a centimeter of similar shading, and leap to the conclusion of substantial similarity.  This is not the type of original, creative lighting choice that is protected by copyright law.  *See Fulks*, 207 F. Supp. 3d at 281 ("[T]he nature of the shot requires that the subject's face be 'hidden' because, unless the camera was pointed upwards, the downward tilt of the subject's head would block the line of sight." (citation omitted)).

　　This becomes apparent when observing portraits of Prince taken by other photographers, and reproduced below.

 

  

(AWF Counterstmt. ¶96.)

Each of the elements Goldsmith identifies are equally observable in these (and many other) portraits of the man, as they inhere in and flow naturally from the choice of the subject himself.  Where, as here, "similar works resemble each other only in unprotected aspects—for example, when similarities inhere in ideas, which are by definition unprotected, or in expression that is not proprietary to [a copyright holder]—[the copyright defendant] prevails."  *Kate Spade*, 388 F. Supp. 2d at 390; *see also Kaplan*, 133 F. Supp. 2d at 323-25 (no substantial similarity where "almost all of the similarities in expression between the two photographs are unprotectable elements or themes that predictably flow from the underlying subject matter.").

In the face of this overwhelming body of case law, Goldsmith can do nothing more than cite two unpublished decisions from one district court in California—*Friedman v. Guetta*, 2011 WL 3510890 (C.D. Cal. May 27, 2011), and *Morris v. Guetta*, 2013 WL 440127 (C.D. Cal. Feb. 4, 2013).  She contends they support her position.  (Br. 24-25.)  But they don't.  Both *Friedman* and *Guetta* involved copyright infringement claims against the same defendant, an appropriation street artist called "Mr. Brainwash."  These cases are easily distinguishable for four reasons.

*First*, *Morris* did not even address the element of substantial similarity.  It is therefore legally irrelevant.

*Second*, to the extent Goldsmith relies on these cases for the proposition that the selection and pose of a subject are protectable elements, they are at direct odds with the Ninth Circuit's more recent, controlling opinion to the contrary in *Rentmeester*, 883 F.3d at 1122–23, as well as the settled law of the Second Circuit that is binding here, *e.g., supra, Kate Spade*, 388 F. Supp. 2d at 392–93; *Kaplan*, 133 F. Supp. 2d at 323; *Belair*, 831 F. Supp. 2d at 691–92; *Leibovitz*, 137 F.3d at 116.  In *Rentmeester,* the Ninth Circuit affirmed dismissal of a copyright infringement

claim where both works were photographs of Michael Jordan dunking a basketball in a highly distinctive pose:



*Plaintiff's Photograph*                    *Defendant's Photograph*

Despite the "similarities in general ideas or concepts" found in both photographs—which included "Michael Jordan attempting to dunk in a pose inspired by ballet's *grand jete*"—the Ninth Circuit declined to find either the subject or the pose, or the distinctive combination of the two, copyright protected. *Id.* at 1122-23. The Ninth Circuit concluded instead that "Rentmeester cannot claim an exclusive right to ideas or concepts at that level of generality, even in combination." *Id.* The Ninth Circuit's decision in *Rentmeester* controls on this issue over the earlier decisions from the district courts in *Friedman* and *Morris*.

Third, *Friedman* and *Morris* are factually distinguishable, because in both cases the subjects' poses were far more deliberate and distinctive than in Goldsmith's photograph. In *Friedman*, the infringed work depicted a unique arrangement of three people in a stylized pose before the camera. 2011 WL 3510890, at *3, 5. Here's the photo:



**RUN-DMC-JMJ   Hollis Queens, New York 1985**
photograph © GLEN E. FRIEDMAN, from the book **FUCK YOU HEROES**, reprinted with permission from Burning Flags Press

(Werbin Declaration (Dkt. No. 57), Ex. H, at 2.)

In *Morris*, the infringed work showed rock star Sid Vicious "tilting his head and winking" in another highly stylized pose.  2013 WL 440127, at *1.  Here's the photo:



(Werbin Decl. Ex. I, at 2.)

