```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
THE ANDY WARHOL FOUNDATION FOR THE   :
VISUAL ARTS, INC.,                   :
                                     :
                 Plaintiff,          :    Case No.  17-cv-02532-JGK
                                     :
         vs.                         :
                                     :    ECF Case
                                     :
LYNN GOLDSMITH AND LYNN GOLDSMITH,   :
LTD.                                 :
                                     :
                                     :
                 Defendants.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :
LYNN GOLDSMITH,                      :
                                     :
                 Counterclaim Plaintiff, :
                                     :
         vs.                         :
                                     :
                                     :
THE ANDY WARHOL FOUNDATION FOR THE   :
VISUAL ARTS, INC.,                   :
                                     :
                 Counterclaim Defendant. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**REPLY MEMORANDUM OF LAW OF DEFENDANTS AND COUNTERCLAIM PLAINTIFF LYNN GOLDSMITH AND LYNN GOLDSMITH, LTD. IN <u>FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT</u>**

HERRICK, FEINSTEIN LLP
Barry Werbin
Gabrielle C. Wilson
2 Park Avenue
New York, N.Y. 10016
(212) 592-1418
Email: bwerbin@herrick.com

LAW OFFICES OF JOEL L. HECKER
Joel Hecker
230 Park Avenue, Suite 660
New York, N.Y. 10169
(212) 481-1850
HeckerEsq@aol.com

*Attorneys for Defendants Lynn Goldsmith and Lynn Goldsmith, Ltd., and Counterclaim Plaintiff Lynn Goldsmith*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT .......................................................................................................................... 2

POINT I     Warhol's images captured protected elements of, and
            are substantially similar to, the Goldsmith Photo .................................. 2

POINT II    Warhol's Prince images are not transformative
            under the Second Circuit's "ordinary observer" standard .................... 4

POINT III   AWF fails to rebut the harm to Goldsmith's licensing markets ........... 7

CONCLUSION ................................................................................................................... 10

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Authors Guild, Inc. v. HathiTrust*,
    755 F.3d 87 (2d Cir. 2014)..................................................................................................8

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994).......................................................................................................7, 9

*Cariou v. Prince*,
    714 F.3d 694 (2d Cir. 2013).....................................................................................5, 6, 10

*Ferdman v. CBS Interactive Inc.*,
    2018 WL 4572241 (S.D. N.Y. Sept. 24, 2018)................................................................7, 8

*Friedman v. Guetta*,
    2011 WL 3510890 (C.D. Cal. May 27, 2011) ...................................................................6

*Hosseinzadeh v. Klein*,
    276 F. Supp. 3d 34 (S.D.N.Y. 2017)..................................................................................8

*Kienitz v. Sconnie Nation LLC*,
    766 F.3d 756 (7th Cir. 2014) ..........................................................................................4, 6

*Kisch v. Ammirati & Puris Inc.*,
    657 F. Supp. 380 (S.D.N.Y. 1987) ................................................................................2, 4

*Morris v. Guetta*,
    2013 WL 440127 (C.D. Cal. Feb. 4, 2013).........................................................................6

*Oyewole v. Ora*,
    291 F. Supp. 3d 422 (S.D.N.Y. 2018)................................................................................9

*Psihoyos v. Nat'l Geographic Soc'y*,
    409 F. Supp. 2d 268 (S.D.N.Y. 2005)................................................................................4

*Rogers v. Koons*,
    960 F. 2d 301 (2d Cir. 1992)......................................................................................2, 3, 4

*Salinger v. Random House, Inc.*,
    811 F.2d 90 (2d Cir. 1987).................................................................................................7

*Smith v. Cash Money Records, Inc.*,
    253 F. Supp. 3d 737 (S.D.N.Y. 2017)................................................................................8

**Statutes**

17 U.S.C. § 107 ...............................................................................................................................1

**Miscellaneous**

1 Nimmer on Copyright §2A.08[E][3][a][i] (2018) ........................................................................2

The Goldsmith Parties respectfully submit this Reply Memorandum of Law in further support of their cross-motion for summary judgment against The Andy Warhol Foundation For The Visual Arts, Inc. ("AWF").[1]

## PRELIMINARY STATEMENT

AWF ignores the substantial similarity of protected elements from the unique, unpublished, Goldsmith Photo. Having copied that photo to create his Prince images for a Vanity Fair commission, Warhol maintained the look and feel of the photo in his images, which reflect Prince's same expression and pose that were captured by Goldsmith in a moment of time in a private studio shoot.