Goldsmith cannot claim protection over the depiction of Prince facing forward and looking neutrally at a camera. (AWF Counterstmt. ¶¶96, 104.) Other photographers have captured a virtually identical pose simply by taking a photograph of Prince's face. *E.g.*, *supra* 22. Further, whereas the allegedly infringing works in *Friedman* and *Morris* involved nearly "verbatim" copying of the protected images, *see, e.g.*, *Friedman*, 2011 WL 3510890 at *5 (noting that defendant's works "were created by making *small alterations* to a digital copy" of the original photograph), the Prince Series significantly alters the scale and composition of the image and the perceived angle of Prince's head, as well as its dimensionality, colors, and background. (AWF Counterstmt. ¶¶116–24, 126–38.) Goldsmith ignores these facts, as well as the entirely distinct and creative artistic process that resulted in the transformed image of Prince. Therefore, like in *Rentmeester*, and unlike in *Friedman* and *Morris*, the Prince Series is similar to the Prince Photograph only "at a conceptual level" because they depict the same person, *Rentmeester*, 883 F.3d at 1122, but "differ[s] as to expressive details in material respects" that

26

preclude a finding of similarity, *id.* (noting differences that "affect the visual impact of the images" as including the position and appearance of the subjects, the background scene and colors, and the lighting).

For these reasons, the material undisputed facts require denial of Goldsmith's motion and summary judgment in AWF's favor on infringement.

## III.   The Warhol Prince Series Makes Fair Use Of the Goldsmith Prince Photograph

Nor is Goldsmith entitled to summary judgment on the question of fair use.  Rather, the undisputed material facts show that Warhol made fair use of Goldsmith's photograph.

### A.   The Prince Series Is Fair Use Under Any Interpretation Of The Test

Goldsmith criticizes the Second Circuit's decision in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013), as an outlier in its treatment of the significance of "transformation" in assessing fair use.  (Br. 29.)  Her criticism betrays the obvious:  she loses under *Cariou*.  *In re Arab Bank, PLC Alien Tort Statute Litig.*, 808 F.3d 144, 148 (2d Cir. 2015) ("A decision by a panel of the Second Circuit is binding unless and until it is overruled by the Court en banc or by the Supreme Court.").  Even if the Court *could* look beyond *Cariou*, however, Goldsmith's position would find no support.  A finding of fair use is required under any application of the four-factor test. *See* 17 U.S.C. §107.

Like Goldsmith, the Seventh Circuit has criticized the Second Circuit's emphasis on transformation.  Yet, in *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 757 (7th Cir. 2014) (Easterbrook, J.), the Seventh Circuit found that a second work constituted fair use in analogous circumstances.  Goldsmith admits her copyright infringement claim is based on her contention that Warhol copied the "outline" of Prince's head from her photograph.  (AWF Counterstmt. ¶115.)  In *Kienitz*, the defendants used a photograph of a public figure to create a distinct work of

art, depicting the outline of the man's head in flat, unnatural colors against a black background, surrounded in multi-colored writing:

 

*Plaintiff's Photograph*                    *Defendants' Art*

*Id.* The Seventh Circuit declined to consider the transformative effect of the derivative work, but nonetheless concluded that defendants were entitled to summary judgment on fair use, because "Defendants removed so much of the original that . . . . [w]hat is left, besides a hint of [the subject's] smile, is the outline of his face, which can't be copyrighted." *Id.* at 759. The Seventh Circuit also concluded that any adverse market impact that plaintiff may have suffered as a result of the derivative work was "offset [by] the fact that, by the time defendants were done, almost none of the copyrighted work remained." *Id.* at 759-60. The decision in *Keinitz* would require the same result here. Because Goldsmith concedes that her case is based on Warhol's alleged copying of the outline of Prince's head and face, this alone is dispositive of fair use, even under the more stringent standards imposed outside the Second Circuit, *id.* at 759.

28

**B.    The Second Circuit Test Requires A Finding Of Fair Use**

**1.    *The Prince Series Is "Transformative" Under Cariou and Other Cases***

Goldsmith argues that Warhol's Prince Series is not transformative.  (Br. 31-34.)  She is wrong.