Section 107 of the Copyright Act does not contain a protected fair use category called "Warhol." Yet that is exactly what AWF urges this Court to find in making the sweeping statement that "[Warhol]…transformed the nature and meaning of art itself." AWF Opp. Mem. p. 1 [Docket No. 68]. Warhol himself made no such pronouncements; instead, AWF improperly relies upon inadmissible after-the-fact pronouncements of purported experts in contradiction of the Second Circuit's "ordinary observer" standard for assessing "transformative" fair use. Warhol's images reflect the same essence of Prince's expression that was captured in the Goldsmith Photo and which Vanity Fair no doubt sought to maintain by commissioning Warhol to create an illustration based on that photo.

AWF's targeting of the same types of commercial and editorial licensing markets that Goldsmith has historically exploited will, if left unchecked, ultimately usurp the potential markets for her photo. Accordingly, the Goldsmith Parties are entitled to summary judgment.

---

[1] Abbreviations are from the Goldsmith Parties' moving Memorandum of Law dated October 12, 2018 (Docket No. 53).

## ARGUMENT

## POINT I

### Warhol's images captured protected elements of, and are substantially similar to, the Goldsmith Photo

In dissecting Warhol's images, AWF improperly discounts the protected elements of the photo that are evident when comparing the images. AWF also ignores the critical fact that Warhol copied that photo to create his images.[2]

AWF is wrong that Prince's "pose" reflected in the Goldsmith Photo is not protectable. AWF Opp. Mem. at 18, 20. "Elements of originality in a photograph may include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved….." *Rogers v. Koons*, 960 F. 2d 301, 307 (2d Cir. 1992) (citations omitted.) Goldsmith's timing of her unpublished studio photo captured Prince's momentary pose and facial expression, and these protectable elements carry over in Warhol's images. *See Kisch v. Ammirati & Puris Inc.*, 657 F. Supp. 380, 382 (S.D.N.Y. 1987) ("copyrightable elements include such features as the photographer's selection of lighting, shading, positioning and timing."); 1 Nimmer on Copyright §2A.08[E][3][a][i] at 2A-103 (2018) ("*timing* involves 'being at the right place at the right time.'") (Emphasis in original; citation

---

[2] The silkscreen used by Warhol to create his silkscreen paintings and screenprints was created by copying the Goldsmith Photo. Goldsmith R. 56.1 ¶¶66, 69 (disputed in part by AWF based only on Neil Printz testifying this was "[t]ypically" how it was done. AWF Response to Goldsmith R. 56.1 ¶66). The drawings were created by projecting the Goldsmith Photo onto paper. *Id*. ¶70 (undisputed). The screenprints did not contain any painted backgrounds or faces and were created directly from the silkscreen. Goldsmith R. 56.1 ¶69 (undisputed).

omitted)).

Shadow areas from the photo remain (particularly around Prince's eyes, on his lips and under his hairline) and the higher contrast created by the silkscreen process is accentuated where those shadows appear in the Goldsmith Photo, as is evident from comparing the images. Prince's hair tendrils are accentuated in the Goldsmith Photo by lighting against a white background, and remain accentuated in Warhol's images. The reflection of Goldsmith's studio lights in Prince's eyes — a focal point of the photo — remain in Warhol's images. Prince's head angle is virtually the same. AWF admits Goldsmith's lighting accentuated Prince's "chiseled bone structure" and that Goldsmith selected the camera, lenses and type of film; applied eye shadow and lip gloss to Prince; wanted to "draw attention to [Prince's] mouth" which was "very sensual"; played songs that were "designed to manipulate Prince's energy during the shoot"; and set up the lighting. AWF Counter R. 56.1 ¶¶ 25 - 27, 32; AWF R. 56. 1 ¶¶ 73 - 75, 82 - 85. *See also* Goldsmith Opp. Mem. at 2 - 9 [Docket No. 65]. These elements, coupled with Prince's captured pose and facial expression, were the product of the environment Goldsmith created in her studio and her skill as an accomplished photographer; they contribute significantly to the overall look and feel of Warhol's images.