The Supreme Court has noted that "[t]he goal of copyright … is generally furthered by the creation of transformative works."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994).  In the Second Circuit, transformation is the "heart of the fair use inquiry."  *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006).  The key inquiry is whether the secondary work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message."  *TCA Television Corp. v. McCollum*, 839 F.3d 168, 180 (2d Cir. 2016); *see also Cariou*, 714 F.3d at 705; *Blanch*, 467 F.3d at 251, 253.  If "looking at the [works] side-by-side," the secondary use "ha[s] a different character…new expression, and employ[s] new aesthetics with creative and communicative results distinct" from the original, the work is "transformative as a matter of law."  *Cariou*, 714 F.3d at 707–08.

The Prince Series easily satisfies this standard.  It "manifest[s] an entirely different aesthetic" from the Prince Photograph.  *Id*.  Warhol stripped away the photorealism and individuality that characterize the Prince Photograph, leaving a flat, two-dimensional, and high-contrast symbolic head.  *See supra* 14–16.  Whereas Goldsmith testified her "photography is about light" (AWF Counterstmt. ¶57), Warhol's artistic techniques removed the lighting and shading seen in the Prince Photograph.  (*Id.* ¶119.)  Warhol cropped and flattened the original image, making it appear disembodied and mask-like, and changed the artistic medium altogether.  (*Id.* ¶¶116-24.)  He painted the works with multiple layers of bright and exotic colors and, in some, superimposed a floating outline of Prince's head.  (*Id.* ¶¶132-35, 137.)  Warhol's drawings outline only the shape of Prince's disembodied head and facial features (and in one drawing, a

set of floating, disembodied suspenders).  (*Id.* ¶114.)   When Warhol completed his transformative process, the realistic image of Prince *the person* was gone.  He "diverg[ed] from the given facts of the photographic impression to provide his portrayal of Prince with a confrontational presence and intensity absent in his source."  (*Id.* ¶129); *see also Blanch*, 467 F.3d at 253 (listing similar artistic alterations as "perfectly describ[ing]" the first factor of transformation).

Warhol's Prince Series also delivers "new…communicative results distinct" from the Prince Photograph.  *Cariou*, 714 F.3d at 708.  Goldsmith concedes that her intent was to convey the humanity and individuality of Prince the person.  She states that he appeared "fragile" to her, and his discomfort conveyed that he was a "vulnerable human being."  (Goldsmith R56.1 ¶¶29, 31.)  She believes she captured these sentiments in her photograph, stating that "the image she captured of Prince in the Goldsmith Photo was unique to that moment and froze a telling portrait, which in her mind reflected an expressive yet uncomfortable person who was a 'vulnerable human being.'"  (Br. 21; *see also* Br. 3-4; Goldsmith R56.1 ¶31.)  Warhol's Prince Series communicates exactly the opposite message.  Warhol "creat[ed] an image of Prince as a kind of icon or totem of something rather than just being the actual human being that made the music." (AWF Counterstmt. ¶142.)  The Prince Series "communicate[s] a message about the impact of celebrity and defining the contemporary conditions of life."  (*Id.* ¶147.)  *See Blanch*, 467 F.3d at 253 ("When, as here, the copyrighted work is used as raw material, in furtherance of distinct creative or communicative objectives, the use is transformative.").

Goldsmith responds that *Cariou* was the "high-water mark" of the Second Circuit's consideration of transformation.  (Br. 29.)  But *Cariou* is not unique.  It is consistent with a long line of Second Circuit cases that recognize the importance of transformation in assessing fair use.

*E.g.*, *Blanch*, 467 F.3d at 251 (identifying transformation as "the heart of the fair use inquiry"); *Bill Graham Archives v. Dorling Kindersley Ltd*., 448 F.3d 605, 608 (2d Cir. 2006) ("Most important to the court's analysis of the first factor is the 'transformative' nature of the work."); *Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132, 142 (2d Cir. 1994).