*Rogers* emphasized that plaintiff's black and white photo of puppies with their owner was "the product of plaintiff's artistic creation. Rogers' inventive efforts in posing the group for the photograph, taking the picture, and printing 'Puppies' suffices to meet the original work of art criteria." *Rogers*, 960 F. 2d at 307. As in *Rogers*, where that "case present[ed] the rare scenario where there is direct evidence of copying," *id.*, Warhol physically copied the Goldsmith Photo as the starting point for his Prince images, included the same pose and facial expression, and increased contrast in shaded and lighter areas. *Rogers* emphasized that Koons' sculpture, despite

3

it being in a different three-dimensional media, with colors added and other changes made to the original photo, nevertheless copied the creative expression of the photo: "[T]he composition, the poses, and the expressions were all incorporated into the sculpture to the extent that, under the ordinary observer test, we conclude that no reasonable jury could have differed on the issue of substantial similarity." *Id.* at 308.

This is not a case where the subject of a photo appeared in public for all to photograph, as in *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756 (7th Cir. 2014), or where the subject matter is found in nature, as in *Psihoyos v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 268, 275 (S.D.N.Y. 2005). The different expressions of Prince reflected in other black and white photos appearing in the CN Issue, for example, highlight the uniqueness of that expression in the Goldsmith Photo that is replicated in Warhol's images. *See* Goldsmith Opp. Mem. at 6 - 7. Indeed, of the multiple Prince studio photos Goldsmith made in 1981, her agency selected only one, which Vanity Fair then licensed and used to commission the VF Warhol Image.

It is not up to AWF to characterize (or in this case to mischaracterize) the protected elements of the Goldsmith Photo. On the contrary, a comparison by this Court of "the works themselves supersede and control any contrary allegations of the parties." *Kisch*, 657 F. Supp. at 383-84 (citation omitted). That comparison supports a finding of substantial similarity of the Warhol images respecting the overall look and feel and similarity of protected elements of the Goldsmith Photo.

## POINT II

### Warhol's Prince images are not transformative under the Second Circuit's "ordinary observer" standard

AWF ignores the Second Circuit's admonition that "transformative use" must be assessed from the perspective of the "ordinary observer." AWF's after-the-fact characterizations

4

of Warhol's images that do not emanate from Warhol himself cannot be considered as they violate the "ordinary observer" standard. This includes the inadmissible expert report of Thomas Crow and improper disguised expert report of Neil Printz.

The infringing Warhol CN Image was used on the cover of a consumer magazine about a rock and roll star. There is no evidence that ordinary consumers would view that cover as anything more than a colorful illustration of Prince, as opposed to reading into it some "commenting on the nature of celebrity and modern consumerism." AWF Opp. Mem. at 35. AWF's references to Warhol's 1960's Marilyn Monroe images have no relevance because those images were not commissioned works, were based on widely available publicity photos, and were never challenged as infringing.

AWF's statement that Warhol's images convey the "opposite message" of the Goldsmith Photo is not based on an ordinary observer standard. AWF Opp. Mem. at 30. AWF cites no legal support for its conclusion that transformative use is properly supported by "expert opinions of renowned Warhol scholars and critics, which can properly be considered on this motion." *Id*. at 31. Indeed, AWF argued to the Second Circuit in *Cariou v. Prince*, 714 F.3d 694 (2d Cir. 2013) that the District Court had erred when it "assessed the meaning of [Richard] Prince's work based entirely on Prince's testimony, not the reasonable perceptions of the viewer" and cautioned against the danger of "concoct[ing] a narrative that appeals to legal sensibilities." Goldsmith Opp. Mem. at 15 -16. This caution notwithstanding, experts opining on the purported meaning of Warhol's images long after his death are a far cry from what the artist himself might have opined; to the contrary, Warhol specifically characterized his work as having "no real point" and "no larger meaning." *Id*. at 14 - 15.

AWF's statement that Warhol's images are "far more analogous" to the 25 images found

to be fair use in *Cariou* (AWF Opp. Mem. at 34) is belied by a visual comparison. Those 25 works added substantial imagery of nude women, objects and collage effects; painted areas overlaying the original photos; and coverings over eyes and faces. The original photo imagery was reconstructed so as to be barely recognizable in most of the images. Warhol, however, retained the essence of the Goldsmith Photo, adding only high contrast as a product of the silkscreen process, color in the "PO" paintings (other than PO 50.543), minor cropping that retained Prince's entire face, and in some images drawn outlines. None of those changes altered the protectable expression of the Goldsmith Photo.