The Second Circuit's more recent decision in *TCA Television Corp. v. McCollum*, 839 F.3d 168 (2d Cir. 2016), is no different.  Goldsmith quotes *TCA*'s statement that *Cariou* "'represent[s] the high-water mark of our court's recognition of transformative works'" and "'has drawn some criticism.'"  (Br. 29 (quoting *TCA*, 839 F.3d at 181).)  But *TCA* cites the Seventh Circuit's decision in *Kienitz* as an example of this criticism, *see TCA*, 839 F.3d at 181, and *Kienitz*, as explained above, still requires a finding of fair use in this case.  Further, *TCA* did not overrule *Cariou*.  Rather, it adopted and "scrupulous[ly] adhere[d]" to *Cariou*, holding that the defendant's "verbatim" unaltered use of the original work failed to meet the *Cariou* standard. *Id*. at 181.  *Cariou* remains valid Second Circuit law and requires denial of Goldsmith's motion. *See In re Arab Bank*, 808 F.3d at 148.

Goldsmith also attempts to minimize the impact of Warhol's transformative process.  (Br. 33.)  Her effort fails a simple side-by-side comparison of the works (*supra* at 6, 10–13) and is further undermined by the expert opinions of renowned Warhol scholars and critics, which can properly be considered on this motion, *cf. Graham v. Prince*, 265 F. Supp. 3d 366, 382 (S.D.N.Y. 2017).[2]  AWF's expert Dr. Crow testified that by "bringing all the features of Prince

---

[2]  In *Cariou*, the Second Circuit did not have the opportunity to consider expert testimony because no such testimony was offered by Richard Prince in the district court, *Cariou v. Prince*, 784 F. Supp. 2d 337 (S.D.N.Y. 2011).  But the Second Circuit did, in addition to performing a

up to the surface across the same pla[ne]," Warhol transformed Goldsmith's "retiring" image of Prince into one of "Prince confronting you as his admirer, his fan, a curious onlooker with a kind of uncompromising implacable character which is not present in the Goldsmith."  (AWF Counterstmt. ¶131.)   "Unlike Goldsmith's focus on the individual subjects' unique human identity," Warhol's portraits "sought to use the flattened, cropped, exotically colored, and unnatural depiction of Prince's disembodied head to communicate a message about the impact of celebrity and defining the contemporary conditions of life."  (*Id.* ¶147.)  According to Dr. Crow, "[t]his approach transforms the character, message, and historic and artistic value of Warhol's portrait of Prince compared to Goldsmith's photograph."  (*Id.*)

Goldsmith then goes in the opposite direction—attempting to use *Cariou* to her advantage.  This fails as well.  In *Cariou*, the Second Circuit considered 30 works by the artist Richard Prince that incorporated photographs taken by plaintiff Patrick Cariou.  The Second Circuit ruled that 25 of the Richard Prince works made fair use of Cariou's photographs as a matter of law.  *Cariou*, 714 F.3d at 710.  The Second Circuit remanded five of the Richard Prince

side-by-side comparison of the works themselves, consider Richard Prince's own testimony concerning his approach and aesthetic in support of the transformative nature of his works. *Cariou*, 714 F.3d at 706-07; *accord Blanch*, 467 F.3d at 252-53 (considering Koons' testimony in finding transformation).

works for further consideration by the district court, because it could not "say with certainty at this point" that these works were transformative as a matter of law.[3]  *Id.* at 711.

Goldsmith argues that Warhol's Prince Series is akin to the five Richard Prince works that were remanded by the Second Circuit in *Cariou*.  (Br. 31.)  She is wrong.  Richard Prince started directly with Cariou's original black-and-white photographs, and from there he layered props and spots of color:





*Original Cariou Photograph*          *Richard Prince Work Entitled "Graduation"*

---

[3]  Even as to these five works, the Second Circuit remanded the question of transformation.  It did not grant affirmative summary judgment to Cariou, which is what Goldsmith seeks here.  *Cariou*, 714 F.3d at 711.