AWF relies heavily on *Kienitz*, which Goldsmith has addressed in her Opposition Memorandum at 23. The use of the photograph in that case was intended as "political commentary," the image was combined with additional unrelated subject matter, and the source photo was taken at a public event and posted online in low resolution – all missing here. *Kienitz,* 766 F.3d at 757, 759. AWF's references to Goldsmith admitting only an "outline" of her unpublished studio portrait was used is a false description of her actual testimony, which was that her entire photo was used by Warhol. Goldsmith Opp. Mem. at 24 - 25. The comment in *Kienitz* that all that remained was an "outline" of the plaintiff's photo is, respectfully, belied by the imagery itself. *Id*. at 23. *Kienitz* also conflicts with the decisions in *Friedman v. Guetta*, 2011 WL 3510890 (C.D. Cal. May 27, 2011) and *Morris v. Guetta*, 2013 WL 440127 (C.D. Cal. Feb. 4, 2013). *See* Goldsmith Mem. at 24 - 27.

While AWF's status as a foundation supporting the arts is a worthy goal, it does not distract from the overt commercial nature of its licensing business, which extends into Goldsmith's core markets for commercial and editorial uses and undercuts AWF's transformative use arguments.

## POINT III

## AWF fails to rebut the harm to Goldsmith's licensing markets

In addressing the fourth fair use factor, AWF largely ignores the key licensing markets for the Goldsmith Photo over the life of its copyright, instead focusing on the market for original Warhol works of art, which are not in issue in this case. AWF's market expert, Laura Paulson, has no licensing expertise and offered no opinion on licensing markets. Goldsmith Opp. Mem. at 26 -27.

This factor requires consideration of "not only the extent of market harm caused by the particular actions of the alleged infringer," but also "'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994) (citations omitted). This includes considering "'harm to the market for derivative works.'" *Id*. (citation omitted). AWF fails to address the impact on Goldsmith's licensing markets that would arise from AWF's "unrestricted and widespread conduct" of its unfettered licensing of the Warhol images for commercial, editorial and merchandise uses.

That Goldsmith has not licensed her 1981 Prince studio photos, apart from the 1984 Vanity Fair artist's reference license, does not demonstrate the absence of market harm. *See Salinger v. Random House, Inc.*, 811 F.2d 90, 99 (2d Cir. 1987) (plaintiff "is entitled to protect his *opportunity* to sell his letters") (emphasis in original). In *Ferdman v. CBS Interactive Inc.*, 2018 WL 4572241, at *19 (S.D.N.Y. Sept. 24, 2018), the court observed that defendant's infringing publication of plaintiff's photos in media articles "is a clear substitute for the market use of Plaintiff's photographs. Indeed, Defendant's use is 'paradigmatic of the only market the photographs could reasonably have: licensing to media outfits.'" *Id.* (citations omitted.) The

7

court further noted that "the licensing of photographs to media outlets is a 'traditional, reasonable, [and] likely to be developed market' of the sort courts consider in assessing this [fourth] factor…." *Id*.

Goldsmith testified she reserved the right to exploit her Prince studio portraits as she ages; her expert, Jeff Sedlik, highlighted the availability of licensing markets throughout the life of Goldsmith Photo's copyright. Goldsmith Mem. at 37 - 38. Goldsmith's core licensing markets for her photography have historically included consumer magazines and media outlets. Goldsmith R. 56.1 ¶¶9, 144 - 54. Condé Nast, for example, falls squarely in that media market.

AWF's delay in licensing Warhol's Prince images highlights the existence of potential markets that wax and wane over time. AWF waited 12 years after Warhol's death to first grant a license to one of his Prince images in 1999. Goldsmith R. 56.1 ¶136. Those images remain available for licensing and merchandising, despite few licenses having been issued to date. *Id*. ¶¶136, 128 - 35. Similarly, Goldsmith and her successors have the right to time the market and decide how and when to exploit the lengthy copyright in her photo.