*Cariou*, 714 F.3d at 710.  Even Goldsmith concedes that "[t]he five works remanded in *Cariou* were created 'by [imposing new elements] *over Cariou's classical black-and-white photographs*.'"  (Br. 32–33 (emphasis added) (citation omitted).)

By contrast, Warhol did not layer detail on top of Goldsmith's original black-and-white photograph of Prince.  He created an entirely new work, with an entirely different aesthetic, that did not directly use any of the underlying black-and-white photograph. (AWF Counterstmt. ¶¶115–24, 132–38.)  Warhol's Prince Series did not contain only "relatively minimal alterations" to Goldsmith's photograph, as Goldsmith suggests.  (Br. 32).  Apart from the underlying subject (Prince), the Prince Series looks *nothing* like the Prince Photograph aesthetically.  Warhol's Prince Series is far more analogous, on the issue of transformation, to the 25 Richard Prince works in *Cariou* found to be transformative as a matter of law, including these:

 



(AWF Counterstmt. ¶239 ("Cheese and Crackers", "Color Me Mine", "Cookie Crumbles").) Like Richard Prince's works in *Cariou*, Warhol's Prince Series differs from Goldsmith's Prince Photograph in, among other ways, "composition, presentation, scale, color palette, and media." *Cariou*, 714 F.3d at 706; *see also supra* 14–16; AWF Counterstmt. ¶¶112–24, 132–38, 147.  And Warhol even went a step further removed from the photograph than Richard Prince, such that Warhol's artistic process so "heavily obscured and altered" the original photograph as to make it "barely recognizable" within the Prince Series.  *Cariou*, 714 F.3d at 710.

Goldsmith cites *Friedman* and *Morris* again, but this time to support her arguments about fair use.  (Br. 33.)  Those cases are distinguishable.  In *Friedman*, the court concluded that the second works were not of a sufficiently "distinct character," and instead replicated much of the original work's detail.  2011 WL 3510890 at *6.  In *Morris*, the court emphasized that both works were composed of the subject "making a distinct facial impression," which dominated the court's view of the aesthetic similarities of the works.  2013 WL 440127, at *8.  The *Morris* court was also influenced by the fact that defendants offered a belated explanation of the purportedly transformative intent behind the works, which the court found to be "a post-hoc rationalization of the justification for copying."  *Id.*

*Friedman* and *Morris* have no relevance here.  AWF has submitted extensive scholarship and expert evidence attesting to the clear transformative intent and message of Warhol's celebrity portraits, including the Prince Series.   Unlike in *Friedman* and *Morris,* Warhol intentionally transformed a photograph of Prince *the person* into an image of Prince *the icon*, thereby commenting on the nature of celebrity and modern consumerism.  (AWF Counterstmt. ¶147.)  Warhol's transformative process and message has been well recognized for decades, including by the Second Circuit.  *See Cariou*, 714 F.3d at 706.

Finally, Goldsmith asserts that the commercial nature of AWF's use weighs against fair use. (Br. 34.) But the law is clear that the commercial nature of a second work is afforded little weight where, as here, the second work is transformative. *E.g.*, *Cariou*, 714 F.3d at 708; *Blanch*, 467 F.3d at 254. Further, AWF's alleged commercial activity is dwarfed by its charitable mission and endeavors. (AWF Counterstmt. ¶238.) AWF is a not-for-profit foundation that exists to promote the visual arts. (*Id.*; Goldsmith R56.1 ¶¶4, 72.) AWF makes significant grants "to support the creation, presentation and documentation of contemporary visual art, particularly work that is experimental, under-recognized, or challenging in nature." (AWF Counterstmt. ¶238.) It has given and lent major Warhol works, including Prince Series works, for public viewing to institutions and museums, including The Andy Warhol Museum in Pittsburg, Pennsylvania. (*Id.* ¶150.) AWF's significant charitable activities weigh against Goldsmith's purely commercial, profit-seeking enterprise.