Other cases cited by AWF, not previously addressed by Goldsmith, are inapposite. *See* AWF Opp. Mem. pp. 40 - 42. In *Hosseinzadeh v. Klein*, 276 F. Supp. 3d 34 (S.D.N.Y. 2017), the subject video was a "critical commentary," a classic example of fair use and therefore not a market substitute. *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87 (2d Cir. 2014) involved digital copies of library texts made available for search and reference purposes, which were core fair uses. In *Smith v. Cash Money Records, Inc.*, 253 F. Supp. 3d 737, 752 (S.D.N.Y. 2017), the court found that "JSR, a spoken-word criticism of non-jazz music at the end of an improvisational jazz album, targets a sharply different primary market than Pound Cake, a hip-hop track." Here, however, AWF's licensing of Warhol's images targets the same commercial

and editorial markets targeted by Goldsmith, who did license her Goldsmith Photo once to Vanity Fair. Goldsmith and her successors reserve the right to license that photo over the life of its copyright.

In *Oyewole v. Ora*, 291 F. Supp. 3d 422, 434, 436 (S.D.N.Y. 2018), defendants' hip hop song used one phrase as a hook ("Party and Bullshit") from plaintiff's poem "'in contravention' of Oyewole's original purpose." The court understandably found that because "the allegedly infringing works are different in character and purpose from the original work, it is unlikely that Defendants' target audience and The Last Poets' audience are the same." *Id*. In contrast, the licensing markets for Warhol's images and Goldsmith's actual and potential future markets for her photo overlap.

AWF's characterization of Goldsmith as a "rock and roll" photographer supports a finding of market harm because Prince was a rock star, and Warhol used that same imagery to illustrate a Vanity Fair article about Prince. AWF previously offered Warhol's Prince images for license to Gibson Guitar, which is closely aligned with rock and roll. Goldsmith R. 56. ¶133. AWF licensed the CN Warhol Image for the cover of a consumer magazine dedicated to Prince. Warhol imagery has adorned the covers of numerous rock music album covers. *Id*. at ¶134. "Rock and roll" is clearly a "Warhol market" that AWF seeks to exploit for the Warhol Prince Images.

That Goldsmith only licensed the Goldsmith Photo to Vanity Fair in 1984 for an artist reference does not foreclose future licensing opportunities for that image in "potential" markets during her remaining life and beyond. It is that "potential" market that *Campbell* pinpointed, along with an assessment of the "unrestricted and widespread conduct of the sort engaged in by the defendant." Because the media and consumer-oriented licensing uses—existing and

potential—of both the Warhol images and the Goldsmith photo overlap, and are traditional, reasonable and likely to be developed markets for Goldsmith, the fourth factor favors Goldsmith. "[A]n accused infringer has usurped the market for copyrighted works, including the derivative market, where the infringer's target audience and the nature of the infringing content is the same as the original." *Cariou*, 714 F.3d at 709.

## CONCLUSION

WHEREFORE, the Goldsmith Parties respectfully request that the Court grant judgment in their favor on Goldsmith's counterclaim and against AWF for the relief sought in its complaint.

Dated: New York, New York
December 11, 2018

Respectfully submitted,

HERRICK, FEINSTEIN LLP

By: s/ Barry Werbin, Esq.
Barry Werbin
Gabrielle C. Wilson
2 Park Avenue
New York, NY 10016
(212) 592-1418
bwerbin@herrick.com

LAW OFFICES OF JOEL L. HECKER
Joel L. Hecker
230 Park Avenue, Suite 660
New York, NY 10169
(212) 481-1850
HeckerEsq@aol.com
*Attorneys for Lynn Goldsmith and Lynn Goldsmith, Ltd.*

Certification of Compliance with Court's Word Count and Formatting Rules

The undersigned counsel for Defendants Lynn Goldsmith and Lynn Goldsmith, Ltd., and Counterclaim Plaintiff Lynn Goldsmith, hereby certifies that the body of the within Opposition Memorandum of Law contains 2,788 words (excluding the cover page, this certification of compliance, table of contents, and table of authorities) and complies with this Court's formatting rules for memorandum of law in civil cases and the word limit set forth in the Court's Order entered July 13, 2018 [Docket #44].

   /Barry Werbin/

Barry Werbin, Esq.

Herrick, Feinstein LLP