### 2.       *The Nature of the Copyrighted Work Is Not Dispositive*

Goldsmith incorrectly argues that the second factor weighs against fair use. (Br. 35.) Instead, it is immaterial. The Prince Series uses the Prince Photograph "in a transformative manner." *Blanch*, 467 F.3d at 257; *see supra* at 14–16. In these circumstances, courts discount the second factor in the fair use analysis. *See Campbell*, 510 U.S. at 586; *Cariou*, 714 F.3d at 710; *Bill Graham*, 448 F.3d at 612.

### 3.       *The Amount and Substantiality of Use Favors Fair Use*

Arguing incorrectly that the third factor weighs against fair use, Goldsmith contends that the Prince Series "incorporates a substantial portion of the Goldsmith Photo" and conveys "the same protected expressive content." (Br. 35.) Goldsmith is wrong. The Prince Series uses virtually *none* of the Prince Photograph. Warhol heavily cropped the image in Goldsmith's photograph so that only Prince's disembodied head remains. He also altered or eliminated every

other element of the Prince Photograph besides the bare outline of Prince's head (and in one image, his disembodied suspenders).   Even Goldsmith admitted as much in her deposition. (AWF Counterstmt. ¶115.)   Such *de minimis* use favors AWF.   *See Kate Spade*, 338 F. Supp. 2d at 390; *Kienitz*, 766 F.3d at 759.

Nor did Warhol copy any of the expressive elements of Goldsmith's photograph.   (Br. 35.)   Warhol removed or altered *every* protectable element in the photograph, *e.g.*, Goldsmith's choice of camera and lens, lighting, shading, perspective, angle, and depth.   *Supra* at 14–16.

Warhol's transformative use of the Prince Photograph also weighs heavily in favor of fair use under the third factor.   *See Cariou*, 714 F.3d at 711 ("[Richard] Prince transformed those photographs into something new and different and, as a result, this [third] factor weighs heavily in [Richard] Prince's favor.").

### 4.    *The Absence of Market Impact Favors Fair Use*

Goldsmith is also wrong that the fourth factor weighs against fair use.   The fourth factor of the fair-use analysis concerns "whether the secondary use usurps the market of the original work."   *Cariou*, 714 F.3d at 708 (quoting *Blanch*, 467 F.3d at 258).   An infringer "has usurped the market for copyrighted works, including the derivative market, where the infringer's target audience and the nature of the infringing content is the same as the original."   *Id*. at 709.   The markets for the Prince Series and the Prince Photograph could hardly be more distinct, which strongly favors a finding of fair use.

Goldsmith focuses on the derivative licensing market for the Prince Photograph, and in particular on the *potential* licensing market for the photograph.   (Br. 36–39.)   She contends that "[h]er licensing markets overlap [with] the same markets into which AWF has licensed Warhol's imagery for editorial and commercial uses, including magazines."   (Br. 36.)   Yet she concedes that she "has never editioned or licensed the Goldsmith Photo," except once to Vanity Fair as an

37

artist reference in 1984.  (Br. 37; *see also* AWF Counterstmt. ¶¶182–83; Goldsmith R56.1 ¶¶40, 143.)  She has never again licensed any photograph for use as an artist reference.  (*Id.* ¶¶182–83.)  Nor is there any evidence that she has again licensed the Prince Photograph or any other photograph from the 1981 studio shoot of Prince.  (*Id.* ¶182.)  She conceded that the black-and-white Prince Photograph she shot was not usually one she would give to a publication, but rather shot for herself.  (Goldsmith R56.1 ¶28.)  Her contention that a potential derivative licensing market exists for this photograph is therefore entirely hypothetical.

Regardless, Goldsmith is incorrect that the hypothetical markets for her Prince Photograph overlap with the actual markets for Warhol's Prince Series.  This, of course, is not even the relevant test.  Mere overlap is not enough.  Rather, "the Factor Four analysis is concerned with only one type of economic injury to a copyright holder: the harm that results because the secondary use serves as a *substitute for the original work*."  *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 99 (2d Cir. 2014) (citing *Campbell*, 510 U.S. at 591 ("cognizable market harm" is limited to "market substitution")).  Goldsmith cannot show that the Prince Series is a substitute for her Prince Photograph *in any market.*

*First*, the Prince Series does not usurp the primary (sale) market for the Prince Photograph.  Goldsmith claims otherwise, but she has no evidence to support her position.  She says (without any support) that a single collector purchased one of her fine art prints of Prince— *not* the Prince Photograph—and also owned Warhol works.  (Br. 18, 37.)  This would not show usurpation even if Goldsmith had submitted evidence to support it.  There is no evidence that this supposed collector bought the works for the same reason, perceives the works similarly, or believes the works are substitutes for each other (the fact that the collector owns both of them suggests the opposite).

38

Moreover, evidence as to a single collector is hardly evidence of market similarity. Instead, the only real evidence in this case—and the obvious truth to anyone who transacts in the art market—is that there is a significant market difference between Goldsmith and Warhol. The Prince Series has been exhibited in the finest museums and galleries in the world, and sold for prices upwards of $150,000 to the wealthiest collectors of fine art. *See supra* 16. Dealers sell Warhol's works by reference to their transformative aesthetic and their commentary about consumerism and pop culture. *See supra* 9. In sharp contrast, Goldsmith's Prince Photograph has never been shown publicly. *See supra* 5. Goldsmith has never sold or even attempted to sell one of the photographs from her December 1981 Prince studio shoot. *Id.*; *see also* Goldsmith R56.1 ¶143. Her other photographs of Prince have never sold for more than $2,500. *See supra* 5. Goldsmith sells her photographs through rock-and-roll photography galleries, which target buyers interested in photographs of musicians or who want a photograph of a musician at a concert they attended. *See supra* 3.

*Second,* Goldsmith cannot demonstrate that the Warhol Prince Series usurps her Prince Photograph in the licensing market. Goldsmith asserts generally that her photographs (not the Prince Photograph) and Warhol's images (not limited to the Prince Series) have appeared on "music album covers" and in "magazines." (Br. 36–37.) This level of generality is not accretive to any analysis of the specific markets for these specific works. Goldsmith supplies zero evidence that the two artists' works appeared in magazines of similar types, or in similar ways, or for a similar purpose, such that it might be inferred that the use of the Warhol image usurped the opportunity for use of the Goldsmith photograph. She has no evidence that a magazine editor or a musician chose to license a work from the Prince Series *instead of* the Prince Photograph.

And she has no evidence that she has lost any revenue due to the Prince Series or that the value of her Prince Photograph has decreased.

Instead, all evidence is to the contrary.  Goldsmith has never licensed the Prince Photograph to appear anywhere (whether in a magazine, on an album cover, or otherwise), and never stated that she intended to do so until this lawsuit.  *See Estate of Smith v. Cash Money Records, Inc.*, 253 F. Supp. 3d 737, 752 (S.D.N.Y. 2017) (observing, negatively, that "Plaintiffs never attempted to establish a market for licensed derivative uses of the JSR composition copyright until Defendants used the recording on the Album").  The only licensing use of this image was as an artist reference to Vanity Fair, one time more than three decades ago.  (AWF Counterstmt. ¶¶182–83; Goldsmith R56.1 ¶40.)  By contrast, Warhol's Prince Series works have been licensed at least seven times, and for as much as $10,000.  (AWF Counterstmt. ¶¶179–80.)  Contrary to Goldsmith's suggestion (Br. 38–39), the fact that Conde Nast and Vanity Fair featured works from the Warhol Prince Series in their 2013 and 2016 anthologies does not show that those works were substitutes for Goldsmith's photograph.  There is no evidence that Conde Nast or Vanity Fair even considered, or would have considered, a Goldsmith photograph instead.  Goldsmith is not entitled to this presumption, as she has never licensed a Prince photograph for reproduction in either publication, and there is no evidence she has ever been asked to.

When Goldsmith has licensed her *other* photographs of Prince, she has done so primarily to rock-and-roll and music publications (*e.g.*, Guitar World, Guitar Magazine, Blender Magazine, and Hard Rock Hotel), photography publications (*e.g.*, Camera Press/Earth Port FX), and generalist publications seeking a photorealistic portrait of the singer, for no more than $2,300.  (Goldsmith R56.1 ¶¶144–54.)  She has also licensed for between $150 and $1000 other photographs of Prince to generalist publications that sought a photorealistic portrait.  (*See id*.

40

¶¶144–45 (concert photographs), ¶149 (museum exhibition catalogue), ¶150 (*Reader's Digest*), ¶153 (photograph of "Prince Jumping").)  There is simply no evidence that the same clients license Warhol's and Goldsmith's works for the same reasons.  And a representative from Artist Rights Society, which acts as a licensing agent for Warhol's work, testified that she was not aware of any instance where a potential licensee was debating between a Warhol and a Goldsmith.  (AWF Counterstmt. ¶226.)

Goldsmith attempts to fill her evidentiary gaps by offering the opinion of Jeffrey Sedlik, her purported "market expert."  (Br. 37.)  But Sedlik's opinion is baseless, and he is unqualified to offer it.  (*See* AWF Summ. J. Br. 43–44 (Dkt. 55).)  The opinion should be excluded under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and disregarded when ruling on this motion, *In re Fosamax Prods. Liability Litig.*, 2009 WL 2878439, at *4 (S.D.N.Y. Sept. 9, 2009).

In any event, the transformative nature of the Prince Series mitigates any likelihood that these works would have a negative impact on Goldsmith's primary and derivative markets.  The Second Circuit has noted that courts are "mindful that '[t]he more transformative the secondary use, the less likelihood that the secondary use substitutes for the original,'" *Cariou*, 714 F.3d at 709 (quoting *Castle Rock*, 150 F.3d at 145).  The Court explained that "any economic 'harm' caused by transformative uses does not count because such uses, by definition, do not serve as substitutes for the original work."  *Authors Guild*, 755 F.3d at 99 (citing *Bill Graham Archives*, 448 F.3d at 614).

The fourth factor therefore strongly favors a finding of fair use.  *See Authors Guild*, 755 F.3d at 99; *Cariou*, 714 F.3d at 709; *Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34, 47 (S.D.N.Y. 2017) (holding it was "clear" that secondary use did not "serve as a market substitute", and that

"anyone seeking to enjoy" the original "will have a very different experience" watching the second); *Oyewole v. Ora*, 291 F. Supp. 3d 422, 436 (S.D.N.Y. 2018) (defendants' songs were "unlikely to usurp the market for" the original:  because the allegedly infringing songs "are different in character and purpose from the original work, it is unlikely that Defendants' target audience and [the original song's] audience are the same.").

## IV.   GOLDSMITH'S COUNTERCLAIM IS BARRED BY THE STATUTE OF LIMITATIONS

Because Goldsmith concedes that her copyright infringement claim relates only to AWF's 2016 license to Condé Nast and to any potential future licensing (Br. 40), AWF is entitled to summary judgment on any alleged infringements that occurred before that date.

### CONCLUSION

For the above reasons, Goldsmith's motion for summary judgment should be denied.

DATED:   New York, New York
November 20, 2018

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: *Luke Nikas*
_____
Luke Nikas
Maaren A. Shah
Daniel Koffmann
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
Facsimile:  (212) 849-7100
lukenikas@quinnemanuel.com
maarenshah@quinnemanuel.com
danielkoffmann@quinnemanuel.com

*Attorneys for Plaintiff The Andy Warhol
Foundation for the Visual Arts, Inc.*

## CERTIFICATE OF COMPLIANCE WITH THE COURT'S INDIVIDUAL PRACTICES

I certify that this brief complies with the Individual Practices of Judge John G. Koeltl and the Court's scheduling order (Dkt. 44).  This brief contains a table of contents and a table of authorities.  It is double-spaced (including footnotes); written in 12-point Times New Roman, a legible font; has reasonable (one inch) margins; and contains 9992 words (as counted by Microsoft Word 2013), excluding the parts of the brief exempted by Individual Practice Rule 2(D).

 *Luke Nikas*
Luke Nikas

*Attorney for Plaintiff The Andy Warhol Foundation for the Visual Arts, Inc.*